**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 23, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

| | |
|---|---|
| IN RE: FCC 11-161 | No. 11-9900 |

DIRECT COMMUNICATIONS CEDAR VALLEY, LLC, a Utah limited liability company; TOTAH COMMUNICATIONS, INC., an Oklahoma corporation; H & B COMMUNICATIONS, INC., a Kansas Corporation; MOUNDRIDGE TELEPHONE COMPANY, a Kansas corporation; PIONEER TELEPHONE ASSOCIATION, INC., a Kansas corporation; TWIN VALLEY TELEPHONE, INC., a Kansas corporation; PINE TELEPHONE COMPANY, INC., an Oklahoma corporation; PENNSYLVANIA PUBLIC UTILITY COMMISSION; CHOCTAW TELEPHONE COMPANY; CORE COMMUNICATIONS, INC.; NATIONAL ASSOCIATION OF STATE UTILITY CONSUMER ADVOCATES; NATIONAL TELECOMMUNICATIONS COOPERATIVE ASSOCIATION d/b/a NTCA-THE RURAL BROADBAND ASSOCIATION; CELLULAR SOUTH, INC.; AT&T INC.; HALO WIRELESS, INC.; THE VOICE ON THE NET COALITION, INC.; PUBLIC UTILITIES COMMISSION OF OHIO; TW TELECOM INC.; VERMONT PUBLIC SERVICE BOARD; TRANSCOM ENHANCED SERVICES, INC.; THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS; CENTURYLINK, INC.; GILA RIVER

Consolidated Case Nos.:
11-9581, 11-9585, 11-9586, 11-9587, 11-9588, 11-9589, 11-9590, 11-9591, 11-9592, 11-9594, 11-9595, 11-9596, 11-9597, 12-9500, 12-9510, 12-9511, 12-9513, 12-9514, 12-9517, 12-9520, 12-9521, 12-9522, 12-9523, 12-9524, 12-9528, 12-9530, 12-9531, 12-9532, 12-9533, 12-9534, 12-9575

INDIAN COMMUNITY; GILA RIVER TELECOMMUNICATIONS, INC.; ALLBAND COMMUNICATIONS COOPERATIVE; NORTH COUNTY COMMUNICATIONS CORPORATION; UNITED STATES CELLULAR CORPORATION; PR WIRELESS, INC.; DOCOMO PACIFIC, INC.; NEX-TECH WIRELESS, LLC; CELLULAR NETWORK PARTNERSHIP, A LIMITED PARTNERSHIP; U.S. TELEPACIFIC CORP.; CONSOLIDATED COMMUNICATIONS HOLDINGS, INC.; NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS; RURAL TELEPHONE SERVICE COMPANY, INC.; ADAK EAGLE ENTERPRISES LLC; ADAMS TELEPHONE COOPERATIVE; ALENCO COMMUNICATIONS, INC.; ARLINGTON TELEPHONE COMPANY; BAY SPRINGS TELEPHONE COMPANY, INC.; BIG BEND TELEPHONE COMPANY, INC.; THE BLAIR TELEPHONE COMPANY; BLOUNTSVILLE TELEPHONE LLC; BLUE VALLEY TELE-COMMUNICATIONS, INC.; BLUFFTON TELEPHONE COMPANY, INC.; BPM, INC., d/b/a Noxapater Telephone Company; BRANTLEY TELEPHONE COMPANY, INC.; BRAZORIA TELEPHONE COMPANY; BRINDLEE MOUNTAIN TELEPHONE LLC; BRUCE TELEPHONE COMPANY, INC.; BUGGS ISLAND TELEPHONE COOPERATIVE; CAMERON TELEPHONE COMPANY, LLC; CHARITON VALLEY TELEPHONE CORPORATION; CHEQUAMEGON COMMUNICATIONS

2

COOPERATIVE, INC.; CHICKAMAUGA TELEPHONE CORPORATION; CHICKASAW TELEPHONE COMPANY; CHIPPEWA COUNTY TELEPHONE COMPANY; CITIZENS TELEPHONE COMPANY; CLEAR LAKE INDEPENDENT TELEPHONE COMPANY; COMSOUTH TELECOMMUNICATIONS, INC.; COPPER VALLEY TELEPHONE COOPERATIVE; CORDOVA TELEPHONE COOPERATIVE; CROCKETT TELEPHONE COMPANY, INC.; DARIEN TELEPHONE COMPANY; DEERFIELD FARMERS' TELEPHONE COMPANY; DELTA TELEPHONE COMPANY, INC.; EAST ASCENSION TELEPHONE COMPANY, LLC; EASTERN NEBRASKA TELEPHONE COMPANY; EASTEX TELEPHONE COOP., INC.; EGYPTIAN TELEPHONE COOPERATIVE ASSOCIATION; ELIZABETH TELEPHONE COMPANY, LLC; ELLIJAY TELEPHONE COMPANY; FARMERS TELEPHONE COOPERATIVE, INC.; FLATROCK TELEPHONE COOP., INC.; FRANKLIN TELEPHONE COMPANY, INC.; FULTON TELEPHONE COMPANY, INC.; GLENWOOD TELEPHONE COMPANY; GRANBY TELEPHONE LLC; HART TELEPHONE COMPANY; HIAWATHA TELEPHONE COMPANY; HOLWAY TELEPHONE COMPANY; HOME TELEPHONE COMPANY (ST. JACOB, ILL.); HOME TELEPHONE COMPANY (MONCKS CORNER, SC); HOPPER TELECOMMUNICATIONS LLC; HORRY TELEPHONE COOPERATIVE, INC.; INTERIOR

3

TELEPHONE COMPANY; KAPLAN TELEPHONE COMPANY, INC.; KLM TELEPHONE COMPANY; CITY OF KETCHIKAN, ALASKA, d/b/a KPU Telecommunications; LACKAWAXEN TELECOMMUNICATIONS SERVICES, INC.; LAFOURCHE TELEPHONE COMPANY, LLC; LA HARPE TELEPHONE COMPANY, INC.; LAKESIDE TELEPHONE COMPANY; LINCOLNVILLE TELEPHONE COMPANY; LORETTO TELEPHONE COMPANY, INC.; MADISON TELEPHONE COMPANY; MATANUSKA TELEPHONE ASSOCIATION, INC.; MCDONOUGH TELEPHONE COOPERATIVE; MGW TELEPHONE COMPANY, INC.; MID CENTURY COOPERATIVE.; MIDWAY TELEPHONE COMPANY; MID-MAINE TELECOM LLC; MOUND BAYOU TELEPHONE & COMMUNICATIONS, INC.; MOUNDVILLE TELEPHONE COMPANY, INC.; MUKLUK TELEPHONE COMPANY, INC.; NATIONAL TELEPHONE OF ALABAMA, INC.; ONTONAGON COUNTY TELEPHONE COMPANY; OTELCO MID-MISSOURI LLC; OTELCO TELEPHONE LLC; PANHANDLE TELEPHONE COOPERATIVE, INC.; PEMBROKE TELEPHONE COMPANY, INC.; PEOPLES TELEPHONE CO.; PEOPLES TELEPHONE COMPANY; PIEDMONT RURAL TELEPHONE COOPERATIVE, INC.; PINE BELT TELEPHONE COMPANY, INC.; PINE TREE TELEPHONE LLC; PIONEER TELEPHONE COOPERATIVE, INC.; POKA LAMBRO TELEPHONE

4

COOPERATIVE, INC.; PUBLIC SERVICE TELEPHONE COMPANY; RINGGOLD TELEPHONE COMPANY; ROANOKE TELEPHONE COMPANY, INC.; ROCK COUNTY TELEPHONE COMPANY; SACO RIVER TELEPHONE LLC; SANDHILL TELEPHONE COOPERATIVE, INC.; SHOREHAM TELEPHONE LLC; THE SISKIYOU TELEPHONE COMPANY; SLEDGE TELEPHONE COMPANY; SOUTH CANAAN TELEPHONE COMPANY; SOUTH CENTRAL TELEPHONE ASSOCIATION; STAR TELEPHONE COMPANY, INC.; STAYTON COOPERATIVE TELEPHONE COMPANY; THE NORTH-EASTERN PENNSYLVANIA TELEPHONE COMPANY; TIDEWATER TELECOM, INC.; TOHONO O'ODHAM UTILITY AUTHORITY; UNITEL, INC.; WAR TELEPHONE LLC; WEST CAROLINA RURAL TELEPHONE COOPERATIVE, INC.; WEST TENNESSEE TELEPHONE COMPANY, INC.; WEST WISCONSIN TELCOM COOPERATIVE, INC.; WIGGINS TELEPHONE ASSOCIATION; WINNEBAGO COOPERATIVE TELECOM ASSOCIATION; YUKON TELEPHONE CO., INC.; ARIZONA CORPORATION COMMISSION; WINDSTREAM CORPORATION; WINDSTREAM COMMUNICATIONS, INC.,

Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF

AMERICA,

        Respondents,

and

SPRINT NEXTEL CORPORATION;
LEVEL 3 COMMUNICATIONS, LLC;
CENTURYLINK, INC.; CONNECTICUT
PUBLIC UTILITIES
REGULATORY AUTHORITY;
INDEPENDENT TELEPHONE &
TELECOMMUNICATIONS ALLIANCE;
WESTERN TELECOMMUNICATIONS
ALLIANCE; NATIONAL EXCHANGE
CARRIER ASSOCIATION, INC.;
ARLINGTON TELEPHONE COMPANY;
THE BLAIR TELEPHONE COMPANY;
CAMBRIDGE TELEPHONE COMPANY;
CLARKS TELECOMMUNICATIONS
CO.; CONSOLIDATED TELEPHONE
COMPANY; CONSOLIDATED TELCO,
INC.; CONSOLIDATED TELECOM,
INC.; THE CURTIS TELEPHONE
COMPANY; EASTERN NEBRASKA
TELEPHONE COMPANY; GREAT
PLAINS COMMUNICATIONS, INC.; K.
& M. TELEPHONE COMPANY, INC.;
NEBRASKA CENTRAL TELEPHONE
COMPANY; NORTHEAST NEBRASKA
TELEPHONE COMPANY; ROCK
COUNTY TELEPHONE COMPANY;
THREE RIVER TELCO; RCA - The
Competitive Carriers Association; RURAL
TELECOMMUNICATIONS GROUP,
INC.; T-MOBILE USA, INC., CENTRAL
TEXAS TELEPHONE COOPERATIVE,
INC.; VENTURE COMMUNICATIONS
COOPERATIVE, INC.; ALPINE
COMMUNICATIONS, LC; EMERY
TELCOM; PEÑASCO VALLEY

6

TELEPHONE COOPERATIVE, INC.; SMART CITY TELECOM; SMITHVILLE COMMUNICATIONS, INC.; SOUTH SLOPE COOPERATIVE TELEPHONE CO., INC.; SPRING GROVE COMMUNICATIONS; STAR TELEPHONE COMPANY; 3 RIVERS TELEPHONE COOPERATIVE, INC.; WALNUT TELEPHONE COMPANY, INC.; WEST RIVER COOPERATIVE TELEPHONE COMPANY, INC.; RONAN TELEPHONE COMPANY; HOT SPRINGS TELEPHONE COMPANY; HYPERCUBE TELECOM, LLC; VIRGINIA STATE CORPORATION COMMISSION OF THE STATE OF KANSAS; MONTANA PUBLIC SERVICE COMMISSION; VERIZON WIRELESS; VERIZON; AT&T INC.; COX COMMUNICATIONS, INC.; NATIONAL TELECOMMUNICATIONS COOPERATIVE ASSOCIATION d/b/a NTCA-THE RURAL BROADBAND ASSOCIATION; INDEPENDENT TELEPHONE & TELECOMMUNICATIONS ALLIANCE; NATIONAL EXCHANGE CARRIER ASSOCIATION, INC. (NECA), COMCAST CORPORATION; VONAGE HOLDINGS CORPORATION; RURAL TELECOMMUNICATIONS GROUP, INC.; NATIONAL CABLE & TELECOMMUNICATIONS ASSOCIATION; CENTRAL TEXAS TELEPHONE COOPERATIVE, INC.; VENTURE COMMUNICATIONS COOPERATIVE, INC.; ALPINE COMMUNICATIONS, LC; EMERY TELCOM; PEÑASCO VALLEY TELEPHONE COOPERATIVE, INC.; SMART CITY TELECOM; SMITHVILLE

7

COMMUNICATIONS, INC.; SOUTH
SLOPE COOPERATIVE TELEPHONE
CO., INC.; SPRING GROVE
COMMUNICATIONS; STAR
TELEPHONE COMPANY; 3 RIVERS
TELEPHONE COOPERATIVE, INC.;
WALNUT TELEPHONE COMPANY,
INC.; WEST RIVER COOPERATIVE
TELEPHONE COMPANY, INC.; RONAN
TELEPHONE COMPANY; HOT
SPRINGS TELEPHONE COMPANY;
HYPERCUBE TELECOM, LLC,

      Intervenors.

STATE MEMBERS OF THE FEDERAL-
STATE JOINT BOARD ON UNIVERSAL
SERVICE,

      Amicus Curiae.

---

**PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL COMMUNICATIONS COMMISSION
(FCC Nos. 11-161, 12-47)**

---

Argued for Petitioners:

James Bradford Ramsay, National Association of Regulatory Utility Commissioners,
Washington, D.C., Russell Blau, Bingham McCutchen LLP, Washington, D.C., Robert
Allen Long, Jr., Covington & Burling, Washington, D.C., Michael B. Wallace, Wise
Carter Child & Caraway, Jackson, Mississippi, Pratik A. Shah, Akin Gump Strauss Hauer
& Feld LLP, Washigton, D.C, Russell Lukas, Lukas, Nace, Gutierrez & Sachs, LLP,
McLean, Virginia, Joseph K. Witmer, Pennsylvania Public Utility Commission,
Harrisburg, Pennsylvania, Christopher F. Van de Verg, Annapolis, Maryland, Lucas M.
Walker, Molo Lamken, Washington, D.C., Don L. Keskey, Public Law Resource Center
PLLC, Lansing, Michigan, Harvey Reiter, Stinson Leonard Street LLP, Washington,

David Bergmann, Columbus, Ohio, E. Ashton Johnston, Communications Law Counsel, P.C., Washington, D.C., Heather M. Zachary, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C., and W. Scott McCollough, McCollough Henry, Austin, Texas.

Argued for Respondents:

Richard K. Welch, James M. Carr, and Maureen Katherine Flood, Federal Communications Commission, Washington, D.C.

Argued for Respondents-Intervenors:

Scott H. Angstreich, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, D.C., Howard J. Symons, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., and Samuel L. Feder, Jenner & Block LLP, Washington, D.C.

Appearances for Petitioners:

David R. Irvine, Salt Lake City, Utah, and Alan L. Smith, Salt Lake City, Utah, for Direct Communications Cedar Valley, LLC, Totah Communications, Inc., H&B Communications, Inc., The Moundridge Telephone Company, Pioneer Telephone Association, Inc., Twin Valley Telephone, Inc., and Pine Telephone Company, Inc.

Bohdan R. Pankiw, Kathryn G. Sophy, Shaun A. Sparks, and Joseph K. Witmer, Pennsylvania Public Utility Commission, Harrisburg, Pennsylvania, for Pennsylvania Public Utility Commission.

Benjamin H. Dickens, Jr. and Mary J. Sisak, Blooston, Mordkofsky, Dickens, Duffy & Prendergrast, LLP, and Craig S. Johnson, Johnson & Sporleder, Jefferson City, Missuori, for Choctaw Telephone Company.

James Christopher Falvey and Charles Anthony Zdebski, Eckert Seamens Cherin & Mellott, Washington, D.C., for Core Communications, Inc.

David Bergmann, Columbus, Ohio, Paula Marie Carmody, Maryland's Office of People's Counsel, Baltimore, Maryland, and Christopher J. White, New Jersey Division of Rate Counsel, Office of the Public Advocate, Newark, New Jersey, for National Association of State Utility Consumer Advocates.

Russell Blau and Tamar Elizabeth Finn, Bingham McCutchen LLP, Washington, D.C., for National Telecommunications Cooperative Association d/b/a NTCA-The Rural

Broadband Association, U.S. TelePacific Corp., and Western Telecommunications Alliance.

Rebecca Hawkins and Michael B. Wallace, Wise Carter Child & Caraway, Jackson, Mississippi, David LaFuria and Russell Lukas, Lukas, Nace, Gutierrez & Sachs, LLP, McLean, Virginia, for Cellular South Inc.

Daniel T. Deacon, Kelly P. Dunbar, Jonathan E. Nuechterlein, and Heather M. Zachary, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C., and Christopher M. Heimann and Gary L. Phillips, AT&T Services, Inc., Washington, D.C., for AT&T Inc.

W. Scott McCollough, McCollough Henry, Austin, Texas, Walter Harriman Sargent, II, Walter H. Sargent, a professional corporation, Colorado Springs, Colorado, and Steven H. Thomas, McGuire, Craddock & Strother, P.C., Dallas, Texas, for Halo Wireless, Inc.

Jennifer P. Bagg and E. Ashton Johnston, Communications Law Counsel, P.C., and Donna M. Lampert, Lampert, O'Connor & Johnston, P.C., Washington, D.C., and Glenn Richards, Pillsbury Winthrop Shaw Pittman, Washington, D.C., for The Voice on the Net Coalition, Inc.

John Holland Jones, Office of the Ohio Attorney General, Columbus, Ohio, for Public Utilities Commission of Ohio.

Thomas Jones, David Paul Murray, and Nirali Patel, Willkie, Farr & Gallagher LLP, Washington, D.C., for tw telecom inc.

Bridget Asay, Office of the Attorney General for the State of Vermont, Montpelier, Vermont, for Vermont Public Service Board.

W. Scott McCollough, McCollough Henry, Austin, Texas, Walter Harriman Sargent, II, Walter H. Sargent, a professional corporation, Colorado Springs, Colorado, and Steven H. Thomas, McGuire, Craddock & Strother, P.C., Dallas, Texas, for Transcom Enhanced Services, Inc.

Robert A. Fox, Kansas Corporation Commission Topeka, Kansas, for The State Corporation Commission of the State of Kansas.

Yaron Dori, Robert Allen Long, Jr., Gerard J. Waldron, Mark Mosier, and Michael Beder, Covington & Burling, Washington, D.C., for CenturyLink, Inc.

John Boles Capehart, Akin Gump Strauss Hauer & Feld, Dallas, Texas, Sean Conway, Patricia Ann Millett, and James Edward Tysse, Akin Gump Strauss Hauer & Feld, Washington, D.C., and Michael C. Small, Akin Gump Strauss Hauer & Feld, Washington, D.C., for Gila River Indian Community and Gila River Telecommunications, Inc.

Don L. Keskey, Lansing Michigan, forAllband Communications Cooperative.

Roger Dale Dixon, Jr., Law Offices of Dale Dixon, Carlsbad, California, for North County Communications Corporation.

David LaFuria and Russell Lukas, Lukas, Nace, Gutierrez & Sachs, LLP, McLean, Virginia, for United States Cellular Corporation.

David LaFuria, Todd Bradley Lantor, and Russell Lukas, Lukas, Nace, Gutierrez & Sachs, LLP, McLean, Virginia, for Petitioners PR Wireless, Inc. and Docomo Pacific, Inc., Todd Bradley Lantor, and Russell Lukas, Lukas, Nace, Gutierrez & Sachs, LLP, McLean, Virginia, for Petitioners Nex-Tech Wireless, LLC, and Cellular Network Partnership, A Limited Partnership.

Russell Blau, Bingham McCutchen LLP, Washington, D.C., for Consolidated Communications Holdings, Inc.

James Bradford Ramsay and Holly R. Smith, National Association of Regulatory Utility Commissioners, Washington, D.C., for National Association of Regulatory Utility Commissioners.

David Cosson, Washington, D.C., H. Russell Frisby, Jr., Dennis Lane, and Harvey Reiter, Stinson Leonard Street LLP, Washington, D.C., for Rural Independent Competitive Alliance, Rural Telephone Service Company, Inc., Adak Eagle Enterprises LLC, Adams Telephone Cooperative, Alenco Communications, Inc., Arlington Telephone Company, Bay Springs Telephone Company, Big Bend Telephone Company, The Blair Telephone Company, Blountsville Telephone LLC, Blue Valley Tele-communications, Inc., Bluffton Telephone Company, Inc., BPM, Inc., Brantley Telephone Company, Inc., Brazoria Telephone Company, Brindlee Mountain Telephone LLC, Bruce Telephone Company, Inc., Buggs Island Telephone Cooperative, Cameron Telephone Company, LLC, Chariton Valley Telephone Corporation, Chequamegon Communications Cooperative, Inc., Chickamauga Telephone Corporation, Chicksaw Telephone Company, Chippewa County Telephone Company, Clear Lake Independent Telephone Company, Comsouth Telecommunications, Inc., Copper Valley Telephone Cooperative, Cordova Telephone Cooperative, Crockett Telephone Company, Inc., Darien Telephone Company, Deerfield

Famers' Telephone Company, Delta Telephone Company, Inc., East Ascension Telephone Company, LLC, Eastern Nebraska Telephone Company, Eastex Telephone Coop., Inc., Egyptian Telephone Cooperative Association, Elizabeth Telephone Company, LLC, Ellijay Telephone Company, Farmers Telephone Cooperative, Inc., Flatrock Telephone Coop., Inc., Franklin Telephone Company, Inc., Fulton Telephone Company, Inc., Glenwood Telephone Company, Granby Telephone Company LLC, Hart Telephone Company, Hiawatha Telephone Company, Holway Telephone Company, Home Telephone Company (St. Jacob Illinois), Home Telephone Company (Moncks Corner, South Carolina), Hopper Telecommunications LLC., Horry Telephone Cooperative, Inc., Interior Telephone Company, Kaplan Telephone Company, Inc., KLM Telephone Company, City of Ketchikan, Alaska, Lackawaxen Telecommunications Services, Inc., Lafourche Telephone Company, LLC, La Harpe Telephone Company, Inc., Lakeside Telephone Company, Lincolnville Telephone Company, Loretto Telephone Company, Inc., Madison Telephone Company, Matanuska Telephone Association, Inc., McDonough Telephone Coop., MGW Telephone Company, Inc., Mid Century Cooperative, Midway Telephone Company, Mid-Maine Telecom, LLC, Mound Bayou Telephone & Communications, Inc., Mondville Telephone Company, Inc., Mukluk Telephone Company, Inc., National Telephone of Alabama, Inc., Ontonagon County Telephone Company, Otelco Mid-Missouri LLC, Otelco Telephone LLC, Panhandle Telephone Cooperative, Inc., Pembroke Telephone Company, Inc., People's Telephone Company, Peoples Telephone Company, Piedmont Rural Telephone Cooperative, Inc., Pine Belt Telephone Company, Inc., Pine Tree Telephone LLC, Pioneer Telephone Cooperative, Inc., Poka Lambro Telephone Cooperative, Inc., Public Service Telephone Company, Ringgold Telephone Company, Roanoke Telephone Company, Inc., Rock County Telephone Company, Saco River Telephone LLC, Sandhill Telephone Cooperative, Inc., Shoreham Telephone LLC, The Siskiyou Telephone Company, Sledge Telephone Company, South Canaan Telephone Company, South Central Telephone Association, Star Telephone Company, Inc., Stayton Cooperative Telephone Company, The North-Eastern Pennsylvania Telephone Company, Tidewater Telecom, Inc., Tohono O'Odham Utility Authority, Unitel, Inc., War Telephone LLC, West Carolina Rural Telephone Cooperative, Inc., West Tennessee Telephone Company, Inc., West Wisconsin Telecom Cooperative, Inc., Wiggins Telephone Association, Winnebago Cooperative Telecom Association, Yukon Telephone Co., Inc.

Maureen A. Scott, Wesley Van Cleve, and Janet F. Wagner, Arizona Corporation Commission, Legal Division, Phoenix, Arizona, for Arizona Corporation Commission.

Jeffrey A. Lamken and Lucas M. Walker, Molo Lamken, Washington, D.C., for Windstream Communications, Inc., and Windstream Corporation.

Appearances for Respondents:

Laurence Nicholas Bourne, James M. Carr, Maureen Katherine Flood, Jacob Matthew Lewis, Joel Marcus, Matthew J. Dunne, and Richard K. Welch, Federal Communications Commission, Washington, D.C., for the Federal Communications Commission.

Robert Nicholson and Robert J. Wiggers, United States Department of Justice, Washington, D.C., for United States of America.

Appearances for Intervenors:

Thomas J. Moorman, Woods & Aitken LLP, Washington, D.C. and Paul M. Schudel, Woods & Aitken LLP, Lincoln, Nebraska, for Arlington Telephone Company, The Blair Telephone Company. Cambridge Telephone Company, Clarks Telecommunications Co., Consolidated Telco, Inc., Consolidated Telephone Company, Inc., Consolidated Telecom, Inc., The Curtis Telephone Company, Eastern Nebraska Telephone Company, Great Plains Communications, Inc., K. & M. Telephone Company, Inc., Nebraska Central Telephone Company, Northeast Nebraska Telephone Company, Rock County Telephone Company and Three River Telco.

Yaron Dori, Robert Allen Long, Jr., Gerard J. Waldron, Mark Mosier, and Michael Beder, Covington & Burling, Washington, D.C., for CenturyLink, Inc.

Gerard J. Duffy, Benjamin H. Dickens, Jr., Robert M. Jackson, and Mary J. Sisak, Blooston, Mordkofsky, Dickens, Duffy & Prendergrast, LLP, Washington, D.C., for 3 Rivers Telephone Cooperative, Inc. , Venture Communications Cooperative, Inc., Alpine Communications, LC, Emery Telcom, Peñasco Valley Telephone Cooperative, Inc., Smart City Telecom, Smithville Communications, Inc., South Slope Cooperative Telephone Co., Inc., Spring Grove Communications, Star Telephone Company, Walnut Telephone Company, and West River Cooperative Telephone Company, Inc.

Ivan C. Evilsizer, Evilsizer Law Office, Helena, Montana, for Ronan Telephone Company and Hot Springs Telephone Company.

Helen E. Disenhaus and Ashton Johnston, Lampert, O'Connor & Johnston, P.C., Washington, D.C., for Hypercube Telecom, LLC.

Raymond L. Doggett, Jr., Virginia State Corporation Commission, Richmond, Virginia, for Virginia State Corporation Commission.

Dennis Lopach, Montana Public Service Commission, Helena, Montana, for Montana Public Service Commission.

Christopher M. Heimann and Gary L. Phillips, AT&T Services, Inc., Washington, D.C., and Daniel T. Deacon, Kelly P. Dunbar, Jonathan E. Nuechterlein, and Heather M. Zachary, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C., for AT&T Inc.

J.G. Harrington and David E. Mills, Cooley, LLP, Washington, D.C., for Cox Communications, Inc.

Scott H. Angstreich, Joshua D. Branson, Brendan J. Crimmins, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, D.C., and Michael E. Glover and Christopher M. Miller, Arlington, Virginia, for Verizon and Verizon Wireless.

Russell Blau, Bingham McCutchen LLP, Washington, D.C., for National Telecommunications Cooperative Association, d/b/a NTCA-The Rural Broadband Association.

Clare Kindall, Office of the Attorney General Energy Department, New Britain, Connecticut, for Connecticut Public Utilities Regulatory Authority.

Samuel L. Feder and Luke C. Platzer, Jenner & Block LLP, Washington, D.C., for Comcast Corporation.

Christopher J. Wright, Wiltshire & Grannis, LLP, Washington, D.C., for Level 3 Communications, LLC, Vonage Holdings Corp., and Sprint Nextel Corporation.

Rick C. Chessen, Neal M. Goldberg, Jennifer McKee, and Steven F. Morris, National Cable & Telecommunications Association, Washington, D.C., and Ernest C. Cooper, Robert G. Kidwell, and Howard J. Symons, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Washington, D.C., for National Cable & Telecommunications Association.

Genevieve Morelli, The Independent Telephone & Telecommunications Alliance, Washington, D.C., for Independent Telephone & Telecommunications Alliance.

Gerard J. Duffy, Blooston, Mordkofsky, Dickens, Duffy & Prendergrast, LLP, Washington, D.C., for Western Telecommunications Alliance.

Gregory Jon Vogt, Law Offices of Gregory J. Vogt, PLLC, Alexandria, Virginia, and Richard A. Askoff, Sr., National Exchange Carrier Association, Inc., Whippany, New Jersey  for National Exchange Carrier Association.

Craig Edward Gilmore, L. Charles Keller, and David H. Solomon, Wilkinson, Barker, Knauer, LLP, Washington, D.C., for T-Mobile USA, Inc.

Caressa Davison Bennet, Kenneth Charles Johnson, Anthony Veach, and Daryl Altey Zakov, Bennet & Bennet, Bethesda, Maryland, for Rural Telecommunications Group, Inc. and Central Telephone Cooperative, Inc.

Appearances for Amicus Curiae:

James Hughes Cawley, Pennsylvania Public Utility Commission, Harrisburg, Pennsylvania, and James Bradford Ramsay, National Association of Regulatory Utility Commissioners, Washington, D.C., for State Members of the Federal-State Joint Board on Universal Service.

Counsel on the briefs:

David Cosson, H. Russell Frisby, Jr., Dennis Lane, Harvey Reiter, Don L. Keskey, Maureen A. Scott, Wesley Van Cleve, Janet F. Wagner, Russell D. Lukas, David A. LaFuria, Todd B. Lantor, Rebecca Hawkins, Michael B. Wallace, Yaron Dori, Robert Allen Long, Jr., Gerard J. Waldron, Benjamin H. Dickens, Jr., Mary J. Sisak, Craig S. Johnson, James C. Falvey, Charles A. Zdebski, David R. Irvine, Alan Lange Smith, Patricia A. Millet, James Edward Tysse, Sean T. Conway, John Boles Capehart, Michael C. Small, James Bradford Ramsay, Holly R. Smith, David Bergmann, Paula Marie Carmody, Christopher J. White, Russell Blau, Tamar Finn, Roger Dale Dixon, Jr., Bohdan R. Pankiw, Kathryn G. Sophy, Joseph K. Witmer, Shaun A. Sparks, John H. Jones, Robert A. Fox, Jennifer P. Bagg, E. Ashton Johnston, Donna N. Lampert, Glenn Richards, W. Scott McCollough, Steven H. Thomas, Bridget Asay, David P. Murray, Thomas Jones, and Nirali Patel on the Joint Preliminary Brief.

Don L. Keskey, Maureen A. Scott, Wesley Van Cleave, Janet F. Wagner, Robert Allen Long, Jr., Gerard J. Waldron, Yaron Dori, Mark W. Mosier, Benjamin H. Dickens, Jr., Mary J. Sisak, Craig S. Johnson, Clare E. Kindall, James C. Falvey, Charles A. Zdebski, Patricia A. Millett, James E. Tyesse, Sean Conway, John B. Capehart, Michael C. Small, Robert A. Fox, R. Dale Dixon, Paula M. Carmody, David C. Bergmann, Christopher J. White, Russell Blau, Tamar Finn, Bohdan R. Pankiw, Kathryn G. Sophy, Joseph K. Witmer, Shaun A. Sparks, John H. Jones, Raymond L. Doggett, Jr., David Cosson, H. Russell Frisby, Jr., Dennis Lane and Harvey Reiter, on the Joint Intercarrier Compensation Principal Brief and Reply Brief.

James C. Falvey, Charles A. Zdebski, Russell Blau, Tamar Finn, R. Dale Dickson, Jr., David Cosson, H. Russell Frisby, Jr., Dennis Lane, Harvey Reiter on the Additional Intercarrier Compensation Issues Principal Brief and Reply Brief.

David Cosson, H. Russell Frisby, Jr., Dennis Lane, Harvey Reiter, Don L. Keskey, Maureen A. Scott, Wesley Van Cleve, Janet F. Wagner, Rebecca Hawkins, Michael B. Wallace, Benjamin H. Dickens, Jr., Mary J. Sisak, Craig S. Johnson, David R. Irvine, Alan Lange Smith, Patricia A. Millet, James Edward Tysse, Sean T. Conway, John Boles Capehart, Michael C. Small, James Bradford Ramsay, David Bergmann, Paula Marie Carmody, Christopher J. White, Russell Blau, Tamar Finn, Bohdan R. Pankiw, Kathryn G. Sophy, Joseph K. Witmer, Shaun A. Sparks, Holly Rachel Smith, and Bridget Asay, on the Joint Universal Service Fund Principal Brief and Reply Brief.

David Cosson, H. Russell Frisby, Jr., Harvey Reiter, Don L. Keskey, Maureen A. Scott, Wesley Van Cleve, Janet F. Wagner, James Bradford Ramsay, Russell Blau, Tamar Finn, and Bridget Asay, Elisabeth H. Ross, Robert Allen Long, Jr., Gerard J. Waldron, Yaron Dori, Michael P. Beder, Benjamin H. Dickens, Jr., and Holly Rachel Smith, on the Additional Universal Service Fund Issues Principal Brief.

Russell D. Lukas, David A. LaFuria, and Todd B. Lantor, on the Wireless Carrier Universal Service Fund Principal Brief and Reply Brief.

Christopher M. Heimann, Gary L. Phillips, Peggy Garber, Heather M. Zachary, and Daniel T. Deacon, on the AT&T Inc. Principal Brief and Reply Brief.

E. Ashton Johnston, Jennifer P. Bagg, and Glenn S. Richards, on the Voice on the Net Coalition, Inc. Principal Brief and Reply Brief.

Steven H. Thomas, and W. Scott McCollough, on the Transcom Principal and Reply Briefs.

Michael C. Small, Patricia A. Millett, James E. Tysse, Sean T. Conway, John B. Capehart, on the Tribal Carriers Principal Brief.

Paula M. Carmody, Christopher J. White, and David C. Bergmann, on the National Association of State Utility Consumer Advocates Principal Brief and Reply Brief.

Thomas J. Moorman, Paul M. Schudel, Genevieve Morelli, Gregory J. Vogt, Richard A. Askoff, Ivan C. Evilsizer, Benjamin H. Dickens, Jr., Mary J. Sisak, Robert M. Jackson, Gerard J. Duffy, Russell M. Blau, Tamar E. Finn on Incumbent Local Exchange Carrier Intervenors' Brief and Reply Brief in Support of Petitioners.

Jeffrey A. Lamken and Lucas M. Walker, on the Windstream Principal Brief and Reply Brief.

William J. Baer, Robert B. Nicholson, Robert J. Wiggers, Joel Marcus, Richard K. Welch, Laurence N. Bourne, James M. Carr, Maureen K. Flood, and Matthew J. Dunne, on the briefs for Respondents.

James H. Cawley on the Amicus Brief of the State Members of the Federal-State Joint Board on Universal Service in Support of Petitioners.

Heather M. Zachary and Kelly P. Dunbar, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C., Cathy Carpino, Gary L. Phillips, and Peggy Garber, AT&T Services, Inc., Washington, D.C., Scott H. Angstreich, Brendan J. Crimmins, and Joshua D. Branson, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, D.C., and Michael E. Glover, Christopher M. Miller, and Curtis L. Groves, Verizon, Arlington, Virginia, J.G. Harrington and David E. Mills, Cooley, LLP, Washington, D.C., and Rick C. Chessen, Neal M. Goldberg, Jennifer McKee, and Steven F. Morris, National Cable & Telecommunications Association, Washington, D.C., Christopher J. Wright, Timothy J. Simeone, and Brita D. Strandberg, Wiltshire & Grannis, LLP, Washington, D.C., Ernest C. Cooper, Robert G. Kidwell, and Howard J. Symons, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Washington, D.C., L. Charles Keller, and David H. Solomon, Wilkinson, Barker, Knauer, LLP, Washington, D.C., and Brendan Kasper, Vonage Holdings Corporation, Holmdel, New Jersey, on the Intervenors Supporting Respondents in Response to the Joint Intercarrier Compensation Brief.

Christopher J. Wright and Timothy J. Simeone, Wiltshire & Grannis, LLP, Washington, D.C., Jonathan E. Nuechterlein, Heather M. Zachary and Kelly P. Dunbar, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C., Cathy Carpino, Gary L. Phillips, and Peggy Garber, AT&T Services, Inc., Washington, D.C., Scott H. Angstreich, Brendan J. Crimmins, and Joshua D. Branson, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, D.C., and Michael E. Glover, Christopher M. Miller, and Curtis L. Groves, Verizon, Arlington, Virginia, and Rick C. Chessen, Neal M. Goldberg, Jennifer McKee, and Steven F. Morris, National Cable & Telecommunications Association, Washington, D.C., Ernest C. Cooper, Robert G. Kidwell, and Howard J. Symons, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Washington, D.C., L. Charles Keller, and David H. Solomon, Wilkinson, Barker, Knauer, LLP, Washington, D.C., on the Intervenors' Brief in Support of the Response of the Respondents to the Additional Intercarrier Compensation Issues Brief.

Scott H. Angstreich, Brendan J. Crimmins, and Joshua D. Branson, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, D.C., and Michael E. Glover, Christopher M. Miller, and Curtis L. Groves, Verizon, Arlington, Virginia, Heather M. Zachary and Kelly P. Dunbar, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C., Cathy Carpino, Gary L. Phillips, and Peggy Garber, AT&T Services, Inc., Washington, D.C., Robert Allen Long, Jr., Gerard J. Waldron, Yaron Dori, and Michael Beder, Covington & Burling, Washington, D.C., Howard J. Symons, Robert G. Kidwell, and Ernest C. Cooper, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Washington, D.C., Rick C. Chessen, Neal M. Goldberg, Jennifer McKee, and Steven F. Morris, National Cable & Telecommunications Association, Washington, D.C., Christopher J. Wright, and Brita D. Strandberg, Wiltshire & Grannis, LLP, Washington, D.C., Brendan Kasper, Vonage Holdings Corporation, Holmdel, New Jersey, on the Intervenors' Brief Supporting Respondents Re: The Joint Universal Service Fund Principal Brief.

Samuel L. Feder and Luke C. Platzer, Jenner & Block, LLP, Washington, D.C., J.G. Harrington and David E. Mills, Cooley, LLP, Washington, D.C., Christopher J. Wright and John T. Nakahata, Wiltshire & Grannis, LLP, Washington, D.C., Rick C. Chessen, Neal M. Goldberg, Jennifer McKee, and Steven F. Morris, National Cable & Telecommunications Association, Washington, D.C., E. Ashton Johnson and Helen E. Diesenhaus, Lampert, O'Connor & Johnston, P.C., Washington, D.C., Ernest C. Cooper, Robert G. Kidwell, and Howard J. Symons, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Washington, D.C., on the Final Brief of Intervenors in Support of Federal Respondents in Response to the AT&T Principal Brief.

Russell M. Blau and Tamar E. Finn, Bingham McCutchen, LLP, Washington, D.C., on the Brief of Intervenor National Telecommunications Cooperative Association in Support of the FCC's Response to the Voice on the Net Coalition, Inc. Brief.

Heather M. Zachary and Kelly P. Dunbar, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C., Cathy Carpino, Gary L. Phillips, and Peggy Garber, AT&T Services, Inc., Washington, D.C., Scott H. Angstreich, Brendan J. Crimmins, and Joshua D. Branson, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, D.C., and Michael E. Glover, Christopher M. Miller, and Curtis L. Groves, Verizon, Arlington, Virginia, on the Brief of Intervenors Supporting Respondents in Response to the Brief of the National Association of State Utility Consumer Advocates.

David E. Mills and J.G. Harrington, Cooley, LLP, Washington, D.C., Howard J. Symons, Robert G. Kidwell, and Ernest C. Cooper, Mintz Levin Cohn Ferris Glovsky and Popeo, P.C., Washington, D.C., Scott H. Angstreich, Brendan J. Crimmins, and Joshua D. Branson, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, D.C., Michael E. Glover, Christopher M. Miller, and Curtis L. Groves, Verizon, Arlington,

Virginia, Rick Chessen, Neal M. Goldberg, Steven Morris, and Jennifer McKee, The National Cable & Telecommunications Association, Washington, D.C., on the Brief of Intervenors Supporting Respondents in Response to the Windstream Principal Brief.

———————————

Before **BRISCOE,** Chief Judge, **HOLMES** and **BACHARACH**, Circuit Judges.

———————————

**BRISCOE**, Chief Judge.

———————————

In late 2011, the Federal Communications Commission (FCC or Commission) issued a Report and Order and Further Notice of Proposed Rulemaking (Order) comprehensively reforming and modernizing its universal service and intercarrier compensation systems. Petitioners, each of whom were parties to the FCC's rulemaking proceeding below, filed petitions for judicial review of the FCC's Order. The Judicial Panel on Multidistrict Litigation consolidated the petitions in this court.

In the Joint Universal Service Fund Principal Brief, Additional Universal Service Fund Issues Principal Brief, Wireless Carrier Universal Service Fund Principal Brief, and Tribal Carriers Principal Brief, petitioners assert a host of challenges to the portions of the Order revising how universal service funds are to be allocated to and employed by recipients. After carefully considering those claims, we find them either unpersuasive or barred from judicial review. Consequently, we deny the petitions to the extent they are based upon those claims.

19

*Table of Contents*

I. *Glossary*

II. *Background*
    A. *Introduction*
    B. *Distinction between telecommunications service providers and information-service providers*
    C. *The FCC's pre-Order regulatory framework for telephone services*
    D. *The deficiencies identified by the FCC regarding its pre-Order regulatory framework*
    E. *The FCC's National Broadband Plan*
    F. *The FCC's Notice of Inquiry and Notice of Proposed Rulemaking*
    G. *The FCC's Report and Order of November 18, 2011*
    H. *This litigation*

III. *Standards of review*
    A. *The <u>Chevron</u> standard*
    B. *The arbitrary and capricious standard*
    C. *The de novo standard*

IV. *Universal Service Fund Issues*
    A. *Joint Universal Service Fund Principal Brief*
        1. *Did the FCC's broadband requirement exceed its authority under 47 U.S.C. § 254?*
        2. *Did the FCC act arbitrarily in simultaneously imposing the broadband requirement and reducing USF support?*
        3. *Does the FCC's use of auctions to distribute USF violate § 214(e)?*
        4. *Was the FCC's decision to reduce USF support in areas with "artificially low" end user rates unlawful or arbitrary?*
        5. *Does the Order unlawfully deprive rural carriers of a reasonable opportunity to recover their prudently-incurred costs?*
        6. *Do the FCC's regression and SNA rules have unlawful retroactive effects?*
        7. *Did the FCC disregard evidence that allocating USF to rural price cap carriers by competitive bidding would reduce service quality?*
        8. *Does eliminating USF support for the highest-cost areas defeat the very purpose of universal service?*
        9. *Is the FCC's decision to eliminate high-cost support to RLECs, where an unsubsidized competitor offers voice and broadband to*

20

*all of the RLECs' customers in the same study area, unlawful and unsupported by substantial evidence?*

10. *Did the FCC arbitrarily fail to explain how its new definition of supported telecommunications services took into account the four factors it was required to consider under § 254(c)(1)?*

11. *Did the FCC arbitrarily disregard comments that the Order's incremental USF support provisions would duplicate or undermine state-initiated plans for broadband deployment?*

12. *Did the Order unlawfully make changes not contained in the FCC's proposed rule that could not reasonably have been anticipated by commenters?*

B. *Additional Universal Service Fund Issues Principal Brief*

1. *The FCC's decision to limit USF support for broadband deployment to price-cap ILECs*

2. *Did the FCC violate the mandatory referral duty imposed by 47 U.S.C. § 410(c)?*

3. *Did the FCC irrationally refuse to modify service obligations for carriers to whom it denied USF support?*

4. *Is the Order, as applied to Allband and similarly-situated small rural carriers, unconstitutional under due process principles and as a bill of attainder, and/or does it violate the Act, principles of estoppel and contract law?*

C. *Wireless Carrier Universal Service Fund Principal Brief*

1. *Does the FCC lack authority to redirect USF support to broadband or to regulate broadband?*

2. *Must the USF portions of the Order be vacated?*

3. *Did the FCC act arbitrarily and capriciously in reserving CAF II support for ILECs?*

4. *Did the FCC act arbitrarily and capriciously in repealing the identical support rule and adopting a single-winner reverse auction?*

5. *Did the FCC act arbitrarily and capriciously in setting the Mobility II budget at $500 million?*

6. *Did the FCC fail to respond to comments calling for a separate mobility fund for insular areas?*

D. *Tribal Carriers Principal Brief*

1. *Did the FCC act arbitrarily and capriciously in prescribing funding cuts for tribal carriers?*

V. *Conclusion*

I. *Glossary*

| | |
|---|---|
| 1996 Act | Telecommunications Act of 1996 |
| Act (or 1934 Act) | Communications Act of 1934 |
| APA | Administrative Procedure Act |
| ARC | Access Recovery Charge |
| Joint Board | Federal-State Joint Board on Universal Service |
| CAF | Connect America Fund |
| CETC | Competitive Eligible Telecommunications Carrier |
| COLR | Carrier of Last Resort |
| ETC | Eligible Telecommunications Carrier |
| FCC (or Commission) | Federal Communications Commission |
| HCLS | High Cost Loop Support |
| IAS | Interstate Access Support |
| ICC | Intercarrier Compensation |
| ICLS | Interstate Common Line Support |
| ILEC | Incumbent Local Exchange Carrier |
| IP | Internet Protocol |
| JA | Joint Appendix |
| LEC | Local Exchange Carrier |
| Mobility Fund | CAF Mobility Fund |
| NPRM | Notice of Proposed Rulemaking |

| | |
|---|---|
| PSTN | Public Switched Telephone Network |
| RLEC | Rate-of-Return ILEC |
| SA | Supplemental Joint Appendix |
| SNA | Safety Net Additive |
| USF | Universal Service Fund |
| VoIP | Voice over Internet Protocol |
| WCB | FCC's Wireline Competition Bureau |

## II. *Background*

### A. *Introduction*

For nearly eighty years, the FCC has regulated interstate communications. When it was first created by way of the Communications Act of 1934 (the 1934 Act or the Act), the FCC's regulatory activities were focused on "communication[s] by wire and radio." 47 U.S.C. § 151. The FCC's regulatory oversight subsequently expanded to include telephone service. Most recently, the FCC was charged by Congress with developing a "[N]ational [B]roadband [P]lan," American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, § 6001(k)(1), 123 Stat. 115, 515, the purpose of which is "to ensure that all people of the [U]nited [S]tates have access to broadband capability and [to] establish benchmarks for meeting that goal," id. § 6001(k)(2), 123 Stat. at 516.

In a statement issued on March 16, 2010, the FCC concluded that Congress's stated goals for the National Broadband Plan could not be achieved unless the FCC "comprehensively reformed" its existing regulatory system for telephone service. JA at 2. On February 9, 2011, the FCC issued a Notice of Proposed Rulemaking (NPRM) "propos[ing] to fundamentally modernize the [FCC]'s Universal Service Fund (USF or Fund) and intercarrier compensation (ICC) system." Id. at 284 (NPRM ¶ 1). After receiving and considering comments in response to the NPRM, the FCC on November 18, 2011 issued a Report and Order and Further Notice of Proposed Rulemaking (Order). The Order, and the reforms it proposes, are the subject of this litigation.

B. *Distinction between telecommunications service providers and information-service providers*

The 1934 Act, as amended by the Telecommunications Act of 1996 (the 1996 Act), "subjects all providers of 'telecommunications servic[e]' to mandatory common-carrier regulation, [47 U.S.C.] § 153(44)." Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 973 (2005). "Telecommunications service" is defined as "the offering of telecommunications for a fee directly to the public . . . regardless of the facilities used." 47 U.S.C. § 153(46). In turn, "[t]elecommunications" is "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." 47 U.S.C. § 153(43). "Telecommunications carrier[s]" are defined as "provider[s] of telecommunications services." 47 U.S.C. § 153(44).

Notably, the 1934 Act, as amended by the 1996 Act, does not regulate information-service providers. "[I]nformation service" is defined as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications . . . ." 47 U.S.C. § 153(20). In March 2002, the FCC formally "concluded that broadband Internet service provided by cable companies is an 'information service' but not a 'telecommunications service' under the [1934] Act, and therefore not subject to mandatory Title II common-carrier regulation." Nat'l Cable, 545 U.S. at 977-78. In June 2005, the Supreme Court held that this "conclusion [wa]s a lawful construction of the [1934] Act under Chevron

25

U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and the Administrative Procedure Act." Nat'l Cable, 545 U.S. at 974.

C. *The FCC's pre-Order regulatory framework for telephone services*

The pre-Order regulatory system for telephone service, which was developed by the FCC over decades, was revised by the FCC in accordance with the 1996 Act. The 1996 Act, which "fundamentally restructure[d] local telephone markets," AT&T Corp. v. Iowa Util. Bd., 525 U.S. 366, 370 (1999), "sought to introduce competition to local telephone markets" while simultaneously "preserving universal service." Qwest Corp. v. FCC, 258 F.3d 1191, 1196 (10th Cir. 2001) (Qwest Corp.). "Universal service" was defined in the 1996 Act "[a]s an evolving level of telecommunications services that the [FCC] shall establish periodically under [§ 254 of the 1996 Act], taking into account advances in telecommunications and information technologies and services." 47 U.S.C. § 254(c)(1). In other words, the 1996 Act "anticipate[d] . . . that in the future other types of telecommunications m[ight] become necessary for the nation to remain at the forefront of technological development," and, consequently, it "outlin[ed] a process for the FCC to adjust [the definition of 'universal service'] as new technologies ar[o]se." Wireless World, LLC v. Virgin Islands Pub. Servs. Comm'n, No. Civ. A. 02-0061STT at *7 n.7 (D. Virgin Islands 2008).

The FCC implemented "high-cost universal service support . . . to help ensure that consumers ha[d] access to telecommunications services in areas where the cost of

26

providing such services would otherwise be prohibitively high." JA at 2. This "high-cost

[universal service] support [wa]s provided through a complicated patchwork of programs

. . . in which the types of support a carrier receive[d] depend[ed] on the size and

regulatory classification of the carrier." Id. at 3. More specifically, "[t]he federal high-

cost support mechanism include[d] five major components," id.:

> 1) "High-cost loop support [that] provide[d] support for intrastate network costs to rural incumbent local exchange carriers (LECs) in service areas where the cost to provide service exceed[ed] 115 percent of the national average," id.;
>
> 2) "Local switching support [that] provide[d] intrastate support for switching costs for companies that serve[d] 50,000 or fewer access lines," id.;
>
> 3) "High-cost model support [that] provide[d] support for intrastate network costs to non-rural incumbent LECs in states where the cost to provide service in non-rural areas exceed[ed] two standard deviations above the national average cost per line," id.;
>
> 4) "Interstate access support (IAS) [that] provide[d] support for price cap carriers to offset certain reductions in interstate access charges," id.; and
>
> 5) "Interstate common line support (ICLS) [that] provide[d] support to rate-of-return carriers, to the extent that subscriber line charge (SLC) caps d[id] not permit such carriers to recover their interstate common line revenue requirements," id.

This system, often referred to as the intercarrier compensation or ICC system, was

"designed for an era of separate long-distance companies[,] . . . high per-minute charges,

and [little] competition . . . among telephone companies . . . ." Id. at 396 (Order ¶ 9).

D. *The deficiencies identified by the FCC regarding its pre-Order regulatory framework*

In devising its National Broadband Plan, the FCC noted what it perceived as deficiencies in its pre-Order regulatory framework. To begin with, "only voice [wa]s a supported service" under this framework, and "there [wa]s no requirement to provide broadband service to consumers, nor [wa]s there any mechanism to ensure that support [wa]s targeted toward extending broadband service to unserved areas." Id. at 3. Further, "some of the . . . high-cost programs d[id] not provide support in an economically efficient manner." Id. "In addition, several programs provide[d] support based on an incumbent carrier's embedded costs, whether or not a competitor provide[d], or could provide, service at a lower cost." Id.[1] Thus, "only non-rural high-cost support [wa]s based on forward-looking economic cost, as determined by the [FCC]'s voice telephony cost model."[2] Id. at 4. As a result, "[i]n 2009, the [FCC] disbursed almost $4.3 billion in high-cost support, of which $331 million was calculated on the basis of forward-looking costs." Id. at 6-7.

---

[1] The FCC defined "embedded costs" as "the costs that the incumbent LEC incurred in the past and that are recorded in the incumbent LEC's book of accounts." 47 C.F.R. § 51.505(d)(1) (1997). Prior to the 1996 Act, "explicit federal universal service support was based on embedded costs." JA at 3. Despite its intention to abandon embedded cost support following enactment of the 1996 Act, the FCC ultimately allowed it to remain in place "for rural carriers pending more comprehensive reform." Id. at 4.

[2] The FCC's cost model was based upon ten criteria and was intended to "estimate the cost of providing service for all businesses and households within a geographic region." JA at 4-5 (internal quotation marks omitted).

E.  *The FCC's National Broadband Plan*

"On March 26, 2010, the [FCC] delivered to Congress [its] National Broadband

Plan."  Id. at 7.  "The National Broadband Plan estimated that 14 million people living in

seven million housing units in the United States currently do not have access to terrestrial

broadband infrastructure capable of meeting this target, described as 'the broadband

availability gap.'"  Id.  Consequently, the National Broadband Plan "recommend[ed] the

creation of a Connect America Fund [(CAF)] to address the broadband availability gap in

unserved areas and to provide any ongoing support necessary to sustain service in areas

that require public funding, including those areas that already may have broadband."  Id.

The National Broadband Plan outlined five principles that the CAF should adhere to,[3] and

it recommended that the FCC "create a fast-track program in CAF for providers to receive

targeted funding for new broadband construction in unserved areas, and create a Mobility

Fund to provide one-time support for deployment of 3G networks, to bring all states to a

minimum level of 3G (or better) mobile service availability."  Id. at 7 (internal quotation

marks omitted).  "The National Broadband Plan [also] recommend[ed] that the [FCC]

direct public investment toward meeting an initial national broadband availability target

---

[3] The five principles included: (1) providing funding only in geographic areas where there is no private sector business case to provide broadband and high-quality voice-grade service; (2) allowing at most only one subsidized provider of broadband per geographic area; (3) making the eligibility criteria for obtaining broadband support from CAF company- and technology-agnostic so long as the service provided meets the FCC's specifications; (4) identifying ways to drive funding to efficient levels to determine the firms that will receive CAF support and the amount of support they will receive; and (5) making CAF support recipients accountable for its use and subject to enforceable timelines for achieving universal access.  JA at 7.

29

of 4 Mbps of actual download speed and 1 Mbps of actual upload speed." Id. at 7. In addition, the National Broadband Plan recommended that the FCC's "long range goal should be to replace all of the legacy High-Cost programs with a new program that preserves the connectivity that Americans have today and advances universal broadband in the 21st century." Id. (internal quotation marks omitted). In other words, the National Broadband Plan proposed "cap[ping] and cut[ting] the legacy high-cost programs and" shifting the "realize[d] savings . . . to targeted investment in broadband infrastructure." Id. at 9.

F. *The FCC's Notice of Inquiry and Notice of Proposed Rulemaking*

On April 21, 2010, the FCC issued a Notice of Inquiry and Notice of Proposed Rulemaking (Notice of Inquiry). The Notice of Inquiry sought "comment on three discrete groups of issues." Id. at 8. First, the Notice of Inquiry sought "comment on use of a model as a competitively neutral and efficient tool for helping [the FCC] to quantify the minimum amount of universal service support necessary to support networks that provide broadband and voice service, such that the contribution burden that ultimately falls on American consumers is limited." Id. Second, the Notice sought "comment on potential approaches to providing such targeted funding on an accelerated basis in order to extend broadband networks in unserved areas, such as a competitive procurement auction." Id. Third, the Notice sought "comment on specific proposals to cap and cut the legacy high-cost programs [for voice services] and realize savings that c[ould] be shifted to targeted investment in broadband infrastructure." Id. at 8-9.

The FCC subsequently "received over 2,700 comments, reply comments, and ex parte filings totaling over 26,000 pages, including hundreds of financial filings from telephone companies of all sizes, including numerous small carriers that operate in the most rural parts of the nation." Id. at 398 (Order ¶ 12). The FCC "held over 400 meetings with a broad cross-section of industry and consumer advocates." Id. The FCC also "held three open, public workshops, and engaged with other federal, state, Tribal, and local officials throughout the process." Id.

G. *The FCC's Report and Order of November 18, 2011*

On November 18, 2011, the FCC released its 752-page Order. Id. at 390. The Order stated that "[t]he universal service challenge of our time is to ensure that all Americans are served by networks that support high-speed Internet access—in addition to basic voice service—where they live, work, and travel." Id. at 395 (Order ¶ 5). In turn, the Order stated that the "existing universal service and intercarrier compensation systems [we]re based on decades-old assumptions that fail[ed] to reflect today's networks, the evolving nature of communications services, or the current competitive landscape." Id. at 396 (Order ¶ 6). In light of these factors, the Order purported to "comprehensively reform[] and modernize[] the universal service and intercarrier compensation systems to ensure that robust, affordable voice and broadband service, both fixed and mobile, [we]re available to Americans throughout the nation." Id. at 394 (Order ¶ 1).

The Order summarized the key components of the universal service reform the FCC would be implementing. Because the vast majority of Americans "that lack access

31

to residential fixed broadband at or above the [FCC]'s broadband speed benchmark live in areas served by price cap carriers," i.e., "Bell Operating Companies and other large and mid-sized carriers," the FCC stated that it "w[ould] introduce targeted, efficient support for broadband in two phases" for these areas. Id. at 400 (Order ¶ 21). Phase I of this plan, intended "[t]o spur immediate broadband buildout," would freeze "all existing high-cost support to price cap carriers" and make "an additional $300 million in CAF funding . . . available." Id. (Order ¶ 22). "Frozen support w[ould] be immediately subject to the goal of achieving universal availability of voice and broadband, and subject to obligations to build and operate broadband-capable networks in areas unserved by an unsubsidized competitor over time." Id. Phase II of the plan "w[ould] use a combination of a forward-looking broadband cost model and competitive bidding to efficiently support deployment of networks providing both voice and broadband service for five years." Id. (Order ¶ 23).

With respect to rate-of-return carriers, which "serve[d] less than five percent of access lines in the U.S.," but received "total support from the high-cost fund . . . approaching $2 billion annually," the Order imposed substantial reforms. Id. at 401 (Order ¶ 26). In particular, any such carriers "receiving legacy universal service support, or CAF support to offset lost ICC revenues," were required to "offer broadband service meeting initial CAF requirements . . . upon their customers' reasonable requests." Id. The Order noted that, because of "the economic challenges of extending service in the high-cost areas of the country served by rate-of-return carriers, this flexible approach

[would] not require rate-of-return companies to extend service to customers absent such a request." Id.

The Order indicated that a CAF Mobility Fund would be created to "promot[e] the universal availability" of "mobile voice and broadband services." Id. at 402 (Order ¶ 28). Phase I of the CAF Mobility Fund would "provide up to $300 million in one-time support to immediately accelerate deployment of networks for mobile voice and broadband services in unserved areas." Id. at 402. This support, the Order indicated, would "be awarded through a nationwide reverse auction." Id. Phase II of the Mobility Fund would "provide up to $500 million per year in ongoing support" in order to "expand and sustain mobile voice and broadband services in communities in which service would be unavailable absent federal support." Id. Included in this $500 million annual budget was "ongoing support for Tribal areas of up to $100 million per year." Id. Phase II also anticipated "eliminat[ing] the identical support rule that determines the amount of support for mobile, as well as wireline, competitive ETCs [(eligible telecommunications carriers)]," id. (Order ¶ 29), and the creation of a "Remote Areas Fund" designed "to ensure that Americans living in the most remote areas in the nation, where the cost of deploying traditional terrestrial broadband networks is extremely high, can obtain affordable access through alternative technology platforms, including satellite and unlicensed wireless services," id. (Order ¶ 30).

The Order also indicated that the FCC was reforming its intercarrier compensation rules, including "adopt[ing] a uniform national bill-and-keep framework as the ultimate

33

end state for all telecommunications traffic exchanged with a LEC." Id. at 403 (Order ¶ 34). "Under bill-and-keep," the Order noted, "carriers look first to their subscribers to cover the costs of the network, then to explicit universal service support where necessary." Id. Relatedly, the Order noted that the FCC was "abandon[ing] the calling-party-network-pays model that dominated ICC regimes of the last century." Id. However, the Order noted, "states will have a key role in determining the scope of each carrier's financial responsibility for purposes of bill-and-keep, and in evaluating interconnection agreements negotiated or arbitrated under the framework in sections 251 and 252 of the Communications Act." Id.

H. *This litigation*

Petitioners, who were parties to the FCC's rulemaking proceeding below, each filed petitions for judicial review of the Order. After the Judicial Panel on Multidistrict Litigation consolidated the petitions in this court, we held oral argument on the petitions on November 19, 2013.

III. *Standards of review*

The issues raised by petitioners in their respective briefs implicate three different standards of review: the Chevron standard, which applies to all of the issues in which petitioners assert that the FCC acted contrary to its statutory authority; the arbitrary and capricious standard, which applies to petitioners' challenges to rules implemented by the FCC in its Order; and the de novo standard of review that applies to the constitutional issues raised by petitioners.

34

A. *The Chevron standard*

In "review[ing] an agency's construction of [a] statute which it administers," the first question for the court is "whether Congress has directly spoken to the precise question at issue." Chevron, 467 U.S. at 842. "If the intent of Congress is clear, that is the end of the matter," id., and both the agency and the court "must give effect to the unambiguously expressed intent of Congress," id. at 843. "If, however, . . . the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. This court gives deference to the agency's interpretation so long as that interpretation is not arbitrary, capricious, or manifestly contrary to the statute. Id. at 844.

B. *The arbitrary and capricious standard*

The Administrative Procedure Act (APA) directs us to "hold unlawful and set aside agency action, findings and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under the arbitrary and capricious standard, "a reviewing court may not set aside an agency rule that is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute." Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." Id. "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including

35

a rational connection between the facts found and the choice made." Id. (internal quotation marks omitted). A reviewing court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Id. (internal quotation marks omitted).

C. *The de novo standard*

The APA also compels us to "set aside agency action, findings and conclusions found to be . . . contrary to constitutional right." 5 U.S.C. § 706(2)(B). "Because constitutional questions arising in a challenge to agency action under the APA fall expressly within the domain of the courts, we review de novo whether agency action violated a claimant's constitutional rights." Copar Pumice Co. v. Tidwell, 603 F.3d 780, 802 (10th Cir. 2010) (internal quotation marks omitted).

IV. *Universal Service Fund Issues*

In the Joint Universal Service Fund Principal Brief, Additional Universal Service Fund Issues Principal Brief, Wireless Carrier Universal Service Fund Principal Brief, and Tribal Carriers Principal Brief,[4] petitioners assert various challenges to the portions of the

---

[4] Petitioners filed twelve sets of briefs in this action: one joint preliminary brief, four briefs addressing universal service fund issues, and seven briefs addressing intercarrier compensation issues. In addition, intervening local exchange carriers filed a brief in support of the petitioners. For ease of reference and citation, we have assigned a number to each of these twelve briefs. The four briefs addressed in this opinion have been assigned the following numbers:
Brief 3 - Joint Universal Service Fund Principal Brief;
Brief 4 - Additional Universal Service Fund Issues Principal Brief;
Brief 5 - Wireless Carrier Universal Service Fund Principal Brief; and
Brief 9 - Tribal Carriers Principal Brief.

Order revising how universal service funds are to be allocated to and employed by recipients. We proceed to address each of those briefs and the issues raised therein.

A. *Joint Universal Service Fund Principal Brief*

1. *Did the FCC's broadband requirement exceed its authority under 47 U.S.C. § 254?*

Petitioners argue that the FCC's "continued classification of broadband Internet access service as an 'information service' is fatal to" the FCC's condition that "USF support recipients . . . provide broadband Internet access to consumers on reasonable request." Pet'r Br. 3 at 11. More specifically, petitioners argue that the FCC, in requiring USF support recipients to provide broadband Internet access to consumers upon reasonable request, exceeded its authority under 47 U.S.C. § 254 in two ways. First, petitioners argue that the Act "expressly dictates that supported services are limited to an 'evolving level of *telecommunications services*.'" Id. (italics in brief). "But the Order," petitioners argue, "unlawfully mandates that carriers provide non-supported information services to receive USF support." Id. at 11-12. Second, petitioners argue that, although the Act expressly provides that USF support is to go exclusively to telecommunications carriers for the purpose of providing "telecommunications services," the Order "unlawfully gives USF support to entities that are not telecommunications carriers to provide non-telecommunications services." Id. at 11.

*a) Relevant statutory language*

In addressing petitioners' arguments, we begin by quoting at length the statutory

language at issue. The primary statute upon which petitioners rely, 47 U.S.C. § 254,

provides, in pertinent part, as follows:

> (b) **Universal service principles**. The [Federal-State] Joint Board[, which was created in subsection (a) by the 1996 Act,] and the Commission shall base policies for the preservation and advancement of universal service on the following principles:
>> (1) Quality and rates. Quality services should be available at just, reasonable, and affordable rates.
>> (2) Access to advanced services. Access to advanced telecommunications and information services should be provided in all regions of the Nation.
>> (3) Access in rural and high-cost areas. Consumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services, including interexchange services and advanced telecommunications and information services, that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas.
>> (4) Equitable and nondiscriminatory contributions. All providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service.
>> (5) Specific and predictable support mechanisms. There should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service.
>> (6) Access to advanced telecommunications services for schools, health care, and libraries. Elementary and secondary schools and classrooms, health care providers, and libraries should have access to advanced telecommunications services as described in subsection (h).
>> (7) Additional principles. Such other principles as the Joint Board and the Commission determine are necessary and appropriate for the

protection of the public interest, convenience, and necessity and are consistent with this Act.

(c) **Definition**. (1) In general. Universal service is an evolving level of telecommunications services that the Commission shall establish periodically under this section, taking into account advances in telecommunications and information technologies and services. The Joint Board in recommending, and the Commission in establishing, the definition of the services that are supported by Federal universal service support mechanisms shall consider the extent to which such telecommunications services—

(A) are essential to education, public health, or public safety;
(B) have, through the operation of market choices by customers, been subscribed to by a substantial majority of residential customers;
(C) are being deployed in public telecommunications networks by telecommunications carriers; and
(D) are consistent with the public interest, convenience, and necessity.

(2) Alterations and modifications. The Joint Board may, from time to time, recommend to the Commission modifications in the definition of the services that are supported by Federal universal service support mechanisms.

(3) Special services. In addition to the services included in the definition of universal service under paragraph (1), the Commission may designate additional services for such support mechanisms for schools, libraries, and health care providers for the purposes of subsection (h).

(d) **Telecommunications carrier contribution**. Every telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service. The Commission may exempt a carrier or class of carriers from this requirement if the carrier's telecommunications activities are limited to such an extent that the level of such carrier's contribution to the preservation and advancement of universal service would be de minimis. Any other provider of interstate telecommunications may be required to contribute to the preservation and advancement of universal service if the public interest so requires.

(e) **Universal service support**. After the date on which Commission regulations implementing this section take effect, only an eligible

telecommunications carrier designated under section 214(e) [47 U.S.C. § 214(e)] shall be eligible to receive specific Federal universal service support.  A carrier that receives such support shall use that support only for the provision, maintenance, and upgrading of facilities and services for which the support is intended.  Any such support should be explicit and sufficient to achieve the purposes of this section.

47 U.S.C. § 254(b), (c), (d), (e).

The terms "telecommunications," "telecommunications carrier," and "telecommunications service," which are used in § 254 and throughout the Act, are defined in the following manner:

(50) Telecommunications.  The term "telecommunications" means the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received.

(51) Telecommunications carrier.  The term "telecommunications carrier" means any provider of telecommunications services, except that such term does not include aggregators of telecommunications services (as defined in section 226 [47 USCS § 226]).  A telecommunications carrier shall be treated as a common carrier under this Act only to the extent that it is engaged in providing telecommunications services, except that the Commission shall determine whether the provision of fixed and mobile satellite service shall be treated as common carriage.

* * *

(53) Telecommunications service.  The term "telecommunications service" means the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used.

47 U.S.C. § 153(50), (51), (53).  Notably, "telecommunications service" is treated distinctly under the Act from "information service," which is defined under the Act as "the offering of a capability for generating, acquiring, storing, transforming, processing,

retrieving, utilizing, or making available information via telecommunications . . . ." 47 U.S.C. § 153(24).

b) *Is the FCC prohibited from imposing the broadband requirement?*

Petitioners argue that § 254 unambiguously bars the FCC from conditioning USF funding on recipients' agreement to provide broadband internet access services. Pet'r Br. 3 at 12. In support, petitioners begin by noting that § 254(c)(1) "explicitly defines 'universal service' as 'an evolving level of *telecommunications services*' the [FCC] is to establish, 'taking into account advances in telecommunications and information technologies and services.'" Id. at 12 (quoting 47 U.S.C. § 254(c)(1); emphasis added in brief). In turn, petitioners note that "'telecommunications services' are common carrier services under Title II of the Act, distinct from 'information services' defined in 47 U.S.C. § 153(24), and the [FCC] has declined to classify [broadband] services such as Voice over Internet Protocol ('VoIP'), as telecommunications services." Id. In particular, petitioners note that the FCC previously determined "that bundled broadband internet access is an 'information service,' not a 'telecommunications service,'" and that this determination "was upheld [by the Supreme Court] as a permissible choice under Chevron." Id. at 14 n. 7 (citing Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs., Inc., 545 U.S. 967 (2005)).

Notwithstanding these facts, petitioners argue, the FCC concluded that, because "consumers are increasingly obtaining voice services" not from traditional methods "but through services like VoIP," "its 'authority to promote universal service . . . does not

41

depend on whether VoIP services are telecommunications services or information services.'" Id. at 13 (quoting JA at 412 (Order ¶ 63)). "And," petitioners assert, "based on this conclusion, [the FCC] lumps supported telecommunications services with VoIP to create a new 'voice telephony service' classification and orders USF recipients to provide bundled Internet access, an information service, 'on reasonable request' as a condition of continued USF support." Id. at 13-14 (internal citations omitted).

Petitioners argue "that Section 254(c)(1)'s limits are unambiguous and deny the FCC the authority it claims." Id. at 14. More specifically, petitioners argue that the FCC, "[h]aving declined [previously] to define broadband Internet access or VoIP as telecommunications services, . . . is not then empowered to include them on the list of supported services simply because advancing the availability of broadband is a desirable goal." Id. Petitioners further argue that "[a]ny doubt on this score is dispelled by subsection (3) of Subsection 254(c)." Id. at 15. Section 245(c)(3), petitioners note, authorizes the FCC to "designate additional services for support mechanisms for schools, libraries and health care providers." 47 U.S.C. § 254(c)(3). Petitioners argue that, "[i]nterpreting the term 'additional services,' as the FCC has, to mean services in addition to telecommunications services, leads, inescapably, to the conclusion that Section 254(c)(3) creates a limited 'schools, libraries and hospitals' exception to the requirement that USF be used only to support 'telecommunications services.'" Pet'r Br. 3 at 15. "Under the doctrine of *expressio unius est exclusio alterius* ('the express mention of one thing excludes all others')," petitioners argue, "the inclusion of this authorization in

42

Section 254(c)(3) to support non-telecommunications services in specified circumstances precludes an interpretation authorizing the FCC to compel use of USF support to provide broadband Internet access, a non-telecommunication service, in others." Id. at 15-16 (italics in original).

The FCC, in its response, does not dispute that it has previously declined to classify broadband services, including VoIP, as "telecommunications services." But it does not view this, or anything else in § 254(c)(1)'s definition of "universal service," as a limitation on its authority to require recipients of USF funds to expend some of those funds to deploy networks capable of providing voice and broadband services. As it noted in the Order, it believes its "authority to promote universal service in this context does not depend on whether interconnected VoIP services are telecommunications services or information services under the . . . Act."[5] JA at 412 (Order ¶ 63). Rather, the FCC contends "that section 254(e) of the Act allow[s] it to . . . 'require carriers receiving federal universal service support to invest in modern broadband-capable networks.'" FCC Br. 3 at 13 (quoting JA at 413-414 (Order ¶ 65)). The FCC explains that Congress, by referring in § 254(e) "to 'facilities' and 'services' as distinct items for which federal universal service funds may be used, . . . granted [the FCC] the flexibility not only to

---

[5] The FCC concluded that "[i]f interconnected VoIP services are telecommunications services, [its] authority under section 254 to define universal service after 'taking into account advances in telecommunications and information technologies and services' enables [it] to include interconnected VoIP services as a type of voice telephony service entitled to federal universal service support." JA at 412 (Order ¶ 63 n.67).

43

designate the types of telecommunications services for which support would be provided, but also to encourage the deployment of the types of facilities that will best achieve the principles set forth in section 254(b) and any other universal service principle that the [FCC] may adopt under section 254(b)(7)." JA at 413 (Order ¶ 65).

The FCC further asserts that, under section 254(b), it possesses authority to create inducements, such as linking the receipt of USF funds to the requirement of deploying voice and broadband networks, to ensure that the universal service policies outlined in section 254(b) are achieved. Id.

Thus, the resolution of this issue hinges, in substantial part, on the interpretation of two subsections of § 254: subsection (c)(1) and subsection (e). Addressing these subsections in order, it is beyond dispute that subsection (c)(1) expressly authorizes the FCC to define "periodically" the types of telecommunications services that are encompassed by "universal service" and thus "supported by Federal universal service support mechanisms." Further, there is no question that the FCC, to date, has interpreted the term "telecommunications services" to include only telephone services and not VoIP or other broadband internet services. All that said, however, nothing in the language of subsection (c)(1) serves as an express or implicit limitation on the FCC's authority to determine what a USF recipient may or must do with those funds. More specifically, nothing in subsection (c)(1) expressly or implicitly deprives the FCC of authority to direct that a USF recipient, which necessarily provides some form of "universal service" and has been deemed by a state commission or the FCC to be an eligible telecommunications

44

carrier under 47 U.S.C. § 214(e), use some of its USF funds to provide services or build facilities related to services that fall outside of the FCC's current definition of "universal service." In other words, nothing in the statute limits the FCC's authority to place conditions, such as the broadband requirement, on the use of USF funds.

That leaves § 254(e), the second sentence of which the FCC asserts authorizes it to direct that USF recipients provide broadband Internet access to customers upon reasonable request. The threshold question we must address, under Chevron, is whether Congress in § 254(e) "has directly spoken to the precise question at issue," 467 U.S. at 842, i.e., did Congress in the second sentence of § 254(e) delegate authority to the FCC to identify precisely what a recipient of USF funds must do with those funds, id. at 844.

As noted above, the second sentence of subsection (e) provides that "[an eligible telecommunications] carrier [designated under 47 U.S.C. § 214(e)] that receives [Federal universal service] support shall use that support only for the provision, maintenance, and upgrading of facilities and services for which the support is intended." 47 U.S.C. § 254(e). Quite clearly, this language does not explicitly delegate any authority to the FCC. But the question remains whether this language can reasonably be construed, as the FCC suggests, as an implicit grant of authority to specify what a USF recipient may or must do with the funds?

Upon careful examination, we conclude that the FCC's interpretation of § 254(e) is not "arbitrary, capricious, or manifestly contrary to the statute." Chevron, 467 U.S. at 844. Congress clearly intended, by way of the second sentence of § 254(e), to mandate

45

that USF funds be used by recipients "only for the provision, maintenance, and upgrading of facilities and services for which the support is intended." And it seems highly unlikely that Congress would leave it to USF recipients to determine what "the support is intended" for. Instead, as the FCC suggests, it is reasonable to conclude that Congress left a gap to be filled by the FCC, i.e., for the FCC to determine and specify precisely how USF funds may or must be used. And, as the FCC explained in the Order, carriers "that benefit from public investment in their networks must be subject to clearly defined obligations associated with the use of such funding." JA at 418 (Order ¶ 74).

The FCC also, in our view, reasonably concluded that Congress's use of the terms "facilities" and "service" in the second sentence of § 254(e) afforded the FCC "the flexibility not only to designate the types of telecommunications services for which support would be provided, but also to encourage the deployment of the types of facilities that will best achieve the principles set forth in section 254(b)." Id. at 412-13 (Order ¶ 64). Indeed, the FCC's interpretation "ensures that the term[s] ['facilities' and services'] carr[y] meaning, as each word in a statute should." Ransom v. FIA Card Servs., N.A., 131 S.Ct. 716, 724 (2011).

To be sure, petitioners argue that the concluding phrase of the second sentence of § 254(e), which reads "for which the support is intended," must be interpreted as a limit on the FCC's authority and effectively requires USF funds to be used, whether for "facilities" or "services," only in relation to "universal service," which, petitioners again note, the FCC has never expressly defined to include broadband or VoIP services. Pet'r

46

Br. 3 at 22-23. But that is not the only, or even the most sensible, interpretation of the phrase "for which the support is intended." Indeed, petitioners' proposed interpretation relies on the implicit assumption that USF funds were intended solely to support the provision of universal service. Had Congress intended such a result, however, it clearly could have said so in a more precise manner. For example, the concluding phrase could have read "for universal service" (rather than "for which the support is intended"). Because Congress instead chose to utilize broader language, it was certainly reasonable for the FCC to have concluded that the language was intended as an implicit grant of authority to the FCC to flesh out precisely what "facilities" and "services" USF funds should be used for. And the FCC's interpretation, we note, is consistent both with § 254(c)(1)'s express grant of authority to the FCC to periodically redefine "universal service" and § 254(b)'s express charge to the FCC to "base policies for the preservation and advancement of universal services on" a specific set of controlling principles outlined by Congress.

That leads to one final point regarding the FCC's interpretation of the second sentence of § 254(e). The FCC concluded, in pertinent part, that Congress, "[b]y referring [in the second sentence of § 254(e)] to 'facilities' and 'services' as distinct items for which [USF] funds may be used, . . . granted the [FCC] the flexibility not only to designate the types of telecommunications services for which support would be provided, but also to encourage the deployment of types of facilities that will best achieve the principles set forth in section 254(b) and any other universal service principle that the

47

[FCC] may adopt under section 254(b)(7)." JA at 412 (Order ¶ 64). This interpretation, in our view, is reasonable because it "consider[s] the operation of the statute as a whole." Adoptive Couple v. Baby Girl, 133 S.Ct. 2552, 2573 (2013). Section 254(b) clearly states that the FCC "shall base policies for the preservation and advancement of universal service" on six specific principles outlined by Congress (in subsections (b)(1) through (7)), as well as on "[s]uch other principles as . . . the [FCC] determine[s] are necessary and appropriate for the protection of the public interest, convenience, and necessity and are consistent with th[e] Act." By interpreting the second sentence of § 254(e) as an implicit grant of authority that allows it to decide how USF funds shall be used by recipients, the FCC also acts in a manner consistent with the directive in § 254(b) and allows itself to make funding directives that are consistent with the principles outlined in § 254(b)(1) through (7).

Thus, in sum, we conclude that petitioners are wrong in arguing that § 254 unambiguously bars the FCC from conditioning USF funding on recipients' agreement to provide broadband internet access services.

*c) Is the FCC prohibited from providing USF support to entities that do not provide telecommunications services?*

Petitioners also assert that the FCC exceeded the authority granted to it under § 254 by "extending USF support to non-ETCs for provision of broadband Internet access, a non-telecommunications service." Pet'r Br. 3 at 1. In support, petitioners note that § 254(e) "provides that only 'eligible telecommunications carriers,' i.e., those

48

telecommunications carriers designated [by the FCC or a state commission] under Section 214, 'shall be eligible to receive specific Federal universal service support.'" Id. at 17 (quoting 47 U.S.C. § 254(e)).  "To ensure that USF support is limited to telecommunications carriers providing telecommunications service," petitioners assert, Section 254(e) also provides that "'[a] carrier that receives such support shall use that support only for the provision, maintenance, and upgrading of facilities and services for which the support is intended.'" Id. (quoting § 254(e)).  In turn, petitioners argue, "[t]he [FCC's] broadband condition is unlawful because it does not limit support to telecommunications carriers or require that USF be used for telecommunications services." Id.  "Instead," they argue, "it provides USF support for 'voice telephony service,' which it called 'a technically neutral approach, allowing companies to provision voice service over any platform, including the PSTN and IP networks.'" Id. at 17-18 (internal citation omitted).  Thus, petitioners argue, "[w]hile [USF] recipients must provide 'voice telephony service,' they are not required to provide *telecommunications* service subject to common carrier regulations under Title II of the Communications Act." Id. at 18 (emphasis in original; internal citation omitted).  "Instead," petitioners argue, "a [USF] recipient may provide voice telephony service as VoIP, which the FCC has declined to classify as a telecommunications service." Id.

The FCC, acting under the express authority granted to it under § 254(c)(1), chose in the Order "to simplify how [it] describe[d]," JA at 411 (Order ¶ 62), the types of telecommunications services that are encompassed by "universal service" and thus

49

"supported by Federal universal service support mechanisms," 47 U.S.C. § 254(c)(1).

Prior to the Order, the FCC had defined those services "in functional terms (e.g., voice grade access to the PSTN, access to emergency services)." JA at 411 (Order at ¶ 62). In the Order, the FCC chose instead to employ "a single supported service designated as 'voice telephony service.'" Id. The FCC indicated that its primary justification for adopting this designation was the fact that "consumers are [increasingly] obtaining voice services not through traditional means but instead through interconnected VoIP providers offering service over broadband networks." Id. at 412 (Order ¶ 63). Although petitioners do not expressly challenge the FCC's decision in this regard, they contend that the FCC has used this new, simpler classification to provide funding to what they claim are entities that do not provide telecommunications services.

The fact remains, however, that in order to obtain USF funds, a provider must be designated by the FCC or a state commission as an "eligible telecommunications carrier" under 47 U.S.C. § 214(e). See 47 U.S.C. § 254(e) ("only an eligible telecommunications carrier designated under section 214(e) . . . shall be eligible to receive specific Federal universal service support."). And, under the existing statutory framework, only "common carriers," defined as "any person engaged as a common carrier for hire . . . in interstate or foreign communication by wire or radio or in interstate or foreign radio transmission of energy," 47 U.S.C. § 153(10), are eligible to be designated as "eligible telecommunications carriers," 47 U.S.C. § 214(e). Thus, under the current statutory regime, only ETCs can receive USF funds that could be used for VoIP support.

Consequently, there is no imminent possibility that broadband-only providers will receive USF support under the FCC's Order, since they cannot be designated as "eligible telecommunications carriers." As a result, we agree with the FCC that the petitioners' argument "will not be ripe for judicial review unless and until a state commission (or the FCC) designates . . . an entity" that is not a telecommunications carrier as "an 'eligible telecommunications carrier'" under § 214(e). FCC Br. 3 at 5.

*(d) Does Section 706 of the Act, 47 U.S.C. § 1302, serve as an independent grant of authority to the FCC to impose the broadband requirement?*

In a related attack on the FCC's broadband requirement, petitioners argue that Section 706 of the Act, 47 U.S.C. § 1302, does not, contrary to the conclusion reached by the FCC in the Order, serve as an independent grant of authority to the FCC.

Section 706 of the 1996 Act, entitled "Advanced telecommunications incentives," provides, in pertinent part, as follows:

> (a) **In general**. The Commission and each State commission with regulatory jurisdiction over telecommunications services shall encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms) by utilizing, in a manner consistent with the public interest, convenience, and necessity, price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment.
>
> (b) **Inquiry**. The Commission shall, within 30 months after the date of enactment of this Act [enacted Oct. 10, 2008], and annually thereafter, initiate a notice of inquiry concerning the availability of advanced telecommunications capability to all Americans (including, in particular,

51

elementary and secondary schools and classrooms) and shall complete the inquiry within 180 days after its initiation. In the inquiry, the Commission shall determine whether advanced telecommunications capability is being deployed to all Americans in a reasonable and timely fashion. If the Commission's determination is negative, it shall take immediate action to accelerate deployment of such capability by removing barriers to infrastructure investment and by promoting competition in the telecommunications market.

\* \* \*

(d) **Definitions**. For purposes of this subsection:
> (1) Advanced telecommunications capability. The term "advanced telecommunications capability" is defined, without regard to any transmission media or technology, as high-speed, switched, broadband telecommunications capability that enables users to originate and receive high-quality voice, data, graphics, and video telecommunications using any technology.

47 U.S.C. § 1302.

In the Order, the FCC interpreted Section 706 as providing it with "independent authority . . . to fund the deployment of broadband networks." JA at 414 (Order ¶ 66). The FCC explained the basis for its decision as follows:

> 66.    . . . In section 706, Congress recognized the importance of ubiquitous broadband deployment to Americans' civic, cultural, and economic lives and, thus, instructed the Commission to "encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans." Of particular importance, Congress adopted a definition of "advanced telecommunications capability" that is not confined to a particular technology or regulatory classification. Rather, "'advanced telecommunications capability' is defined, without regard to any transmission media or technology, as high-speed, switched, broadband telecommunications capability that enables users to originate and receive high-quality voice, data, graphics, and video communications using any technology." Section 706 further requires the Commission to "determine whether advanced telecommunications capability is being deployed to all Americans in a reasonable and timely fashion" and, if the

52

Commission concludes that it is not, to "*take immediate action* to accelerate deployment of such capability by removing barriers to infrastructure investment and by promoting competition in the telecommunications market." The Commission has found that broadband deployment to all Americans has not been reasonable and timely and observed in its most recent broadband deployment report that "too many Americans remain unable to fully participate in our economy and society because they lack broadband." This finding triggers our duty under section 706(b) to "remov[e] barriers to infrastructure investment" and "promot[e] competition in the telecommunications market" in order to accelerate broadband deployment throughout the Nation.

67.    Providing support for broadband networks helps achieve section 706(b)'s objectives. First, the Commission has recognized that one of the most significant barriers to investment in broadband infrastructure is the lack of a "business case for operating a broadband network" in high-cost areas "[i]n the absence of programs that provide additional support." Extending federal support to carriers deploying broadband networks in high-cost areas will thus eliminate a significant barrier to infrastructure investment and accelerate broadband deployment to unserved and underserved areas of the Nation. The deployment of broadband infrastructure to all Americans will in turn make services such as interconnected VoIP service accessible to more Americans.

68.    Second, supporting broadband networks helps "promot[e] competition in the telecommunications market," particularly with respect to voice services. As we have long recognized, "interconnected VoIP service 'is increasingly used to replace analog voice service.'" Thus, we previously explained that requiring interconnected VoIP providers to *contribute* to federal universal service support mechanisms promoted competitive neutrality because it "reduces the possibility that carriers with universal service obligations will compete directly with providers without such obligations." Just as "we do not want contribution obligations to shape decisions regarding the technology that interconnected VoIP providers use to offer voice services to customers or to create opportunities for regulatory arbitrage," we do not want to create regulatory distinctions that serve no universal service purpose or that unduly influence the decisions providers will make with respect to how best to offer voice services to consumers. The "telecommunications market" — which includes interconnected VoIP and by statutory definition is broader than just telecommunications services — will be more competitive, and thus will provide greater benefits to

consumers, as a result of our decision to support broadband networks, regardless of regulatory classification.

69. By exercising our authority under section 706 in this manner, we further Congress's objective of "accelerat[ing] deployment" of advanced telecommunications capability "to all Americans." Under our approach, federal support will not turn on whether interconnected VoIP services or the underlying broadband service falls within traditional regulatory classifications under the Communications Act. Rather, our approach focuses on accelerating broadband deployment to unserved and underserved areas, and allows providers to make their own judgments as to how best to structure their service offerings in order to make such deployment a reality.

70. We disagree with commenters who assert that we lack authority under section 706(b) to support broadband networks. While 706(a) imposes a general duty on the Commission to encourage broadband deployment through the use of "price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment," section 706(b) is triggered by a specific finding that broadband capability is not being "deployed to all Americans in a reasonable and timely fashion." Upon making that finding (which the Commission has done), section 706(b) requires the Commission to "take immediate action to accelerate" broadband deployment. Given the statutory structure, we read section 706(b) as conferring on the Commission the additional authority, beyond what the Commission possesses under section 706(a) or elsewhere in the Act, to take steps necessary to fulfill Congress's broadband deployment objectives. Indeed, it is hard to see what additional work section 706(b) does if it is not an independent source of authority.

71. We also reject the view that providing support for broadband networks under section 706(b) conflicts with section 254, which defines universal service in terms of telecommunications services. Information services are not excluded from section 254 because of any policy judgment made by Congress. To the contrary, Congress contemplated that the federal universal service program would promote consumer access to both advanced telecommunications and advanced information services "in all regions of the Nation." When Congress enacted the 1996 Act, most consumers accessed the Internet through dial-up connections over the PSTN, and broadband capabilities were provided over tariffed common carrier facilities. Interconnected VoIP services had only a nominal presence

54

in the marketplace in 1996. It was not until 2002 that the commission first determined that one form of broadband — cable modem service — was a single offering of an information service rather than separate offerings of telecommunications and information services, and only in 2005 did the Commission conclude that wireline broadband service should be governed by the same regulatory classification. Thus, marketplace and technological developments and the Commission's determinations that broadband services may be offered as information services have had the effect of removing such services from the scope of the explicit reference to "universal service" in section 254(c). Likewise, Congress did not exclude interconnected VoIP services from the federal universal service program; indeed, there is no reason to believe it specifically anticipated the development and growth of such services in the years following the enactment of the 1996 Act.

72.    The principles upon which the Commission "shall base policies for the preservation and advancement of universal service" make clear that supporting networks used to offer services that are or may be information services for purposes of regulatory classifications is consistent with Congress's overarching policy objectives. For example, section 254(b)(2)'s principle that "[a]ccess to advanced telecommunications and *information services* should be provided in all regions of the Nation" dovetails comfortably with section 706(b)'s policy that "advanced telecommunications capability [be] deployed to all Americans in a reasonable and timely fashion." Our decision to exercise authority under Section 706 does not undermine section 254's universal service principles, but rather ensures their fulfillment. By contrast, limiting federal support based on the regulatory classification of the services offered over broadband networks as telecommunications services would exclude from the universal service program providers who would otherwise be able to deploy broadband infrastructure to consumers. We see no basis in the statute, the legislative history of the 1996 Act, or the record of this proceeding for concluding that such a constricted outcome would promote the Congressional policy objectives underlying sections 254 and 706.

73.    Finally, we note the limited extent to which we are relying on section 706(b) in this proceeding. Consistent with our longstanding policy of minimizing regulatory distinctions that serve no universal service purpose, we are not adopting a separate universal service framework under section 706(b). Instead, we are relying on section 706(b) as an alternative basis to section 254 to the extent necessary to ensure that the federal

universal service program covers services and networks that could be used to offer information services as well as telecommunications services. Carriers seeking federal support must still comply with the same universal service rules and obligations set forth in sections 254 and 214, including the requirement that such providers be designated as eligible to receive support, either from state commissions or, if the provider is beyond the jurisdiction of the state commission, from this Commission. In this way, we ensure that our exercise of section 706(b) authority will advance, rather than detract from, the universal service principles established under section 254 of the Act.

JA at 414-18 (Order ¶¶ 66-73) (internal footnotes omitted).

Petitioners offer a number of arguments in opposition to the FCC's conclusions. First, petitioners assert that the FCC previously concluded, in a 1998 order entitled In re Deployment of Wireline Servs. Offering Advanced Telecomms. Capability, 13 F.C.C.R. 24,012, 24,047, ¶ 77 (1998) (In re Deployment), that Section 706 "does not constitute an independent grant of authority." That prior conclusion, petitioners assert, is still binding and is directly contrary to the conclusion reached by the FCC in the Order at issue.

The problem with petitioners' argument, however, is that the FCC's conclusion in the 1998 order was confined to interpreting Section 706(a). See In re Deployment, 13 F.C.C.R. at 24,046-24,048. The 1998 order made no mention of, let alone attempted to interpret, Section 706(b). And, as outlined above, it is Section 706(b) that the FCC concludes in the Order provides it with independent authority relevant to this case. Thus, petitioner's argument fails.

Petitioners next take issue with the FCC's conclusion, in ¶ 70 of the Order, that "it is hard to see what additional work section 706(b) does if it is not an independent source

56

of authority." According to petitioners, "[s]ubsection (b) . . . is not redundant at all."

Pet'r Br. 3 at 25. More specifically, petitioners assert that subsection (a) imposes a

general duty on the FCC without mandating any specific action, and that subsection (b),

in turn, "mandates 'immediate action' if the FCC reaches a negative determination on

'whether advanced telecommunications capability is being deployed to all Americans in a

reasonable and timely fashion.'" Id. (quoting 47 U.S.C. § 1302(b)). "This language,"

petitioners argue, "tells the FCC to put the powers it has to 'immediate action' but does

not purport to grant any new powers." Id. at 26.

We reject petitioners' arguments. To be sure, both section 706(a) and section

706(b) focus on "the deployment . . . of advanced telecommunications capability to all

Americans." Further, both sections make reference, in terms of achieving such

deployment, to the removal of "barriers to infrastructure investment." But that is where

the similarities end. As noted, section 706(a) is a general directive stating that the FCC

"shall encourage the deployment . . . of advanced telecommunications capability to all

Americans . . . by utilizing . . . price cap regulation, regulatory forbearance, measures that

promote competition in the local telecommunications market, or other regulating methods

that remove barriers to infrastructure investment." The FCC has concluded "that section

706(a) gives [it] an affirmative obligation to encourage the deployment of advanced

services, relying on [its] authority established elsewhere in the [1996] Act." In re

Deployment, 13 F.C.C.R. at 24,046 (¶74). In other words, the FCC has concluded that

section 706(a) is "not . . . an independent grant of authority, but rather, . . . a direction to

57

the [FCC] to use the forbearance [and other] authority granted elsewhere in the Act." Id. at 24,047 (¶76).

In contrast, section 706(b) requires the FCC to perform two related tasks. First, the FCC must conduct an annual inquiry to "determine whether advanced telecommunications capability is being deployed to all Americans in a reasonable and timely fashion." Second, and most importantly for purposes of this appeal, if the FCC's annual "determination is negative," it is required to "take immediate action to accelerate deployment of such capability by removing barriers to infrastructure investment and by promoting competition in the telecommunications market." Unlike section 706(a), section 706(b) does not specify how the FCC is to accomplish this latter task, or otherwise refer to forms of regulatory authority that are afforded to the FCC in other parts of the Act. As the FCC concluded in the Order, section 706(b) thus appears to operate as an independent grant of authority to the FCC "to take steps necessary to fulfill Congress's broadband deployment objectives," and "it is hard to see what additional work section 706(b) does if it is not an independent source of authority." JA at 416 (Order ¶ 70).

Lastly, petitioners argue that section 706(b), even if it does function as an independent source of authority for the FCC, cannot allow the FCC to ignore the limitations that section 254 imposes on the use of USF funds. Pet'r Br. 3 at 27. In support, petitioners repeat their previous argument that "[s]ection 254 expressly limits the availability of USF support to telecommunications carriers and defines 'telecommunications services' as the only services eligible for support." Id. For the

reasons we have outlined above, however, that argument is without merit. In other words, section 254 does not limit the use of USF funds to "telecommunications services." Thus, to the extent the FCC relies on section 706(b) as support for its broadband requirement, section 706(b) is not contrary to section 254.

In sum, then, we conclude that the FCC reasonably construed section 706(b) as an additional source of support for its broadband requirement.

2. *Did the FCC act arbitrarily in simultaneously imposing the broadband requirement and reducing USF support?*

Petitioners next complain that the FCC's broadband requirement was "impose[d] . . . in the face of a *net reduction* to USF and related intercarrier compensation revenues for rural carriers." Pet'r Br. 3 at 29 (emphasis in original). They argue, in turn, that "[t]his 'do more with less' directive flies in the face of Congress's interrelated requirements under Section 254(b) that the FCC use USF to keep quality service 'affordable,' that consumers in high cost areas receive services comparable to those available to their urban counterparts at 'reasonably comparable' rates, that USF support mechanisms be 'predictable and sufficient' to preserve and advance universal service, and that telecommunications service providers contribute equitably to achieve that objective." Id. (citing 47 U.S.C. §§ 254(b)(1), (3), (5)). And, they argue, the FCC "made no attempt to measure whether reduced support, coupled with the added costs of the broadband obligation, will allow carriers to meet the universal service objectives of Section 254(b)." Id. at 30.

As previously noted, § 254(b) provides as follows:

(b) **Universal service principles**. The [Federal-State] Joint Board[, which was created in subsection (a) by the 1996 Act,] and the Commission shall base policies for the preservation and advancement of universal service on the following principles:

(1) Quality and rates. Quality services should be available at just, reasonable, and affordable rates.

(2) Access to advanced services. Access to advanced telecommunications and information services should be provided in all regions of the Nation.

(3) Access in rural and high-cost areas. Consumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services, including interexchange services and advanced telecommunications and information services, that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas.

(4) Equitable and nondiscriminatory contributions. All providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service.

(5) Specific and predictable support mechanisms. There should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service.

(6) Access to advanced telecommunications services for schools, health care, and libraries. Elementary and secondary schools and classrooms, health care providers, and libraries should have access to advanced telecommunications services as described in subsection (h).

(7) Additional principles. Such other principles as the Joint Board and the Commission determine are necessary and appropriate for the protection of the public interest, convenience, and necessity and are consistent with this Act.

47 U.S.C. § 254(b).

This is not the first time we have analyzed § 254(b). In Qwest Corp., we noted that "[t]he plain text of the statute . . . indicates a mandatory duty on the FCC" to "base its universal policies on the principles listed in § 254(b)." 258 F.3d at 1200. "However," we emphasized, "each of the principles in § 254(b) internally is phrased in terms of 'should,'" which "indicates a recommended course of action, but does not itself imply the obligation associated with 'shall.'" Id. Consequently, we held, "the FCC must base its policies on the principles, but any particular principle can be trumped in the appropriate case." Id. In other words, "the FCC may exercise its discretion to balance the principles against one another when they conflict, but may not depart from them altogether to achieve some goal." Id.

*a) Does the Order fail to ensure that USF support for rural carriers is sufficient to preserve and advance universal service?*

Petitioners argue that the FCC failed to ensure that USF support for rural carriers is "'sufficient' . . . to achieve Congress's goals." Pet'r Br. 3 at 30. "The overarching problem," petitioners assert, "is that the [FCC] improperly limited its analysis to whether, without reform [i.e., a fixed budget], USF support would be *excessive*." Id. at 31 (emphasis in original). As a result, petitioners assert, "[t]he Order leaves unanalyzed whether reduced USF support will be sufficient to preserve and enhance traditional voice services." Id.

The term "sufficient" is mentioned in both § 254(b)(5) ("There should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance

61

universal service.") and § 254(e) ("Any such support should be . . . sufficient to achieve the purposes of this section.").  The Fifth Circuit has concluded, however, that "§ 254(b) [simply] identifies a set of principles and does not lay out any specific commands for the FCC," and that "[e]ven § 254(e), which is framed as a direct, statutory command, is ambiguous as to what constitutes 'sufficient' support."  Texas Office of Public Util. Counsel v. FCC, 183 F.3d 393, 425 (5th Cir. 1999).  Consequently, the Fifth Circuit concluded, a reviewing court need "not consider the language an expression of Congress's 'unambiguous intent' allowing Chevron step-one review," and instead need only "review [the FCC's] interpretation for reasonability under Chevron step-two."  Id. at 425-26.  Because we agree with the Fifth Circuit, we need determine in this case only that the FCC's "sufficiency" analysis was not arbitrary, capricious, or manifestly contrary to the statute.

At the outset, we note that the FCC's counsel conceded at oral argument that the FCC, in preparing the Order and establishing the amount of USF funding, made no attempt to determine the precise cost for each potential USF recipient to fulfill the broadband requirement.  According to the FCC's counsel, that would have been exceedingly difficult to do, given the fact that there are approximately eight hundred rate-

of-return carriers in the United States.[6]  Instead, the FCC chose a different strategy for

achieving the goal of budgetary "sufficiency."[7]

In setting the overall budget for the Connect America Fund (CAF), the FCC

expressed a "commitment to controlling the size of the universal service fund," and,

consequently, it "sought comment on setting an overall budget for the CAF such that the

sum of the CAF and any existing legacy high-cost support mechanisms . . . in a given

year would remain equal to current funding levels."  JA at 437 (Order ¶ 121).  "[A] broad

cross-section of interested stakeholders . . . agreed" with this proposal, "with many urging

the [FCC] to set that budget at $4.5 billion per year, the estimated size of the program in

fiscal year (FY) 2011."  Id. (Order ¶ 122).  After considering these comments, the FCC

concluded that the "establish[ment] [of] a defined budget for the high-cost component of

---

[6] As discussed below, even objectors to the FCC's proposed budget failed to offer the FCC details of their individual circumstances.

[7] The dissent, relying on Qwest Corp., effectively rejects the FCC's strategy and takes it to task for not "estimat[ing] . . . the cost of its new broadband requirements on the industry as a whole."  Dissent at 5.  But Qwest, though useful for its general analysis of § 254(b), does not provide a relevant point of comparison when it comes to assessing whether the Order in this case achieves the goal of budgetary "sufficiency."  That is because Qwest dealt with a cost model employed by the FCC for purposes of determining universal service funding for non-rural telecommunications carriers in areas "where the average cost of providing service exceeded [a] national benchmark defined in terms of the average cost across the nation."  258 F.3d at 1197.  Necessarily, a cost model is intended to estimate, with some degree of accuracy, the costs of a product or project.  In contrast, the Order at issue in this case never purported, nor was it statutorily required, to estimate the costs of broadband deployment, either per carrier or for the industry as a whole.

We also, in any event, question how the FCC could have "estimate[d] . . . the cost of its new broadband requirements on the industry as a whole" when, as the dissent itself concedes, the FCC "could not have determined the cost of the broadband condition for each carrier seeking relief through the Universal Service Fund."  Dissent at 5.

the universal service fund" would "best ensure that [it] ha[d] in place 'specific, predictable, and sufficient' funding mechanisms to ensure [its] universal service objectives." Id. (Order ¶ 123). In reaching this conclusion, the FCC expressed concern that, "were the CAF to significantly raise the end-user cost of services, it could undermine [the FCC's] broader policy objectives to promote broadband and mobile deployment and adoption." Id. at 438 (Order ¶ 124). And, consistent with many of the comments it received, the FCC "establish[ed] an annual funding target, set at the same level as [its] current estimate for the size of the high-cost program for FY 2011, of no more than $4.5 billion."[8] Id. (Order ¶ 125). The FCC found "that amount [was not] excessive given" its decision to "expand the high-cost program in important ways to promote broadband and mobility; facilitate intercarrier compensation reform; and preserve universal voice connectivity." Id. "At the same time," the FCC found that "a higher budget [was not] warranted, given the substantial reforms [it was] adopt[ing] to modernize [its] legacy funding mechanisms to address long-standing inefficiencies and wasteful spending." Id. The FCC also noted that it would need "to evaluate the effect of these reforms before adjusting [its] budget," id., and it specifically stated that it "anticipate[d] . . . revisit[ing] and adjust[ing] accordingly the appropriate size of each of [its] programs by the end of the six-year period, based on market developments," id. at 399 (Order ¶ 18).

---

[8] Of this amount, "approximately $4 billion . . . will be divided between areas served by price cap carriers and areas served by rate-of-return carriers, with no more than $1.8 billion available annually for price cap territories . . . and up to $2 billion available annually for rate-of-return territories." JA at 438 (Order ¶ 126).

After establishing this overall budget, the FCC stated that it intended to "step away from distinctions based on whether a company is classified as a rural carrier or a non-rural carrier" and to "establish two pathways for how support is determined—one for companies whose interstate rates are regulated under price caps, and the other for those whose interstate rates are regulated under rate-of-return." Id. at 440 (Order ¶ 129). The FCC then proceeded to allocate portions of the overall CAF budget to these two groups of carriers.

Turning first to price cap carriers, the FCC noted that they serve "[m]ore than 83 percent of the approximately 18 million Americans who lack access to fixed broadband." Id. at 439 (Order ¶ 127). The FCC outlined a two-phase framework for distributing CAF funds to these carriers. "CAF Phase I," the FCC explained, would "freeze support under [its] existing high-cost support mechanisms . . . for price cap carriers and their rate of return affiliates," and would also, in order "to spur the deployment of broadband in unserved areas, . . . allocate up to $300 million in additional support to such carriers." Id. (Order ¶ 128). The distribution of this additional, or "incremental support," the FCC stated, would be "distribute[d] . . . using a simplified forward-looking cost estimate" that was not objected to by any party. Id. at 442 (Order ¶ 133); see id. at 442-43 (Order ¶ 134). The FCC emphasized that this incremental support was not intended to cover the full costs of broadband deployment:

> We acknowledge that our existing cost model, on which our distribution
> mechanism for CAF Phase I incremental funding is based, calculates the
> cost of providing voice service rather than broadband service, although we

are requiring carriers to meet broadband deployment obligations if they accept CAF Phase I incremental funding. We find that using estimates of the cost of deploying voice service, even though we impose broadband deployment obligations, is reasonable in the context of this interim support mechanism. First, this interim mechanism is designed to identify the most expensive wire centers, and the same characteristics that make it expensive to provide voice service to a wire center (e.g., lack of density) make it expensive to provide broadband service to that wire center as well. Using a cost estimation function based on our existing model will help to identify *which* wire centers are likely to be the most expensive to provide broadband service to, even if it does not reliably identify precisely *how expensive* those wire centers will be to serve. Second, and related, our funding threshold is determined by our budget limit of $300 million for CAF Phase I incremental support rather than by a calculation of what amount we expect a carrier to need to serve that area. That is, this interim mechanism is not designed to "fully" fund any particular wire center—it is not designed to fund the difference between (i) the deployment cost associated with the most expensive wire center in which we could reasonably expect a carrier to deploy broadband without any support at all and (ii) the actual estimated deployment cost for a wire center. Instead, the interim mechanism is designed to provide support to carriers that serve areas where we expect that providing broadband service will require universal service support.

Id. at 444 (Order ¶ 137 n.220). In short, the FCC stated, its objective for CAF Phase I was not "to identify the precise cost of deploying broadband to any particular location," but instead "to identify an appropriate standard to spur immediate broadband deployment to as many unserved locations as possible, given [its] budget constraint."[9] Id. at 445

---

[9] For purposes of CAF Phase I incremental funding, the FCC found "that a one-time support payment of $775 per unserved location for the purpose of calculating broadband deployment obligations for companies that elect[ed] to receive additional support [wa]s appropriate." JA at 445 (Order ¶ 139). In arriving at this amount, the FCC "considered broadband deployment projects undertaken by a mid-sized price cap carrier under the BIP program," id. (Order ¶ 140), "data from the analysis done as part of the National Broadband Plan," id. (Order ¶ 141), its own "analysis using the ABC plan cost model, which calculate[d] the cost of deploying broadband to unserved locations on a census block basis," id. at 444-45 (Order ¶ 142), and "estimates of the per-location cost of extending broadband to unserved locations" placed in the record by several carriers, id. at

66

(Order ¶ 139). Relatedly, the FCC noted that it "expect[ed] that carriers w[ould]

supplement incremental support with their own investment."[10]  Id. at 446 (Order ¶ 144).

The FCC's Order also "adopt[ed] Phase II of the Connect America Fund" for

price-cap carriers, which established "a framework for extending broadband to millions of

unserved locations over a five-year period, . . . while sustaining existing voice and

broadband services."  Id. at 452 (Order ¶ 156).  "Within the total $4.5 billion annual

[CAF] budget, [the FCC] set the total annual CAF budget for areas currently served by

price cap carriers at no more than $1.8 billion for a five-year period."  Id. (Order ¶ 158).

The FCC concluded that this amount "represent[ed] a reasonable balance" of several

considerations, including its "universal service mandate to unserved consumers residing

in [price cap] communities," and its need "to balance many competing demands for

universal service funds."  Id.  And the FCC "adopt[ed] the following methodology for

providing CAF support in price cap areas" during CAF Phase II:

> First, the Commission will model forward-looking costs to estimate the cost
> of deploying broadband-capable networks in high-cost areas and identify at
> a granular level the areas where support will be available.  Second, using
> the cost model, the Commission will offer each price cap LEC annual
> support for a period of five years in exchange for a commitment to offer
> voice across its service territory within a state and broadband service to
> supported locations within that service territory, subject to robust public
> interest obligations and accountability standards.  Third, for all territories

445 (Order ¶ 143).

[10] The Order emphasized that price cap carriers were free to decline CAF Phase I
incremental support, in which case they would be under no obligation to satisfy the
broadband conditions outlined in the Order.  JA at 444 (Order ¶ 138); id. at 447 (Order ¶
144).

for which price cap LECs decline to make that commitment, the Commission will award ongoing support through a competitive bidding mechanism.

Id. at 454-55 (Order ¶ 166).

The FCC then turned to rate-of-return carriers and, as with price cap carriers, established a new funding framework. To begin with, the FCC allocated "approximately $2 billion per year" to rate-of-return carriers, an amount "approximately equal to current levels." Id. at 465 (Order ¶ 195). In doing so, the FCC expressed its belief "that keeping rate-of-return carriers at approximately current support levels in the aggregate during th[e] transition [to a more incentive-based form of regulation] appropriately balance[d] the competing demands on universal service funding and the desire to sustain service to consumers and provide continued incentives for broadband expansion as [it] improve[d] the efficiency of rate-of-return mechanisms." Id.

Along with setting this annual budget for rate-of-return carriers, the FCC "implement[ed] a number of reforms to eliminate waste and inefficiency and improve incentives for rational investment and operation by rate-of-return LECs." Id. These included: (1) establish[ing] parameters for what actual unseparated loop and common line costs carriers [could] seek recovery for under the federal universal service program," id. (Order ¶ 196); (2) "reduc[ing] . . . high-cost loop support to the extent that a [rural] carrier's local rates [we]re below a specified urban local rate floor," id. at 466 (Order ¶ 197); (3) eliminating safety net additive support received as a result of line loss, id. (Order ¶ 198); (4) eliminating local switching support, id. (Order ¶ 199); (5)

"eliminat[ing] support for rate-of-return companies in any study area that is completely overlapped by an unsubsidized competitor," id. (Order ¶ 200); and (6) "adopt[ing] a rule that support in excess of $250 per line per month will no longer be provided to any carrier," id. (Order ¶ 201).

In a section of the Order entitled "Public Interest Obligations of Rate-of-Return Carriers," the FCC announced its requirement "that [rate-of-return] recipients use their support in a manner consistent with achieving universal availability of voice and broadband." Id. at 467 (Order ¶ 205). But, the FCC emphasized, "rather than establishing a mandatory requirement to deploy broadband-capable facilities to all locations within their service territory, [it would] continue to offer a more flexible approach for these smaller carriers." Id. (Order ¶ 206). In particular, the FCC emphasized that "rate-of-return carriers w[ould] not necessarily be required to build out to and serve the most expensive locations within their service area," id. at 468 (Order ¶ 207), nor would they be subject to "intermediate build-out milestones or increased speed requirements for future years," id. at 467-68 (Order ¶ 206). Thus, the relative cost of providing broadband service to a particular location is a relevant factor in determining whether a customer's request to a rate-of-return carrier for broadband service is reasonable. And, as the FCC's counsel emphasized at oral argument, the Order leaves it to rate-of-return carriers in the first instance to determine whether a customer's request for broadband service is reasonable.

In a separate section discussing the "Connect America Fund in Remote Areas," the Order expressly "exempted the most remote areas, including fewer than 1 percent of all American homes, from the home and business broadband service obligations that otherwise apply to CAF recipients." Id. at 564-65 (Order ¶ 533). The Order also noted that "universal service revenues account for [only] approximately 30 percent of the typical rate-of-return carrier's total revenues," and it concluded that the intercarrier compensation reforms outlined in the Order "w[ould] provide rate-of-return carriers with access to a new explicit recovery mechanism in [the Connect American Fund], offering a source of stable and certain revenues that the [prior] intercarrier system c[ould] no longer provide." Id. at 496-97 (Order ¶ 291).

The Order also, in a section entitled "Impact of these Reforms on Rate-of-Return Carriers and the Communities They Serve," addressed the likely impact of its proposed reforms on rate-of-return carriers and the communities served by those carriers. To begin with, the Order concluded that its intercarrier compensation reforms and set budget would "provide greater certainty and a more predictable flow of revenues [to those carriers] than the status quo." Id. at 495 (Order ¶ 286). The Order in turn opined "that carriers that invest and operate in a prudent manner w[ould] be minimally affected by th[e] Order." Id. at 496 (Order ¶ 289). In support, the Order concluded "that nearly 9 out of 10 rate-of-return carriers w[ould] see reductions in high-cost universal service receipts of less than 20 percent annually, . . . approximately 7 out of 10 w[ould] see reductions of less than 10

70

percent," and "almost 34 percent w[ould] see an increase in high-cost universal service receipts." Id. (Order ¶ 290).

Lastly, the Order noted that "various parties . . . ha[d] argued that reductions in current support levels would threaten their financial viability, imperiling service to consumers in the areas they serve[d]." Id. at 566 (Order ¶ 539). The FCC determined it could not "evaluate those claims absent detailed information about individualized circumstances," and thus "conclude[d] that they [we]re better handled in the course of a case-by-case review."[11] Id. Consequently, the Order authorizes "any carrier negatively affected by the universal service reforms" adopted in the Order "to file a petition for waiver that clearly demonstrates that good cause exists for exempting the carrier from some or all of those reforms, and that waiver is necessary and in the public interest to ensure that consumers in the area continue to receive voice service." Id.

In sum, the FCC determined that budgetary "sufficiency" for price cap and rate-of-return carriers could be achieved through a combination of measures, including, but not limited to: (1) maintaining current USF funding levels while reducing or eliminating waste and inefficiencies that existed in the prior USF funding scheme; (2) affording

---

[11] Although the dissent asserts that "[t]he sufficiency of the budget was challenged in the FCC proceedings," it cites to only two objections contained in the record. Dissent at 3. And, as it turns out, only one of those two (from tribal carrier Gila River Telecommunications, Inc.) offered any details of the costs of complying with the broadband requirement (and in that regard, Gila cited only one extreme example, rather than outlining its average or overall costs of broadband deployment). See JA at 4094 ("Costs of deploying fiber-to-the-home have been as high as $12,000 for a single residence.").

carriers the authority to determine which requests for broadband service are reasonable; (3) allowing carriers, when necessary, to use the waiver process; and (4) conducting a budgetary review by the end of six years. And, relatedly, the FCC quite clearly rejected any notion that budgetary "sufficiency" is equivalent to "complete" or "full" funding for carrying out the broadband and other obligations imposed upon carriers who are voluntary recipients of USF funds. In our view, these determinations were not arbitrary, capricious, or manifestly contrary to the directives outlined in § 254. To contrary, the FCC's determinations, particularly when considered in light of the other statutory directives the FCC was charged with achieving, were reasonable and sufficient to survive scrutiny under Chevron step-two analysis.

*b) Does the Order fail to ensure service and rate comparability between rural and urban areas?*

According to petitioners, the FCC "acknowledges it has not investigated what broadband service or rate levels are offered in either rural or urban areas." Pet'r Br. 3 at 33. Petitioners argue, in turn, that the FCC "cannot possibly confirm that its policies enable rural carriers to provide broadband service 'at rates reasonably comparable to rates charged for similar services in urban areas,' Section 254(b)(3), if it has failed to determine the urban rate and service levels to which rural rates and service are to be compared." Id. at 33-34.

We reject petitioners' arguments, however, because they ignore the FCC's efforts to accurately assess urban rates and satisfy its statutory obligations. In the Order, the

FCC noted that it "ha[d] never compared broadband rates for purposes of section 254(b)(3)." JA at 435 (Order ¶ 113). Consequently, the FCC "directed [its Wireline Competition Bureau and its Wireless Telecommunications Bureau] to develop a specific methodology for defining that reasonable range, taking into account that retail broadband service is not rate regulated and that retail offerings may be defined by price, speed, usage limits, if any, and other elements." Id. The FCC also sought "comment on how specifically to define a reasonable range." Id. Relatedly, the FCC "delegate[d] to the Wireline Competition Bureau and Wireless Telecommunications Bureau the authority to conduct an annual survey of urban broadband rates, if necessary, in order to derive a national range of rates for broadband service." Id. at 435 (Order ¶ 114). "By conducting [its] own survey," the FCC concluded, it "w[ould] be able to tailor the data specifically to [its] need to satisfy [its] statutory obligation." Id.

> *c) Does the Order's establishment of a budget cap, without widening the contribution base, fail to protect affordability or ensure equitable fund contributions?*

Petitioners argue that the Order's imposition of a USF budget cap, "[w]ithout widening the contribution base, . . . will do nothing to ensure affordability." Pet'r Br. 3 at 34. "The problem," according to petitioners, "is that telecommunications voice revenues are declining." Id. As a result, they argue, "[e]ven a fixed budget will have to be recovered from fewer customers, whose individual charges will *go up* (become *less* affordable), unless the contribution base is widened." Id. at 34-35 (emphasis in original). In turn, petitioners argue that, even assuming that the FCC acted within its authority in

73

imposing the broadband mandate, "it is inequitable to exempt telecommunications providers who also offer broadband from being required to contribute to universal service from the revenues they receive for such services, particularly since rural carriers assuming a broadband obligation will incur added costs." Id. at 35. And, they argue, it is not enough for the FCC to "decide at some unspecified future date . . . whether to expand its contribution base." Id.

Two points are clear from the Order and the parties' briefs. First, the Order concluded that the existing contribution framework (which is comprised of assessments paid by interstate telecommunications service providers) was sufficient to satisfy the annual USF budget established in the Order. Second, the FCC chose to address potential changes to the contribution framework in a separate proceeding. More specifically, the FCC in a separate rulemaking docket has sought comment on proposals to reform and modernize how USF contributions are assessed and recovered. See Universal Service Contribution Methodology; A National Broadband Plan for Our Future, 27 FCC Rcd 5357, 5358 (2012).

As the FCC correctly notes in its appellate response brief, 47 U.S.C. § 154(j) affords it the discretion to "conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice." FCC Br. 3 at 68. And we agree with the FCC that its decision to address USF contributions not in the Order, but rather in a separate proceeding, falls well within that discretion.

*d) Does the FCC's "regression rule" violate § 254's predictability requirement?*

Petitioners next take issue with what they describe as the Order's "regression rule."[12]  According to petitioners, the regression rule is inconsistent with § 254(b)(5)'s mandate that "[t]here should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service."  47 U.S.C. § 254(b)(5).  More specifically, petitioners assert that "[t]he Order's regression rule . . . contravenes this mandate in three respects: (1) it delegates authority to devise a rule limiting USF support to its Wireline Competition Bureau ('WCB') in violation of its own rules and then compounds the uncertainty thereby created by (2) leaving the WCB unbounded discretion to devise the rule and subsequently (3) to revise it without abiding by APA notice and comment procedures."  Pet'r Br. 3 at 36-37.  The end result, petitioners argue, is unpredictability because "a carrier simply cannot know from year to year which investment or expenses will be supported and which will not," and thus will be "at a loss as to how to make business plans for the future."  Id. at 38.

The "regression rule" referred to by petitioners, as best we can tell, is part of the FCC's new "benchmarking rule" for limiting the reimbursable capital and operating expenses in the formula used to determine high-cost loop support (HCLS) for rate-of-return carriers.  See FCC Br. 3 at 41.  The benchmarking rule was adopted by the FCC in the Order to "ensur[e] that companies do not receive more support than necessary to serve

_____

[12] Notably, petitioners fail to identify in their briefs where the so-called "regression rule" is discussed in the Order.

75

their communities," JA at 468 (Order ¶ 210), and to "create structural incentives for rate-of-return companies to operate more efficiently and make prudent expenditures," id. at 469 (Order ¶ 210). The benchmarking rule is based on the FCC's "proposed . . . regression analyses to estimate appropriate levels of capital expenses and operating expenses for each incumbent rate-of-return study area and limit expenses falling above a benchmark based on this estimate." Id. (Order ¶ 212). "Th[is] methodology," the Order stated, "will generate caps, to be updated annually, for each rate-of-return company." Id. at 470 (Order ¶ 214).

The FCC, in the Order, "delegate[d] authority to the Wireline Competition Bureau to implement a methodology." Id. at 469 (Order ¶ 210). In doing so, the Order "set forth in" an attached Further Notice of Proposed Rulemaking "a specific methodology for capping recovery for capital expenses and operating expenses using quantile regression techniques and publicly available cost, geographic and demographic data." Id. at 470 (Order ¶ 216). The FCC "invite[d] public input . . . on that methodology." Id. at 471 (Order ¶ 471). On April 25, 2012, the Wireline Competition Bureau completed its assigned task and finalized the benchmarking methodology after considering the record compiled in response to the Further Notice of Proposed Rulemaking. FCC Br. 3 at 42.

According to the FCC, the challenges that petitioners now pose to the benchmarking and regression rules were never raised by petitioners during the administrative process. In particular, the FCC asserts, "[p]etitioners did not raise these contentions before the [FCC] in a petition for reconsideration." Id. at 43. Consequently,

76

the FCC asserts, the contentions must be considered waived pursuant to 47 U.S.C. § 405(a).

Section 405(a) authorizes a party to file with the FCC a motion for reconsideration of "an order, decision, report, or action" of the FCC.  47 U.S.C. § 405(a).  "[F]iling a petition for reconsideration before the [FCC] is 'a condition precedent to judicial review . . . where the party seeking such review . . . relies on questions of fact or law upon which the [FCC] . . . has been afforded no opportunity to pass.'"  See Globalstar, Inc. v. FCC, 564 F.3d 476, 483 (D.C. Cir. 2009) (quoting § 405(a)).  "Thus, even when a petitioner has no reason to raise an argument until the FCC issues an order that makes the issue relevant, the petitioner must file a petition for reconsideration with the [FCC] before it may seek judicial review."  Id. at 484 (internal quotation marks omitted).  In short, then, § 405(a) requires that the FCC be given an "opportunity to pass" on an issue before the issue is raised in federal court.  Id. at 479.  If the FCC has not been given such an opportunity, the issue is deemed waived for purposes of federal court review.  Id.

In their reply brief, petitioners assert that "[t]he illegality of [the regression rule]'s delegation was in fact raised in [the] Petition for Reconsideration and Clarification of the National Exchange Carrier Association, Inc., et al."  Pet'r Reply Br. 3 at 20 n.8.  A review of the Joint Appendix confirms that the National Exchange Carrier Association (NECA), an entity that is not a petitioner or intervenor in this appeal, did, in fact, move for reconsideration of the FCC's adoption of the use of annual regression analysis.  Petitioners have not identified with specificity, however, which statements in the NECA's

77

petition for reconsideration they believe related to the arguments they now seek to assert. Having conducted our own review of the NECA's petition for reconsideration, we note that two sentences therein specifically addressed the FCC's "use of a regression analysis." JA at 4087. The first sentence stated: "By firmly adopting the use of regression analysis before giving parties the ability to consider whether this approach truly works or whether other constraints might yield better result, the [FCC] has ventured down a path that could limit cost recovery in unworkable or unlawful ways." Id. The second, and immediately following sentence, stated: "The [FCC] should accordingly reconsider its conclusion to utilize a regression analysis to develop the new caps, and should state instead that it will *examine* a regression analysis approach . . . , subject to adequate notice and comment, *before* it adopts and implements a particular form of investment or operating expense constraint." Id. (emphasis in original). The NECA's petition for reconsideration also, in reference to the FCC's "decision to change the caps each year based upon a refreshed 'run' of the regression analyses," complained that "this dynamic capping does nothing to restore predictability to the high-cost program but instead only exacerbates uncertainty." Id. Lastly, the NECA's petition for reconsideration asserted in a footnote that the FCC's "decision to delegate to the Wireline Competition Bureau the authority to establish regression-based constraints raises serious legal concerns as well."[13] Id. n.22.

---

[13] The NECA's petition for reconsideration did not otherwise specify the purported "serious legal concerns." Instead, it simply cited to a "Letter from Michael R. Romano, NTCA, to Marlene H. Dortch, FCC, WC Docket No. 10-90, *et al.* (filed Oct. 21, 2011) at 2." Notably, petitioners in this appeal have not themselves cited to the "Letter from Michael R. Romano," nor have they cited to where in the record this document can be

We conclude that none of these statements in the NECA's petition for reconsideration are sufficiently specific to encompass the petitioners' arguments that the FCC's regression rule "(1) . . . delegates authority to devise a rule limiting USF support to its Wireline Competition Bureau . . . in violation of its own rules and then compounds the uncertainty thereby created by (2) leaving the WCB unbounded discretion to devise the rule and subsequently (3) to revise it without abiding by APA notice and comment procedures."  Pet'r Br. 3 at 36-37.  Consequently, we deem these arguments waived since the FCC was never given an opportunity pass on them prior to this appeal.  See Globalstar, 564 F.3d at 484 (holding that, when a party complains of a technical or procedural mistake, the party must raise the precise claim before the FCC).

We are persuaded, however, that petitioners' general attack on the predictability of the FCC's regression rule was sufficiently raised in the NECA's petition for reconsideration and thus is subject to judicial review.  But, that said, we agree with the FCC that there is no merit to this attack.  To begin with, the method to be utilized by the WCB in arriving at the annual HCLS disbursement amounts is far from unpredictable.  The Order circumscribed the WCB's authority by "set[ting] forth . . . parameters of the methodology that the [WCB must] use to limit payments from HCLS."[14]  JA at 471

---

found.  And our own examination indicates that the October 21, 2011 "Letter from Michael R. Romano" was not included in the Joint Appendix.  Consequently, we conclude that the NECA's reference to "serious legal concerns" was simply too vague to have alerted the FCC to the specific concerns now asserted by petitioners.

[14] These parameters "require that companies' costs be compared to those of similarly situated companies," "that statistical techniques should be used to determine

79

(Order ¶ 217). In turn, the Order requires the WCB "[e]ach year" to "publish in a public notice the updated capped values that will be used." Id. (Order ¶ 218). Together, we believe, these measures are sufficient to satisfy § 254(b)(5)'s predictability requirement. See Alenco Commc'ns, Inc. v. FCC, 201 F.3d 608, 622 (5th Cir. 2000) (concluding that "[t]he methodology governing subsidy disbursements" was predictable because it was "plainly stated and made available to" carriers). Relatedly, we agree with the FCC that nothing in the Act guarantees that HCLS disbursements will be the same from year to year. Nor does the Act guarantee "predictable market outcomes" or "protection from competition." Alenco, 201 F.3d at 622.

3. *Does the FCC's use of auctions to distribute USF violate § 214(e)?*

Petitioners contend that the FCC's use of auctions to distribute USF violates 47 U.S.C. § 214(e). According to petitioners, "Congress," by way of § 214(e), "expressly gave State commissions the job of deciding *who* would receive universal service support and *where* supported services would be advertised and provided by the carrier." Pet'r Br. 3 at 40 (emphasis in original). More specifically, petitioners assert, § 214(e) "provides that only ETCs may receive USF support and that, with narrow exceptions, only states may designate ETCs and their service areas." Id. at 39. And, they assert, "[o]nce an ETC is designated by a state commission to serve a particular service area under Section

---

which companies shall be deemed similarly situated," a "non-exhaustive list of variables that may be considered" by the WCB, and a grant of authority to the WCB "to determine whether other variables . . . would improve the regression analysis. JA at 471 (Order ¶ 217).

80

214(e)(2), it is eligible to receive funding and must offer and advertise the supported services throughout its service area." Id.

Petitioners complain that "[t]he *Order* contravenes this statutory scheme in two respects." Id. (italics in original). "First," petitioners assert, the Order "adopted various competitive bidding mechanisms to distribute USF support, and provided that the [FCC] will define the geographic areas to be auctioned off." Id. at 39-40. "Second," petitioners assert, "the FCC created an entirely new 'conditional designation,' nowhere mentioned in the statute, that will require state commissions to conditionally designate 'ETCs' before auctions to distribute Mobility Fund support are concluded." Id. at 40.

To properly address petitioners' arguments, it is useful to begin with the language of § 214(e). That section, entitled "Provision of universal service," provides, in pertinent part, as follows:

> (1) Eligible telecommunications carriers. A common carrier designated as an eligible telecommunications carrier under paragraph (2), (3), or (6) shall be eligible to receive universal service support in accordance with section 254 [47 USCS § 254] and shall, throughout the service area for which the designation is received—
> > (A) offer the services that are supported by Federal universal service support mechanisms under section 254(c) [47 USCS § 254(c)], either using its own facilities or a combination of its own facilities and resale of another carrier's services . . . ; and
> > (B) advertise the availability of such services and the charges therefor using media of general distribution.
> (2) Designation of eligible telecommunications carriers. A State commission shall upon its own motion or upon request designate a common carrier that meets the requirements of paragraph (1) as an eligible telecommunications carrier for a service area designated by the State commission. * * *

81

(3) Designation of eligible telecommunications carriers for unserved areas. If no common carrier will provide the services that are supported by Federal universal support mechanisms under section 254(c) [47 USCS 254(c)] to an unserved community or any portion thereof that requests such service, the Commission, with respect to interstate services or an area served by a common carrier to which paragraph (6) applies, or a State commission, with respect to intrastate services, shall determine which common carrier or carriers are best able to provide such service to the requesting unserved community or portion thereof and shall order such carrier or carriers to provide such service for that unserved community or portion thereof. * * * * * *

(6) Common carriers not subject to State commission jurisdiction. In the case of a common carrier providing telephone exchange service and exchange access that is not subject to the jurisdiction of a State commission, the Commission shall upon request designate such a common carrier that meets the requirements of paragraph (1) as an eligible telecommunications carrier for a service area designated by the Commission consistent with applicable Federal and State law. * * *

47 U.S.C. § 214(e).

As the FCC notes in its response brief, its Order "reformed the distribution of high-cost universal service support, [but] left intact the state commissions' authority to designate ETCs and their service areas." FCC Br. 3 at 63. In particular, the Order "decline[d] to adopt the structure of the [existing] competitive ETC rules, which provide[d] support for multiple providers in an area." JA at 506 (Order ¶ 316). In the FCC's view, "that structure . . . led to duplicative investment by multiple competitive ETCs in certain areas at the expense of investment that could be directed elsewhere, including areas that are not currently served." Id. In place of the existing system, the FCC adopted, in pertinent part, "a competitive bidding mechanism" that "award[s] support based on the lowest per-unit bid amounts submitted in a reverse auction, subject

82

to the constraint . . . that there will be no more than one recipient per geographic area, so as to make the limited funds available go as far as possible."[15] Id. at 507 (Order ¶ 321).

Notably, the Order emphasized that "[c]arriers seeking federal support must still comply with the same universal service rules and obligations set forth in sections 254 and 214, including the requirement that such providers be designated as eligible to receive support, either from state commissions or, if the provider is beyond the jurisdiction of the state commission, from th[e] [FCC]." Id. at 418 (Order ¶ 73). In other words, "parties that seek to participate in the auction must be ETCs in the areas for which they will seek support at the deadline for applying to participate in the auction." Id. at 525 (Order ¶ 389). The Order "decline[d] to adopt the alternative of allowing parties to bid for support prior to being designated an ETC." Id. at 526 (Order ¶ 392). Relatedly, the Order recognized that "the states have primary jurisdiction to designate ETCs; the [FCC] designates ETCs where states lack jurisdiction." Id. at 525 (Order ¶ 390 n.662). Lastly, the Order concluded that "nothing in the statute compels that every party eligible for support actually receives it." Id. at 507 (Order ¶ 318).

The key flaw in petitioners' argument, as the FCC correctly notes in its response brief, is that "it conflates eligibility for subsidies with the right to receive subsidies."

---

[15] For price cap areas, the Order indicated that the FCC would "offer each price cap LEC annual support for a period of five years in exchange for a commitment to offer voice across its service territory, subject to robust public interest obligations and accountability standards." JA at 454 (Order ¶ 166). However, "for all territories for which price cap LECs decline to make that commitment, the [FCC] will award ongoing support through" the reverse auction process. Id.

FCC Br. 3 at 62.  To be sure, § 214(e) authorizes state commissions to decide which

entities will be designated as ETCs and, relatedly, to determine the service areas served

by those ETCs.[16]  But nothing in § 214(e) gives authority to the state commissions to

allocate USF funds, nor does § 214(e) give a designated ETC the absolute right to receive

USF funds.  Rather, as the language of § 214(e)(1) makes clear, "[a] common carrier

designated as an eligible telecommunications carrier under paragraph (2), (3), or (6) shall

be eligible to receive universal service support in accordance with section 254 [47 USCS

§ 254]."  47 U.S.C. § 214(e) (emphasis added).  Had Congress intended designated ETCs

to automatically receive USF funds, it could and should have omitted the phrase "be

eligible to" from the language of § 214(e)(1).

> 4. *Was the FCC's decision to reduce USF support in areas with "artificially low" end user rates unlawful or arbitrary?*

Petitioners contend that the FCC's decision to reduce USF support in areas with

"artificially low" end user rates was both unlawful and arbitrary.

The portion of the Order being challenged by petitioners is a section entitled

"Reducing High Cost Loop Support for Artificially Low End-User Rates."  Therein, the

Order "adopt[ed] a rule," applicable "to both rate-of-return carriers and price cap

companies," "to limit high-cost support where end-user rates do not meet a specified local

---

[16] States will continue to define the larger geographic regions for ETC status, and the FCC will use the smaller parts of these regions (through census blocks) to determine the existence and level of financial support.  JA at 812-13 (Order ¶¶ 1191-92); see id. at 455 (Order ¶ 167), 459 (Order ¶ 179).  Thus, states will continue to define the service areas for ETCs, while the FCC will decide (on a census block basis) the zones within those areas that are eligible for support through competitive bidding.

floor." JA at 476 (Order ¶ 235). In doing so, the Order noted there was "evidence in the record" indicating that "there [were] a number of carriers with local rates that [we]re significantly lower than rates that urban consumers pay." Id. at 477 (Order ¶ 235). "For example," the Order noted, there were "two carriers in Iowa and one carrier in Minnesota [that] offer[ed] local residential rates below $5 per month." Id. The Order concluded that Congress did not "intend[] to create a regime in which universal service subsidizes artificially low local rates in rural areas when it adopted the reasonably comparable principle in section 254(b); rather, [the Order concluded], it [wa]s clear from the overall context and structure of the statute that its purpose [wa]s to ensure that rates in rural areas not be significantly higher than in urban areas." Id. (emphasis in original). Relatedly, the Order concluded:

> It is inappropriate to provide federal high-cost support to subsidize local rates beyond what is necessary to ensure reasonable comparability. Doing so places an undue burden on the Fund and consumers that pay into it. Specifically, we do not believe it is equitable for consumers across the country to subsidize the cost of service for some consumers that pay local service rates that are significantly lower than the national urban average.

Id. at 478 (Order ¶ 237).

The Order stated that the FCC would "phase in [a] rate floor in three steps, beginning with an initial rate floor of $10 for the period July 1, 2012 through June 30, 2013 and $14 for the period July 1, 2013 through June 30, 2014." Id. (Order ¶ 239). "Beginning July 1, 2014," the Order stated, "and in each subsequent calendar year, the

rate floor will be established after the Wireline Competition Bureau completes an updated annual survey of voice rates." Id.

Petitioners argue that "the de facto effect of the *Order*" is that the FCC is setting local rates. Pet'r Br. 3 at 41 (italics in original). "And," they argue, "since local rate setting is exclusively the province of state commissions under the Act, 47 U.S.C. § 152(b), the *Order* unlawfully usurps a power reserved to the states." Id. (italics in original). "The perverse result of" this portion of the Order, petitioners argue, is that to avoid depriving local carriers of needed USF support, states must raise some local rates above levels they would have deemed reasonable." Id. at 41-42.

The FCC asserts, however, and we agree, that we are not bound to examine the "practical effect" of an agency order. Cable & Wireless P.L.C. v. FCC, 166 F.3d 1224, 1230 (D.C. Cir. 1999). As the District of Columbia Circuit has noted, "no canon of administrative law requires [a reviewing court] to view the regulatory scope of agency actions in terms of their practical or even foreseeable effects." Id. As the District of Columbia Circuit noted, "[o]therwise, [a reviewing court] would have to conclude, for example, that the Environmental Protection Agency regulates the automobile industry when it requires states and localities to comply with national ambient air quality standards, or that the Department of Commerce regulates foreign manufacturers when it collects tariffs on foreign-made goods." Id. Thus, we summarily reject the petitioners' argument regarding the practical effect of the Order's new rate floors.

86

In any event, to the extent the Order encourages states to adjust local rates to ensure that they are not excessively low in comparison to urban rates, that appears to be permissible under, and indeed is consistent with, the universal service principles outlined in the Act. As we noted in Qwest Corp., "the FCC may not simply assume that the states will act on their own to preserve and advance universal service." 258 F.3d at 1204. Rather, the FCC "remains obligated to create some inducement . . . for the states to assist in implementing the goals of universal service," i.e., in this case to ensure that rural rates are not artificially low. Id. The portion of the Order at issue appears to serve that purpose by encouraging states to set rural rates that are least comparable to urban rates.

Petitioners also argue that this portion of the Order is arbitrary and capricious in two respects. First, they argue, it "fails to give adequate consideration to . . . comments explaining that the rural and urban basic services at issue may not be comparable." Pet'r Br. 3 at 42. Second, they argue that the Order failed to consider "the fact that rate[s] may have been kept low by state funds, placing *no* burden on the federal USF fund." Id. (emphasis in original).

Addressing these arguments in order, the record on appeal indicates that the Missouri Small Telephone Company Group (MSTCG), in response to the FCC's Notice of Proposed Rulemaking, filed initial comments with the FCC regarding the proposed benchmark rule. The MSTCG stated, in pertinent part: "Because rural calling scopes are smaller, many rural subscribers incur greater long distance charges to place calls to schools, health care facilities, and government offices." JA at 2284. "As a result," the

MSTCG asserted, "the total bills for rural customers (including both local and long distance calling) may be comparable to or higher than the bills of urban customers, and the proposal to establish a nationwide benchmark does not take into account local calling scopes." Id. "Therefore," MSTCG argued, "the FCC may wish to consider establishing a separate rural benchmark." Id.

As far as we can determine, the FCC did not expressly respond to these comments in the Order. In its appellate response brief, the FCC asserts that the MSTCG's comment was "'unsupported by any data' showing that rural customers actually pay as much, or more, for telecommunications services than their urban counterparts by incurring greater long distance charges." FCC Br. 3 at 58 (quoting Vt. Pub. Serv. Bd. v. FCC, 661 F.3d 54, 63 (D.C. Cir. 2011)). "Thus," the FCC argues, "it [wa]s not a significant comment that warranted a response from the agency." Id.

It is well established that "agencies need not respond to every comment." Vt. Pub. Serv. Bd., 661 F.3d at 63. In particular, "[c]omments must be significant enough to step over a threshold requirement of materiality before any lack of agency response or consideration becomes of concern." Vt. Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 553 (1978) (internal quotation marks omitted). Here, the three sentence-comment offered by MSTCG, though not necessarily frivolous, was entirely speculative. As the FCC now notes, the MSTCG offered virtually no evidence in support of the comment. Instead, the MSTCG merely surmised that there might be a difference between urban and rural areas in what it uniquely deemed "local calling scopes." Given the

88

speculative nature of the comment and the complete lack of supporting evidence, we conclude that the FCC did not act arbitrarily or capriciously in failing to address the comment in the Order.

As for petitioners' argument that the FCC failed to consider "the fact that rate[s] may have been kept low by state funds," this claim was never presented to the FCC. Consequently, the claim is waived. See 47 U.S.C. § 405(a).

5. *Does the Order unlawfully deprive rural carriers of a reasonable opportunity to recover their prudently-incurred costs?*

Petitioners argue that the Order unlawfully deprives rural carriers of a reasonable opportunity to recover their prudently-incurred costs. In support, petitioners assert that "they are required to continue to provide current services and, at considerable additional expense, to provide broadband service as well." Pet'r Br. 3 at 43. "At the same time," they assert, "their ICC revenue streams are being narrowed and their USF support will be capped, reduced or eliminated outright (depending on their regulatory status)." Id. In turn, petitioners argue that "[i]t would be one thing if the [FCC] had tied the reductions in USF support to a determination that the individual carriers had imprudently incurred costs, or that they were recovering the costs of investments not 'used and useful' in delivering regulated services, or that these costs could somehow be recovered from end users without violating the statutory universal service principle calling for rural service rates to be reasonably comparable with those in urban areas." Id. at 44. "But," they assert, "the FCC made none of these findings." Id. at 45. Lastly, petitioners acknowledge

89

that the Order contains a waiver provision, but they argue that that provision applies only in narrow circumstances and does not reflect "[t]he constitutional test," which they assert "is whether the carrier has been afforded a reasonable opportunity to recover its costs." Id.

The FCC asserts, in response, that all of this amounts to an "unsubstantiated takings claim" that "is not ripe." FCC Br. 3 at 39. The FCC notes that the Order made clear that if "any rate-of-return carrier can effectively demonstrate that it needs additional support to avoid constitutionally confiscatory rates, the [FCC] will consider a waiver request for additional support." JA at 498 (Order ¶ 294). The FCC thus argues that "[n]o takings claim is ripe until a party has invoked that process and been denied." FCC Br. 3 at 39.

In their reply brief, petitioners deny asserting a takings claim. Pet'r Reply Br. 3 at 15. Instead, they assert, their argument is that "the *Order* was arbitrary and inconsistent with the statutory requirement of 'sufficient support' because it will not provide them a reasonable opportunity to recover prudently incurred costs." Id. (italics in original). The problem, however, is that these arguments were not clearly framed at all in petitioners' opening brief. Indeed, their opening brief made no mention of the Order being arbitrary (in fact, the discussion did not use the word "arbitrary" at all), nor did they clearly assert that the Order violated a statutory requirement of "sufficient support." Instead, the arguments in petitioners' opening brief made reference to a "constitutional test" for "whether [a] carrier has been afforded a reasonable opportunity to recover its costs," Pet'r

90

Br. 3 at 45, and also cited to a Supreme Court takings case, id. at 43 (citing Duquesne Light Co. v. Barasch, 488 U.S. 299, 307-08 (1989)). Thus, we would be well within our discretion to invoke our longstanding rule that a party waives issues and arguments raised for the first time in a reply brief.[17] See Reedy v. Werholtz, 660 F.3d 1270, 1274 (10th Cir. 2011).

In any event, however, it is clear to us that the FCC did not act arbitrarily in implementing changes to the USF mechanisms. Notably, the Order includes a section expressly discussing the "Impact of These Reforms on Rate-of-Return Carriers and the Communities They Serve." JA at 495. In that section, the FCC concluded that its "intercarrier compensation reforms" would provide rate-of-return carriers with "greater certainty and a more predictable flow of revenues than the status quo." Id. (Order ¶ 286). The FCC further noted that the Order's "package of universal service reforms [wa]s targeted at eliminating inefficiencies and closing gaps in [the] system, not at making indiscriminate industry-wide reductions." Id. at 496 (Order ¶ 287). Relatedly, the FCC noted that its "reforms w[ould] not affect all carriers in the same manner or in the same magnitude," but it expressed confidence "that carriers that invest and operate in a prudent manner will be minimally affected." Id. (Order ¶ 289). In support, the FCC stated that its "analysis show[ed] that nearly 9 out of 10 rate-of-return carriers w[ould] see reductions in high-cost universal service receipts of less than 20 percent annually, . . . approximately 7

---

[17] The FCC has moved to strike these arguments on the grounds that they were not adequately raised in petitioners' opening brief.

out of 10 w[ould] see reductions of less than 10 percent, . . . almost 34 percent . . . w[ould] see no reductions whatsoever, and more than 12 percent . . . w[ould] see an increase in high-cost universal service receipts." Id. (Order ¶ 290). The FCC also "reject[ed] the sweeping argument that the rule changes . . . would unlawfully necessarily affect a taking." Id. at 497 (Order ¶ 293). And it emphasized "that carriers have no vested property interest in USF." Id. More specifically, it noted "there [wa]s no statutory provision or Commission rule that provides companies with a vested right to continued receipt of support at current levels, and we are not aware of any other, independent source of law that gives particular companies an entitlement to ongoing USF support." Id. at 498 (Order ¶ 293). Lastly, the FCC concluded that "carriers ha[d] not shown that elimination of USF support w[ould] result in confiscatory end-user rates." Id. (Order ¶ 294). In reaching this conclusion, the FCC noted that, "[t]o the extent that any rate-of-return carriers can effectively demonstrate that it needs additional support to avoid constitutionally confiscatory rates, the Commission will consider a waiver request for additional support." Id.

Nothing about this analysis is remotely arbitrary or capricious. Rather, we conclude the FCC's analysis is both reasoned and reasonable. Further, the FCC's analysis is entirely consistent with the overarching universal service principles outlined in 47 U.S.C. § 254(b), including the principle that "[t]here should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service." 47 U.S.C. § 254(b)(5).

92

6. *Do the FCC's regression and SNA rules have unlawful retroactive effects?*

Petitioners argue that "the FCC's regression and SNA [(Safety Net Additive)] rules," "by limiting recovery of costs lawfully incurred pursuant to federal and state law before the *Order* was adopted," "violate the strong judicial presumption against retroactive rulemaking." Pet'r Br. 3 at 46 (italics in original). According to petitioners, prior to the Order they incurred "capital and operating expenses . . . to comply with the ETC [eligible telecommunications carrier] provisions of Section 214(e) of the Act, Rural Utilities Service ('RUS') loan covenants and/or state Carrier of Last Resort ('COLR') requirements." Id. And, they assert, under the pre-Order regulatory scheme, they were able to receive SNA support to compensate them for those expenses.

The SNA support petitioners refer to is considered to be a "component" of high-cost loop support (HCLS). JA at 401 (Order ¶ 27). HCLS, which was established by the FCC in 1997 during its implementation of the 1996 Act, "provides support for the 'last mile' of connection for rural companies in service areas where the cost to provide this service exceeds 115% of the national average cost per line." Universal Service Administrative Company, High Cost, http://www.usac.org/hc/legacy/incumbent-carriers/step01/hcl.aspx (last visited Dec. 16, 2013). SNA, like HCLS generally, was "available to rural price-cap and rate-of-return carriers and competitive carriers providing service in the areas of these rural companies." Universal Service Administrative Company, http://www.usac.org/hc/legacy/incumbent-carriers/step01/sna.aspx (last visited

93

Dec. 16, 2013). "SNA support [wa]s support 'above the cap' for carriers that ma[d]e significant investment in rural infrastructure in years in which HCL support [wa]s capped." Id. It "[wa]s intended to provide rural carriers with the appropriate incentives to invest in the network infrastructure serving their communities." Id.

Beginning in early 2010, however, the FCC began notifying carriers "that [it] intended to undertake comprehensive universal service reform in the near term." JA at 485 (Order ¶ 252 n.409). And in the Order, the FCC "conclude[d] the [SNA] [wa]s not designed effectively to encourage additional significant investment in telecommunications plant." Id. at 484 (Order ¶ 250). Instead, the FCC concluded, "[t]he majority of incumbent LECs that currently are receiving the [SNA] qualified in large part due to significant loss of lines, not because of significant increases in investment, which is contrary to the intent of the rule." Id. (Order ¶ 249).

Consequently, the Order "phase[s] out the [SNA] over time." Id. at 401 (Order ¶ 27). In particular, during "CAF Phase I," effective January 1, 2012, the Order "freeze[s] support under [the] existing high-cost support mechanisms," including HCLS and SNA, "for price cap carriers and their rate-of-return affiliates." Id. at 439 (Order ¶ 128). CAF Phase I, the Order stated, "set[s] the stage for a full transition to a system where support in price cap territories is determined based on competitive bidding or the forward-looking costs of a modern multi-purpose network." Id. at 440 (Order ¶ 129). And, as we have already discussed, the Order adopted a new "benchmarking rule" for limiting the reimbursable capital and operating expenses in the formula used to determine high-cost

94

loop support (HCLS) for rate-of-return carriers. FCC Br. 3 at 41. This benchmarking rule was based on the FCC's "proposed . . . regression analyses to estimate appropriate levels of capital expenses and operating expenses for each incumbent rate-of-return study area and limit expenses falling above a benchmark based on this estimate." JA at 469 (Order ¶ 212).

Petitioners now argue that "[t]he [Order's] regression and SNA rules violate the presumption against retroactive rulemaking because each 'takes away or impairs vested rights' or 'attaches new legal consequences to events completed before its enactment.'" Pet'r Br. 3 at 47 (quoting Arkema, Inc. v. EPA, 618 F.3d 1, 16 (D.C. Cir. 2010)). Alternatively, petitioners argue that "even if reasonable and prudent expenditures made pursuant to federal and state law are not deemed to entail a vested right to federal support, they render the regression and SNA rules invalid as arbitrary and capricious under the 'secondary retroactivity' standard . . . because they 'alter[] future regulation in a manner that makes worthless substantial past investment incurred in reliance upon the prior rule.'" Id. (quoting Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 220 (1988) (Scalia, J., concurring)).

We reject petitioners' arguments. "Retroactive rules 'alter[] the *past* legal consequences of past actions.'" Mobile Relay Assoc. v. FCC, 457 F.3d 1, 11 (D.C. Cir. 2006) (quoting Bowen, 488 U.S. at 219 (Scalia, J., concurring); emphasis in Bowen). "[A]n agency order that alters the future effect, not the past legal consequences of an action, or that upsets expectations based on prior law, is not retroactive." Id. (internal

95

quotation marks omitted).  Consequently, the Order in this case, which makes only

prospective changes to the reimbursement framework, including the elimination of SNA,

is not retroactive.  "To conclude otherwise would hamstring not only the FCC in its

[telecommunications] management, but also any agency whose decision affects the

financial expectations of regulated entities."  Id.  As the District of Columbia Circuit

noted in Mobile Relay, "[i]t is often the case that a business will undertake a certain

course of conduct based on the current law, and will then find its expectations frustrated

when the law changes."  Id.  "This has never been thought to constitute retroactive

lawmaking, and indeed most economic regulation would be unworkable if all laws

disrupting prior expectations were deemed suspect."  Id.

   "Secondary activity—which occurs if an agency's rule affects a regulated entity's

investment made in reliance on the regulatory status quo before the rule's

promulgation—will be upheld if it is reasonable, i.e., if it is not arbitrary or capricious."

Id. (internal quotation marks omitted); see Bowen, 488 U.S. at 220 (Scalia, J.,

concurring)(suggesting that "[a] rule that has unreasonable secondary retroactivity . . .

may for that reason be 'arbitrary' or capricious' and thus invalid.").  Our review of the

Order in this case persuades us that the FCC's elimination of the SNA rule and its

adoption of the new benchmarking rule was neither arbitrary nor capricious.  As outlined

above, the FCC considered in detail the rationale for the SNA rule and concluded, for

reasons detailed at length in the Order, that a new framework needed to be created and

enacted.  Because the FCC's actions in this regard were neither arbitrary nor capricious,

96

that is sufficient to overcome the petitioners' objection grounded on the theory of secondary retroactivity.

       7.  *Did the FCC disregard evidence that allocating USF to rural price cap carriers by competitive bidding would reduce service quality?*

       Petitioners assert that the FCC, "[i]n adopting an auction mechanism" for the allocation of USF to rural price cap carriers, "has arbitrarily either ignored entirely or failed adequately to address arguments and evidence that the auction approach would result in a 'race to the bottom,' where bidders need only meet minimum service standards inadequate to . . . satisfy future customer needs." Pet'r Br. 3 at 49. Although petitioners concede that the Order acknowledged their arguments, they assert that the Order "never *tackled* them," which, they argue, is "a hallmark of arbitrary agency action." Id. at 50 (emphasis in original; citing Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

       The FCC responds that "[t]his claim is not ripe for judicial review, because the FCC did not 'adopt[] an auction mechanism' for price cap carriers in the Order," but "[r]ather . . . merely sought comment on how best to design and implement such a mechanism in the attached FNPRM [(Further Notice of Proposed Rulemaking)]." FCC Br. 3 at 54. The FCC in turn argues that it "addressed the 'arguments' that it allegedly 'ignored' by seeking comment on them in that FNPRM." Id. Lastly, the FCC argues that, "[u]ntil [it] adopts an auction mechanism based on the record developed under the outstanding FNPRM, the Court will not be able to determine whether [it] adequately

responded to petitioners' arguments that competitive bidding will degrade service and disadvantage small carriers." Id. at 55.

Our review of the Order confirms the FCC's arguments. The Order, in Section XVII, entitled "FURTHER NOTICE OF PROPOSED RULEMAKING," expressly "adopt[ed] a framework for USF reform in areas served by price cap carriers where support will be determined using a combination of a forward-looking broadband cost model and competitive bidding to efficiently support deployment of networks providing both voice and broadband service over the next several years." JA at 812 (Order ¶ 1189). The Order explained this framework:

> In each state, each incumbent price cap carrier will be asked to undertake a state-level commitment to provide affordable broadband to all high-cost locations in its service territory in that state, excluding locations served by an unsubsidized competitor, for a model-determined efficient amount of support. In areas where the incumbent declines to make that commitment, we will use a competitive bidding mechanism to distribute support in a way that maximizes the extent of robust, scalable broadband service and minimizes total cost. This FNPRM addresses proposals for this competitive bidding process, which we refer to here as the CAF auction for price cap areas. The FNPRM proposes program and auction rules, consistent with the goals of the CAF and the [FCC]'s broader objectives for USF reform.

Id. The Order then proceeded to outline, in detail, how the proposed auction process would work and the performance requirements that successful bidders would be required to meet. Notably, the Order sought comment on all of these details.

Although petitioners' opening brief cites to various points in the Order where the FCC purportedly recounted and then briefly responded to arguments in opposition to the proposed auction process, those cited portions deal with the FCC's "discussion of a

different auction mechanism for [dispersing Mobility Fund Phase I funds to] wireless carriers." FCC Br. 3 at 54; see JA at 502-04 (Order ¶¶ 306-11).

We therefore conclude that petitioners' challenges to the FCC's proposed auction mechanism for price-cap carriers are not yet ripe for review.

8. *Does eliminating USF support for the highest-cost areas defeat the very purpose of universal service?*

Petitioners complain that the Order delays indefinitely, and thereby effectively eliminates, support for remote, so-called "extremely high-cost areas," and thus defeats the very purpose of universal service. Pet'r Br. 3 at 52.

We begin our analysis of this claim by outlining the Order's treatment of universal funding for "extremely high-cost" service areas. The Order, in pertinent part, "adopt[s] Phase II of the Connect America Fund: a framework for extending broadband to millions of unserved locations over a five-year period, including households, businesses, and community anchor institutions, while sustaining existing voice and broadband services." JA at 452 (Order ¶ 156). The primary focus of CAF Phase II is to provide "increased support to areas served by price cap carriers." Id. (Order ¶ 159). Those areas, the Order noted, accounted for "more than 83 percent of the unserved locations in the nation" in 2010, but only "receive[d] approximately 25 percent of high-cost support." Id. (Order ¶ 158).

99

"CAF Phase II will have an annual budget of no more than $1.8 billion," which will be distributed "us[ing] a combination of competitive bidding and a new forward-looking model of the cost of constructing modern multi-purpose networks." Id. "Using th[is] [forward-looking] model," the FCC "will estimate the support necessary to serve areas where costs are above a specified benchmark, but below a second 'extremely high-cost' benchmark." Id. The FCC "delegate[d] to the Wireline Competition Bureau the responsibility for setting the extremely high-cost threshold in conjunction with adoption of a final-cost model." Id. at 456 (Order ¶ 169).

Relatedly, the Order created a "Remote Areas Fund" intended "to ensure that the less than one percent of Americans living in remote areas where the cost of deploying traditional terrestrial broadband networks is extremely high can obtain affordable broadband." Id. at 819 (Order ¶ 1224). The Remote Areas Fund, the Order indicated, will receive "$100 million in annual CAF funding to maximize the availability of affordable broadband in such areas." Id. at 455 (Order ¶ 168). In the FNPRM portion of the Order, the FCC "s[ought] comment on how best to utilize" the Remote Areas Fund. Id. The Order proposed that the "universal service goals [could be fulfilled in extremely high-cost areas] by taking advantage of services such as next-generation broadband satellite service or wireless internet service provider (WISP)." Id. The Order also sought "comment on how to structure the Remote Areas Fund." Id. at 820 (Order ¶ 1225). In doing so, the Order proposed several alternative structures, including "a portable

100

consumer subsidy," id., "a competitive bidding process," id. at 820 (Order ¶ 1226), and "a competitive proposal evaluation process," id. (Order ¶ 1227).

As the FCC notes in its response brief, until the Remote Areas Fund distribution rules "are in place, extremely high-cost areas will continue to receive support under existing mechanisms for price cap and rate-of-return carriers." FCC Br. 3 at 64 (citing JA at 442 (Order ¶¶ 133 (freezing support for price-cap carriers), 195 (maintaining support for rate-of-return carriers)).

In light of these undisputed facts, it is readily apparent that the Order neither "indefinitely" delays distribution of the Remote Areas Fund, nor effectively denies USF funding to extremely high-cost areas.[18] Further, any specific challenges that petitioners may seek to assert against the manner in which the Remote Areas Fund is distributed are not yet ripe.

> 9. *Is the FCC's decision to eliminate high-cost support to RLECs, where an unsubsidized competitor offers voice and broadband to all of the RLECs' customers in the same study area, unlawful and unsupported by substantial evidence?*

---

[18] In their reply brief, petitioners offer two new arguments. First, they assert that "the FCC's rule provides that if a census block in a price cap service area exceeds the alternative technology threshold by even one dollar, the area is removed from Phase II support entirely and instead relegated to a separate remote areas fund." Pet'r Reply Br. 3 at 24. Second, and relatedly, they complain that the FCC failed to respond to "[c]ommenters [who] offered an alternative in which the alternative technology threshold would serve as a cap on support instead of an absolute limit." Id. Because we generally "decline to consider arguments not raised in [an appellant's] opening brief," United States v. Ford, 613 F.3d 1263, 1272 n.2 (10th Cir. 2010), we shall grant the FCC's motion to strike these arguments.

Petitioners argue that "[t]he Order's directive that high cost support to RLECs be phased out as unnecessary where unsubsidized competitors offer voice and broadband to all of an RLEC's residential and business customers in the same study area is unlawful and unsupported by substantial evidence." Pet'r Br. 3 at 54. According to petitioners, "unsubsidized competitors have no obligation either to continue providing voice or broadband service to existing customers or to serve new ones once the RLEC's support is eliminated, much less an obligation to provide services comparable in quality and prices to those enjoyed by customers of urban telecommunications carriers." Id. "The *Order*," petitioners argue, "disregards entirely evidence that the moment the rural carrier loses its USF support . . . , consumers are at risk." Id. at 55-56 (italics in original).

At issue here is a section of the Order entitled "Elimination of Support in Areas with 100 Percent Overlap." JA at 493. In the first paragraph of that section, entitled "Background," the FCC explained that "in many areas of the country, universal service provides more support than necessary to achieve [the FCC's] goals by subsidizing a competitor to a voice and broadband provider that is offering service without governmental assistance." Id. (Order ¶ 280; internal quotation marks omitted). In the ensuing paragraphs, entitled "Discussion," the FCC "adopt[ed] a rule to eliminate universal service support where an unsubsidized competitor — or a combination of unsubsidized competitors — offers voice and broadband service throughout an incumbent carrier's study area, and [sought] comment on a process to reduce support where such an unsubsidized competitor offers voice and broadband service to a substantial majority, but

102

not 100 percent of the study area." Id. at 494 (Order ¶ 281). The FCC thus "exclude[d] from the CAF areas that are overlapped by an unsubsidized competitor." Id. The FCC also announced its intent to discontinue its "current levels of high-cost support to rate-of-return companies where there is overlap with one or more unsubsidized competitors." Id. More specifically, the FCC "adopt[ed] a rule to phase out all high-cost support received by incumbent rate-of-return carriers over three years in study areas where an unsubsidized competitor — or a combination of unsubsidized competitors — offers voice and broadband service at" certain specified speeds "for 100 percent of the residential and business locations in the incumbent's study area." Id. 494-95 (Order ¶ 283).

In announcing these rules, the FCC "recognize[d] that there [we]re instances where an unsubsidized competitor offer[ed] broadband and voice service to a significant percentage of the customers in a particular study area (typically where customers are concentrated in a town or other higher density sub-area), but not to the remaining customers in the rest of the study area, and that continued support may be required to enable the availability of supported voice services to those remaining customers." Id. at 494 (Order ¶ 282). "In those cases," the FCC concluded, "there should be a process to determine appropriate support levels." Id. "The FNPRM" thus sought "comment on the methodology and data for determining overlap." Id. at 495 (Order ¶ 284). The Order also "direct[ed] the Wireline Competition Bureau to publish a finalized methodology for determining areas of overlap." Id.

Although petitioners complain that the Order "disregards entirely evidence that the moment the rural carrier loses its USF support (because there is an unsubsidized competitor offering to serve all its customers), consumers are at risk," Pet'r Br. 3 at 55-56, they fail to cite to any such evidence in the record. In any event, the purported "risks" cited by the petitioners appear, at best, speculative, and, at worst, nonexistent. Indeed, as the FCC notes in its response brief, it "made a very different predictive judgment" regarding the effects of its decision: "that an 'unsubsidized competitor' — which, by definition, is a facilities-based provider that is not eligible for support yet serves the incumbent LEC's entire geographic service area — would have an incentive to recover its investment by continuing to serve every possible customer." FCC Br. 3 at 60. We agree with the FCC that this predictive judgment was "entirely reasonable." Id.

Further, as the FCC also points out, both it and the state commissions possess authority under 47 U.S.C. § 214(e)(3) ("Designation of eligible telecommunications carriers for unserved areas") to order one or more carriers "to provide . . . service for [an] unserved community or portion thereof." And any carrier(s) ordered to do so must in turn satisfy the requirements to be designated an ETC under § 214(e)(1). 47 U.S.C. § 214(e)(3). Thus, to the extent that a currently served area would become "unserved," the FCC possesses authority to remedy that situation.

> 10. *Did the FCC arbitrarily fail to explain how its new definition of supported telecommunications services took into account the four factors it was required to consider under § 254(c)(1)?*

104

Petitioners next assert that "[s]ection 254(c)(1) of the Act requires the FCC, in consultation with the [Federal-State] Joint Board [on Universal Service], to consider four specific factors in establishing its definition of supported telecommunications services, namely the extent to which such telecommunications services (a) are essential to education, public health, or safety, (b) have been freely purchased by a substantial majority of residential customers, (c) are actually being publicly deployed by telecommunications carriers and (d) are in the public interest."[19] Pet'r Br. 3 at 56. "But," they argue, "with the exception of brief references . . . to the first, third and fourth factors, the *Order* fails to discuss how its new 'voice telephony service' definition takes any of these factors into account." Id. (italics in original). "That failure," they argue, "was arbitrary." Id.

What petitioners ignore or overlook, however, is that the FCC's new "voice telephony service" definition was intended by the FCC merely "to simplify how [it] describe[s] the various supported services that [it] historically has defined in functional terms (e.g., voice grade access to the PSTN, access to emergency services) into a single supported service." JA at 411 (Order ¶ 62). In other words, the FCC was not, in adopting its new "voice telephony service" definition, adding new services that would be

---

[19] The header to this argument in petitioners' opening brief makes reference to the FCC's "new definition of supported information services." Pet'r Br. 3 at 56. But the FCC clearly did not classify "voice telephony service" as an "information service."

"supported by Federal universal service support mechanisms."[20]  47 U.S.C. § 254(c)(1).

Thus, under the wording of the statute, it was unnecessary for the FCC to review in detail,

or at all, the four factors listed § 254(c)(1)(A) through (D).

> 11. *Did the FCC arbitrarily disregard comments that the Order's incremental USF support provisions would duplicate or undermine state-initiated plans for broadband deployment?*

Petitioners argue that, assuming the FCC possesses authority to impose its

broadband requirement, the FCC nevertheless failed to consider petitioner's argument

"that it was arbitrary and discriminatory to distribute USF support only to carriers in

states who [have done] nothing to promote broadband, while carriers in states with

extensive broadband development commitments . . . get nothing to upgrade what they

have done."  Pet'r Br. 3 at 57.

In the Order, the FCC noted that "[c]arriers have been steadily expanding their

broadband footprints, funded through a combination of support provided under current

mechanisms and other sources, and we expect such deployment will continue."  JA at 444

(Order ¶ 137).  The FCC in turn stated that it "intend[ed] for CAF Phase I to enable

additional deployment beyond what carriers would otherwise undertake absent this

reform."  Id.  In other words, the FCC explained, "CAF Phase I incremental support [wa]s

designed to provide an immediate boost to broadband deployment in areas that are

---

[20] To be sure, the Order recognized interconnected VoIP as a form of "telephony voice service."  But, as the Order noted, interconnected VoIP is simply a nontraditional method that consumers are increasingly using to obtain voice services.  JA at 412 (Order ¶ 63).  Thus, the service at issue (i.e., "voice service") is unchanged; only the delivery method is new.

unserved by any broadband provider." Id. In a related footnote, the FCC stated that its "distribution mechanism for CAF Phase I incremental funding [wa]s . . . designed to identify the most expensive wire centers, and [that] the same characteristics that make it expensive to provide voice service to a wire center . . . make it expensive to provide broadband service to that wire center as well." Id. (Order ¶ 137 n.220). Thus, the FCC's "interim mechanism [wa]s designed to provide support to carriers that serve areas where [the FCC] expects that providing broadband service will require universal service support." Id.

Although it is apparent that petitioners disagree with the policy judgments made by the FCC regarding how to allocate CAF Phase I funds, we conclude that the FCC's decision was neither arbitrary nor capricious. In particular, it is clear from the above-quoted provisions of the Order that the FCC was focused on promoting universal service to the areas most in need, rather than allocating additional funds to areas that were already served by broadband providers.

12. *Did the Order unlawfully make changes not contained in the FCC's proposed rule that could not reasonably have been anticipated by commenters?*

Petitioners argue that "[k]ey provisions in the Order were not part of the proposed rule" and that, "because Petitioners had no reasonable opportunity to comment on these rule changes[,] the Order violated Sections 553(b) and (c) of the APA," i.e., the APA's notice-and-comment requirements. Pet'r Br. 3 at 58. In particular, petitioners point to "the ARC rules," id., the "dual process for ICC revenue recovery for price cap carriers

and rate-of-return carriers," id. at 59, and the decision to "give[] price cap carriers an exclusive right of first refusal . . . to receive $300 million in CAF Phase I funding for unserved areas," id.

According to the FCC, however, this issue "was not presented to [it] either before [it] issued the Order or on reconsideration once [it] allegedly acted without notice." FCC Br. 3 at 65. In their reply brief, petitioners do not dispute that they failed to present the issue to the FCC. Instead, they assert that they were not required to present this issue to the FCC because 47 U.S.C. § 405(a) does not apply to claims of lack of APA notice. Pet'r Reply Br. 3 at 28. Alternatively, they argue, "this Court has denied the FCC's request to stay proceedings while reconsideration petitions are pending, . . . and the FCC's history of sitting on pending reconsideration petitions would have made a reconsideration request futile anyway." Id.

As we have previously discussed, 47 U.S.C. § 405(a), which authorizes a party to file with the FCC a motion for reconsideration of "an order, decision, report, or action" of the FCC, essentially requires, in part, that the FCC be given an "opportunity to pass" on an issue before the issue is raised in federal court. See Globalstar, 564 F.3d at 479. The District of Columbia Circuit has "strictly construed § 405(a), holding that [it] generally lack[s] jurisdiction to review arguments that have not first been presented to the [FCC]." Id. at 483 (internal quotation marks omitted; brackets added). "Thus," it has held, "even when a petitioner has no reason to raise an argument until the FCC issues an order that makes the issue relevant, the petitioner must file a petition for reconsideration with the

108

[FCC] before it may seek judicial review." Id. (internal quotation marks omitted; brackets added). Notably, the District of Columbia Circuit has adhered to this strict construction rule even in instances "[w]hen . . . a party complains of only a technical or procedural mistake, such as an obvious violation of a specific APA requirement." Id. at 484 (internal quotation marks omitted). In other words, even in cases involving only a purported technical or procedural mistake, the District of Columbia Circuit "ha[s] insisted that a party raise the precise claim before the [FCC]." Id. The court has explained that "such rigid adherence to § 405(a) is necessary with respect to claims of procedural error in order to give the agency the opportunity to consider the claim in the first instance and to correct any error in the rulemaking process prior to judicial review." Id.

Although we are not bound by the District of Columbia Circuit's decision in Globalstar, we find its reasoning to be both sound and persuasive and we thus adopt it in this case. In doing so, we note that petitioners have failed to cite to a single case in which another circuit has interpreted § 405(a) differently. Further, petitioners have made no attempt to refute the District of Columbia Circuit's reasoning for adopting a strict construction of § 405(a). Consequently, we conclude that petitioners have waived their inadequate notice and comment claim by failing to present it at any time to the FCC.

That leaves only petitioners' arguments that it would have been futile for them to file a petition for reconsideration because (a) this court refused the FCC's request to stay these proceedings while petitions for reconsideration were pending, and (b) the FCC has a history of "sitting on pending reconsideration petitioners." Pet'r Reply Br. 3 at 28. These

109

arguments, however, are unsupported by the record. To begin with, a review of the docket sheet in this case fails to confirm that the FCC filed a motion to stay these proceedings. Indeed, the only motion for stay was filed by one of the petitioners (the National Telecommunications Cooperative Association) seeking to delay implementation of the Order. Notably, the FCC opposed that motion and this court ultimately denied it. As for petitioners' assertion that the FCC has a "history of sitting on pending reconsideration petitions," they cite to nothing in the record or elsewhere that would confirm that assertion. Thus, both of petitioners' assertions are baseless.

B. *Additional Universal Service Fund Issues Principal Brief*

We now proceed to address the issues raised by petitioners in Brief 4, entitled "Additional Universal Service Fund Issues Principal Brief."

1. *The FCC's decision to limit USF support for broadband deployment to price-cap ILECs*

Petitioners argue that the FCC's decision to "deny[] any USF support to competitive carriers for broadband and reserving it exclusively to price cap ILECs was arbitrary in two respects." Pet'r Br. 4 at 7. "First," they argue, "the FCC failed to explain how a USF policy reserving USF support for incumbents and excluding competitive rural carriers from USF support could be reconciled with the Act's directive that local telecom markets be open to competition." Id. In petitioners' view, "making CAF II support accessible only to the largest LECs will serve only to preserve and advance their dominance in the local telecom market." Id. (internal quotation marks omitted).

110

"Second," petitioners argue, "the FCC departed without reasoned explanation from its own USF competitive neutrality principle that 'universal support mechanisms and rules neither unfairly advantage or disadvantage one provider over another.'" Id. at 8 (quoting Universal Service Order, 12 F.C.C.R. 8776, ¶¶ 46-48 (1997)).  According to petitioners, the FCC "could not logically claim that admittedly disparate treatment is acceptable as long as it is not 'unfair' without addressing how it could possibly be fair to exclude CETCs from USF support entirely and still preserve competitive neutrality."  Id.

### a) The relevant portions of the Order

The Order "create[d] the Connect America Fund [(CAF)], which will ultimately replace all existing high-cost support mechanisms."  JA at 400 (Order ¶ 20).  The Order summarized the CAF in the following manner:

> The CAF will help make broadband available to homes, businesses, and community anchor institutions in areas that do not, or would not otherwise, have broadband, including mobile voice and broadband networks in areas that do not, or would not otherwise, have mobile service, and broadband in the most remote areas of the nation.  The CAF will also help facilitate our ICC reforms.  The CAF will rely on incentive-based, market-driven policies, including competitive bidding, to distribute universal service funds as efficiently and effectively as possible.

Id.

Because "[m]ore than 83 percent of the approximately 18 million Americans that lack access to residential fixed broadband at or above the [FCC]'s broadband speed benchmark live in areas served by price cap carriers—Bell Operating Companies and other large and mid-sized carriers," the Order stated that "the CAF will introduce

111

targeted, efficient support for broadband in two phases." Id. (Order ¶ 21). Phase I, intended "[t]o spur immediate broadband buildout, . . . will provide additional funding for price cap carriers to extend robust, scalable broadband to hundreds of thousands of unserved Americans in early 2012." Id. (Order ¶ 22). "To enable this [Phase I] deployment, all existing legacy high-cost support to price cap carriers will be frozen and an additional $300 million in CAF funding will be made available." Id. Phase II of the process "will use a combination of a forward-looking broadband cost model," to be developed by the FCC's Wireline Competition Bureau, "and competitive bidding to efficiently support deployment of networks providing both voice and broadband service for five years." Id. (Order ¶ 23). Phase II "of the CAF will distribute a total of up to $1.8 billion annually in support for areas with no unsubsidized broadband competitor." Id. at 401 (Order ¶ 25). More specifically, "[i]n determining areas eligible for support, [the FCC] will . . . exclude areas where an unsubsidized competitor offers broadband service that meets the broadband performance requirements" outlined in the Order. Id. at 456 (Order ¶ 170). In areas that are not served by an unsubsidized competitor, "[e]ach incumbent carrier will . . . be given an opportunity to accept, for each state it serves, the public interest obligations associated with all the eligible census blocks in its territory, in exchange for the total [cost] model-derived annual [CAF Phase II] support associated with those census blocks, for a period of five years." Id. (Order ¶ 171). "If the incumbent accepts the state-level broadband commitment, it . . . shall be the presumptive recipient of the model-derived support amount for the five-year CAF Phase II period."

112

Id. After that five-year CAF Phase II period, however, the FCC anticipates distributing all support through a competitive bidding process. Id. at 459 (Order ¶ 178); FCC Br. 4 at 4.

The Order also "transition[s] existing competitive ETC support to the CAF . . . over a five-year period beginning July 1, 2012." JA at 557 (Order ¶ 513). In doing so, the Order found "that a five-year transition w[ould] be sufficient for competitive ETCs that are currently receiving high-cost support to adjust and make necessary operational changes to ensure that service is maintained during the transition." Id. at 558 (Order ¶ 513). The Order outlined a "phase-down" framework in which "[c]ompetitive ETC support" would first "be frozen at the 2011 baseline" level, and then reduced in each of the ensuing five years until the competitive ETCs received no support at all. Id. at 559 (Order ¶ 519).

*b) Relevant statutory provisions*

Sections 214(e)(1) and (2) of the Act, which address the "provision of universal service," provide as follows:

> (1) Eligible telecommunications carriers. A common carrier designated as an eligible telecommunications carrier under paragraph (2), (3), or (6) shall be eligible to receive universal service support in accordance with section 254 [47 USCS § 254] and shall, throughout the service area for which the designation is received—
> > (A) offer the services that are supported by Federal universal service support mechanisms under section 254(c) [47 USCS 254(c)], either using its own facilities or a combination of its own facilities and resale of another carrier's services (including the services offered by another eligible telecommunications carrier); and

(B) advertise the availability of such services and the charges therefor using media of general distribution.

(2) Designation of eligible telecommunications carriers. A State commission shall upon its own motion or upon request designate a common carrier that meets the requirements of paragraph (1) as an eligible telecommunications carrier for a service area designated by the State commission. Upon request and consistent with the public interest, convenience, and necessity, the State commission may, in the case of an area served by a rural telephone company, and shall, in the case of all other areas, designate more than one common carrier as an eligible telecommunications carrier for a service area designated by the State commission, so long as each additional requesting carrier meets the requirements of paragraph (1). Before designating an additional eligible telecommunications carrier for an area served by a rural telephone company, the State commission shall find that the designation is in the public interest.

47 U.S.C. §§ 214(e)(1), (2).

Section 254(e), entitled "Universal service support," provides as follows:

After the date on which Commission regulations implementing this section take effect, only an eligible telecommunications carrier designated under section 214(e) [47 USCS § 214(e)] shall be eligible to receive specific Federal universal service support. A carrier that receives such support shall use that support only for the provision, maintenance, and upgrading of the facilities and services for which the support is intended. Any such support should be explicit and sufficient to achieve the purposes of this section.

47 U.S.C. § 254(e).

*c) Arguments and analysis*

Petitioners argue that "[t]he Act requires both that only designated ETCs may receive universal service support, 47 U.S.C. §§ 214(e)(1) and 254(e), and that additional qualified carriers shall be designated ETCs in the areas of non-rural carriers[,] 47 U.S.C. § 214(e)(2)." Pet'r Br. 4 at 9. "These provisions," petitioners argue, "reflect the dual

114

nature of the FCC's obligations under the Act, namely that it must see to it that both universal service and local competition are realized." Id. at 9-10 (internal quotation marks and italics omitted). But, they argue, the FCC "has rendered meaningless the competition-promoting aspect of its dual statutory obligations" by "determining . . . that only price cap carriers (the great majority of which are non-rural), but not their competitors, are eligible for additional USF support over the next five years – while their competitors' existing support is phased out during that same time period." Id. at 10.

We conclude, however, that the FCC reasonably interpreted § 214(e)(2) as not requiring it to offer USF support to all ETCs in a particular area. The Order itself notes, and we agree, that "nothing in the statute compels that every party eligible for support actually receives it." JA at 507 (Order ¶ 318). Rather, both §§ 214(e) and 254(e) clearly speak only in terms of "eligibility" for USF support. Further, as the Order reasonably noted, "the statute's goal is to expand availability of service to users," id., "not to subsidize competition through universal service in areas that are challenging for even one provider to serve," id. (Order ¶ 319).

To be sure, the FCC, acting pursuant to 47 U.S.C. § 254(b)(7), adopted and generally attempts to adhere to a principle of "competitive neutrality." That principle holds that "universal service support mechanisms . . . should not unfairly advantage nor disadvantage one provider over another, and neither unfairly favor nor disfavor one technology over another." Id. at 458 (Order ¶ 176; internal quotation marks omitted). But that is only one of the seven statutory principles outlined in 47 U.S.C. § 254(b)(1)-(7)

115

that are intended to guide the FCC "in drafting policies to preserve and advance universal service," including the distribution of USF support. Qwest Comm'n Int'l, Inc. v. FCC, 398 F.3d 1222, 1234 (10th Cir. 2005) (Qwest Comm'n). As we have noted, the "FCC may exercise its discretion to balance the principles against one another when they conflict," and "any particular principle can be trumped in the appropriate case." Id. (internal quotation marks omitted). The only caveat is that the FCC "may not depart from [the principles] altogether to achieve some other goal." Id. (internal quotation marks omitted).

Here, the FCC's Order concluded that, for price cap areas that are not served by an unsubsidized competitor,[21] "adhering to strict competitive neutrality at the expense of state-level commitment process would unreasonably frustrate achievement of the universal service principles of ubiquitous and comparable broadband services and promoting broadband deployment," and would also "unduly elevate the interests of competing providers over those of unserved and under-served consumers . . . as well as . . . consumers and telecommunications providers who make payments to support the Universal Service Fund." JA at 459 (Order ¶ 178). In making that decision, the FCC found that in price-cap areas that lack an unsubsidized competitor, the incumbent LEC is likely to be the only provider with wireline facilities that are already deployed. The FCC also found that incumbent LECs, in contrast to competitive LECs, "generally continue to

---

[21] As previously noted, the Order eliminates all USF support in price-cap areas that are served by an unsubsidized competitor.

have carrier of last resort ["COLR"] obligations for voice services," id. at 457-58 (Order ¶ 175), and therefore must maintain networks capable of "ensur[ing] service to consumers who request it" throughout their designated service area, id. at 458-59 (Order ¶ 177 n.290). "[C]ompetitive LECs," the FCC found, "typically have not built out their networks subject to COLR obligations" and, as a result, typically serve much smaller geographic areas. Id. at 692-93 (Order ¶ 864). As the FCC explains in its response brief, it essentially "predicted that it could get more 'bang for its buck' by providing subsidies to incumbent LECs to upgrade their extensive existing facilities than by providing subsidies to competitive ETCs . . . to deploy entirely new facilities." FCC Br. 4 at 9.

Notably, the interim USF arrangement adopted by the Order for price-cap carriers is not wholly dissimilar from the pre-Order balance of USF funding. According to the FCC, "wireline competitive ETCs . . . received only $23 million of high-cost universal service support annually prior to the Order." FCC Br. 4 at 10. "By contrast, price cap carriers received more than $1 billion annually." Id. (citing Order ¶¶ 7, 158, 501, 503 n.834). "That differential," the FCC argues, "underscores the fact that competitive ETCs serve very few lines relative to the price cap carriers." Id.

Finally, it is true, as petitioners suggest, "that by far the largest amount—both in absolute and percentage terms—of areas unserved by broadband are in the service areas of the price cap companies." Pet'r Br. 4 at 14. But the inference that petitioners draw from that fact, i.e., that price cap carriers "have previously ignored" large portions of their service areas, id. at 12, is not entirely accurate. In the Order, the FCC found that the price

117

cap areas only "receive[d] approximately 25 percent of high-cost support" under the pre-Order USF funding framework.  JA at 452 (Order ¶ 158).  The FCC thus inferred, and it appears reasonably so, that the coverage gaps in price cap areas were a product of inadequate funding, rather than price-cap carrier mismanagement or inattention.

We thus conclude that the FCC reasonably exercised its discretion in adopting this USF funding framework for price-cap areas, particularly since the framework applies only during the interim period marked by CAF Phase II.  See generally Rural Cellular Ass'n v. FCC, 588 F.3d 1095, 1105 (D.C. Cir. 2009) ("The 'arbitrary and capricious' standard is particularly deferential in matters implicating predictive judgments and interim regulations."); id. at 1106 (holding that "the FCC should be given 'substantial deference' when acting to impose interim regulations").

2. *Did the FCC violate the mandatory referral duty imposed by 47 U.S.C. § 410(c)?*

Petitioners next assert that the FCC violated the mandatory referral duty imposed by 47 U.S.C. § 410(c) when it (a) "directly adopted new separations rules with new formal separations methodologies," Pet'r Br. 4 at 4, and (b) "made decisions that had as much effect on separations as direct changes to the rules themselves, such as by ordering the reduction of intrastate access rates (and thereby revenues) and replacing them in part with a new interstate charge, without also adjusting the allocation of the underlying costs between jurisdictions," id. at 4-5.

*a) Jurisdictional separations under the Act*

118

The 1934 Act "establishe[d], among other things, a system of dual state and federal regulation over telephone service." La. Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 360 (1986). "In broad terms, the [1934] Act grant[ed] to the FCC the authority to regulate 'interstate and foreign commerce in wire and radio communication,' 47 U.S.C. § 151, while expressly denying [the FCC] 'jurisdiction with respect to . . . intrastate communication service,' 47 U.S.C. § 152(b)." Id. "[T]he realities of technology and economics," however, "belie . . . a clean parceling of responsibility" between the FCC and the states. Id. Thus, "[t]he determination of whether any particular service or facility is 'interstate' or 'intrastate' is not always a straightforward matter; any particular facility or service often provides some combination of the two." Puerto Rico Tel. Co. v. T-Mobile Puerto Rico LLC, 678 F.3d 49, 64 (1st Cir. 2012).

"Addressing this issue, the Act establishes a process designed to resolve what is known as jurisdictional separations matters, by which process it may be determined what portion of an asset is employed to produce or deliver interstate as opposed to intrastate service." Id. (internal quotation marks omitted; citing 47 U.S.C. §§ 221(c), 410(c)). To begin with, Section 221(c) of the Act authorizes the FCC to "classify the property" of any "carriers engaged in wire telephone communication" in order to "determine what property of said carrier shall be considered as used in interstate or foreign telephone toll service." 47 U.S.C. § 221(c). In turn, § 410(c) of the Act, 47 U.S.C. § 410(c), "creates a 'Federal–State Joint Board,' and provides that '[t]he Commission shall refer any proceeding regarding the jurisdictional separation of common carrier property and

119

expenses between interstate and intrastate operations . . . to a Federal–State Joint Board.'" Puerto Rico Tel., 678 F.3d at 64 (quoting 47 U.S.C. § 410(c)).  Although the Board is composed of "three Commissioners of the Commission and . . . four State commissioners," the State commissioners are allowed only to participate in deliberations and may not vote.  47 U.S.C. § 410(c).  The Board "is charged with 'prepar[ing] a recommended decision for prompt review and action by the Commission.'" Puerto Rico Tel., 678 F.3d at 64 (quoting § 410(c)).

"[T]he separations process literally separates costs such as taxes and operating expenses between interstate and intrastate service," and thereby "facilitates the creation or recognition of distinct spheres of regulation."  Louisiana Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 375 (1986).  According to the FCC's web site, "[t]he primary purpose of separations is to determine whether a local exchange carrier (LEC)'s cost of providing regulated services are to be recovered through its rates for intrastate services or through its rates for interstate services."  Jurisdictional Separations, FCC Encyclopedia, http://www.fcc.gov/encyclopedia/jurisdictional-separations (last visited Dec. 16, 2013); see State Corp. Comm'n of State of Kan. v. FCC, 787 F.2d 1421, 1423 (10th Cir. 1986) ("The process of 'jurisdictional separations' determines how . . . costs are allocated for ratemaking purposes.").  "The first step in the current separations process requires carriers to apportion regulated costs among categories of plant and expenses."  Jurisdictional Separations, FCC Encyclopedia, supra.  "In the second step of the current separations process, the costs in each category are apportioned between intrastate and interstate

120

jurisdictions." Id. "Once costs are separated between the jurisdictions, carriers can then apportion their interstate regulated costs among their interexchange services and their intrastate costs among intrastate services." Id. Historically, one of the primary purposes of the separations process has been to prevent incumbent LECs from recovering the same costs in both the interstate and intrastate jurisdictions.

b) *The jurisdictional separations process is currently frozen*

In 2001, the FCC, acting pursuant to the recommendation of the Federal-State Joint Board on Jurisdictional Separations, froze the jurisdictional separations process. Although the freeze was intended originally to last only five years, it has since been extended and remains currently in effect (until June 30, 2014). JA at 729 (Order ¶ 932) ("The jurisdictional process, which has been frozen for some time, is currently the subject of a referral to the Separations Joint Board."). In its most recent order extending the freeze, the FCC noted that the freeze remained appropriate to afford "Joint Board members" the "significant time and effort" it will take "to educate themselves about the impacts of . . . reforms" to intercarrier compensation and universal service "on separations." FCC Report and Order, FCC 12-49 at ¶13, p.5 (May 8, 2012).

The FCC has expressly noted the freezing of the jurisdictional separations process in its regulations. 47 C.F.R. § 36.3. And, notably, the Order stated that "[t]he jurisdictional separations process . . . is currently the subject of a referral to the Separations Joint Board." JA at 729 (Order ¶ 932).

c) *Did the Order effectively impact or change jurisdictional separations?*

Petitioners point to "a number of key changes" that the Order purportedly made "to separations rules and policies" and that in turn necessitated referral to the Joint Board. Pet'r Br. 4 at 17. To begin with, petitioners assert, the Order "made numerous and substantial changes directly to [the FCC's] Part 36 rules,"[22] including "limit[ing] the portion of nationwide loop cost expense that certain carriers could allocate to the interstate jurisdiction," "curtail[ing] carriers' ability to receive 'Safety net additive support' for new Telecommunications Plant in Service," "limit[ing] the amount of Corporate Operations Expenses carriers could allocate to the interstate jurisdiction," and "giving [FCC] staff[, i.e., the Wireline Competition Bureau,] discretion to publish a schedule each year establishing new limits on unseparated loop cost allocated to the interstate jurisdiction." Id. Further, petitioners argue that the Order's "changes to [the] universal service rules affected [the FCC's] separations rules, thereby [again] requiring referral" to the Joint Board. Id. at 20. In particular, they note that the Order "capped the level of High Cost Loop ('HCL') Fund limit the support carriers would receive for various expenses, including capital and operating expenses," id., and "reduced HCL support for carriers whose intrastate end user local rates were below a local rate floor," id. at 20-21. These changes, petitioners assert, "essentially reassigned to the intrastate jurisdiction for possible recovery from other sources" "[c]osts that were [originally] assigned to the interstate jurisdiction for recovery from the Universal Service Fund." Id.

---

[22] The "Part 36 rules" referred to by petitioners are the jurisdictional separations procedures outlined by the FCC in 47 C.F.R. Part 36.

at 21. Petitioners also assert that the Order, "[t]hrough its intercarrier compensation reform, . . . reduced and eliminated certain intrastate access charges over a transition period." Id. at 22. "For many carriers," petitioners assert, "the intrastate access revenues can represent a substantial portion of their existing intrastate revenues." Id. "The [Order] also," petitioners assert, "allowed carriers to charge a new interstate-approved rate, the Access Recovery Charge, and receive some limited support from the Connect America Fund as a partial and limited means of addressing substantial lost revenue." Id. But, petitioners argue, "[t]he FCC failed to reclassify carrier access costs between jurisdictions as a corollary to these actions," thus leaving the states with these costs "in their intrastate allocations for ratemaking." Id. at 23.

The FCC argues, in response, that there "was no . . . jurisdictional separation here: the Order did not reallocate costs for any type of telecommunications plant or any operating expense between the federal and the state jurisdictions." FCC Br. 4 at 13 (italics omitted). Addressing the specific points raised by petitioners, the FCC asserts as follows:

> • the only changes the Order made to Part 36 were to Subpart F thereof, which "contains universal service rules governing high-cost loop support ('HCLS') for rate-of-return carriers," id., and those changes, which "simply adjusted the amount of universal service *funding* that is prospectively available for HCLS," id. at 14 (emphasis in original), "have nothing to do with jurisdictional separations," id.;
>
> • the amended rules eliminating Safety Net Additive Support and imposing new limits on recoverable corporate operations expenses, capital expenses, and operating expenses . . . merely prohibit carriers from obtaining universal service *subsidies* to cover certain costs already allocated to the

123

federal jurisdiction" and thus "did not change the jurisdictional allocation of costs," id.;

• the reductions in "universal service support and intercarrier compensation revenues" implemented by the Order do not constitute "formal changes to the allocation of costs" that would "require consultation with the Joint Board," id. at 15;

• "petitioners' assertion that states have been 'left' with the responsibility to recover certain carrier access costs overlooks the Order's explicit holding that 'states will not be required to bear the burden of establishing and funding state recovery mechanisms for intrastate access reductions,'" id. at 16 (quoting Order ¶ 795); and

• "the Order established a federal recovery mechanism to 'provide carriers with recovery for reductions to eligible interstate and intrastate [intercarrier compensation] revenue.'" id. (quoting Order ¶ 795), "[a]nd the backstop Total Cost and Earnings Review process permits a carrier to make a comprehensive cost showing to the FCC that additional recovery is needed to avoid a taking," id. at 17.

Although § 410(c) does not expressly indicate who determines whether a particular FCC proceeding concerns "the jurisdictional separation of common carrier property and expenses between interstate and intrastate operations," the only reasonable conclusion that can be drawn from the statute is that Congress afforded the FCC the authority and discretion to make that determination (subject, of course, to judicial review). See Crockett Tel. Co. v. FCC, 963 F.2d 1564, 1570 (D.C. Cir. 1992) (holding that "[n]o procedural requirements are triggered [under § 410(c)] absent the Commission's discretionary choice to adopt a new formal separation guideline."). And, consequently, under the Administrative Procedure Act, the FCC's determination as to whether a particular proceeding involved "jurisdictional separation" issues could be held unlawful

and set aside only it if was found by a court to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

In this case, we are not persuaded that the FCC, in determining that the Order did not involve jurisdictional separations issues, has violated that deferential standard. Quite clearly, the purpose of the FNPRM and the Order was not "to adopt a new formal separation guideline" or methodology. Crockett, 963 F.2d at 1570. Rather, as the Order itself notes, the purpose was to "comprehensively reform[] and modernize[] the universal service and intercarrier compensation systems to ensure that robust, affordable voice and broadband service . . . [we]re available to Americans throughout the nation." JA at 394 (Order ¶ 1). Relatedly, the Order makes no changes to the FCC's "formal separation guideline[s]." Crockett, 963 F.2d at 1570; see Southwestern Bell Tel. Co. v. FCC, 153 F.3d 523, 556 (D.C. Cir. 1992) (holding that FCC order deciding "that federal support for universal service should be applied to satisfy the interstate revenue requirement" did not involve a jurisdictional separations issue that required referral to the joint board; "the FCC was not allocating jointly used plant, nor was it changing the proportions for allocating jointly used plant to interstate and intrastate jurisdictions."). Consequently, we conclude that the FCC did not violate § 410(c) in adopting the Order.

3. *Did the FCC irrationally refuse to modify service obligations for carriers to whom it denied USF support?*

Petitioners argue that, even assuming it was proper for the FCC to eliminate USF support for all carriers serving any territory that is also served by an unsubsidized

125

competitor, the FCC nevertheless erred "by refusing to relieve Eligible Telecommunications Carriers (ETCs) of their ongoing duty to serve all comers without USF support." Pet'r Br. 4 at 24. According to petitioners, the "statutory structure" of 47 U.S.C. § 214(e) "leaves no room for doubt that Congress intended eligibility for support and the duty to serve to be two sides of the same coin." Id. at 26.

*a) The requirements imposed by § 214(e)*

As noted by petitioners, § 214(e)(1) of the Act imposes certain requirements on ETCs:

> (1) Eligible telecommunications carriers. A common carrier designated as an eligible telecommunications carrier under paragraph (2), (3), or (6) shall be eligible to receive universal service support in accordance with section 254 [47 USCS § 254] and shall, throughout the service area for which the designation is received—
> (A) offer the services that are supported by Federal universal service support mechanisms under section 254(c) [47 USCS § 254(c)], either using its own facilities or a combination of its own facilities and resale of another carrier's services . . . ; and
> (B) advertise the availability of such services and the charges therefor using media of general distribution.

47 U.S.C. § 214(e)(1).

*b) Relevant portions of the Order*

In the Order, the FCC found that "USF support should be directed to areas where providers would not deploy and maintain network facilities absent a USF subsidy, and not in areas where unsubsidized facilities-based providers already are competing for customers." JA at 494 (Order ¶ 281; internal quotation marks omitted). In turn, the FCC, in a portion of the Order entitled "Elimination of Support in Areas with 100 Percent

126

Overlap," id. at 493, outlined certain changes to the USF funding system. In the first paragraph of that section, entitled "Background," the FCC explained that "in many areas of the country, universal service provides more support than necessary to achieve [the FCC's] goals by subsidizing a competitor to a voice and broadband provider that is offering service without governmental assistance." Id. (Order ¶ 280; internal quotation marks omitted). In the ensuing paragraphs, entitled "Discussion," the FCC "adopt[ed] a rule to eliminate universal service support where an unsubsidized competitor — or a combination of unsubsidized competitors — offers voice and broadband service throughout an incumbent carrier's study area, and [sought] comment on a process to reduce support where such an unsubsidized competitor offers voice and broadband service to a substantial majority, but not 100 percent of the study area." Id. at 494 (Order ¶ 281). The FCC thus "exclude[d] from the CAF areas that are overlapped by an unsubsidized competitor." Id. The FCC also announced its intent to discontinue its "current levels of high-cost support to rate-of-return companies where there is overlap with one or more unsubsidized competitors." Id. More specifically, the FCC "adopt[ed] a rule to phase out all high-cost support received by incumbent rate-of-return carriers over three years in study areas where an unsubsidized competitor — or a combination of unsubsidized competitors — offers voice and broadband service at" certain specified

127

speeds "for 100 percent of the residential and business locations in the incumbent's study area."[23] Id. at 494-95 (Order ¶ 283).

In announcing these rules, the FCC "recognize[d] that there [we]re instances where an unsubsidized competitor offer[ed] broadband and voice service to a significant percentage of the customers in a particular study area (typically where customers are concentrated in a town or other higher density sub-area), but not to the remaining customers in the rest of the study area, and that continued support may be required to enable the availability of supported voice services to those remaining customers." Id. at 494 (Order ¶ 282). "In those cases," the FCC concluded, "there should be a process to determine appropriate support levels." Id. "The FNPRM" thus sought "comment on the methodology and data for determining overlap." Id. at 495 (Order ¶ 284). And the Order "direct[ed] the Wireline Competition Bureau to publish a finalized methodology for determining areas of overlap." Id.

The Order also recognized the possibility that ETCs might be required to provide service in areas where they no longer receive support, or receive reduced support. As a result, in the attached FNPRM, the FCC sought comment on whether the reductions in USF support "should be accompanied by relaxation of those carriers' section 214(e)(1) voice service obligations in some cases." Id. at 790 (Order ¶ 1095); see id. at 791 (Order ¶ 1096). Although petitioners contend "[i]t was arbitrary, capricious, unreasonable and

---

[23] Likewise, in areas served by price cap carriers, a new rule eliminates high-cost support in a census block only where an unsubsidized competitor already serves that census block. JA at 456 (Order ¶¶ 170-71).

contrary to law for the [FCC] to maintain the [214(e)] service obligations while eliminating support," Pet'r Br. 4 at 27, they make no attempt to explain precisely how it was arbitrary or capricious. And a reading of the Order refutes that assertion; clearly, the FCC is taking a reasoned approach to the situation by seeking comment regarding the possible relaxation of service obligations. As for their assertion that the FCC is acting "contrary to law," petitioners argue simply that "Congress clearly intended the[] obligations and benefits [outlined in § 214(e)] to be complementary." Id. But that argument rests on the faulty assumption that being designated an ETC under § 214(e) entitles a carrier to USF funds. As we have explained, ETC designation simply makes a carrier eligible for USF. Nothing in the language of § 214(e) entitles an ETC to USF funding.

Finally, as the FCC notes in its response, once it finalizes its rules following comment and further order, ETCs will "have avenues to seek relief should their continuing section 214(e)(1) obligations prove too onerous." FCC Br. 4 at 21. In particular, the Order expressly authorizes "any carrier negatively affected by the universal service reforms . . . to file a petition for waiver that clearly demonstrates that good cause exists for exempting the carrier from some or all of those reforms, and that waiver is necessary and in the public interest to ensure that consumers in the area continue to receive voice service." JA at 566 (Order ¶ 539). To be sure, the Order cautions that the FCC will "subject such requests to a rigorous, thorough and searching review comparable to a total company earnings review," and will "take into account not only all revenues

129

derived from network facilities that are supported by universal service but also revenues derived from unregulated and unsupported services as well." Id. at 567 (Order ¶ 540). But the Order states that "[w]aiver w[ill] be warranted where an ETC can demonstrate that, without additional universal service funding, its support would not be sufficient to achieve the purposes of [section 254 of the Act]." Id. (internal quotation marks omitted; brackets in original).

*c) The FCC's notice of supplemental authority*

On November 5, 2013, the FCC filed with this court a Rule 28(j) letter advising that on October 31, 2013, the FCC's Wireline Competition Bureau (WCB) released an order that allows ETCs to challenge a price-cap ILEC's exclusive right to high-cost support. Connect America Fund, Report and Order, WC Docket 10-90 (rel. Oct. 31, 2013) (WCB Order). More specifically, the WCB Order states, in pertinent part, as follows:

> The Commission directed the [WCB] to exclude areas with unsubsidized competitors from Phase II funding. The codified rule states that an unsubsidized competitor is one that "does not receive high-cost support." The Commission's intent in adopting this rule was to preclude support to areas where voice and broadband is available without burdening the federal support mechanisms. We will presume that any recipient of high-cost support at the time the challenge process is conducted does not meet the literal terms of the definition, but will entertain challenges to that presumption from any competitive eligible telecommunications carrier that otherwise meets or exceeds the performance obligations established herein and whose high-cost support is scheduled to be eliminated during the five-year term of Phase II. This will provide an opportunity for the Commission to consider whether to waive application of the "unsubsidized" element of the unsubsidized competitor definition in situations that would result in

130

Phase II support being used to overbuild an existing broadband-capable network.

WCB Order ¶ 41, p.18.

We agree with the FCC that this portion of the WCB Order further serves to undercut petitioners' argument that the Order violates the FCC's principle of competitive neutrality. Specifically, "[a] competitive ETC that successfully utilizes the challenge process will not be forced to compete against an ILEC whose service in the same areas is subsidized by federal universal service funding." FCC Rule 28(j) Letter at 2.

> 4. *Is the Order, as applied to Allband and similarly-situated small rural carriers, unconstitutional under due process principles and as a bill of attainder, and/or does it violate the Act, principles of estoppel and contract law?*

The fourth and final issue of Brief 4 is devoted exclusively to issues raised by Allband Communications Cooperative (Allband).

*a) Background information regarding Allband*

Allband is a communications cooperative created in 2003 to offer communications services to residents in four rural contiguous counties in northern Michigan. In 2005, the FCC approved Allband as an ILEC. Allband, in turn, obtained $8 million in loans from the USDA Rural Utility Service (RUS), premised upon receipt of USF revenues as security. With those loan proceeds, Allband constructed an advanced communications network and began offering partial service in late 2005. By 2010, Allband had completed its network and was offering services to the residents in its rural exchange area.

131

According to petitioners, "[t]he annual USF funds provided to Allband comprise the bulk of the revenues necessary to make payments on Allband's RUS loans." Pet'r Br. 4 at 30.

Shortly after the Order at issue was released, Allband, acting pursuant to the authority granted to it in the Order, filed a petition for waiver of both the $250 per-line cap and the benchmarking rule adopted in the Order. FCC Br. 4 at 24. The FCC's Wireline Competition Bureau (WCB) considered the petition and found "good cause to grant [Allband] a waiver of [the $250 per-line cap] for three years." Id. (internal quotation marks omitted). The WCB advised Allband, however, that it was expected "to actively pursue any and all cost-cutting and revenue generating measures in order to reduce its dependency on federal high-cost USF support." Id. (internal quotation marks omitted). The WCB also expressly noted Allband's willingness to work with RUS to restructure its loan terms. But the WCB did not grant Allband the unlimited waiver Allband had requested. Instead, the WCB concluded it would reassess Allband's financial condition to determine whether a waiver remained necessary in the future.

Allband sought full Commission review of the WCB's Order and has asked the FCC to waive both the $250 per-line cap and the regression rule until 2026, when Allband will have repaid its loan from RUS. Allband's petition remains pending before the FCC.

*b) The issues raised by Allband in this appeal*

Allband argues that the Order violates its constitutional rights in several respects. Pet'r Br. 4 at 31. In support, Allband begins by asserting that it "fully meets all of the provisions and purposes of the 1996 Act, such as the USF provisions of Section 254(b)."

132

Id. In turn, Allband argues that the Order "contravenes the provisions[] and . . . goals and objectives of Congress under Section 254(b)(5) and 254(d) of the Act, requiring 'specific, predictable and sufficient . . . mechanisms to preserve and advance universal service'; and under Section 254(e) which requires that universal service support provided to ETC Providers 'should be explicit and sufficient to achieve the purposes of this section.'" Id. (quoting statutes). Continuing, Allband argues that the Order "imposes a drastic reduction in the per-line USF funding support to be provided some small rural companies such as Allband, and also established a 'benchmark regression rule' which purports to impose limitations on capital and operations costs reimbursable from the USF." Id. at 32. Allband argues that this benchmark regression rule "is . . . hopelessly vague, unascertainable, uncertain, and arbitrary as applied to small companies such as Allband." Id.

Ultimately, Allband argues that the Order, as applied to it, is "unconstitutional under the Due Process clause because (i) it imposes a retroactive reversal of Commission orders and USF program commitments upon which Allband (and the RUS) have relied in establishing Allband and in incurring capital costs, . . . and (ii) because the expense reimbursement limitations under the ever-changeable 'benchmark regression rule,' on a going-forward basis, are hopelessly vague and unascertainable." Id. "The Order thus fails," Allband argues, "to meet the holdings and reasoning stated in Federal Communications Commission, et al. v. Fox Television Stations, Inc., 132 S.Ct. 2307 (2012)." Pet'r Br. 4 at 32-33 (italics in original omitted).

133

We readily reject Allband's due process claim. To begin with, it is questionable whether Allband has supported the due process claim with sufficient reasoned argument. At best, Allband mentions the term "due process" and cites to a single case in support, i.e., Fox Television, without explaining its relevance. In any event, our own independent review of that case persuades us it is inapposite. At issue in Fox Television was whether the FCC had violated the due process rights of two television networks by failing to give them fair notice that, in contrast to a prior FCC policy, a fleeting expletive or a fleeting shot of nudity could be actionably indecent. In addressing this issue, the Supreme Court noted that "[a] fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." 132 S.Ct. at 2317. In turn, the Court held that "[t]his requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment." Id. In the case at hand, there is no basis for us to conclude that the FCC failed to give petitioners, including Allband, adequate notice of its intent or planned regulations. Indeed, the FCC issued a NPRM and allowed petitioners to file comments thereto. Thus, in short, there is no lack of fair notice in this case. Relatedly, it is unclear precisely what "process" Allband is claiming it was deprived of. Notably, Allband was given notice and an opportunity to comment, like all other carriers, and was also allowed to file a petition for waiver from certain of the Order's new USF rules. And, as noted, the FCC has granted Allband temporary relief from certain of those rules.

Allband also argues that the Order is "unconstitutional as applied to Allband under the Fifth Amendment Due Process clause" because it "would effect a confiscation of Allband's (and its customer-members' property), and will financially destroy commitments made by Allband to its employees, vendors, and entities providing credit and loans." Pet'r Br. 4 at 33. The only cases that Allband cites in support of its claim, however, are distinguishable. For example, in Bluefield Waterworks & Improvement Co. v. Pub. Serv. Comm'n of W. Va., 262 U.S. 679, 690 (1923), the Supreme Court held that public utility rates established by a state commission that "are not sufficient to yield a reasonable return on the value of the property used at the time it is being used to render the service are unjust, unreasonable and confiscatory, and their enforcement deprives the public utility company of its property in violation of the Fourteenth Amendment." In the instant case, in contrast, Allband is not a public utility, and, in any event, the Order is not reasonably comparable to a rate-setting order issued by a state utility commission. Moreover, as the FCC notes in its response brief, any takings-type claim is not yet ripe because the FCC has exempted Allband for a period of three years from the USF reforms outlined in the Order, and has also afforded Allband the opportunity to seek an additional waiver at the end of that time period.

Allband next argues that the Order "constitutes an unconstitutional Bill of Attainder." Pet'r Br. 4 at 34. That is because, Allband argues, the "benchmark regression rule" adopted in the Order "threatens to reduce reimbursement funding from the USF,

135

crippling Allband and a small class of rural carriers which relied on the 1996 Act's USF."

Id.

Allband's argument, however, is clearly baseless. According to the Supreme Court, "the Bill of Attainder Clause was intended . . . as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function, or more simply-trial by legislature." United States v. Brown, 381 U.S. 437, 442 (1965). Thus, "[a] bill of attainder is a legislative act which inflicts punishment without a judicial trial." United States v. Lovett, 328 U.S. 303, 315 (1946) (internal quotation marks omitted). In this case, there has been no legislative act, let alone one that punishes Allband without a judicial trial.[24] Consequently, Allband has failed to establish the existence of an unconstitutional Bill of Attainder.

In addition to these constitutional arguments, Allband also asserts several other non-constitutional claims. To begin with, Allband argues that the Order "is irrational to the extreme" and "should be reversed as applied to Allband based upon estoppel principles." Pet'r Br. 4 at 35. Notably, however, Allband fails to flesh out this estoppel claim by citing any case law or outlining the essential elements of an estoppel claim. Consequently, the claim is inadequately briefed. In any event, as the FCC notes in its response brief, it never represented to Allband that USF funding would remain constant

---

[24] Presumably, Allband would have us treat the Order as a legislative act. Even if we were to do so, there clearly has been no "punishment" of Allband that would render the Order an unconstitutional bill of attainder.

136

for the duration of Allband's loan with RUS, or, for that matter, any other set length of time. Thus, there is no basis for an estoppel claim.

Relatedly, Allband argues that the Order "arbitrarily failed to consider Allband's assertions that the USF funding should not be reduced as applied to already invested capital and expenses incurred in reliance on the USF, and at most, should apply only to prospective investment incurred after the Order." Id. at 36 (italics omitted). And, Allband further argues, the Order "will cause a prompt default by Allband of its RUS loan contracts and obligations," and "wholly ignores that the pre-Order USF revenue stream was relied upon by both Allband and the RUS to pay back the RUS loans." Id. at 37. As we have noted, however, the FCC, in its pre-Order USF funding system, never promised Allband or any other carriers that they would continue to receive USF funding indefinitely. And, in any event, the FCC has effectively considered Allband's unique situation by granting Allband's petition for waiver and authorizing Allband to seek an additional waiver at the end of three years.

Allband next argues that the Order is "arbitrary because it fails to recognize that the destructive impacts upon Allband (or similar rural small carriers) are wholly unnecessary to achieve the stated goals or objectives of the Order." Pet'r Br. 4 at 35 (italics omitted). In support, Allband argues that there is "no evidence of waste or insufficiency attributable to [it]." Id. at 36. But, notwithstanding the fact that Allband may operate efficiently (and Allband cites to no evidence in the record on this point), the Order found that there were systemic inefficiencies in the existing USF funding system

137

that required a complete alteration of that system. Notably, Allband does not dispute the Order's findings on that point. Further, the purported "destructive effects" on Allband have clearly been mitigated, at least in the short term, by the FCC's grant of Allband's petition for waiver. Consequently, there is no merit to this claim.

Lastly, Allband argues that the Order is "unlawful and beyond the jurisdiction of the FCC because it intrudes much too far into the economic market place" and "serves to pick 'winners and losers' among companies." Id. at 37. Allband, however, fails to cite to a single case or statute in support of its claim. Consequently, we deem the claim inadequately briefed and thus waived. See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 679 (10th Cir. 1998).

C. *Wireless Carrier Universal Service Fund Principal Brief*

1. *Does the FCC lack authority to redirect USF support to broadband or to regulate broadband?*

In the first issue of Brief 5, petitioners assert that the FCC lacks statutory authority to redirect USF support to broadband or to regulate broadband. The specific arguments offered by petitioners in support are, in large part, identical to those raised in the first issue of Brief 3. We therefore reject those arguments for the reasons we have outlined above. Petitioners in Brief 5 have also asserted that the Order's broadband condition is contrary to three additional provisions of the Act. We thus turn to address that argument.

*a) Does the Order violate Congressional intent as expressed in 47 U.S.C. §§ 153(51), 214(e)(1) and 254?*

Petitioners argue that the Order's broadband condition violates Congressional intent as expressed in 47 U.S.C. §§ 153(51), 214(e)(1) and 254.  Section 153(51) defines the term "Telecommunications carrier" to mean:

> [A]ny provider of telecommunications services, except that such term does not include aggregators of telecommunications services (as defined in section 226 [47 USCS §226]).  A telecommunications carrier shall be treated as a common carrier under this Act only to the extent that it is engaged in providing telecommunications services, except that the Commission shall determine whether the provision of fixed and mobile satellite service shall be treated as common carriage.

47 U.S.C. § 153(51).

The terms "common carrier," "telecommunications," and "telecommunications service," all of which are used in the above-quoted definition, are themselves defined as follows:

> (11) Common carrier.  The term "common carrier" or "carrier" means any person engaged as a common carrier for hire, in interstate or foreign communication by wire or radio or in interstate or foreign radio transmission of energy, except where reference is made to common carriers not subject to this Act; but a person engaged in radio broadcasting shall not, insofar as such person is so engaged, be deemed a common carrier.
> * * *
> (50) Telecommunications.  The term "telecommunications" means the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received.
> * * *
> (53) Telecommunications service.  The term "telecommunications service" means the offering of telecommunications for a fee directly to the public . . . regardless of the facilities used.

47 U.S.C. §§ 153(11), (50), (53).

Title II of the Act imposes certain specific requirements on "common carriers" in their provision of "telecommunications services." Because telephone service is quite clearly a "telecommunications service," entities that provide telephone service are treated and regulated as common carriers under Title II. Broadband internet service, however, has been treated differently by the FCC. In 2002, the FCC determined that cable broadband service was not a "telecommunications service" subject to regulation under Title II, but rather was an "information service" subject only to the FCC's ancillary authority under Title I of the Act.

All of which leads to petitioners' argument that § 153(51)'s definition of "telecommunications carrier" "clearly prohibits the FCC from treating telecom carriers as common carriers under Title II when they are engaged in providing an information service." Pet'r Br. 5 at 14. In other words, petitioners argue, the statement in § 153(51) that "[a] telecommunications carrier shall be treated as a common carrier under this Act only to the extent that it is engaged in providing telecommunications services," "places a statutory limitation on the FCC's jurisdiction to regulate." Id. at 13.

Relatedly, petitioners argue that when 47 U.S.C. §§ 153(51), 214(e)(1) and 254 are considered together, the only conclusion that can be drawn is "that a common-carrier ETC shall be eligible to receive USF support only to the extent it is engaged in providing telecom services on a common-carrier basis." Pet'r Br. 5 at 17. And in turn, petitioners argue that Congress, "[b]y specifying [in 47 U.S.C. § 214(e)(1)] that only a common

140

carrier can be an ETC [(eligible telecommunications carrier)], . . . imposed the requirement that an ETC provide USF-supported telecom services on a common-carrier basis." Id. at 16. In short, petitioners argue, the wording of the relevant statutes clearly indicates that (a) USF funding may only be given to ETCs providing telecommunications services, and (b) ETCs that receive USF funding may use that funding only for the provision of telecommunications services. Consequently, they argue, the FCC lacked statutory authority (which they refer to in their brief as "jurisdiction") to require ETCs to offer broadband service upon reasonable request.

We conclude, however, that the FCC has the better of the argument. As the FCC notes in its response brief, petitioners' arguments "fail to acknowledge that carriers use the same facilities to provide both telecommunications and information services [i.e., broadband]." FCC Br. 5 at 16-17. Indeed, the FCC asserts, at the present time "more than 800 incumbent LECs voluntarily offer broadband subject to common carrier regulation under Title II of the Act." Id. at 21. Consequently, petitioners' reading of the Act "would prohibit universal service support for any dual-use facilities — despite the fact that hundreds of carriers, including petitioners, expended support on such facilities under the FCC's prior 'no barriers' policy." Id. at 17-18 (citing Order ¶¶ 64-65, 308).

Petitioners' suggested reading of the Act also ignores 47 U.S.C. § 254(b), which, as we have already discussed, outlines a set of "Universal service principles" that the FCC must follow in establishing "policies for the preservation and advancement of universal service." Notably, these principles include providing "[a]ccess to advanced

141

telecommunications and information services . . . in all regions of the Nation," 47 U.S.C. § 254(b)(2), and ensuring that "[c]onsumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, . . . have access to telecommunications and information services," 47 U.S.C. § 254(b)(3).

Thus, considering the Act as a whole, and in context of the realities of existing technology, we agree with the FCC that it was entirely reasonable for it to conclude that, "[s]o long as a provider offers some service on a common carrier basis, it may be eligible for universal service support as an ETC under sections 214(e) and 254(e), even if it offers other services - including 'information services' like broadband Internet access- on a non-common carrier basis." FCC Br. 5 at 19.

Finally, it is clear that the Order does not regulate broadband internet service or providers. Rather, it merely imposes broadband-related conditions on those ETCs that voluntarily seek to participate in the USF funding scheme. As the FCC notes, a provider of telecommunications services is not required to seek USF funding. But if it does so, it clearly can be subjected to certain conditions that the FCC may choose to attach to the funding. As the FCC notes, "[a] funding condition, like the broadband public interest obligation, is unlike common carrier regulation because providers voluntarily assume the condition in exchange for support and 'retain[] the ability to opt out of [the condition] entirely by declining . . . federal universal service subsidies.'" Id. at 22 (quoting WWC Holding Co. v. Sopkin, 488 F.3d 1262, 1274 (10th Cir. 2007)).

2. *Must the USF portions of the Order be vacated?*

Petitioners argue, relatedly, that the USF portions of the Order must be vacated. Pet'r Br. 5 at 31. But that argument is dependent upon a ruling in petitioners' favor on their claim that the Order's broadband condition is contrary to statutory authority. Because we have rejected this latter claim, there is no basis for vacating the USF portions of the Order.

3. *Did the FCC act arbitrarily and capriciously in reserving CAF II support for ILECs?*

Petitioners next argue that, even if the FCC possessed statutory authority to impose the broadband condition, it acted arbitrarily and capriciously in "mak[ing] its CAF II support program the virtual preserve of the big ILEC price-cap carriers." Pet'r Br. 5 at 33. This issue is identical to the first issue raised in Brief 4 ("Additional Universal Service Fund Issues Principal Brief") that we rejected above.

4. *Did the FCC act arbitrarily and capriciously in repealing the identical support rule and adopting a single-winner reverse auction?*

Petitioners challenge the FCC's decision to "[a]bandon[] its practice of providing USF support to multiple CETCs in an area" and instead "disburse Mobility I support to only one CETC per area," i.e., "the winning bidder in a reverse auction." Id. at 36.

*a) The Order's plan for disbursement of the Mobility Fund*

"In 2008, the [FCC] concluded that rapid growth in support to competitive ETCs as a result of the identical support rule threatened the sustainability of the universal service fund." JA at 499 (Order ¶ 296). The FCC also found at that time "that providing

143

the same per-line support amount to competitive ETCs had the consequence of encouraging wireless competitive ETCs to supplement or duplicate existing services while offering little incentive to maintain or expand investment in unserved or underserved areas." Id. Accordingly, "the [FCC] adopted an interim state-by-state cap on high-cost universal support for competitive ETCs, . . . pending comprehensive high-cost universal service reform." Id.

In the Order, the FCC "establish[ed] the Mobility Fund," id. at 500 (Order ¶ 299), to "secure funding for mobility directly, rather than as a side-effect of the competitive ETC system, while rationalizing how universal service funding is provided to ensure that it is cost-effective and targeted to areas that require public funding to receive the benefits of mobility," id. at 499-500 (Order ¶ 298). "The first phase of the Mobility Fund will provide one-time support through a reverse auction, with a total budget of $300 million, and will provide the [FCC] with experience in running reverse auctions for universal service support." Id. at 500 (Order ¶ 299). "The second phase of the Mobility Fund will provide ongoing support for mobile service . . . with an annual budget of $500 million." Id. "This dedicated support for mobile service supplements the other competitive bidding mechanisms under the Connect America Fund." Id.

According to the FCC's response brief, it "completed the Mobility Fund Phase I Auction" on September 27, 2012. FCC Br. 5 at 32. "Based on this auction, thirty-three winning bidders became eligible to receive a total of $299,998,632 in one-time universal service support to provide third-generation or better mobile voice and broadband services

144

covering up to 83,494 road miles in 795 biddable geographic areas located in thirty-one states and one territory." Id.

b) *Petitioners' specific challenges to the Mobility Fund disbursement plan*

In attacking the Order's Mobility Fund Phase I plan, petitioners begin by arguing that "the FCC ignored its prior policy choice of ensuring competitively-neutral funding." Pet'r Br. 5 at 37. But as the FCC correctly notes, the Order expressly discussed and ultimately "eliminate[d] the [pre-existing] identical support rule." JA at 554 (Order ¶ 502). The "identical support rule," the Order noted, "provide[d] competitive ETCs the same per-line amount of high-cost universal service support as the incumbent local exchange carrier serving the same area." Id. at 552 (Order ¶ 498). The Order further noted that the "rule's primary role ha[d] been to support mobile services, [even though] the [FCC] did not identify that purpose when it adopted the rule." Id. For example, the Order noted, "the largest competitive ETC recipient by holding company in 2010 was AT&T, which received $289 million," and in 2011, "about $611 million went to one of the four national wireless providers." Id. at 553 (Order ¶ 501). The Order concluded that the "rule fail[ed] to efficiently target support where it [wa]s needed," and thus "ha[d] not functioned as intended."[25] Id. at 554 (Order ¶ 502). Thus, rather than "ignoring" the pre-existing identical support rule as suggested by petitioners, the Order expressly reviewed and rejected it.

---

[25] The Order explains in much greater detail the inefficiencies that resulted from the identical support rule. JA at 555 (Order ¶¶ 502-506).

145

Petitioners next argue that "[t]he FCC did not explain how its goal [of providing appropriate levels of support for the efficient deployment of mobile services] was based on any of the § 254(b) principles insofar as broadband services are ineligible for USF support." Pet'r Br. 5 at 37. According to petitioners, "[t]he FCC was obliged to provide a detailed explanation of how its 'balancing calculus' of the statutory principles led it to replace the rule with the Mobility I auction." Id. at 38.

This argument is flawed in several respects. To begin with, the Mobility Fund Phase I auction was not intended to replace the identical support rule. Rather, this auction was intended to "swiftly extend[] current generation wireless coverage in areas where it is cost effective to do so with one-time support." JA at 505 (Order ¶ 314). Further, the Order directly addressed and rejected the argument that broadband services are ineligible for USF support:

> 307.    As an initial matter, it is wholly apparent that mobile wireless providers offer "voice telephony services" and thus offer services for which federal universal support is available. Furthermore, wireless providers have long been designated as ETCs eligible to receive universal service support. * * *

> 308.    . . . [W]e reject the argument that we may not support mobile networks that offer services other than the services designated for support under section 254. As we have already explained, under our longstanding "no barriers" policy, we allow carriers receiving high-cost support "to invest in infrastructure capable of providing access to advanced services" as well as supported voice services. Moreover, section 254(e)'s reference to "facilities" and "services" as distinct items for which federal universal service funds may be used demonstrates that the federal interest in universal service extends not only to supported services but also the nature of the facilities over which they are offered. Specifically, we have an interest in promoting the deployment of the types of facilities that will best achieve the

146

principles set forth in section 254(b) (and any other universal service principles that the Commission may adopt under section 254(b)(7)), including the principle that universal service program [sic] be designed to bring advanced telecommunications and information services to all Americans, at rates and terms that are comparable to the rates and terms enjoyed in urban areas. Those interests are equally strong in the wireless arena. We thus conclude that USF support may be provided to networks, including 3G and 4G wireless services networks, that are capable of providing additional services beyond supported voice services.

309. . . . [T]he Mobility Fund will be used to support the provision of "voice telephony service" and the underlying mobile network. That the network will also be used to provide information services to consumers does not make the network ineligible to receive support; to the contrary, such use directly advances the policy goals set forth in section 254(b), our new universal service principle recommended by the Joint Board, as well as section 706.

JA at 502-03 (Order ¶¶ 307-309; internal footnotes omitted). Finally, as the above-quoted language makes clear, the FCC expressly considered the principles outlined in § 254(b) and concluded that the Mobility Fund Phase I auction was consistent with and served to promote those principles. Nothing about the FCC's analysis on this point strikes us as arbitrary or capricious.

Lastly, petitioners argue that "[b]y virtue of the FCC's decision 'not to subsidize competition,' and its adoption of a single-winner Mobility I auction, States were deprived of their § 214(e)(2) authority to designate more than one CETC in a given area." Pet'r Br. 5 at 39. That is, petitioners argue, "[b]y unilaterally deciding that it would define the areas throughout which CETCs would provide USF-supported services based on census blocks, the FCC preempted the primary jurisdiction of the States to establish such areas."

147

Id. at 39-40. Petitioners argue that "§ 214(e)(2) conferred on the States the authority 'to designate more than one . . . ETC in a given area' and to 'determine whether that is in the public interest.'" Id. at 40. "That conferral of authority," petitioners assert, "necessarily deprived the FCC of authority to limit Mobility I support to one CETC in any FCC-designated, census block-based service area." Id.

Contrary to petitioners' arguments, nothing in the Order deprives states of their statutory authority to designate ETCs. Indeed, only designated ETCs may participate in the Mobility Fund Phase I auction. JA at 524 (Order ¶ 386) ("to be eligible for Mobility Fund support, entities must (1) be designated as a wireless ETC pursuant to section 214(e) of the Communications Act, by the state public utilities commission"). Ultimately, petitioners' arguments rest on the faulty assumption that ETC designation by a State entitles an entity to USF funding. As we have discussed elsewhere in this opinion, ETC designation by a State simply makes an entity eligible for, but not entitled to, USF funding. Consequently, the rules adopted by the Order for distributing Mobility Fund Phase I funds are not contrary to § 214(e), nor do they deprive the states of their designation authority under that statute.

5. *Did the FCC act arbitrarily and capriciously in setting the Mobility II budget at $500 million?*

Petitioners also argue that the FCC acted arbitrarily and capriciously in setting the Mobility Fund Phase II annual budget at $500 million, particularly when "compared to a $4 billion annual budget for ILECs." Pet'r Br. 5 at 42. Although petitioners concede that

the FCC concluded in its Order that "the Mobility II budget would 'be sufficient to sustain and expand the availability of mobile broadband,'" they argue that the Order "failed to supply a nexus between any record findings and [that] conclusion." Id. (quoting Order ¶ 495). In particular, petitioners complain that (a) "[t]he FCC did not cite to any record representation by Verizon, Sprint, AT&T or T-Mobile that [they] would maintain current coverage if [their] USF support is phased out," id. at 43, (b) "[t]he FCC made no findings supporting its conclusions that $579 million was sufficient support for regional and small wireless CETCs in 2010 and that $500 million in annual support would be sufficient for them in the future," id., and (c) "no findings supported the FCC's conclusion that providing 800 percent more USF funding to large ILECs than to wireless CETCs would constitute competitively-neutral funding," id. at 43-44.

Addressing these three complaints in turn, the FCC concluded in the Order that it was "reasonable to assume that the four national [wireless] carriers will maintain at least their existing coverage footprints even if the [USF] support they receive today [i.e., pre-Order] is phased out." JA at 551 (Order ¶ 495). Contrary to petitioners' suggestion, the FCC made this prediction based upon the record evidence that was compiled in response to the Further Notice of Proposed Rulemaking. In particular, the FCC noted that "[u]nder 2008 commitments to phase down their competitive ETC support, Verizon Wireless and Sprint have already given up significant amounts of the support they received under the identical support rule, and there is nothing in the record showing that either carrier is reducing coverage or shutting down towers" as a result of this reduction in USF support.

149

Id. Further, the FCC noted that there was no evidence "in the record . . . suggest[ing] AT&T or T-Mobile would reduce coverage or shut down towers in the absence of ETC support." Id. In light of this analysis, we are not persuaded that the FCC's predictive judgment that the four major wireless carriers would continue their existing coverage even in the absence of USF support was arbitrary or capricious.

The same can be said for petitioners' complaint that the FCC failed to support its conclusion that an annual $500 million budget was sufficient for regional and small wireless carriers. In the Order, the FCC found that "[i]n 2010, $579 million flowed to regional and small carriers, i.e., carriers other than the four nationwide providers." Id. In support of that finding, the FCC cited to its "2010 Disbursement Analysis." Id. (Order ¶ 495 n.821). Notably, petitioners make no attempt to discredit that report. In turn, the FCC found in the Order that "[o]f this $579 million, we know in many instances that this support is being provided to multiple wireless carriers in the same geographic area." Id. (Order ¶ 495). In support of that finding, the FCC cited to its "Response to United States House of Representatives Committee on Energy and Commerce, Universal Service Fund Data Request of June 22, 2011, Request 7: Study Areas with the Most Eligible Telecommunications Carriers (Table 1: Study Areas with the Most Eligible Telecommunications Carriers in 2010)." Id. (Order ¶ 495 n.822). Again, petitioners make no attempt to discredit this source of evidence. Lastly, the FCC "note[d] that the State Members of the Federal State Joint Board on Universal Service have proposed that the Commission establish a dedicated Mobility Fund that would provide $50 million in

150

the first year, $100 million in the second year, and then increase by $100 million each year until support reaches $500 million annually." Id. at 551-52 (Order ¶ 495). Considering this recommendation together with its factual findings, the FCC opined "that [its] $500 million budget w[ould] be sufficient to sustain and expand the availability of mobile broadband." Id. at 552 (Order ¶ 495). Nothing about this predictive judgment was arbitrary or capricious.

Finally, and again contrary to petitioners' assertions, the FCC expressly justified its decision to provide substantially less USF funding to wireless carriers than to other types of carriers, including large ILECs. To begin with, the FCC noted that "[a]lthough the budget for fixed services exceeds the budget for mobile services, . . . today significantly more Americans have access to 3G mobile coverage than have access to residential broadband via fixed wireless, DSL, cable, or fiber." Id. at 551 (Order ¶ 494). In turn, the FCC predicted "that as 4G mobile service is rolled out, this disparity will persist — private investment will enable the availability of 4G mobile service to a larger number of Americans than will have access to fixed broadband with speeds of at least 4 Mbps downstream and 1 Mbps upstream." Id. In support of this finding and prediction, the FCC cited to the "15th Annual Mobile Wireless Competition Report, 26 FCC Rcd at 9736-41, paras. 109-116 and Table 11." Id. (Order ¶ 494 n.820). Petitioners have made no attempt to challenge this source of information. Thus, in sum, we conclude the FCC acted neither arbitrarily nor capriciously in deciding to provide substantially more USF funding to "fixed services" than to wireless services.

151

6. *Did the FCC fail to respond to comments calling for a separate mobility fund for insular areas?*

In the final issue of Brief 5, petitioners complain that the FCC did not respond to comments calling for a separate mobility fund for insular areas. According to petitioners, "[t]he FCC received comments from wireless CETCs in insular areas urging it to establish a separate insular component of the Mobility Fund." Pet'r Br. 5 at 46. The FCC in turn, petitioners complain, "relegated its one-sentence response to the wireless CETCs' comments to the margin of the Order," and "declined to create a Mobility Fund for insular areas[] because 'these areas generally do not face the same level of deployment challenges as Tribal areas.'" Id. (quoting Order ¶ 481 n.790). "That unexplained statement," petitioners assert, "was unresponsive to the comments the FCC invited and received" and was therefore irrational. Id.

The statement at issue was contained in a footnote to the portion of the Order establishing the Tribal Mobility Fund Phase I, which was intended by the FCC "to provide one-time support to deploy mobile broadband to unserved Tribal lands." JA at 546 (Order ¶ 481). In that footnote, the FCC stated:

> Some carriers request a separate funding mechanism for insular areas. See, e.g., PR Wireless Mobility Fund NPRM Comments at 1-5. Because these areas generally do not face the same level of deployment challenges as Tribal lands, we decline to create a separate component of the Mobility Fund for them.

Id. (Order ¶ n.790).

The FCC asserts in its response brief that it was unnecessary for the Order to go into greater detail in justifying this conclusion. In support, the FCC notes that in 2010 it issued an order, referred to in the record as the "2010 Insular Order," that "declin[ed] to adopt a new high-cost support mechanism for non-rural insular carriers." JA at 974 (Appendix D at ¶ 1). The Puerto Rico Telephone Company (PRTC) filed a petition for reconsideration of the 2010 Insular Order. In Appendix D to the Order, the FCC rejected PRTC's petition. In doing so, the FCC noted that PRTC "failed to show that consumers in Puerto Rico lack access to supported voice services because of inadequate federal universal service support." Id. Relatedly, the FCC noted, to the extent that telephone subscribership in Puerto Rico "falls below the national average because of the number of low-income consumers who are unable to afford access to telephone service," id. at 976-977, "it [wa]s not at all apparent why the Commission should establish a new insular high-cost support mechanism rather than increase support for low-income consumers through its existing low-income support programs," id. at 977. Indeed, the FCC noted, "subscribership in Puerto Rico [wa]s on the rise due, in part, to efforts by the Commission, the Telecommunications Regulatory Board of Puerto Rico, and telecommunications carriers in Puerto Rico to improve the effectiveness and consumer awareness of federal low-income support programs." Id. The FCC also rejected the notion that it was "arbitrarily treat[ing] carriers serving insular areas differently from carriers . . . serv[ing] rural areas." Id.

153

According to the FCC, "[p]etitioners' requests for an insular mobility fund relied on the same flawed arguments" as those raised by PRTC and other non-rural insular carriers. FCC Br. 5 at 45. In short, the FCC asserts, "there [we]re no changed circumstances that would [have] require[d] [it] to reconsider its longstanding (and repeatedly confirmed) view that a separate support mechanism for insular areas [wa]s unnecessary because those areas do not exhibit cost or other characteristics that warrant an exemption from generally applicable high-cost support mechanisms." Id. at 45-46. "Thus," the FCC asserts, "it was sufficient for [it] to deny petitioners' request by reiterating that insular areas do not face unique 'deployment challenges' that would warrant the creation of a separate support mechanism." Id. at 46.

Petitioners' reply brief is silent on this issue: they make no attempt to rebut the FCC's assertion that the issues they now raise regarding the need for a mobility insular fund are substantially similar to the issues raised by PRTC regarding the purported need for a special insular fund for Puerto Rico. Consequently, we reject petitioners' argument on this issue.

D. *Tribal Carriers Principal Brief*

   1. *Did the FCC act arbitrarily and capriciously in prescribing funding cuts for tribal carriers?*

In Brief 9, petitioners Gila River Indian Community and Gila River Telecommunications, Inc. (collectively Gila River[26]) challenge the FCC's decision in the

_____

[26] Gila River Indian Community is a federally recognized Indian tribe that is "centered in a[] . . . reservation in rural southern Arizona." Pet'r Br. 9 at 8. The Gila

Order to cut USF funding to many rate-of-return carriers serving Tribal lands. More specifically, Gila River argues that the Order's application of § 254's universal service principles is arbitrary and capricious because there is no rational connection between the FCC's findings regarding the dismal state of communications services on Tribal lands and its subjection of tribal carriers to rules that result in funding cuts. In support, Gila River offers four specific arguments. As outlined below, however, we find no merit to any of these arguments, and we conclude that the FCC's decision was neither arbitrary nor capricious.

*a) The relevant portions of the Order*

In the Order, the FCC concluded that its existing high-cost support rules were outdated. JA at 396 (Order ¶ 6). In place of these rules, the FCC adopted what it considered "fiscally responsible, accountable, incentive-based policies" that further "a framework [designed] to distribute universal service funding in the most efficient and technologically neutral manner possible." Id. at 394 (Order ¶ 1). For instance, the Order establishes, for the first time, a "budget for the high-cost programs within USF" of $4.5 billion over six years, the apportionment of which "represent[s the FCC's] predictive judgment as to how best to allocate limited resources." Id. at 399 (Order ¶ 18). And because the reforms are "focused on rooting out inefficiencies, [they] will not affect all carriers in the same manner or in the same magnitude." Id. at 496 (Order ¶ 289).

River tribe "wholly own[s] and operate[s]" Gila River Telecommunications, Inc. Id. at i. Gila River Telecommunications, Inc. is "the only Tribal carrier to challenge the *Order*." FCC Br. 9 at 14. The tribe and the carrier will be referred to, collectively, as "Gila River."

155

At the same time, the Order also implements several new measures aimed at helping Tribal lands, which, the FCC expressly noted, "have significant telecommunications deployment and connectivity challenges." Id. at 546 (Order ¶ 481). First, the FCC created the Tribal Mobility Fund Phase I, which is a $50 million fund distributed by reverse auction "to provide one-time support to deploy mobile broadband to unserved Tribal lands." Id. This is in addition to the general $300 million Mobility Fund Phase I, for which Tribal lands are eligible. Id. Second, the FCC "adopt[ed] a preference for Tribally-owned or controlled providers seeking general or Tribal Mobility Fund Phase I support." Id. at 550 (Order ¶ 490). This preference comes in the form of a bidding credit in the reverse auction. Third, of the $500 million designated annually "for ongoing support for mobile services" as part of the Mobility Fund Phase II, up to $100 million will be allocated "to address the special circumstances of Tribal lands." Id. at 551 (Order ¶ 494). The FCC "designated [this] substantial level of funding to ensure that [Tribal] communities are not left behind." Id. at 552 (Order ¶ 497). Finally, carriers serving Tribal lands, like all carriers, can petition for an exemption ("waiver") from a reduction in subsidies. Id. at 566 (Order ¶ 539).

> *b) Did the FCC fail to explain how it balanced the § 254(b) universal service principles in determining how much funding to give rate-of-return carriers serving Tribal lands?*

Gila River asserts that the FCC "fail[ed] to articulate [in the Order] how it balanced the Section 254(b) principles as they pertain to rate-of-return carriers serving

Tribal lands," and that this failure "renders the Order arbitrary and capricious with respect to such carriers." Pet'r Br. 9 at 25.

We conclude, however, that the FCC offered sufficient justification for its decision. In its Order, the FCC stated that the funding it was allocating to rate-of-return carriers serving Tribal lands was enough to "make a difference" while remaining "consistent with [the FCC's] commitment to fiscal responsibility and the varied objectives [it had] for [its] limited funds." JA at 548 (Order ¶ 485). In support, the FCC pointed out that the $50 million in allocated funding "is approximately 25 percent of the ongoing support awarded to competitive ETCs serving Covered Locations in 2010," which the FCC predicted will be enough to "help the availability of mobile voice and broadband services" on Tribal lands. Id. at 547 (Order ¶ 482), 548 (Order ¶ 485). Moreover, the FCC noted, the $100 million from the Mobility Fund Phase II "is roughly equivalent to the amount of funding currently provided to Tribal lands in the lower 48 states and in Alaska, excluding support awarded to study areas that include the most densely populated communities in Alaska." Id. at 552 (Order ¶ 497). In short, the FCC concluded, taking into account the special concerns facing carriers serving Tribal lands, that its funding allocations struck the right balance between fiscal efficiency and the need to advance telecommunications access on Tribal lands. Although Gila River disagrees with the FCC, we are not persuaded that the FCC acted arbitrarily or capriciously in reaching its decision.

157

*c) Was it arbitrary and capricious for the FCC to treat carriers serving Tribal lands in a manner similar to rate-of-return carriers or to give certain funding to price-cap carriers and not to rate-of-return carriers?*

Gila River next argues that the Order's "nearly universal cutbacks in support for rate-of-return carriers simply cannot be squared with the evidentiary record that the FCC itself made documenting quite powerfully that Tribal carriers are in an entirely different situation from other carriers." Pet'r Br. 9 at 28. We agree with the FCC, however, that Gila River's "assertion is . . . difficult to fathom." FCC Br. 9 at 22. As explained above, the Order contains several Tribal-specific initiatives that differ from the treatment of rate-of-return carriers generally. We therefore reject Gila River's argument.

Gila River also asserts that the FCC's "decision to maintain the annual support of price-cap carriers, including those serving Tribal lands, at 2011 levels, while also making these same carriers (but not rate-of-return carriers) eligible for up to an additional $300 million of new funding to promote broadband deployment, is arbitrary and capricious." Pet'r Br. 9 at 28. This is because, Gila River asserts, "nowhere did the FCC conclude that Tribal lands served by price-cap carriers were worse served than Tribal lands served by rate-of-return carriers." Id.

As the FCC correctly points out, however, "[t]his contention overlooks the historical distinctions between the existing universal service regimes for price cap and rate-of-return carriers." FCC Br. 9 at 28. The previous framework for rate-of-return carriers provided a stable return "regardless of the necessity or prudence of any given investment." JA at 496 (Order ¶ 287). As a result, the FCC's goal of "rooting out

158

inefficiencies" requires particular focus on rate-of-return carriers. Id. (Order ¶ 289).

Furthermore, although "more than 83 percent of the unserved locations in the nation are

in price cap areas, . . . such areas currently receive approximately 25 percent of high-cost

support." Id. at 452 (Order ¶ 158). In light of these facts, the FCC "conclude[d]

increased support to areas served by price cap carriers . . . [wa]s warranted." Id. at 452

(Order ¶ 159). And we cannot say that this conclusion was arbitrary or capricious.

### d) Did the FCC fail to explain how its funding cuts will allow carriers serving Tribal lands to reasonably fulfill the new broadband obligations imposed in the Order?

Gila River complains that "[a]t the same time it financially hobbled rate-of-return

carriers serving Tribal lands, the FCC increased their load, imposing new and expensive

broadband obligations on them." Pet'r Br. 9 at 30. In other words, Gila River argues,

"the Order irrationally mandates that rate-of-return carriers serving Tribal lands do vastly

more while depriving them of the funding needed just to break even." Id. And that, Gila

River asserts, "confounds the fundamental purpose of Section 254" and is thus arbitrary

and capricious. Id.

"[W]hen an agency's decision is primarily predictive, our role is limited; we

require only that the agency acknowledge factual uncertainties and identify the

considerations it found persuasive." Rural Cellular Ass'n v. FCC, 588 F.3d 1095, 1105

(D.C. Cir. 2009). The FCC did that here. By way of the Order, the FCC explained its

reasoning for each of the subsidies and initiatives that it chose to promote

telecommunications access on Tribal lands.

159

Particularly irksome to Gila River is the Order's repeal of the "identical support rule." The identical support rule provided competitive ETCs the same per-line amount of high-cost universal service support as the incumbent carriers in the same area, regardless of the competitive carriers' costs. But the FCC, "[b]ased on more than a decade of experience with the operation of the [identical support] rule and having received a multitude of comments noting that [it] fail[ed] to efficiently target support where it [wa]s needed," concluded "that [it] ha[d] not functioned as intended." JA at 554, ¶ 502.

Gila River points out that the identical support rule was worth $150 million in 2011 to carriers serving Tribal lands. But Gila River fails to acknowledge that the combination of $50 million from the Tribal Mobility Fund Phase I, up to $100 million annually from the Mobility Fund Phase II, and the additional amount that carriers will receive from the general $300 million Mobility Fund Phase I, should cover most, if not all, of the funds lost from the identical support rule. And, in any event, because the FCC made no claims that the Order would be revenue neutral, a deficit is not fatal to the Order.

For these reasons, we conclude that Gila River has failed to demonstrate that the FCC's line-drawing was unreasonable.

*e) Did the FCC act arbitrarily and capriciously by granting an exemption to one Tribally-owned carrier?*

Although the Order imposes a five-year funding phase-out of all high-cost support that competitive carriers receive under the identical support rule, one Tribally-owned carrier, Standing Rock Telecommunications, received a two-year freeze at current

160

funding levels.  JA at 563 (Order ¶ 530).  Gila River argues that the reasoning behind this exemption applies equally to Gila River and other Tribally-owned carriers.  And, Gila River argues, "[t]he very essence of arbitrariness and capriciousness is the erratic and profoundly disparate treatment of identically situated entities without any reasoned explanation."  Pet'r Br. 9 at 35.

Gila River ignores, however, the key distinction noted by the FCC in its Order. The Order explained that Standing Rock is "a nascent Tribally-owned ETC that was designated to serve its entire Reservation and the only such ETC to have its ETC designation modified since release of the USF-ICC Transformation NPRM in February 2011."  JA at 564 (Order ¶ 531).  The FCC concluded that because the company was new, it needed extra time "to ramp up its operations in order to reach a sustainable scale to serve consumers in its service territory."  Id.  In other words, the FCC explained, it was adopting this approach "in order to enable Standing Rock to reach a sustainable scale so that consumers on the Reservation c[ould] realize the benefits of connectivity that, but for Standing Rock, they might not otherwise have access to."  Id.

To be sure, Gila River argues in its reply brief that the age of Standing Rock should not be dispositive, and that "[s]upport for older carriers could promote Tribal self-sufficiency and economic development just as much as support for newer carriers." Pet'r Reply Br. 9 at 15.  But, that argument notwithstanding, we discern no unreasonableness in the FCC's limited exemption, aimed at giving a new carrier an extra subsidy in order to advance universal service.

161

## V. *Conclusion*

We GRANT in part and DENY in part respondent's Motion to Strike New Arguments in the Joint Universal Service Fund Reply Brief of Petitioners. We DENY the petitions for review, to the extent they are based upon the issues raised in the Joint Universal Service Fund Principal Brief, the Additional Universal Service Fund Issues Principal Brief, the Wireless Carrier Universal Service Fund Principal Brief, and the Tribal Carriers Principal Brief.

In re FCC 11-9900,

**BACHARACH**, J., concurring in part and dissenting in part.

I join virtually all of Chief Judge Briscoe's thorough, persuasive opinion. But, I respectfully dissent on Part IV(A)(2). There, the majority rejects the Petitioners' challenge to the sufficiency of the budget for the Universal Service Fund. On this limited issue, I respectfully dissent. In my view, the FCC failed to supply a rational basis for its conclusion that an annual budget of $4.5 billion would suffice with the new requirements for broadband capability. In this respect, I believe the FCC acted arbitrarily in violation of the Administrative Procedure Act.

The FCC budgeted $4.5 billion for the high-cost portion of the Universal Service Fund. *See* 2 R. at 399 ¶ 18, 438-39 ¶¶ 125-26.[1] This fund includes a variety of mechanisms to provide financial support to carriers. *Id.* at 399 n.16. One of these mechanisms is called the "Connect America Fund." *Id.* at 394 ¶ 1, 399 n.16. To obtain support from this fund, a carrier "must provide broadband with actual speeds of at least 4 [megabits per second] downstream and 1 [megabit per second] upstream." *Id.* at 400 ¶ 22, 423-24 ¶¶ 92-93.

The FCC does not suggest that it considered any cost projections for the new broadband requirements. *See* Combined Responses of Federal Respondents and Support Intervenors to the Joint Universal Services Fund Principal Brief at 36-38 (July 29, 2013). Nonetheless, the FCC urges us to endorse its $4.5 billion budget as a "reasonable

---

[1]     On the challenges involving sufficiency of the budget, many of the petitioners are rate-of-return carriers. The FCC has budgeted $2 billion (out of the annual $4.5 billion) for rate-of-return carriers. *See* 2 R. at 438-39 ¶ 126.

predictive judgment." *Id.* at 33. It is true that predictive judgments within an agency's area of expertise are entitled to "particularly deferential review, so long as they are reasonable." *BNSF Ry. Co. v. Surface Transp. Bd.*, 526 F.3d 770, 781 (D.C. Cir. 2008). But here, the FCC's prediction is not reasonable, for it lacks support in any empirical findings or even rough estimates of the anticipated costs of requiring carriers to upgrade their equipment to meet the newly mandated requirements. Without at least some findings or estimate regarding the new costs, how could the FCC reasonably predict that its $4.5 billion budget for universal fund support would be "sufficient . . . to preserve and advance universal service"? 47 U.S.C. § 254(b)(5).[2]

The majority notes that in *Qwest Corp. v. FCC*, 258 F.3d 1191 (10th Cir. 2001), we qualified the sufficiency requirement, stating that the FCC "should" (rather than "shall") base its universal service policies on sufficiency. Majority Op. at 61. But there, we emphasized the need for at least some data before the FCC could determine the sufficiency of financial support for carriers. *Qwest Corp.*, 258 F.3d at 1195, 1202.

In *Qwest*, the FCC had set a benchmark figure to determine the amount of support that a state would receive. *See id.* at 1197, 1202. The FCC attempted to justify the benchmark as "a 'reasonable compromise of commenters' proposals.'" *Id.* at 1202. We

---

[2]     The majority concludes that the FCC had no duty to estimate the cost of the new broadband requirements. Majority Op. at 63 n.7. I respectfully disagree. The FCC imposed these requirements to promote universal service and justified the budget for high-cost support based on its sufficiency "to achieve [the FCC's] universal service objectives." 2 R. at 397 ¶ 10, 437-38 ¶ 123. The FCC cannot rationally justify the sufficiency of its high-cost support for universal service without considering the costs that are being imposed on the industry.

rejected this justification because the FCC had not made any empirical findings on sufficiency. Without such findings, we concluded that the FCC had failed to set forth a rational basis for the chosen benchmark. *Id.* at 1195, 1202. We reasoned that the FCC is not

> a mediator whose job is to pick the "midpoint" of a range or to come to a "reasonable compromise" among competing positions. As an expert agency, its job is to make rational and informed decisions on the record before it in order to achieve the principles set by Congress. Merely identifying some range and then picking a compromise figure is not rational decision-making.

*Id.*

The $4.5 billion budget is just as arbitrary as the benchmark struck down in *Qwest Corp.* The FCC has required carriers to upgrade their broadband speeds, as a condition of universal service fund support, without pointing to any data or estimates of the costs to be borne by the carriers.

The sufficiency of the budget was challenged in the FCC proceedings. *See, e.g.*, 6 R. at 4074-75 (petition for reconsideration by Windstream Communications, Inc. and Frontier Communications Corp.), 4094, 4098-99 (comments of Gila River Telecommunications, Inc.). For example, the Rural Broadband Alliance stated in the FCC proceedings:

> [America's Broadband Connectivity Plan] assumes that the [Universal Service Fund] is constrained as suggested by the [notice of proposed rulemaking]. We respectfully submit that the size of the fund required to meet the statutory requirements of the Act should be determined by the FCC on the basis of fact and applicable law. The fact that a group of carriers has utilized the proposed $4.5 billion "budget" in the formulation of

> a consensus proposal does not provide the Commission with a basis to constrain the fund in the absence of specific findings consistent with the Commission's obligations under the Act. It is not sufficient for the Commission to claim that it has discretion to constrain the size of the [Universal Service Fund] on the basis that a group of providers suggest that a $4.5 billion fund is "sufficient."

*Id.* at 3182; *see also id.* at 3316-17 (Moss Adams LLP's challenge to the sufficiency of the $4.5 billion fund in light of the new cost of developing and upgrading broadband networks).

Other carriers pointed out that only a minority of existing broadband networks were able to satisfy the new speed requirements. *See id.* at 2053-54 (comments of CenturyLink); *see also* Supp. R. at 60-61 ¶ 170 & Figure 8 (FCC's reference to a survey by the National Telecommunications Cooperative Association, showing that in 2010, 75% of the member carriers reported offering internet access speeds of 1.5 to 3.0 megabits per second).

Faced with these comments, the FCC defended its $4.5 billion budget based on expectations of greater efficiencies, the presence of "safety valves," and the difficulty of projecting the cost for each carrier seeking support from the Universal Service Fund. In my view, these arguments do not supply a rational basis for the FCC's conclusion that the budget would be sufficient with the new broadband requirements.

First, the FCC predicted that its efforts to "root[] out inefficiencies" and "improve accountability" in the legacy system would reduce reliance on the Universal Service Fund. 2 R. at 437-38 ¶ 123; 496 ¶ 289. At the same time, the FCC set the budget at the

2011 expenditure level. *Id.* at 399 ¶ 18. But the FCC did not compare the anticipated cost *savings* to the cost *burdens* associated with the new broadband requirements. Thus, the FCC did not articulate a reasonable basis to predict that the new cost-control measures would materially soften the burden of the new broadband requirements.

Second, the FCC relied on the presence of "safety valves." For example, if a rate-of-return carrier obtains a request for broadband service, it can decline when the request would be considered "unreasonable." *Id.* at 468 ¶¶ 207-08. And when a carrier encounters extenuating circumstances, it can seek relief under the Total Cost and Earnings Review Mechanism. *Id.* at 723-24 ¶ 924. In light of these safety valves, the FCC may have considered the industry-wide cost to be sufficient because it is planning to: (1) generously consider refusals to provide broadband service, and (2) liberally apply the Total Cost and Earnings Review Mechanism. But these safety valves are designed to relieve carriers on a case-by-case basis, not to relieve an entire industry of the additional costs of the new requirements for broadband speed.

Finally, the FCC's counsel argued that the agency could not have determined the cost of the broadband condition for each carrier seeking relief through the Universal Service Fund. I agree, and no one has suggested otherwise. But the FCC made no effort to provide *any* estimate regarding the cost of its new broadband requirements on the industry as a whole.

The development of industry-wide cost estimates were not only feasible, but also part of the record. Six price-cap companies proffered a plan, called "America's

Broadband Connectivity Plan," which included broadband speed requirements similar to those adopted by the FCC. 5 R. at 2990. For these speed requirements, proponents of the plan provided three cost estimates: $2.2 billion, $5.9 billion, and $9.7 billion. *Id.* at 2993-3004. The applicable estimate depended on whether the FCC would require broadband service beyond the areas already being served by price-cap carriers or exclude the highest-cost census blocks. *Id.* The FCC did not comment on these cost estimates or explain how they would affect the scope of the eventual broadband condition.

As the FCC's counsel states, the agency couldn't feasibly project the eventual costs for every single carrier to construct facilities allowing for the newly mandated broadband speeds. But the six price-cap carriers provided detailed estimates of the overall cost, and the FCC never explains its inability to provide this sort of estimate. Instead, the FCC states that it regards the $4.5 billion budget as "sufficient" without *any* information, estimate, or even guess about the cost of what it is requiring.

In *Qwest* we required more of the FCC, and we should do so here. Accordingly, I respectfully dissent on Part IV(A)(2) of the majority opinion.

FILED
United States Court of Appeals
Tenth Circuit

May 23, 2014

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

_____

DIRECT COMMUNICATIONS CEDAR
VALLEY, LLC, a Utah limited liability
company; TOTAH COMMUNICATIONS,
INC., an Oklahoma corporation; H & B
COMMUNICATIONS, INC., a Kansas
Corporation; THE MOUNDRIDGE
TELEPHONE COMPANY OF
MOUNDRIDGE, a Kansas business
organization; PIONEER TELEPHONE
ASSOCIATION, INC., a Kansas
corporation; TWIN VALLEY
TELEPHONE, INC., a Kansas corporation;
PINE TELEPHONE COMPANY, INC., an
Oklahoma corporation; PENNSYLVANIA
PUBLIC UTILITY COMMISSION;
CHOCTAW TELEPHONE COMPANY;
CORE COMMUNICATIONS, INC.;
NATIONAL ASSOCIATION OF STATE
UTILITY CONSUMER ADVOCATES;
NATIONAL TELECOMMUNICATIONS
COOPERATIVE ASSOCIATION;
CELLULAR SOUTH, INC.; AT&T, INC.;
HALO WIRELESS, INC.; THE VOICE
ON THE NET COALITION, INC.;
PUBLIC UTILITIES COMMISSION OF
OHIO; TW TELECOM INC.; VERMONT
PUBLIC SERVICE BOARD; THE STATE
CORPORATION COMMISSION OF THE
STATE OF KANSAS; CENTURYLINK
INC.; GILA RIVER INDIAN
COMMUNITY; GILA RIVER
TELECOMMUNICATIONS, INC.;
ALLBAND COMMUNICATIONS
COOPERATIVE; NORTH COUNTY

11-9900

_____

Consolidated Case Nos.:
11-9581, 11-9585, 11-9586, 11-9587,
11-9588, 11-9589, 11-9590, 11-9591, 11-
9592, 11-9594, 11-9595, 11-9596, 11-
9597, 12-9500, 12-9510, 12-9511, 12-
9513, 12-9514, 12-9517, 12-9520, 12-
9521, 12-9522, 12-9523, 12-9524, 12-
9528, 12-9530, 12-9531, 12-9532, 12-
9533, 12-9534, 12-9575

COMMUNICATIONS CORPORATION; UNITED STATES CELLULAR CORPORATION; PR WIRELESS, INC.; DOCOMO PACIFIC, INC.; NEX-TECH WIRELESS, LLC; CELLULAR NETWORK PARTNERSHIP, A LIMITED PARTNERSHIP; U.S. TELEPACIFIC CORP.; CONSOLIDATED COMMUNICATIONS HOLDINGS, INC.; NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS; RURAL TELEPHONE SERVICE COMPANY, INC.; ADAK EAGLE ENTERPRISES LLC; ADAMS TELEPHONE COOPERATIVE; ALENCO COMMUNICATIONS, INC.; ARLINGTON TELEPHONE COMPANY; BAY SPRINGS TELEPHONE COMPANY, INC.; BIG BEND TELEPHONE COMPANY, INC.; THE BLAIR TELEPHONE COMPANY; BLOUNTSVILLE TELEPHONE LLC; BLUE VALLEY TELECOMMUNICATIONS, INC.; BLUFFTON TELEPHONE COMPANY, INC.; BPM, INC., d/b/a Noxapater Telephone Company; BRANTLEY TELEPHONE COMPANY, INC.; BRAZORIA TELEPHONE COMPANY; BRINDLEE MOUNTAIN TELEPHONE LLC; BRUCE TELEPHONE COMPANY; BUGS ISLAND TELEPHONE COOPERATIVE; CAMERON TELEPHONE COMPANY, LLC; CHARITON VALLEY TELEPHONE CORPORATION; CHEQUAMEGON COMMUNICATIONS COOPERATIVE, INC.; CHICKAMAUGA TELEPHONE CORPORATION; CHICKASAW TELEPHONE COMPANY; CHIPPEWA COUNTY TELEPHONE COMPANY;

CLEAR LAKE INDEPENDENT TELEPHONE COMPANY; COMSOUTH TELECOMMUNICATIONS, INC.; COPPER VALLEY TELEPHONE COOPERATIVE; CORDOVA TELEPHONE COOPERATIVE; CROCKETT TELEPHONE COMPANY, INC.; DARIEN TELEPHONE COMPANY; DEERFIELD FARMERS' TELEPHONE COMPANY; DELTA TELEPHONE COMPANY, INC.; EAST ASCENSION TELEPHONE COMPANY, LLC; EASTERN NEBRASKA TELEPHONE COMPANY; EASTEX TELEPHONE COOP., INC.; EGYPTIAN TELEPHONE COOPERATIVE ASSOCIATION; ELIZABETH TELEPHONE COMPANY, LLC; ELLIJAY TELEPHONE COMPANY; FARMERS TELEPHONE COOPERATIVE, INC.; FLATROCK TELEPHONE COOP., INC.; FRANKLIN TELEPHONE COMPANY, INC.; FULTON TELEPHONE COMPANY, INC.; GLENWOOD TELEPHONE COMPANY; GRANBY TELEPHONE LLC; HART TELEPHONE COMPANY; HIAWATHA TELEPHONE COMPANY; HOLWAY TELEPHONE COMPANY; HOME TELEPHONE COMPANY (ST. JACOB, ILL.); HOME TELEPHONE COMPANY (MONCKS CORNER, SC); HOPPER TELECOMMUNICATIONS COMPANY, INC.; HORRY TELEPHONE COOPERATIVE, INC.; INTERIOR TELEPHONE COMPANY; KAPLAN TELEPHONE COMPANY, INC.; KLM TELEPHONE COMPANY; CITY OF KETCHIKAN, ALASKA, d/b/a KPU Telecommunications; LACKAWAXEN TELECOMMUNICATIONS SERVICES, INC.; LAFOURCHE TELEPHONE

COMPANY, LLC; LA HARPE TELEPHONE COMPANY, INC.; LAKESIDE TELEPHONE COMPANY; LINCOLNVILLE TELEPHONE COMPANY; LORETTO TELEPHONE COMPANY, INC.; MADISON TELEPHONE COMPANY; MATANUSKA TELEPHONE ASSOCIATION, INC.; MCDONOUGH TELEPHONE COOP., INC.; MGW TELEPHONE COMPANY, INC.; MID CENTURY TELEPHONE COOP., INC.; MIDWAY TELEPHONE COMPANY; MID-MAINE TELECOM LLC; MOUND BAYOU TELEPHONE & COMMUNICATIONS, INC.; MOUNDVILLE TELEPHONE COMPANY, INC.; MUKLUK TELEPHONE COMPANY, INC.; NATIONAL TELEPHONE OF ALABAMA, INC.; ONTONAGON COUNTY TELEPHONE COMPANY; OTELCO MID-MISSOURI LLC; OTELCO TELEPHONE LLC; PANHANDLE TELEPHONE COOPERATIVE, INC.; PEMBROKE TELEPHONE COMPANY, INC.; PEOPLE'S TELEPHONE COMPANY; PEOPLES TELEPHONE COMPANY; PIEDMONT RURAL TELEPHONE COOPERATIVE, INC.; PINE BELT TELEPHONE COMPANY; PINE TREE TELEPHONE LLC; PIONEER TELEPHONE COOPERATIVE, INC.; POKA LAMBRO TELEPHONE COOPERATIVE, INC.; PUBLIC SERVICE TELEPHONE COMPANY; RINGGOLD TELEPHONE COMPANY; ROANOKE TELEPHONE COMPANY, INC.; ROCK'S COUNTY TELEPHONE; SACO RIVER TELEPHONE LLC; SANDHILL TELEPHONE

COOPERATIVE, INC.; SHOREHAM
TELEPHONE LLC; THE SISKIYOU
TELEPHONE COMPANY; SLEDGE
TELEPHONE COMPANY; SOUTH
CANAAN TELEPHONE COMPANY;
SOUTH CENTRAL TELEPHONE
ASSOCIATION; STAR TELEPHONE
COMPANY, INC.; STAYTON
COOPERATIVE TELEPHONE
COMPANY; THE NORTH-EASTERN
PENNSYLVANIA TELEPHONE
COMPANY; TIDEWATER TELECOM,
INC.; TOHONO O'ODHAM UTILITY
AUTHORITY; UNITEL, INC.; WAR
TELEPHONE LLC; WEST CAROLINA
RURAL TELEPHONE COOPERATIVE,
INC.; WEST TENNESSEE TELEPHONE
COMPANY, INC.; WEST WISCONSIN
TELCOM COOPERATIVE, INC.;
WIGGINS TELEPHONE ASSOCIATION;
WINNEBAGO COOPERATIVE
TELECOM ASSOCIATION; YUKON
TELEPHONE CO., INC.; ARIZONA
CORPORATION COMMISSION;
WINDSTREAM CORPORATION;
WINDSTREAM COMMUNICATIONS,
INC.,

        Petitioners,

v.

FEDERAL COMMUNICATIONS
COMMISSION; UNITED STATES OF
AMERICA,

        Respondents,

and

SPRINT NEXTEL CORPORATION;
LEVEL 3 COMMUNICATIONS, LLC;
CENTURYLINK, INC.; CONNECTICUT

PUBLIC UTILITIES REGULATORY AUTHORITY; INDEPENDENT TELEPHONE & TELECOMMUNICATIONS ALLIANCE; ORGANIZATION FOR THE PROTECTION AND ADVANCEMENT OF SMALL TELEPHONE COMPANIES, a/k/a ORGANIZATION FOR THE PROMOTION AND ADVANCEMENT OF SMALL TELECOMMUNICATIONS COMPANIES (OPASTCO); WESTERN TELECOMMUNICATIONS ALLIANCE; NATIOINAL EXCHANGE CARRIER ASSOCIATION, INC.; ARLINGTON TELEPHONE COMPANY; THE BLAIR TELEPHONE COMPANY; CAMBRIDGE TELEPHONE COMPANY; CLARKS TELECOMMUNICATIONS CO.; CONSOLIDATED TELEPHONE COMPANY; CONSOLIDATED TELCO, INC.; CONSOLIDATED TELCOM, INC.; THE CURTIS TELEPHONE COMPANY; EASTERN NEBRASKA TELEPHONE COMPANY; GREAT PLAINS COMMUNICATIONS, INC.; K. & M. TELEPHONE COMPANY, INC.; NEBRASKA CENTRAL TELEPHONE COMPANY; NORTHEAST NEBRASKA TELEPHONE COMPANY; ROCK COUNTY TELEPHONE COMPANY; THREE RIVER TELCO; RCA - The Competitive Carriers Association; RURAL TELECOMMUNICATIONS GROUP, INC.; CENTRAL TEXAS TELEPHONE COOPERATIVE, INC.; VENTURE COMMUNICATIONS COOPERATIVE, INC.; ALPINE COMMUNICATIONS, LC; EMERY TELCOM; PENASCO VALLEY TELEPHONE COOPERATIVE, INC.; SMART CITY TELECOM; SMITHVILLE COMMUNICATIONS, INC.; SOUTH SLOPE COOPERATIVE

TELEPHONE CO., INC.; SPRING GROVE COMMUNICATIONS; STAR TELEPHONE COMPANY; 3 RIVERS TELEPHONE COOPERATIVE, INC.; WALNUT TELEPHONE COMPANY, INC.; WEST RIVER COOPERATIVE TELEPHONE COMPANY, INC.; RONAN TELEPHONE COMPANY; HOT SPRINGS TELEPHONE COMPANY; HYPERCUBE TELECOM, LLC; VIRGINIA STATE CORPORATION COMMISSION; MONTANA PUBLIC SERVICE COMMISSION, VERIZON; AT&T, INC.; SPRINT NEXTEL CORPORATION; LEVEL 3 COMMUNICATIONS, LLC; CENTURYLINK INC.; COX COMMUNICATIONS, INC.; NATIONAL TELECOMMUNICATIONS COOPERATIVE ASSOCIATION; INDEPENDENT TELEPHONE & TELECOMMUNICATIONS ALLIANCE; ORGANIZATION FOR THE PROTECTION AND ADVANCEMENT OF SMALL TELEPHONE COMPANIES, a/k/a ORGANIZATION FOR THE PROMOTION AND ADVANCEMENT OF SMALL TELECOMMUNICATIONS COMPANIES (OPASTCO); METROPCS COMMUNICATIONS, INC.; ARLINGTON TELEPHONE COMPANY; THE BLAIR TELEPHONE COMPANY; CAMBRIDGE TELEPHONE COMPANY; CLARKS TELECOMMUNICATIONS CO.; CONSOLIDATED TELEPHONE COMPANY; CONSOLIDATED TELCO, INC.; CONSOLIDATED TELCOM, INC.; THE CURTIS TELEPHONE COMPANY; EASTERN NEBRASKA TELEPHONE COMPANY; GREAT PLAINS COMMUNICATIONS, INC.; K. & M. TELEPHONE COMPANY, INC.;

NEBRASKA CENTRAL TELEPHONE
COMPANY; NORTHEAST NEBRASKA
TELEPHONE COMPANY; ROCK
COUNTY TELEPHONE COMPANY;
THREE RIVER TELCO; NATIONAL
EXCHANGE CARRIER ASSOCIATION,
INC. (NECA), COMCAST
CORPORATION; VONAGE HOLDINGS
CORPORATION; RURAL
TELECOMMUNICATIONS GROUP,
INC.; NATIONAL CABLE &
TELECOMMUNICATIONS
ASSOCIATION; CENTRAL TEXAS
TELEPHONE COOPERATIVE, INC.;
VENTURE COMMUNICATIONS
COOPERATIVE, INC.; ALPINE
COMMUNICATIONS, LC; EMERY
TELCOM; PENASCO VALLEY
TELEPHONE COOPERATIVE, INC.;
SMART CITY TELECOM; SMITHVILLE
COMMUNICATIONS, INC.; SOUTH
SLOPE COOPERATIVE TELEPHONE
CO., INC.; SPRING GROVE
COMMUNICATIONS; STAR
TELEPHONE COMPANY; 3 RIVERS
TELEPHONE COOPERATIVE, INC.;
WALNUT TELEPHONE COMPANY,
INC.; WEST RIVER COOPERATIVE
TELEPHONE COMPANY, INC.; RONAN
TELEPHONE COMPANY; HOT
SPRINGS TELEPHONE COMPANY;
HYPERCUBE TELECOM, LLC,

       Intervenors.

STATE MEMBERS OF THE FEDERAL-
STATE JOINT BOARD ON UNIVERSAL
SERVICE,

       Amicus Curiae.

---

## PETITION FOR REVIEW OF ORDERS OF THE
## FEDERAL COMMUNICATIONS COMMISSION
### (FCC No. 11-161)

---

Before **BRISCOE**, **HOLMES**, and **BACHARACH**, Circuit Judges.

---

**BACHARACH**, Circuit Judge.

---

Argued for Petitioners:

James Bradford Ramsey, National Association of Regulatory Utility Commissioners, Washington, D.C., Russell Blau, Bingham McCutchen LLP, Washington, D.C., Robert Allen Long, Jr., Covington & Burling, Washington, D.C., Michael B. Wallace, Wise Carter Child & Caraway, Jackson, Mississippi, Pratik A. Shah, Akin Gump Strauss Hauer & Feld LLP, Washington, D.C, Russell Lukas, Lukas, Nace, Gutierrez & Sachs, LLP, McLean, Virginia, Joseph K. Witmer, Pennsylvania Public Utility Commission, Harrisburg, Pennsylvania, Christopher F. Van de Verg, Annapolis, Maryland, Lucas M. Walker, Molo Lamken, Washington, D.C., Don Lee Keskey, Public Law Resource Center PLLC, Lansing, Michigan, Harvey Reiter, Stinson Morrison Hecker LLP, Washington, David Bergmann, Columbus, Ohio, E. Ashton Johnston, Lampert, O'Connor & Johnston, P.C., Washington, D.C., Heather Marie Zachary, Wilmer Cutler Pickering Hale and Dorr, Washington, D.C., and William Scott McCollough, McCollough Henry, Austin, Texas.

Argued for Respondents:

Richard Welch, James M. Carr, and Maureen Katherine Flood, Federal Communications Commission, Washington, D.C.

Argued for Respondents-Intervenors:

Scott H. Angstreich, Huber, Hansen, Todd, Evans & Figel, Washington, D.C., Howard J. Symons, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., and Samuel L. Feder, Jenner & Block LLP, Washington, D.C.

Appearances for Petitioners:

David R. Irvine, Jenson Stavros & Guelker, and Alan L. Smith, Salt Lake City, Utah, for Direct Communications Cedar Valley, LLC, Totah Communications, Inc., H&B Communications, Inc., The Moundridge Telephone Company of Moundridge, Pioneer Telephone Association, Inc., Twin Valley Telephone, Inc., and Pine Telephone Company, Inc.

Bohdan R. Pankiw, Kathryn G. Sophy, Shaun A. Sparks, and Joseph K. Witmer, Pennsylvania Public Utility Commission, Harrisburg, Pennsylvania, for Pennsylvania Public Utility Commission.

Benjamin H. Dickens, Jr. and Mary J. Sisak, Blooston, Mordkofsky, Dickens, Duffy & Prendergrast, LLP, and Craig S. Johnson, Johnson & Sporleder, Jefferson City, Missouri, for Choctaw Telephone Company.

James Christopher Falvey and Charles Anthony Zdebski, Eckert Seamens Cherin & Mellott, Washington, D.C., for Core Communications, Inc.

David Bergmann, Columbus, Ohio, Paula Marie Carmody, Maryland's Office of People's Counsel, Baltimore, Maryland, and Christopher J. White, New Jersey Division of Rate Counsel, Office of the Public Advocate, Newark, New Jersey, for National Association of State Utility Consumer Advocates.

Russell Blau and Tamar Elizabeth Finn, Bingham McCutchen LLP, Washington, D.C., for National Telecommunications Cooperative Association, U.S. Telepacific Corp., OPASTCO, and Western Telecommunications Alliance.

Rebecca Hawkins and Michael B. Wallace, Wise Carter Child & Caraway, Jackson, Mississippi, David LaFuria and Russell Lukas, Lukas, Nace, Gutierrez & Sachs, LLP, McLean, Virginia, for Cellular South Inc.

Daniel Deacon, Jonathan Nuechterlein  and Heather Marie Zachary, Wilmer Cutler Pickering Hale and Dorr, Washington, D.C., and Christopher M. Heimann and Gary L. Phillips, AT&T, Inc., Washington, D.C., for AT&T, Inc.

William Scott McCollough, McCollough Henry, Austin, Texas, Walter Harriman Sargent, II, Walter H. Sargent, a professional corporation, Colorado Springs, Colorado,  and Steven H. Thomas, McGuire, Craddock & Strother, P.C., Dallas, Texas, for Halo Wireless, Inc.

Jennifer P. Bagg, E. Ashton Johnston, and Donna M. Lampert, Lampert, O'Connor & Johnston, P.C., Washington, D.C., and Glenn Richards, Pillsbury Winthrop Shaw Pittman, Washington, D.C., for The Voice on the Net Coalition, Inc.

John Holland Jones, Office of the Ohio Attorney General, Columbus, Ohio, for Public Utilities Commission of Ohio.

Thomas Jones, David Paul Murray, and Nirali Patel, Willkie, Farr & Gallagher LLP, Washington, D.C., for TW Telecom Inc.

Bridget Asay, Office of the Attorney General for the State of Vermont, Montpelier, Vermont, for Vermont Public Service Board.

William Scott McCollough, McCollough Henry, Austin, Texas, Walter Harriman Sargent, II, Walter H. Sargent, a professional corporation, Colorado Springs, Colorado, and Steven H. Thomas, McGuire, Craddock & Strother, P.C., Dallas, Texas, for Transcom Enhanced Services, Inc.

Robert A. Fox, Kansas Corporation Commission Topeka, Kansas, for The State Corporation Commission.

Yaron Dori, Robert Allen Long, Jr., and Gerard J. Waldron, Covington & Burling, Washington, D.C., for Centurylink, Inc.

John Boles Capehart, Akin Gump Strauss Hauer & Feld, Dallas, Texas, Sean Conway, Patricia Ann Millett, and James Edward Tysse, Akin Gump Strauss Hauer & Feld, Washington, D.C., and Michael C. Small, Akin Gump Strauss Hauer & Feld, Washington, D.C., for Gila River Indian Community and Gila River Telecommunications, Inc.

Don Lee Keskey, Public Law Resources Center PLLC, Lansing Michigan, for Consolidated Telco, Inc.

Roger Dale Dixon, Jr., Law Offices of Dale Dixon, Carlsbad, California, for North County Communications Corporation.

David LaFuria and Russell Lukas, Lukas, Nace, Gutierrez & Sachs, LLP, McLean, Virginia, for United States Cellular Corporation.

David LaFuria, Todd Bradley Lantor, and Russell Lukas, Lukas, Nace, Gutierrez & Sachs, LLP, McLean, Virginia, for Petitioners PR Wireless, Inc. and Docomo Pacific, Inc.

Todd Bradley Lantor, and Russell Lukas, Lukas, Nace, Gutierrez & Sachs, LLP, McLean, Virginia, for Petitioners Nex-Tech Wireless, LLC, and Cellular Network Partnership, A Limited Partnership.

Russell Blau, Bingham McCutchen LLP, Washington, D.C., for Consolidated Communications Holdings, Inc.

James Bradford Ramsay and Holly R. Smith, National Association of Regulatory Utility Commissioners, Washington, D.C., for National Association of Regulatory Utility Commissioners.

David Cosson, Washington, D.C., H. Russell Frisby, Jr., Dennis Lane, and Harvey Reiter, Stinson Morrison Hecker LLP, Washington, D.C., for Rural Independent Competitive Alliance, Rural Telephone Service Company, Inc., Adak Eagle Enterprises LLC, Adams Telephone Cooperative, Alenco Communications, Inc., Arlington Telephone Company, Bay Springs Telephone Company, Big Bend Telephone Company, The Blair Telephone Company, Blountsville Telephone LLC, Blue Valley Telecommunications, Inc., Bluffton Telephone Company, Inc., BPM, Inc., Brantley Telephone Company, Inc., Brazoria Telephone Company, Brindlee Mountain Telephone LLC, Bruce Telephone Company, Bugs Island Telephone Cooperative, Cameron Telephone Company, LLC, Chariton Valley Telephone Corporation, Chequamegon Communications Cooperative, Inc., Chickamauga Telephone Corporation, Chicksaw Telephone Company, Chippewa County Telephone Company, Clear Lake Independent Telephone Company, Comsouth Telecommunications, Inc., Copper Valley Telephone Cooperative, Cordova Telephone Cooperative, Crockett Telephone Company, Inc., Darien Telephone Company, Deerfield Famers' Telephone Company, Delta Telephone Company, Inc., East Ascension Telephone Company, LLC, Eastern Nebraska Telephone Company, Eastex Telephone Coop., Inc., Egyptian Telephone Cooperative Association, Elizabeth Telephone Company, LLC, Ellijay Telephone Company, Farmers Telephone Cooperative, Inc., Flatrock Telephone Coop., Inc., Franklin Telephone Company, Inc., Fulton Telephone Company, Inc., Glenwood Telephone Company, Granby Telephone Company LLC, Hart Telephone Company, Hiawatha Telephone Company, Holway Telephone Company, Home Telephone Company (St. Jacob Illinois), Home Telephone Company (Moncks Corner, South Carolina), Hopper Telecommunications Company, Inc., Horry Telephone Cooperative, Inc., Interior Telephone Company, Kaplan Telephone Company, Inc., KLM Telephone Company, City of Ketchikan, Alaska, Lackawaxen Telecommunications Services, Inc., Lafourche Telephone Company, LLC, La Harpe Telephone Company, Inc., Lakeside Telephone Company, Lincolnville Telephone Company, Loretto Telephone Company, Inc., Madison Telephone Company, Matanuska Telephone Association, Inc., McDonough Telephone Coop., Inc., MGW Telephone Company, Inc., Mid Century Telephone Coop., Inc., Midway Telephone Company, Mid-Maine Telecom, LLC, Mound Bayou Telephone & Communications, Inc., Mondville Telephone Company, Inc., Mukluk Telephone Company, Inc., National Telephone of Alabama, Inc.,

Ontonagon County Telephone Company, Otelco Mid-Missouri LLC, Otelco Telephone LLC, Panhandle Telephone Cooperative, Inc., Pembroke Telephone Company, Inc., People's Telephone Company, Peoples Telephone Company, Piedmont Rural Telephone Cooperative, Inc., Pine Belt Telephone Company, Pine Tree Telephone LLC, Pioneer Telephone Cooperative, Inc., Poka Lambro Telephone Cooperative, Inc., Public Service Telephone Company, Ringgold Telephone Company, Roanoke Telephone Company, Inc., Rock County Telephone Company, Saco River Telephone LLC, Sandhill Telephone Cooperative, Inc., Shoreham Telephone LLC, The Siskiyou Telephone Company, Sledge Telephone Company, South Canaan Telephone Company, South Central Telephone Association, Star Telephone Company, Inc., Stayton Cooperative Telephone Company, The North-Eastern Pennsylvania Telephone Company, Tidewater Telecom, Inc., Tohono O'Odham Utility Authority, Unitel, Inc., War Telephone LLC, West Carolina Rural Telephone Cooperative, Inc., West Tennessee Telephone Company, Inc., West Wisconsin Telecom Cooperative, Inc., Wiggins Telephone Association, Winnebago Cooperative Telecom Association, Yukon Telephone Co., Inc.

Maureen A. Scott, Wesley Van Cleve, and Janet F. Wagner, Arizona Corporation Commission, Legal Division, Phoenix, Arizona, for Arizona Corporation Commission.

Jeffrey A. Lamken and Lucas M. Walker, Molo Lamkin, Washington, D.C., for Windstream Communications, Inc., and Windstream Corporation.

Appearances for Respondents:

Laurence Nicholas Bourne, James M. Carr, Maureen Katherine Flood, Jacob Matthew Lewis, Austin Schlick, and Richard Welch, Federal Communications Commission, Washington, D.C., for the Federal Communications Commission.

Robert Nicholson and  Robert J. Wiggers, United States Department of Justice, Washington, D.C., for United States of America.

Appearances for Intervenors:

Thomas J. Moorman, Woods & Aitken, Washington, D.C. and Paul M. Schudel, Woods & Aitken, Lincoln, Nebraska, for The Blair Telephone Company, Clarks Telecommunications Co., Consolidated Telco, Inc., Consolidated Telephone Company, Consolidated Telecom, Inc., The Curtis Telephone Company, Great Plains Communication, Inc. K&M Telephone Company, Inc., Nebraska Central Telephone Company, Rock County Telephone Company, Three River Telco, Cambridge Telephone Company, Northeast Nebraska Telephone Company.

David Cosson, Washington, D.C., for Eastern Nebraska Telephone Company, and H. Russell Frisby, Jr., Dennis Lane, and Harvey Reiter, Stinson Morrison Hecker LLP,

Washington, D.C., and Thomas J. Moorman, Woods & Aitken, Washington, D.C. and Paul M. Schudel, Woods & Aitken, Lincoln, Nebraska, for Arlington Telephone Company.

Yaron Dori, Robert Allen Long, Jr., and Gerard J. Waldron, Covington & Burling, Washington, D.C., for Centurylink, Inc.

Gerard J. Duffy, Benjamin H. Dickens, Jr., Robert M. Jackson, and Mary J. Sisak, Blooston, Mordkofsky, Dickens, Duffy & Prendergrast, LLP, Washington, D.C., for 3 Rivers Telephone Cooperative, Inc. , Venture Communications Cooperative, Inc., Alpine Communications, LC, Emery Telcom, Penasco Valley Telephone Cooperative, Inc., Smart City Telecom, Smithville Communications, Inc., South Slope Cooperative Telephone Co., Inc., Spring Grove Communications, Star Telephone Company, Walnut Telephone Company, and West River Cooperative Telephone Company, Inc.

Ivan C. Evilsizer, Evilsizer Law Office, Helena, Montana, for Ronan Telephone Company and Hot Springs Telephone Company.

Helen E. Disenhaus and Ashton Johnston, Lampert, O'Connor & Johnston, P.C., Washington, D.C., for Hypercube Telecom, LLC.

Raymond Lee Doggett, Jr., Virginia State Corporation Commission, Richmond, Virginia, for Virginia State Corporation Commission.

Dennis Lopach, Montana Public Service Commission, Helena, Montana, for Montana Public Service Commission.

Christopher M. Heimann and Gary L. Phillips, SBC Communications, Washington, D.C., Jonathan Nuechterlein and Heather Marie Zachary, Wilmer Cutler Pickering Hale and Dorr, Washington, D.C., for AT&T, Inc.

J. G. Herrington and David E. Mills, Dow Lohnes, PLLC, Washington, D.C., for Cox Communications.

Scott H. Angstreich, Joshua D. Branson, Brendan J. Crimmins, Kellogg, Huber, Hansen, Todd, Evans & Figel, Washington, D.C., and Michael E. Glover and Christopher Michael Miller, Verizon Communications, Inc., Arlington, Virginia, for Verizon.

Russell Blau, Bingham McCutchen LLP, Washington, D.C., for National Telecommunications Cooperative Association.

Carl W. Northrop, Telecommunications Law Professionals PLLC, Washington, D.C., Mark A. Stachiw, MetroPCS Communications, Inc., Richardson, Texas, for MetroPCS Communications, Inc.

Clare Kindall, Office of the Attorney General Energy Department, New Britain, Connecticut, for Connecticut Public Utilities Regulatory Authority.

Samuel L. Feder and Luke C. Platzer, Jenner & Block LLP, Washington, D.C., for Comcast Corporation.

Christopher J. Wright, Wiltshire & Grannis, LLP, Washington, D.C., for Level 3 Communications, LLC, Vonage Holdings Corp., and Sprint Nextel Corporation.

Rick C. Chessen, Neal M. Goldberg, Jennifer McKee, and Steven F. Morris, National Cable & Telecommunications Association, Washington, D.C., and Ernest C. Cooper, Robert G. Kidwell, and Howard J. Symons, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Washington, D.C., for National Cable & Telecommunications Association.

Genevieve Morelli, The Independent Telephone & Telecommunications Alliance, Washington, D.C., for Independent Telephone & Telecommunications Alliance.

Gerard J. Duffy, Blooston, Mordkofsky, Dickens, Duffy & Prendergrast, LLP, Washington, D.C., for Western Telecommunications Alliance.

Gregory Jon Vogt, Law Offices of Gregory J. Vogt, PLLC, Alexandria, Virginia, and Richard A. Askoff, Sr., National Exchange Carrier Association, Inc., Whippany, New Jersey  for National Exchange Carrier Association.

Craig Edward Gilmore, L. Charles Keller, and David H. Solomon, Wilkinson, Barker, Knauer, LLP, Washington, D.C., for T-Mobile USA, Inc.

Caressa Davison Bennet, Kenneth Charles Johnson, Anthony Veach, and Daryl Altey Zakov, Bennet & Bennet, Bethesda, Maryland, for Rural Telecommunications Group, Inc. and Central Telephone Cooperative, Inc.

Appearances for Amicus Curiae:

James Hughes Cawley, Pennsylvania Public Utility Commission, Harrisburg, Pennsylvania, and James Bradford Ramsay, National Association of Regulatory Utility Commissioners, Washington, D.C., for State Members of the Federal-State Joint Board on Universal Service.

**Table of Contents**

Page

I. The FCC's Restructuring of the Telecommunications Market 2

    A. The Old Regime 2

    B. The New Regime 7

    C. The Transition from the Old Regime to the New Regime 8

    D. The Types of Challenges 9

II. Challenges to the FCC's Authority to Implement a National Bill-and-Keep Framework for All Traffic 10

    A. Standard of Review 11

    B. The FCC's Authority Over Access Charges on All Traffic 13

        1. Traffic Between LECs and Long-Distance Carriers 13

            a. The FCC's Rationale 13

            b. The Petitioners' Arguments 14

            c. Traffic Between LECs and IXCs as "Reciprocal Compensation" 15

                i. "Reciprocal Compensation" as a Term of Art 15

                ii. Plain Meaning of the Term "Reciprocal Compensation" 17

            d. The Petitioners' Reliance on §§ 252(d)(2)(A) and 251(c)(2)(A) 18

|     |     | i.  | Section 252(d)(2)(A) | 19 |

| | | ii. | Section 251(c)(2)(A) | 20 |

| | 2. | Preemption of State Regulatory Authority Over Intrastate Access Charges | | 22 |

| | | a. | Sections 152(b) and 601(c) | 22 |

| | | b. | Section 253 | 24 |

| | | c. | Section 251(d)(3) | 26 |

| | | d. | Section 251(g) | 27 |

| | 3. | FCC Authority Over Intrastate Origination Charges | | 29 |

| | | a. | Section 251(b)(5) and Originating Access Traffic | 30 |

| | | b. | The FCC's Interpretations of "Transport" and "Termination" | 31 |

| | | c. | The Purported Prohibition of Originating Access Charges | 32 |

| C. | Bill-and-Keep as a Default Methodology | | | 33 |

| | 1. | Consideration Under § 252 | | 35 |

| | 2. | The "Just and Reasonable" Rate Requirement in §§ 201(b) and 252(d)(2) | | 41 |

| | | a. | Consideration of a Statutory Right to Payments from Other Carriers | 43 |

| | | b. | Sufficiency of Cost Recovery | 44 |

| D. | Authority for the States to Suspend or Modify the New Requirements | | | 45 |

III.  Challenges to Cost Recovery as Arbitrary and Capricious          47

    A.   The Transitional Plan                                         47

    B.   The Petitioners' Challenges                                   49

    C.   Standard of Review                                            49

    D.   Consideration of the Apportionment
         Requirement in *Smith*                                        51

         1.   The Apportionment Requirement                            51

         2.   Application of *Smith* to the FCC's
              Recovery Mechanism                                       52

         3.   Waiver of the Challenge to the Access
              Recovery Charge                                          54

         4.   Recovery of Interstate Costs through
              End-User Rates and Universal Service Support            55

    E.   Challenges Involving the Adequacy of the Recovery
         Mechanism                                                     56

IV.  Procedural Irregularities in the Rulemaking Process               58

    A.   The FCC Proceedings                                           58

    B.   The Petitioners' Arguments                                    60

         1.   The Waiver Issue                                         60

         2.   The FCC's Motion to Strike                               61

    C.   Our Review of the Constitutional Challenges                   62

    D.   The Petitioners' Due Process Challenges                       63

         1.   General Challenges to the *Ex Partes*                    63

2.  *Ex Parte* Challenges Based on Specific
    Documents                                              65

3.  The FCC's Placement of Documents in the
    Rulemaking Record                                      66

4.  The FCC's Decision to Rule on Pending Petitions        67

5.  Adequacy of the August 3, 2011, Notice                 68

6.  Length of the Comment Period                           68

7.  Cumulative Challenge                                   69

E.  "Commandeering" of State Commissions                   69

V.  Individual Challenges to the Order                     71

A.  Rural Independent Competitive Alliance's Challenge
    to the FCC's Limitation on Funding Support for
    Rural Competitive LECs                                 71

B.  The Challenge by National Telecommunications
    Cooperative Association, U.S. TelePacific Corporation,
    and North County Communications Corporation to the
    Transition of CMRS-LEC Traffic to Bill-and-Keep        75

C.  Core Communications, Inc. and North County
    Communications Corporation's Challenge to the
    FCC's New Regulations on Access Stimulation            77

    1.  The FCC's Refusal to Allow CLECs to Use
        ILEC Ratemaking Procedures                         78

    2.  The FCC's Requirement for Access-Stimulating
        CLECs to Benchmark to the Price-Cap LEC
        with the State's Lowest Access Rates               81

D.  AT&T, Inc.'s Challenge to the FCC's Decision
    to Allow VoIP-LEC Partnerships to Collect
    Intercarrier Compensation Charges for Services
    Performed by the VoIP Partner                                83

E.  Voice on the Net Coalition, Inc.'s Challenges to the
    FCC's No-Blocking Obligation                                 86

    1.  The Waiver Test                                          87

    2.  Challenge to the Notice                                  89

    3.  Challenge to the Adequacy of the Explanation             91

    4.  Challenge to the FCC's Ancillary Jurisdiction            91

F.  Transcom Enhanced Services, Inc.'s Challenges to
    the FCC's IntraMTA Rule, Provisions on Call-
    Identification, and Blocking of Calls                        93

    1.  Transcom's Challenge to the FCC's IntraMTA
        Rule                                                     93

    2.  Transcom's Challenge to the Call-Identifying
        Rules                                                    97

    3.  Transcom's Challenge to the FCC's No-
        Blocking Rules                                           99

G.  Windstream Corporation and Windstream
    Communications, Inc.'s Challenges to Origination
    Charges                                                      99

    1.  Windstream's Challenge to the FCC's
        Explanation in the Original Order                       101

    2.  Windstream's Challenge to the FCC's
        Explanation for the New Rule                            102

3. Windstream's Challenge to the FCC's Failure to Provide Funding Support 104

4. Windstream's Challenge to the Initial Period of Six Months 108

VI. Conclusion 108

## Issues Involving Intercarrier Compensation

Exercising its rulemaking authority under the Communications Act of 1934 and the Telecommunications Act of 1996, the FCC overhauled the intercarrier compensation regime and adopted a "uniform national bill-and-keep framework . . . for all telecommunications traffic exchanged with a [local exchange carrier]." 2 R. at 403 ¶ 34. To ease the transition to a new regime of bill-and-keep, the FCC also adopted a comprehensive plan to phase out the old intercarrier compensation system. *See id.* at 403-04 ¶ 35. The Petitioners challenge the plan on grounds that it exceeded the FCC's authority, was arbitrary and capricious, and resulted in a denial of due process.[1] These challenges are rejected.

---

[1]    This opinion involves arguments the Petitioners and Intervenors presented in the following briefs:

- Joint Intercarrier Compensation Principal Brief of Petitioners (July 17, 2013);

- Additional Intercarrier Compensation Issues Principal Brief (Pet'rs) (July 11, 2013);

- AT&T Principal Brief (July 16, 2013);

- Voice on the Net Coalition, Inc. Principal Brief (July 15, 2013);

- Transcom Principal Brief (July 12, 2013);

- National Association of State Utility Consumer Advocates Principal Brief (July 12, 2013);

- Windstream Principal Brief (July 17, 2013);

- Incumbent Local Exchange Carrier Intervenors' Brief in Support of Petitioners (July 15, 2013).

**I.    The FCC's Restructuring of the Telecommunications Market**

In assessing the Petitioners' challenges to this plan, we must take into account what the FCC was trying to accomplish.

**A.    The Old Regime**

The FCC adopted the plan against the backdrop of two types of arrangements. One provided reciprocal compensation for local calls, and the other involved charges for long-distance carriers to connect to a local carrier's network. In the Order, the FCC revamped this regime, exercising authority over all traffic exchanged with a local exchange carrier ("LEC"), including intrastate calls. *See id.* at 632 ¶ 739, 642 ¶¶ 761-62.

Before 1996, regulation of telecommunications was generally divided between the FCC and state commissions. The FCC regulated interstate service, and state commissions regulated intrastate service. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 360 (1986). Under this division of authority, states granted exclusive franchises to LECs within their designated service areas. *See AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371 (1999). Through these franchises, the LECs owned the local telecommunications networks. *Id.*

In 1996, Congress set out to restructure the market to enhance competition. These efforts led to enactment of the Telecommunications Act of 1996. In this statute, Congress empowered the FCC and created a new breed of competitors (called "Competitive LECs" or "CLECs"). *See id.* at 378 n.6; *MCI Telecomm. Corp. v. Bell Atl. Pa.*, 271 F.3d 491, 498 (3d Cir. 2001).

Under the new statute, all LECs would assume certain duties. *See* 47 U.S.C. § 251. One of these duties involved the establishment of arrangements for "reciprocal compensation" in the "transport and termination of telecommunications." *Id.* at § 251(b)(5). This statutory duty includes two key terms underlying the present litigation: "reciprocal compensation" and "telecommunications." In the Order, the FCC recently interpreted these terms to cover all traffic, including intrastate service and use of local networks by long-distance carriers. *Id.* at 643 ¶ 764, 644 n.1374, 647 ¶ 772, 754-55 ¶ 971.

This interpretation reflects a departure from the FCC's previous reading of the 1996 Act. In the past, for example, the FCC had narrowly read the phrase "reciprocal compensation" as limited to local traffic. *See Bell Atl. Tel. Cos. v. FCC*, 206 F.3d 1, 4 (D.C. Cir. 2000). Under the FCC's previous interpretation, the parties or state commissions set the charges for intrastate traffic between two LECs. Supp. R. at 20-21 ¶ 53.

The charges were called "access charges" because long-distance carriers (called "IXCs") paid LECs for the opportunity to use their networks at the start- and end-points of the calls. *See id.* at 19 ¶ 48. This system is known as "exchange access." 47 U.S.C. § 153(20).

3

In exchange access, long-distance calls start (or "originate") on an LEC's network, continue on the IXC's network to another local telephone exchange, and end (or "terminate") on the network of another LEC. This process is illustrated in Diagram 1:



Diagram 1

Under the old regime, compensation between local- and long-distance carriers involved one of three combinations:

- between an IXC and two LECs for an interstate call,

- between an IXC and two LECs for a call within the boundaries of a single state, and

- between two LECs.

The three different combinations led to three different types of access charges, each with its own mode of regulation:

- *Interstate IXC-LEC Traffic*: For this kind of traffic, the IXC paid an access charge to the originating LEC and a terminating interstate access charge to the terminating LEC. The access charges were regulated by the FCC. Supp. R. at 21 ¶ 53. For example, Diagram 2 illustrates a call from Denver to Oklahoma City:

4



Diagram 2
Denver, Colorado to Oklahoma City, Oklahoma

- *Intrastate IXC-LEC Traffic*:  For traffic within a single state by an IXC and LEC, the IXC paid an access charge to the originating LEC and an access charge to the terminating LEC.  The access charge was governed by state law and was typically set above interstate rates.  *Id.*  This illustration reflects a typical intrastate call, one from Denver to Colorado Springs:



Diagram 3
Denver, Colorado to Colorado Springs, Colorado

- *Local LEC-LEC Traffic*:  For local traffic between two LECs, the LECs paid each other consistently with their reciprocal compensation arrangement.  The arrangement was either negotiated by the parties or set by the states using a methodology prescribed by the FCC under 47 §§ 201(b) and 251(b)(5).  *Id.*  An example appears in Diagram 4, which shows a call from someone in Denver to another person in Denver:



Diagram 4

Denver, CO to Denver, CO



Each arrangement assumed that the calling party should pay for the call. 2 R. at 634 ¶ 744. This assumption was based on the view that the callers were the only persons that benefited from the call and that they should bear all of the costs. *Id.* Thus, callers paid their own carriers, which in turn paid other carriers for access to their networks to reach the person being called. Diagram 5 shows the payments for local- and long-distance calls:



Diagram 5
Local Phone Call

## B.    The New Regime

In the Order, the FCC restructured this system in three ways.  First, the FCC reinterpreted the 1996 law to cover all traffic, including traffic subject to charges for access to a network.  *Id.* at 642 ¶ 761-62.  Second, the FCC claimed that it could prevent state commissions from approving access charges for intrastate calls in the absence of an

agreement between the parties. *Id.* at 644 ¶ 766. Third, the FCC rejected the idea that a caller should bear the full cost of the call; thus, the FCC prescribed a new system, known as "bill-and-keep," for all traffic. *Id.* at 632 ¶ 741; *see id.* at 634 ¶ 744, 640 ¶ 756.

"Bill-and-keep" anticipates that carriers will recover their costs from their end-user customers rather than from other carriers. *See id.* at 631 ¶ 737, 648 ¶ 775 n.1408. In moving to "bill-and-keep," the FCC reasoned that the parties to a call should split the costs because both enjoy the benefits. *Id.* at 634 ¶ 744, 640 ¶ 756, 649 n.1409. Once bill-and-keep is fully implemented for all traffic exchanged with an LEC, the calling party and the called party will divide the costs. *Id.* at 649 n.1409.

## C. The Transition from the Old Regime to the New Regime

Recognizing that the change would disrupt the market, the FCC opted to gradually transition to bill-and-keep. In the transition period, incumbent LECs ("ILECs") could recover some, but not all, of their lost intercarrier compensation revenue through the FCC's funding mechanisms. *Id.* at 683-84 ¶¶ 847-48.

The length of the transitional period will vary for different types of LECs. To determine the transitional period, the FCC classifies ILECs based on the way that they are regulated: "Price-cap ILECs" are LECs that must set rates at or below a price cap, and "rate-of-return ILECs" are allowed to charge based on a set rate of return. *Nat'l Rural Telecomm. Ass'n v. FCC*, 988 F.2d 174, 177-78 (D.C. Cir. 1993). For price-cap ILECs, the FCC set a six-year period to gradually decrease reciprocal compensation charges and

8

access charges for termination; for rate-of-return ILECs, the transition for these intercarrier charges will last nine years.  2 R. at 661-63 ¶ 801, 661-63 Figure 9.

CLECs are generally required to benchmark rates to an ILEC and utilize its timeline for the transition.  *Id.* at 272 ¶ 801.  Traffic involving a wireless provider (called "CMRS") must transition to bill-and-keep either immediately or within six months, depending on whether the traffic was subject to an existing agreement on intercarrier compensation.  *Id.* at 765 ¶ 996 (ordering an immediate transition); *id.* at 1145-46 ¶ 7 (extending the transition to six months for some CMRS-LEC traffic).

The FCC allows ILECs to recover some, but not all, of their lost intercarrier compensation revenues through a federal recovery mechanism.  *See id.* at 683-84 ¶¶ 847-48.  Through this mechanism, carriers can recover some of their lost revenue through an Access Recovery Charge on their end users.  *See id.* at 715 ¶ 908.  Carriers unable to recover all of their eligible recovery through the Access Recovery Charge are eligible for explicit support through the Connect America Fund.  *See id.* at 721-22 ¶ 918.

### D.     The Types of Challenges

The Petitioners challenge four aspects of the reforms:  (1) implementation of bill-and-keep for all traffic; (2) limitations on funding mechanisms during the transitional period; (3) irregularities in the rule-making process; and (4) application of the reforms to particular circumstances.  We reject all of the challenges.

**II.** **Challenges to the FCC's Authority to Implement a National Bill-and-Keep Framework for All Traffic**

In the Order, the FCC concluded that 47 U.S.C. § 251(b)(5) applied to all telecommunications traffic exchanged with an LEC. Based on this conclusion, the FCC prescribed bill-and-keep as the default methodology for that traffic. The Petitioners challenge not only the FCC's authority to regulate the traffic, but also the way in which the FCC chose to exercise this authority. Thus, we must address both challenges: the FCC's authority and the content of the new regulations.

The FCC claims authority under 47 U.S.C. §§ 251(b)(5) and 201(b) to implement bill-and-keep as the default intercarrier compensation framework for all traffic exchanged with an LEC. *See id.* at 641 ¶ 760. For traffic between LECs and wireless providers, the FCC also invokes authority under 47 U.S.C. § 332. *Id.* at 641 ¶ 760 n.1350, 675-76 ¶¶ 834-36. And for interstate traffic, the FCC relies on 47 U.S.C. § 201. *Id.* at 646-47 ¶ 771, 675-76 ¶¶ 834-36.

Attacking this framework, the Petitioners raise three challenges.

First, they challenge the FCC's authority under § 251(b)(5). Joint Intercarrier Compensation Principal Br. of Pet'rs at 7-28 (July 17, 2013). This challenge encompasses three aspects of the traffic: (1) the FCC's authority to regulate access charges imposed by LECs on long-distance carriers; (2) the exclusive authority of states in regulating intrastate access charges; and (3) the FCC's authority over origination charges. *Id.*

10

Second, the Petitioners argue that bill-and-keep does not constitute a permissible methodology for at least some of the traffic. *Id.* at 28-45.

Third, the Petitioners argue that the FCC lacks authority to order state commissions to refuse exemptions to the bill-and-keep regime. *Id.* at 46-49.

## A.     Standard of Review

Congress has unambiguously authorized the FCC to administer the Communications Act through rulemaking and adjudication. *City of Arlington v. FCC*, __ U.S. __, 133 S. Ct. 1863, 1874 (2013). Thus, we apply *Chevron* deference to the FCC's interpretation of the statute and its own authority. *Id.* at 1874; *Sorenson Commc'ns, Inc. v. FCC*, 659 F.3d 1035, 1042 (10th Cir. 2011).

*Chevron* involves a two-step inquiry. *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984); *Sorenson*, 659 F.3d at 1042.

In the first step, we ask whether Congress has spoken on the issue. *Qwest Commc'ns Int'l, Inc. v. FCC*, 398 F.3d 1222, 1229-30 (10th Cir. 2005) (quoting *Chevron*, 467 U.S. at 842). When the statute is unambiguous, we look no further and "give effect to Congress's unambiguously expressed intent." *Qwest*, 398 F.3d at 1230 (citing *Chevron*, 467 U.S. at 842-43).

"[I]f the statute is silent or ambiguous with respect to the specific issue," we must decide "whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843; *see City of Arlington*, 133 S. Ct. at 1874 ("Where

11

Congress has established a clear line, the agency cannot go beyond it; and where Congress has established an ambiguous line, the agency can go no further than the ambiguity will fairly allow.").  When we address this issue, the Petitioners must show that the FCC's interpretation of the statute was impermissible.  *Nat'l Cable & Telecomms. Ass'n, Inc. v. Gulf Power Co.*, 534 U.S. 327, 333 (2002).

We review changes in the FCC's interpretation of the Communications Act under the Administrative Procedure Act ("APA").  *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005).  But the APA does not subject the FCC's change in position to heightened review.  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009); *Qwest Corp. v. FCC*, 689 F.3d 1214, 1224 (10th Cir. 2012).  The APA requires only that "'the new policy [be] permissible under the statute, [and] that there are good reasons for it.'"  *Qwest Corp.*, 689 F.3d at 1225 (quoting *Fox Television*, 556 U.S. at 515).  This requirement is satisfied if the FCC acknowledges that it is changing position and provides a reasoned explanation for "disregarding facts and circumstances that underlay or were engendered by the prior policy."  *Fox Television*, 556 U.S. at 515.[2]

In applying *Chevron* and the APA, we confine our review to the grounds relied on by the agency.  *Nat'l R.R. Passenger Corp. v. Bos. & Me. Corp.*, 503 U.S. 407, 420

---

[2]     The Petitioners contended at oral argument that the FCC could not take an expansive approach to its statutory authority when the agency had earlier taken a contrary position.  We reject this contention.  An agency's earlier interpretation of a statute does not restrict future exercises of authority under *Chevron*.  *See Nat'l Cable & Telecomms. Ass'n*, 545 U.S. at 981.

12

(1992) (citing *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 88 (1943)); *S. Utah Wilderness Alliance v. Office of Surface Mining Reclamation & Enforcement*, 620 F.3d 1227, 1236 (10th Cir. 2010).  But we can rely on "implicitly adopted rationales . . . as long as they represent the 'fair and considered judgment' of the agency, rather than a 'post hoc rationalization.'"  *S. Utah Wilderness Alliance*, 620 F.3d at 1236 (quoting *Auer v. Robbins*, 519 U.S. 452, 462 (1997)).

### B.      The FCC's Authority Over Access Charges on All Traffic

The FCC interprets 47 U.S.C. § 201(b) and § 251(b)(5) to apply to all traffic, including access given to long-distance carriers, intrastate traffic, and origination.  This interpretation is reasonable.

### 1.      Traffic Between LECs and Long-Distance Carriers

In adopting the new regulations, the FCC concluded that it had jurisdiction over all traffic between LECs and long-distance carriers.  2 R. at 641 ¶ 760, 642 ¶¶ 761-62, 646-47 ¶¶ 771-72.

### a.      The FCC's Rationale

This interpretation flows in part from the language in § 251(b)(5).  This section provides that each LEC must "establish reciprocal compensation arrangements for the transport and termination of telecommunications."  47 U.S.C. § 251(b)(5).  The term "telecommunications" is defined in the statute and "encompasses communications traffic of any geographic scope . . . or regulatory classification."  47 U.S.C. § 153(50).  Because

the term is untethered to geographic or regulatory limits, the FCC regards its authority under § 251(b)(5) to cover all traffic regardless of geography or regulatory classification. 2 R. at 642 ¶ 761.

In addition, the FCC relies on 47 U.S.C. § 201(b), which authorizes the adoption of regulations as necessary to carry out §§ 251 and 252. *Id.* at 641 ¶ 760; *see* 47 U.S.C. § 201(b); *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 378 (1999).

Based on the broad definition of "telecommunications" and the text of § 201, the FCC recently concluded that § 251(b)(5) covers all traffic between IXCs and LECs. 2 R. at 642 ¶ 761, 643-44 ¶ 765. In doing so, the FCC recognized that it had changed its interpretation of § 251(b)(5). *Id.* at 642 ¶ 761. But the FCC reasoned that its earlier reading of the law had been "inconsistent" with the text. *Id.*[3]

### b. The Petitioners' Arguments

The Petitioners oppose this interpretation, contending that: (1) the statutory term "reciprocal compensation" does not include traffic between IXCs and LECs, and (2) other sections in the Communications Act preclude this reading of the FCC's statutory authority. These contentions fail under *Chevron*.

---

[3]    The Petitioners contend that we should prefer an agency interpretation adopted "when the origins of both the statute and the finding were fresh in the minds of their administrators." Joint Intercarrier Compensation Principal Br. of Pet'rs at 12 n.9 (July 17, 2013) (quoting *Sec'y of Labor v. Excel Mining, LLC*, 334 F.3d 1, 7 (D.C. Cir. 2003)). Because the FCC's interpretation of the Communications Act is entitled to *Chevron* deference under settled law, its "freshness" is irrelevant. *See Brand X Internet Servs.*, 545 U.S. at 1001-02.

### c. Traffic Between LECs and IXCs as "Reciprocal Compensation"

The FCC broadly interprets the phrase "reciprocal compensation" to encompass any intercarrier compensation agreements between carriers. *See id.* at 641-42 ¶¶ 761-62, 643-44 ¶ 765. The Petitioners raise two challenges to this conclusion under the first step of *Chevron*: (1) Congress used the term "reciprocal compensation" as a technical term of art to denote local traffic between two LECs; and (2) the plain meaning of "reciprocal compensation" cannot include traffic between IXCs and LECs because the payments go only one way (to the LECs). Joint Intercarrier Compensation Principal Br. of Pet'rs at 7-13 (July 17, 2013).

### i. "Reciprocal Compensation" as a Term of Art

The Petitioners contend that Congress used the term "reciprocal compensation" as a term of art. *Id.* at 7-9. According to the Petitioners, the term "reciprocal compensation" was used in 1996 to refer to intercarrier compensation for local calls. *Id.* at 8-9. The Petitioners' evidence does not remove the ambiguity in the phrase "reciprocal compensation."

Under step one of *Chevron*, we start with the statutory text to determine whether the phrase "reciprocal compensation" is a term of art. *See Ass'n of Am. R.R.s v. Surface Transp. Bd.*, 161 F.3d 58, 64 (D.C. Cir. 1998). At this step, we give technical terms of art their established meaning absent a contrary indication in the statute. *McDermott Int'l Inc. v. Wilander*, 498 U.S. 337, 342 (1991); *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355,

15

371-72 (1986). Thus, we must decide whether the Petitioners have shown that Congress referred to the term "reciprocal compensation" as a term of art limited to local traffic. We conclude that the Petitioners did not satisfy this burden.

The Petitioners rely on two pieces of evidence: (1) an FCC website description of the term "reciprocal compensation," which limited its application to local calls; and (2) accounts in the trade press, which discussed state-imposed reciprocal compensation requirements for local traffic. Joint Intercarrier Compensation Principal Br. of Pet'rs at 8 n.4, 9 n.5 (July 17, 2013). The two pieces of evidence do not eliminate ambiguity in the phrase.

The website simply described "reciprocal compensation" as the FCC did at the time. The FCC was then defining "reciprocal compensation" as limited to local traffic between two LECs. The FCC now embraces a contrary definition, and we have no reason to treat the prior interpretation as evidence of a term of art and disregard the current interpretation.

Accounts in the trade press also do little to eliminate ambiguity in the phrase "reciprocal compensation." Before enactment of the statute in 1996, the trade press included some references to reciprocal compensation on local calls. *See* 3 R. at 1471 n.19. But these accounts do not suggest that the term "reciprocal compensation" is inherently limited to local calls.

16

Accordingly, the Petitioners have not shown that the term "reciprocal compensation" embodied a term of art limited to local traffic.

### ii. Plain Meaning of the Term "Reciprocal Compensation"

The Petitioners also argue that the FCC has distorted the plain meaning of the term "reciprocal compensation." Joint Intercarrier Compensation Principal Br. of Pet'rs at 25-26 (July 17, 2013). According to the Petitioners, traffic between an LEC and IXC is not "reciprocal" because the charges and traffic go only one way. *Id.* at 10, 25-26; Joint Intercarrier Compensation Reply Br. of Pet'rs at 9-10 (July 31, 2013). For this position, the Petitioners contend that for compensation to be "reciprocal," both carriers must pay each other. Joint Intercarrier Compensation Principal Br. of Pet'rs at 10 (July 17, 2013). Relying on this definition, the Petitioners argue that access charges "are never reciprocal" because the IXC pays the LECs on both ends to originate and terminate the traffic. *Id.* (emphasis omitted).

In effect, the Petitioners are arguing at step one of *Chevron* that § 251(b)(5) is unambiguous because access charges are always paid to the LEC and never to the IXC. But the nature of access charges does not remove ambiguities in the phrase "reciprocal compensation." *See Pac. Bell v. Cook Telecom, Inc.*, 197 F.3d 1236, 1242-44 (9th Cir. 1999) (concluding that § 251(b)(5) can plausibly be read to cover an agreement between an LEC and one-way paging provider even though the compensation flows only one way).

17

Section 251(b)(5) requires LECs to establish arrangements for "reciprocal compensation." 47 U.S.C. § 251(b)(5). Thus, we could adopt the Petitioners' interpretation only if the statute requires traffic and compensation to "actually flow to and from both carriers . . . to be a 'reciprocal compensation arrangement.'" *Pac. Bell*, 197 F.3d at 1244. This is a reasonable reading of the statute. But the statute can also be read to simply require the existence of reciprocal obligations. *See id.* (concluding that one-way paging providers were entitled to reciprocal compensation under the statute even through traffic and payment are never reciprocal). A carrier can have a reciprocal entitlement to compensation for transporting and terminating traffic even if it does not ultimately transport or terminate a call. *See Atlas Tel. Co. v. Okla. Corp. Comm'n*, 400 F.3d 1256, 1264 (10th Cir. 2005) (stating that under 47 U.S.C. § 251(b)(5), the term "reciprocal compensation" can cover traffic transported on an IXC's network).

The statutory term "reciprocal compensation" is ambiguous; thus, we reach the second step of *Chevron*. At step two, we conclude that the FCC reasonably interpreted the term "reciprocal compensation" for "telecommunications" to include the traffic between IXCs and LECs.

### d. The Petitioners' Reliance on §§ 252(d)(2)(A) and 251(c)(2)(A)

The Petitioners argue that two other statutory sections (§§ 252(d)(2)(A) and 251(c)(2)(A)) would prevent application of § 251(b)(5) to access traffic. Joint Intercarrier Compensation Principal Br. of Pet'rs at 10-11 (July 17, 2013). We disagree.

### i.    Section 252(d)(2)(A)

The Petitioners invoke § 252(d)(2)(A), arguing that it precludes an expansive reading of § 251(b)(5) because traffic never originates on an IXC's network. *Id.* at 11-12; Joint Intercarrier Compensation Reply Br. of Pet'rs at 9 (July 31, 2013). This argument is invalid.

Section 252(d)(2)(A) applies to state commission arbitrations of interconnection agreements between an ILEC and another telecommunications carrier. *See* 47 U.S.C. § 252. Under this section, state commissions can consider reciprocal compensation terms just and reasonable only if they "provide for the mutual and reciprocal recovery by each carrier of costs associated with the transport and termination on each carrier's network facilities of calls that originate on the network facilities of the other carrier." *Id.* at § 252(d)(2)(A). Because IXCs do not originate calls, the Petitioners contend that reciprocal compensation arrangements cannot apply to traffic between LECs and IXCs. *See* Joint Intercarrier Compensation Principal Br. of Pet'rs at 11-12 (July 17, 2013).

The FCC rejected this argument, reasoning that § 252(d)(2)(A) does not limit § 251(b)(5). *See* 2 R. at 645-46 ¶ 768. In rejecting the argument, the FCC found that § 252(d)(2)(A) "'deals with the mechanics of who owes what to whom,'" but "'does not define the scope of traffic to which § 251(b)(5) applies.'" *Id.* (quoting *In re High-Cost Universal Serv. Support*, 24 FCC Rcd. 6475, 6481 ¶ 12 (2008)). With this finding, the FCC reiterated that Congress did not intend "'the pricing standards in section 252(d)(2) to

19

limit the otherwise broad scope of section 251(b)(5).'"  2 R. at 645-46 ¶ 768 (quoting

*High-Cost Universal Serv. Support*, 24 FCC Rcd. 6475, 6480 ¶ 11 (2008)).  Instead, the

FCC concluded that § 252(d)(2)'s pricing rules do "not address what happens when

carriers exchange traffic that originates or terminates on a third carrier's network."  *In re*

*High-Cost Universal Serv. Support*, 24 FCC Rcd. at 6481 ¶ 12.

The FCC's interpretation is reasonable.  Section 251(b)(5) broadly refers to "the

transport and termination of telecommunications."  47 U.S.C. § 251(b)(5).  This section is

incorporated into § 252(d)(2), but not the other way around.  Consequently, there is

nothing in § 252(d)(2) to suggest that it limits the scope of § 251(b)(5).  In these

circumstances, the FCC reasonably relied on the breadth of § 251(b)(5) to conclude that it

is not narrowed by § 252(d)(2).

### ii.       Section 251(c)(2)(A)

The Petitioners also rely on § 251(c)(2)(A), which distinguishes between

"exchange access" and "exchange service."  This section requires ILECs to provide

telecommunications carriers with interconnection to their networks "for the transmission

and routing of telephone exchange service [local calls] and exchange access [long-

distance calls]."  47 U.S.C. § 251(c)(2)(A).  Because the section distinguishes between

"exchange service" and "exchange access," the Petitioners argue that "reciprocal

compensation" must refer to something other than "exchange access."  Joint Intercarrier

Compensation Principal Br. of Pet'rs at 11-12 (July 17, 2013).  We reject this argument.

20

The Petitioners' argument does not render § 251(b)(5) unambiguous or vitiate the reasonableness of the FCC's interpretation. For this argument, the Petitioners incorrectly conflate "exchange service" and "reciprocal compensation." Section 251(c)(2)(A) refers to an ILEC's duty to allow others to interconnect for local- and long-distance calls. This duty is distinct from the duty in § 251(b)(5) to establish arrangements for reciprocal compensation. *See, e.g.*, *Verizon Cal., Inc. v. Peevey*, 462 F.3d 1142, 1146 (9th Cir. 2006). Thus, § 251(c)(2)(A) does not unambiguously shed light on how the FCC should interpret § 251(b)(5).

The Petitioners cite a House Conference report. Joint Intercarrier Compensation Principal Br. of Pet'rs at 11 n.8 (July 17, 2013); Joint Intercarrier Compensation Reply Br. of Pet'rs at 11 n.12 (July 31, 2013). But the report does not remove the ambiguity in § 251(b)(5). The House Report addressed only the need for the FCC to preserve its own authority under § 201 and the FCC's continued authority over access charges. "The obligations and procedures prescribed in [§ 251] do not apply to interconnection arrangements between local exchange carriers and telecommunications carriers under § 201 of the Communications Act for the purpose of providing interexchange service, and nothing in this section is intended to affect the Commission's access charge rules." H.R. Conf. Rep. 104-458, at 117. The House Report does not undermine the FCC's authority to enact a national reciprocal compensation framework under §§ 251(b)(5) and 201(b).

### 2. Preemption of State Regulatory Authority Over Intrastate Access Charges

The Petitioners argue that even if the FCC can regulate IXC-LEC traffic, this authority would include calls that were interstate, but not intrastate. Joint Intercarrier Compensation Principal Br. of Pet'rs at 14-25 (July 17, 2013). For this argument, the Petitioners rely on:

- 47 U.S.C. § 152(b),

- 47 U.S.C. § 601(c),

- § 601(c) of the Telecommunications Act of 1996,

- 47 U.S.C. § 253,

- 47 U.S.C. § 251(d)(3), and

- 47 U.S.C. § 251(g).

We disagree with the Petitioners in their interpretation of these sections.

### a. Sections 152(b) and 601(c)

According to the Petitioners, 47 U.S.C. § 152(b) and § 601(c)(1) of the Telecommunications Act of 1996 insulate intrastate access charges from federal regulation under § 251(b)(5). Joint Intercarrier Compensation Principal Br. of Pet'rs at 14-15 (July 17, 2013).

Sections 152(b) and 601(c)(1) provide in part:

> **47 U.S.C. § 152(b):** [N]othing in this chapter shall be construed to apply or to give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations

for or in connection with intrastate communication service by wire or radio of any carrier.

\* \* \* \*

**§ 601(c)(1) of the Telecommunications Act of 1996:** No Implied Effect. This Act and the amendments made by this Act . . . shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments.[4]

Because the FCC's earlier, valid interpretation did not require preemption of intrastate access charges, the Petitioners argue that § 251(b)(5) cannot be read more broadly to require preemption now. *Id.* at 15.

The Petitioners address the argument as if it arises at the first *Chevron* step. But the argument is insufficient at this step because Congress intended the 1996 Act to apply to intrastate communications and expressly allowed the FCC to preempt state law. *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 378 n.6 (1999); *MCI Telecomms. Corp. v. Pub. Serv. Comm'n of Utah*, 216 F.3d 929, 938 (10th Cir. 2000).

Nonetheless, the Petitioners argue that § 152(b) and § 601(c)(1) require the FCC to narrowly interpret § 251(b)(5) to avoid interference with state regulation of intrastate traffic. Joint Intercarrier Compensation Principal Br. of Pet'rs at 14-15, 19, 39 n.29 (July 17, 2013). We disagree. Otherwise, we would be interpreting §§ 152(b) and 601(c)(1) in a way that would upset the regulatory scheme envisioned in the 1996 Act. *See Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 870 (2000).

---

[4]     Section 601(c)(1) was codified at 47 U.S.C. § 152 in the Historical and Statutory Notes.

23

Section 152(b) simply limits the FCC's ancillary jurisdiction. *See AT&T Corp.*, 525 U.S. at 380-81 & n.7 (stating that § 152(b) serves only to limit the FCC's ancillary authority). And, § 601(c)(1) does not limit Congress's actual delegation of authority to the FCC. *See Qwest Corp. v. Minn. Pub. Utils. Comm'n*, 684 F.3d 721, 731 (8th Cir. 2012) (§ 601(c)(1) does not save state regulatory action conflicting with FCC regulations); *Farina v. Nokia, Inc.*, 625 F.3d 97, 131 (3d Cir. 2010) (declining to interpret § 601(c)(1) broadly "where a federal regulatory scheme reflects a careful balancing"). Because §§ 152(b) and 601(c)(1) do not unambiguously narrow the scope of § 251(b)(5), we proceed to *Chevron*'s second step. *See City of Arlington v. FCC*, __ U.S. __, 133 S. Ct. 1863, 1868 (2013).

At that step, we defer to the FCC's interpretation of a statutory ambiguity that concerns the scope of its regulatory authority. *See id.* at 1874. This deference applies to "statutes designed to curtail the scope of agency discretion." *Id.* at 1872.

Administrative deference is suitable here. Congress appears to grant plenary authority to the FCC through § 251, and §§ 152(b) and 601(c)(1) do not preclude the FCC from interpreting § 251(b)(5) to allow preemption of state regulation over intrastate access charges.

### b. Section 253

The Petitioners also argue that the FCC has usurped state authority to promote broadband development through a system of intercarrier compensation. Joint Intercarrier

Compensation Principal Br. of Pet'rs at 16-18, 22 (July 17, 2013). For this argument, the Petitioners use Pennsylvania as an example. *Id.* According to the Petitioners, Pennsylvania uses access charges to promote broadband development and Pennsylvania's laws are not preempted under 47 U.S.C. § 253. *Id.* at 22 & n.20. Reliance on § 253 is misguided.

We have not been asked to decide the validity of the Pennsylvania law. Instead, the Petitioners ask us to decide if the FCC acted arbitrarily and capriciously in deciding to preempt intrastate access charges under § 251(b)(5). In deciding to preempt regimes for state access charges, the FCC did not act arbitrarily or capriciously.

The FCC's policy choice is not undermined by the alleged efforts in Pennsylvania. Though the Petitioners boast of efforts in Pennsylvania, they are silent regarding the steps to promote broadband in the 49 other states. Without evidence of a nationwide effort to promote broadband, the FCC concluded that a national approach would promote certainty and predictability. 2 R. at 656 ¶ 790. In reaching this conclusion, the FCC expressed concern regarding "variability and unpredictability" when broadband development is left to the states. *Id.* at 657-58 ¶ 794.

The lone example of Pennsylvania, as a leader in developing broadband networks, does little to undermine the FCC's concern with variability among the states. The FCC explained its preference for a national strategy to develop broadband, and the Petitioners' example of Pennsylvania does not render the FCC's strategy arbitrary or capricious.

25

## c.     Section 251(d)(3)

The Petitioners further rely on 47 U.S.C. § 251(d)(3) to rebut the FCC's interpretation that § 251(b)(5) includes intrastate traffic between IXCs and LECs.  Joint Intercarrier Compensation Principal Br. of Pet'rs at 16-18 (July 17, 2013).  Section 251(d)(3), entitled "Preservation of State access regulations," prevents the FCC from preempting state commissions' regulations, orders, or policies that:  (1) establish LEC access and interconnection obligations, (2) are consistent with the requirements of § 251, and (3) do not substantially prevent implementation of the requirements of § 251 and the purposes of the Act.  47 U.S.C. § 251(d)(3).  According to the Petitioners, § 251(d)(3) prevents the FCC from preempting state access charges.  Joint Intercarrier Compensation Principal Br. of Pet'rs at 16-18 (July 17, 2013).

This argument is unpersuasive.  The FCC reasonably concluded that § 251(d)(3) does not speak to the preemptive effect of § 251(b)(5) or limit the permissible interpretations of the statute or the FCC's rulemaking authority.  2 R. at 644 n.1374, 644-45 ¶ 767.  The FCC has interpreted intrastate traffic as subject to § 251(b)(5); and, in exercising the grant of power under § 251(b)(5), the FCC is establishing a national bill-and-keep policy for all access traffic.

This is the context for our consideration of § 251(d)(3).  As noted above, § 251(d)(3) preserves state regulations only if they would not substantially prevent implementation of § 251.  And, in exercising its powers under § 251, the FCC views

26

intrastate access charges as an obstacle to reform. *Id.* at 644-45 ¶ 767. That finding is enough for the FCC to exercise its authority to preempt intrastate access charges under § 251(d)(3). *See Qwest Corp. v. Ariz. Corp. Comm'n*, 567 F.3d 1109, 1120 (9th Cir. 2009) (holding that state requirements were inconsistent with, and prevented implementation of, § 251 because the FCC had precluded the requirements); *Ill. Bell Tel. Co. v. Box*, 548 F.3d 607, 611 (7th Cir. 2008) (concluding that § 251(d)(3) did not save state regulations that were contrary to the FCC's determinations). As a result, § 251(d)(3) does not preclude the FCC's broad interpretation of its authority under § 251(b)(5).

### d. Section 251(g)

Section 251(g) preserved existing obligations to provide access and interconnection, along with compensation, until they are explicitly superseded by FCC regulations. 47 U.S.C. § 251(g). This section does not undermine the FCC's interpretation of § 251(b)(5).

Both sides point to § 251(g) as support for their interpretations of § 251(b)(5). The Petitioners argue that § 251(g) involved only interstate traffic, reasoning that when this section took effect, no court or agency decision had purported to give the FCC jurisdiction over intrastate traffic. Joint Intercarrier Compensation Principal Br. of Pet'rs at 23-25 (July 17, 2013). The FCC argues the opposite: that § 251(g) shows that Congress contemplated FCC regulation over intrastate traffic. Federal Resp'ts' Final Resp. to the Joint Intercarrier Compensation Principal Br. of Pet'rs at 18 (July 29, 2013).

27

We need not choose between these conflicting interpretations of § 251(g) because the FCC did not rely on this section. *See* 2 R. at 644 n.1374 (noting that the FCC "need not resolve [the] issue, because all traffic terminated on an LEC [would], going forward, be governed by section 251(b)(5) regardless of whether section 251(g) previously covered the state intrastate access regime").

And the Petitioners' argument would not require us to narrow the scope of traffic governed by § 251(b)(5). At most, the Petitioners' argument would lead to a narrow reading of § 251(g), for it would address only the viability of agreements involving intrastate traffic until the FCC acted. This reading would leave § 251(g) silent on the continued viability of compensation arrangements for intrastate traffic.

Under the first step of *Chevron*, we are called upon to decide whether the FCC's interpretation of § 251(b)(5) is unambiguously foreclosed by § 251(g). For the sake of argument, we can assume that the Petitioners are correct in stating that § 251(g) did not address intrastate traffic. If that is true, however, § 251(g) could not act as an unambiguous expression of congressional intent on the extent of the FCC's authority over intrastate traffic.

The resulting issue is whether the FCC's broad reading of § 251(b)(5) is permissible notwithstanding § 251(g). We conclude that the FCC's interpretation is permissible. Section 251(g) provides only for the continuation of arrangements for access charges under any consent decree existing when the 1996 statute went into effect. *See* 47

28

U.S.C. § 251(g). But the statute also provides that these arrangements would end when the FCC acted. *See id.*

When Congress enacted the 1996 law, the D.C. District Court had required access charges for calls that were both interstate and intrastate. *United States v. AT&T*, 552 F. Supp. 131, 169 n.161 (D.D.C. 1982). Under § 251(g), these arrangements would end when they were superseded by the FCC. 47 U.S.C. § 251(g). In light of § 251(g), the FCC could reasonably conclude that it had the power to supersede the arrangements for access charges that were both interstate and intrastate because all had arisen out of the same consent decree. *See* 2 R. at 644 n.1374.

This interpretation was not the only one possible. For example, one could also view § 251(g) to reflect the widespread assumptions in 1996 that states (not the FCC) regulated intrastate access. But under the second step of *Chevron*, the FCC's contrary reading of § 251(g) was at least reasonable. As a result, we defer to the FCC's reading of § 251(g).

### 3. FCC Authority Over Intrastate Origination Charges

With this reading, we conclude that the FCC enjoys at least some regulatory authority over intrastate traffic between LECs and IXCs. But we must address the scope of this authority, for the Petitioners argue that it would not extend to origination charges. This argument is three-fold: (1) Originating access traffic is exempt from reciprocal compensation because § 251(b)(5) refers only to "transport and termination," not

29

"origination"; (2) the FCC failed to acknowledge that it had changed its definitions of "transport" and "termination"; and (3) the FCC's preemption of originating access charges is arbitrary and capricious because it does not allow originating LECs to recover their origination costs. Joint Intercarrier Compensation Principal Br. of Pet'rs at 25-28 (July 17, 2013). The first two challenges lack merit, and the third challenge is not ripe.

### a. Section 251(b)(5) and Originating Access Traffic

In the Order, the FCC capped charges for originating access. 2 R. at 836-37 ¶ 1298, 661 ¶ 801, 661 Figure 9, 667 ¶ 22. The Petitioners deny regulatory authority over origination charges even under the FCC's interpretation of § 251(b)(5). According to the Petitioners, originating access charges are not subject to § 251(b)(5) because it refers to "transport and termination," but not "origination." Joint Intercarrier Compensation Principal Br. of Pet'rs at 26 (July 17, 2013) (citing 47 U.S.C. § 251(b)(5)). We reject the Petitioners' interpretation of § 251(b)(5).

This section authorizes arrangements for the reciprocal compensation of "transport and termination." Both sides point to the omission of origination charges.

For their part, the Petitioners suggest that the omission leaves the FCC powerless to reform origination charges. *Id.* The FCC argues the opposite: If § 251(b)(5) authorizes arrangements for reciprocal compensation involving transport and termination, the omission of origination charges must have meant that LECs are unable to charge access fees for origination. R. at 669 ¶ 817 (citing *In re Implementation of the Local*

30

*Competition Provisions in the Telecomms. Act of 1996*, 11 FCC Rcd. 15499, 16016 ¶ 1042 (1996)); Federal Resp'ts' Final Resp. to the Joint Intercarrier Compensation Principal Br. of Pet'rs at 21-22 (July 29, 2013).

This view is supported by "a venerable canon of statutory construction," "[t]he maxim '*expressio unius est exclusio alterius*'—which translates roughly as 'the expression of one thing is the exclusion of other things.'" *United States v. Hernandez-Ferrer*, 599 F.3d 63, 67-68 (1st Cir. 2010).

The FCC's interpretation reflects a reasonable approach. The Petitioners state that for toll calls, carriers must perform three types of functions: origination, transport, and termination. Joint Intercarrier Compensation Principal Br. of Pet'rs at 26 (July 17, 2013). Two of the three functions are included in § 251(b)(5). The single omission could suggest that Congress intended to exclude "origination" from the duty to provide compensation. Because the FCC's interpretation of § 251(b)(5) is reasonable, it is entitled to deference under *Chevron*. Thus, we reject the Petitioners' challenge to FCC regulation of origination charges.

### b. The FCC's Interpretations of "Transport" and "Termination"

The Petitioners argue that the FCC has arbitrarily changed its definition of the statutory term "termination" without acknowledging the change. Joint Intercarrier Compensation Principal Br. of Pet'rs at 12-13 (July 17, 2013). According to the

31

Petitioners, the FCC previously defined the term "termination" in a way that excluded "origination." *Id.* at 13.

This argument is incorrect, for the FCC has not changed its definition of "termination." 2 R. at 642 ¶ 761. Instead, the FCC has changed its view regarding the traffic that is subject to § 251(b)(5). *Id.* With this change, the FCC provided an explanation. *Id.* at 642-43 ¶¶ 761-64.

In light of this explanation, we reject the Petitioners' challenge. It presupposes that the FCC has redefined the terms "transport" and "termination" without saying why. But these definitions have not changed. Instead, the FCC has refocused on the statutory term "telecommunications," concluding that it is this term—rather than "transport" or "termination"—that determines the scope of § 251(b)(5). *Id.* at 647 ¶ 761. By focusing on the term "telecommunications" and explaining this focus, the FCC stated why it was reassessing the scope of § 251(b)(5); accordingly, we reject the Petitioners' challenge.

### c. The Purported Prohibition of Originating Access Charges

The Petitioners also argue that the prohibition on originating access charges is arbitrary and capricious because the FCC did not explain why the "prohibition on origination charges applies where the originating LEC receives no further compensation from its end-user." Joint Intercarrier Compensation Principal Br. of Pet'rs at 27-28 (July 17, 2013). This challenge is not ripe.

The FCC has announced that it will eventually abolish originating access charges and has capped originating access charges at current levels. *See* 2 R. at 650 ¶¶ 777-78. In the interim, the FCC has sought further comment "on other possible approaches to originating access reform, including implementation issues and our legal authority to adopt any such reforms." *Id.* at 839 ¶ 1305. Because the FCC has not yet abolished originating access charges, this challenge is unripe. *See AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 386 (1999) ("When . . . there is no immediate effect on the plaintiff's primary conduct, federal courts normally do not entertain pre-enforcement challenges to agency rules and policy statements.").

## C. Bill-and-Keep as a Default Methodology

The FCC not only extended its regulations to all access traffic, but also began a transition to bill-and-keep as the default standard for reciprocal compensation. 2 R. at 646 ¶ 769. According to the FCC's interpretation of its authority, § 201(b) allows the adoption of rules and regulations to implement § 251(b)(5). *Id.* at 646 ¶ 770. In implementing § 251(b)(5), the FCC considers bill-and-keep to be "just and reasonable" under § 201(b); thus, the FCC concluded it has statutory authority to implement bill-and-keep as the default reciprocal compensation standard for all traffic subject to § 251(b)(5). *Id.* at 646-47 ¶¶ 771-72.

In arriving at this conclusion, the FCC addressed opposition based on §§ 252(c) and 252(d)(2). *Id.* at 647-48 ¶ 773. Section 252 does two things: (1) It preserves state

rate-setting authority in state commission arbitrations involving ILECs and other carriers; and (2) it defines "just and reasonable" rates. 47 U.S.C. § 252.

For two reasons, the FCC concluded that these provisions did not prevent adoption of a bill-and-keep methodology. 2 R. at 647-48 ¶¶ 774-75. First, the FCC pointed to *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 384 (1999), which authorizes the FCC to establish a pricing methodology for state commissions to apply in these arbitrations. 2 R. at 648 ¶ 773. In choosing among pricing methodologies, the FCC found specific approval of bill-and-keep in 47 U.S.C. § 252(d)(2)(B). *Id.* at 648-49 ¶ 775. Second, the FCC found that bill-and-keep is just and reasonable under § 252(d)(2) because it allows carriers to recover their transport and termination costs from their end-users. *Id.* at 648-49 ¶¶ 775-76.

Both conclusions are criticized by the Petitioners. Joint Intercarrier Compensation Principal Br. of Pet'rs at 28-45 (July 17, 2013). They argue that: (1) bill-and-keep effectively sets a zero rate that infringes on state rate-setting authority under § 252(d), and (2) bill-and-keep does not lead to just and reasonable intercarrier compensation rates under §§ 252(d)(2)(A) and 201(b). *Id.* at 28-45.

We apply *Chevron* and defer to the FCC's interpretation of its authority to enact bill-and-keep as the default standard for reciprocal compensation.

34

### 1. Consideration Under § 252

The Petitioners contend that the FCC cannot establish bill-and-keep as a methodology because it intrudes on state rate-setting authority under § 252. *Id.* at 28-31. State authority is preserved in three parts of § 252: (b), (c), and (d).

In (b), Congress preserved the authority of states in arbitrating interconnection agreements between ILECs and other carriers. *See* 47 U.S.C. § 252(b).

In (c), § 252 required state commissions—not the FCC—to "establish any rates for interconnection, services, or network elements according to subsection (d) of this section." *Id.* at § 252(c)(2).

And in (d), Congress preserved state arbitration authority over "[c]harges for the transport and termination of traffic." *Id.* § 252(d)(2). Under this section, a state commission cannot consider reciprocal compensation terms and conditions just and reasonable unless:

> (i) such terms and conditions provide for the mutual and reciprocal recovery by each carrier of costs associated with the transport and termination on each carrier's network facilities of calls that originate on the network facilities of the other carrier; and
>
> (ii) such terms and conditions determine such costs on the basis of a reasonable approximation of the additional costs of terminating such calls.

*Id.* at § 252(d)(2)(A). Though subsection (d) preserves state arbitration authority over charges, it also expressly allows approval of bill-and-keep arrangements, prohibiting a

35

construction that would "preclude arrangements that afford the mutual recovery of costs through the offsetting of reciprocal obligations, including arrangements that waive mutual recovery (such as bill-and-keep arrangements)." *Id.* at § 252(d)(2)(B)(i).

The FCC has focused on this language, pointing out that Congress specifically stated that bill-and-keep arrangements are considered "just and reasonable." 2 R. at 648-49 ¶ 775.

The Petitioners argue that the FCC has misinterpreted § 252(d)(2)(B)(i), stating that it simply requires carriers to voluntarily waive payments and submit to bill-and-keep arrangements. Joint Intercarrier Compensation Principal Br. of Pet'rs at 36-37 (July 17, 2013). This interpretation conflicts with the statute. Section 252(d)(2)'s pricing standards apply only to terms imposed through compulsory arbitration. *See* 47 U.S.C. § 252(c). Voluntarily negotiated terms can contradict the statutory requirements and are not subject to this pricing provision. *See id.* at § 252(a)(1). Thus, the FCC was entitled to reject the Petitioners' narrow interpretation of § 252(d)(2).

Because the statute expressly authorizes bill-and-keep arrangements along with state rate-setting authority, we believe the FCC's interpretation of § 252(d)(2) is reasonable and entitled to deference under *Chevron*. *See City of Arlington v. FCC*, __ U.S. __, 133 S. Ct. 1863, 1874 (2013).

Under Section 252(d)(2), states continue to enjoy authority to arbitrate "terms and conditions" in reciprocal compensation. *See* 47 U.S.C. § 252(d)(2). For example, even

under bill-and-keep arrangements, states must arbitrate the "edge" of carrier's networks. 2 R. at 649-50 ¶ 776. This reservoir of state authority can be significant.

The "edge" of a carrier's network consists of the points "at which a carrier must deliver terminating traffic to avail itself of bill-and-keep." *Id.* The location of the "edge" of a carrier's network determines the transport and termination costs for the carrier.

The impact is illustrated in Diagram 6. In this scenario, Carrier A has low transport and termination costs because it needs only to transport the calls a short distance (between Points A and B).



A different delineation of the edge could significantly increase Carrier A's costs. This impact is illustrated in Diagram 7, which would reflect a state commission's decision to set the edge of Carrier A's network at Point D rather than Point A:



Diagram 7

The FCC reasonably determined that by continuing to set the network "edge,"

states retain their role under § 252(d) in "determin[ing] the concrete result in particular

circumstances." *Id.* at 649-50 ¶ 776 (quoting *AT&T v. Iowa Utils. Bd.*, 525 U.S. 366, 384

(1999)).

The Petitioners disagree. In their view, *AT&T Corp. v. Iowa Utilities Board*, 525

U.S. 366 (1999), and *Iowa Utilities Board v. Federal Communications Commission*, 219

F.3d 744 (8th Cir. 2000), *rev'd in part by Verizon Commc'ns. Inc. v. FCC*, 535 U.S. 467

(2002), preserved the states' role in "establishing the actual reciprocal compensation *rate*,

not finding points on a network at which a carrier must deliver traffic." Joint Intercarrier

Compensation Principal Br. of Pet'rs at 29-31 (July 17, 2013). The Petitioners argue that

bill-and-keep effectively sets the intercarrier compensation rate at zero and intrudes on

state rate-setting authority.[5] *Id.* at 29-30 (citing *Iowa Utils. Bd.*, 219 F.3d at 757, *rev'd in part, Verizon Commc'ns, Inc. v. FCC*, 535 U.S. 467 (2002)).

We reject the Petitioners' broad reading of *AT&T* and *Iowa Utilities Board*.

In *AT&T*, the Supreme Court upheld the FCC's rule-making authority over §§ 251 and 252. *AT&T*, 525 U.S. at 378. Interpreting § 252(c)(2)'s reservation of rate-setting authority to state commissions, the Court upheld the FCC's requirement that state commissions use a particular methodology for prices involving interconnection and

---

[5]    In their reply brief, the Petitioners also challenge the FCC's rate limitations during the transition to bill-and-keep. Joint Intercarrier Compensation Reply Br. of Pet'rs at 15 (July 31, 2013). This challenge is new. In their opening brief, the Petitioners did not challenge the FCC's decision to prescribe interim rates. Instead, the Petitioners challenged only the FCC's final prescription of bill-and-keep as a methodology for all traffic. Indeed, the term "interim rates" was mentioned just once in the Petitioners' opening brief. Joint Intercarrier Compensation Principal Br. of Pet'rs at 40 (July 17, 2013). And that reference came in a quotation that the Petitioners used for an unrelated argument, addressing the applicability of § 252(d)(2)(A) to interstate intercarrier compensation rates under § 201. *See id.* Because "[a]rguments inadequately briefed in the opening brief are waived," *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998), we would ordinarily decline to reach the Petitioners' new contention in their reply brief regarding the invalidity of the FCC's interim rates. *See* Joint Intercarrier Compensation Reply Br. of Pet'rs at 14-15 (July 31, 2013).

Though the Petitioners did not challenge interim rates in their opening brief, the LEC Intervenors did. *See* Incumbent Local Exchange Carrier Intervenors' Br. in Supp. of Pet'rs at 8 (July 15, 2013) ("Nonetheless, the *Order* end-runs the statutory directive by adopting a methodology that prescribes specific transition rates plus a specific ultimate rate of zero."). But intervenors generally cannot raise new issues. *Arapahoe Cnty. Pub. Airport Auth. v. FAA*, 242 F.3d 1213, 1217 n.4 (10th Cir. 2001). This prohibition is prudential and should be avoided only in "extraordinary" cases. *Id.* Because we are "hesitant to definitively opine on such [a] legally significant issue[] when [it has] received such cursory treatment," *United States v. Gordon*, 710 F.3d 1124, 1150 (10th Cir. 2013), we decline to disregard the general rule. As a result, we do not reach the Petitioners' arguments in their reply brief on the validity of the FCC's interim rates.

unbundled access.  *See id.* at 384-85.  In doing so, the Supreme Court concluded that the FCC has rulemaking authority to implement a pricing methodology for the states to implement, "determining the concrete result in particular circumstances.  That is enough to constitute the establishment of rates."  *Id.* at 384.

In *Iowa Utilities Board*, the Eighth Circuit Court of Appeals applied judicial estoppel to strike down the FCC's proxy prices for interconnection, network element charges, wholesale rates, and transport and termination rates.  219 F.3d at 756-57.  The court did not distinguish between reciprocal compensation rates and interconnection, network element charges, and wholesale rates.  *Id.*  Instead, the court held that "[s]etting specific prices goes beyond the FCC's authority to design a pricing methodology and intrudes on the states' right to set the actual rates pursuant to § 252(c)(2)."  *Id.* at 757.

Against the backdrop of *AT&T* and *Iowa Utilities Board*, the FCC reasonably concluded that bill-and-keep involves a permissible methodology notwithstanding the states' authority to set rates under § 252(c).  The Petitioners assume that the state commissions have authority to require intercarrier compensation, for the states can set "rates" for interconnection under § 252(c)(2).  This assumption is belied by § 252(d)(2), which governs state arbitrations over the "terms and conditions for reciprocal compensation."  47 U.S.C. § 252(d)(2).

The phrase "terms and conditions" does not necessarily require intercarrier compensation, for the statute expressly provides that § 252(d)(2)(A) should "not be

40

construed . . . to preclude . . . bill-and-keep arrangements." *Id.* at § 252(d)(2)(B)(i). If the states' rate-setting authority required carriers to pay one another, the statutory approval of bill-and-keep arrangements would not make sense. *See The Telecomms. Act of 1996: Law & Legislative History* 6 (eds. Robert E. Emeritz, Jeffrey Tobias, Kathryn S. Berthat, Kathleen C. Dolan, & Michael M. Eisenstadt 1996) (stating that under § 251(b), "each LEC must . . . enter into reciprocal compensation arrangements with interconnecting carriers, a requirement that can be met by 'bill-and-keep' arrangements"). Thus, the FCC reasonably interpreted the statute to allow the elimination of any intercarrier compensation through the adoption of bill-and-keep.

As the Petitioners argue, this methodology would eliminate the existence of any "rates" for intercarrier compensation. With elimination of these "rates," the state commissions would have less to arbitrate under § 252(c). But that is the product of the statutory approval of "bill-and-keep" rather than an invention of the FCC. Through bill-and-keep, state commissions will continue to define the edges of the networks; that role preserves state regulatory authority over the "terms and conditions" of reciprocal compensation. There is no violation of § 252(c).

### 2. The "Just and Reasonable" Rate Requirement in §§ 201(b) and 252(d)(2)

The Petitioners point to 47 U.S.C. §§ 201(b) and 252(d)(2), arguing that they require rates to be "just and reasonable." Joint Intercarrier Compensation Principal Br. of Pet'rs at 39-40 (July 17, 2013); *see* 47 U.S.C. §§ 201(b), 252(d)(2). Invoking these

41

sections, the Petitioners argue that the FCC's bill-and-keep methodology is not "just and reasonable." Joint Intercarrier Compensation Principal Br. of Pet'rs at 39-42 (July 17, 2013). This argument is invalid under *Chevron*.

According to the FCC, bill-and-keep allows for just and reasonable rates by providing for the "mutual and reciprocal recovery of costs through the offsetting of reciprocal obligations." Federal Resp'ts' Final Resp. to the Joint Intercarrier Compensation Principal Br. of Pet'rs at 33-34 (July 29, 2013). Under a bill-and-keep arrangement, each carrier obtains an "in kind" exchange. To illustrate:



In Diagram 8, Carrier 1 transports and terminates calls that originate on Carrier 2's network. In exchange, Carrier 2 transports and terminates calls that originate on Carrier 1's network. Both parties obtain reciprocal benefits, and both can recover their additional costs from their end-users. 2 R. at 648-49 ¶ 775 & n.1408, 649-50 ¶ 776.

The FCC reasoned that under this methodology, a carrier that terminates a call that originates with another carrier performs a service for its end-user, the call's recipient.

42

Because both end-users benefit from the call, the end-users should split the cost and pay their respective carriers for the call. Through this in-kind exchange of services, bill-and-keep allows carriers to obtain compensation for the call from their own customers. *Id.* at 640-41 ¶¶ 756-57, 648 n.1408, 649 n.1410.

The Petitioners contend that bill-and-keep leads to unreasonable rates for two reasons: (1) Carriers have a statutory right to payment from other carriers; and (2) reciprocal compensation arrangements do not allow for sufficient cost recovery. Joint Intercarrier Compensation Principal Br. of Pet'rs at 34-38, 41-43 (July 17, 2013).

### a. Consideration of a Statutory Right to Payments from Other Carriers

The first contention involves a statutory right to payments from other carriers. *Id.* at 42. For this contention, however, the Petitioners do not point to any statutory language. Instead, they rely on *Louisiana Public Service Commission v. Federal Communications Commission*, 476 U.S. 355, 364-65 (1986), for the proposition that carriers are entitled to recover their reasonable expenses and a fair return on their investment through customer rates. *Id.* at 41. But *Louisiana Public Service Commission* requires only that carriers recover their reasonable expenses and a fair return on their investment from their customers and does not specify the source of this recovery. *La. Pub. Serv. Comm'n*, 476 U.S. at 364-65. Therefore, the FCC rationally concluded that §§ 201(b) and 252(d)(2) are satisfied by an in-kind exchange of services. *See id.* at 646-47 ¶ 771, 649-650 ¶ 776.

### b.     Sufficiency of Cost Recovery

Under Section 252(d)(2)(A)(ii), state commissions can consider terms and conditions just and reasonable only if they permit recovery by each carrier of costs based on a "reasonable approximation of the additional costs of terminating such calls."  47 U.S.C. § 252(d)(2)(A)(ii).  Pointing to this provision, the Petitioners argue that:  (1) the FCC was inconsistent by acknowledging that carriers incur costs for termination and generally cannot raise end-user rates because of competition, (2) the FCC failed to explain its departure from earlier reliance on termination costs, and (3) bill-and-keep is not "just and reasonable" because it does not allow sufficient recovery of costs.  Joint Intercarrier Compensation Principal Br. of Pet'rs at 34-38 (July 17, 2013).  These arguments are unpersuasive.

Bill-and-keep anticipates that carriers will recover their costs from their end-users. 2 R. at 648 ¶ 775 & n.1408, 649-50 ¶ 776.  States are free to set end-user rates, and the Order does not prevent states from raising end-user rates to allow a fair recovery of termination costs.  *See id.* at 649-50 ¶ 776.

The Petitioners' fall-back position is that the FCC failed to explain its change in position.  Joint Intercarrier Compensation Principal Br. of Pet'rs at 37-38 (July 17, 2013). We disagree, for the FCC pointed to new analyses showing that both parties benefit from a call and that bill-and-keep  allows for mutual recovery of costs.  2 R. at 640-41 ¶¶ 755-59.

44

Finally, the Petitioners contend that bill-and-keep violates § 252(d)(2) by failing to explicitly provide for cost recovery. Joint Intercarrier Compensation Principal Br. of Pet'rs at 37-38 (July 17, 2013). We reject this argument for two reasons. First, as discussed in Chief Judge Briscoe's separate opinion, the FCC reforms include funds for carriers that would otherwise lose revenues. 2 R. at 683-88 ¶¶ 847-53. Second, the FCC has found that carriers can offset lost revenue by increasing charges on end-users. *Id.* at 403 ¶ 34, 648-49 ¶ 775 n.1408. The FCC's rationale involves a reasonable predictive judgment, warranting our deference. *See Ace Tel. Ass'n v. Koppendrayer*, 432 F.3d 876, 880 (8th Cir. 2005) (holding that a reciprocal compensation rate of zero did not violate the "just and reasonable" requirement in 47 U.S.C. § 252(d)(2)); *MCI Telecomms. Corp. v. U.S. W. Commc'ns*, 204 F.3d 1262, 1271-72 (9th Cir. 2000) (upholding a determination that bill-and-keep was "just and reasonable" under 47 U.S.C. § 252(d)(2)(A)). As a result, we conclude that the FCC did not arbitrarily or capriciously fail to provide for cost recovery.

### D.    Authority for the States to Suspend or Modify the New Requirements

The Petitioners also argue that the FCC has assumed powers reserved to state commissions under 47 U.S.C. § 251(f)(2). This section empowers state commissions to suspend or modify requirements under § 251(b) for small LECs that would otherwise incur an undue burden. 47 U.S.C. § 251(f)(2).

The FCC addressed § 251(f)(2), cautioning "states that suspensions or modifications of the bill-and-keep methodology . . . would . . . re-introduce regulatory uncertainty . . . and undermine the efficiencies gained from adopting a uniform national framework." 2 R. at 671-72 ¶ 824. In light of this concern, the FCC discouraged grants of relief under § 251(f)(2), stating that any suspension or modification of bill-and-keep would likely undermine the public interest. *Id.* The FCC added that it would "monitor state action" and might "provide specific guidance" in the future. *Id.*

The Petitioners object to this admonition, contending that the FCC prejudged state commission decisions and effectively prohibited states from modifying the bill-and-keep regime. Joint Intercarrier Compensation Principal Br. of Pet'rs at 46-48 (July 17, 2013). This challenge is not ripe.

The FCC's cautionary statement does not constitute a binding rule; instead, it reflects only a prediction that applications for suspension or modification would fail under the statutory standard. *See* 2 R. at 671-72 ¶ 824. Because this prediction does not "impose an obligation, deny a right or fix some legal relationship," the Petitioners' challenge is premature. *Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 112-13 (1948); *see Nat'l Ass'n of Broadcasters v. FCC*, 569 F.3d 416, 425 (D.C. Cir. 2009) (holding that a challenge to the FCC's "prediction," which involved future waiver requests, was not ripe); *see also Minn. Pub. Utils. Comm'n v. FCC*, 483 F.3d 570, 582-83

(8th Cir. 2007) (holding that a state regulator's challenge to an FCC order was not ripe because it involved only a prediction of what the FCC would do in the future).

## III.    Challenges to Cost Recovery as Arbitrary and Capricious

The Petitioners have challenged not only the ultimate goal of the reforms, but also the way in which the FCC chose to transition toward a national bill-and-keep methodology.

### A.    The Transitional Plan

Perceiving that an immediate change would unduly disrupt the market, the FCC elected to gradually move toward a bill-and-keep methodology. 2 R. at 659-60 ¶ 798, 661-62 ¶ 801 & Figure 9. The FCC decided to transition terminating access charges to bill-and-keep over a six-year period for price cap carriers and over a nine-year period for rate-of-return carriers. *See id.* at 661-62 ¶ 801 & Figure 9. The FCC limited interstate originating access charges to existing levels, but has not yet decided how to transition these charges to bill-and-keep. *See id.* at 669 ¶¶ 817-18.

The FCC created a federal recovery mechanism to ease the transition to bill-and-keep for incumbent LECs. *See id.* at 683 ¶ 847. This recovery mechanism is not revenue neutral, for the FCC helps incumbent LECs recover only part of their lost revenues. *See id.* at 684-85 ¶ 851, 723-24 ¶ 924. The amount of the recovery will be based on existing trends that show declining revenues. *See id.* at 684-85 ¶ 851. For price-cap carriers, the recovery generally starts at 90% of 2011 revenues and declines 10% per year. *Id.* For

rate-of-return carriers, the recovery starts at 2011 revenues for switched access and net reciprocal compensation. *Id.* When the FCC acted, rate-of-return carriers were experiencing yearly drops in revenue of: (1) 3% for interstate switched access, and (2) 10% for intrastate intercarrier compensation. Choosing a benchmark between 3% and 10%, the FCC chose to reduce the eligible recovery for rate-of-return carriers by 5% each year. *Id.*

Under the FCC's recovery mechanism, carriers can recover part of their lost revenues through: (1) a federally tariffed Access Recovery Charge on end-users, and (2) supplemental support from the Connect America Fund. *Id.* at 685-88 ¶¶ 852-53. The Access Recovery Charge is limited to prevent individual end-users from paying excessive rates and is allocated at a carrier's holding-company level. *Id.* at 685-688 ¶ 852, 717 ¶ 910. To obtain supplemental support from the Connect America Fund, carriers must meet certain broadband obligations. *Id.* at 721-22 ¶ 918.

Although the FCC predicts this recovery mechanism will suffice for regulated services, carriers can request additional support and waiver of their broadband obligations through a "Total Cost and Earnings Review" process. *See id.* at 723-24 ¶ 924, 725 ¶ 926. This process allows a carrier to show that the standard recovery mechanism is "legally insufficient" and "threatens [the carrier's] financial integrity or otherwise impedes [its] ability to attract capital." *Id.* at 723-25 ¶¶ 924-25. The FCC regards this process as a

48

sufficient safety valve to prevent rates from becoming confiscatory. *See id.* at 724 ¶ 924 & n.1834.

The recovery mechanism will phase out over time. *See id.* at 684-85 ¶ 851. As it phases out, carriers will recover their network costs from end-users and the Universal Service Fund. *Id.* at 403 ¶ 34. But carriers will remain able to seek additional support through the FCC's Total Cost and Earnings Review process. *See id.* at 684-85 ¶ 851, 724 ¶ 924.

### B. The Petitioners' Challenges

The Petitioners raise two types of APA challenges to the FCC's recovery mechanism and final bill-and-keep framework. First, the Petitioners argue that the FCC failed to apportion costs, as required in *Smith v. Illinois Telephone Co.*, 282 U.S. 133 (1930). Joint Intercarrier Compensation Principal Br. of Pet'rs at 50-51 (July 17, 2013). Second, the Petitioners challenge the sufficiency of the recovery mechanism for carriers losing revenue under the reforms. *Id.* at 53-54, 56.

### C. Standard of Review

In challenging the interim measures and final bill-and-keep framework, the Petitioners focus on the reasonableness of the FCC's actions; thus, we review these challenges under the APA. *Id.*; *see* 5 U.S.C. § 706(2)(A). For this review, we consider whether the FCC acted arbitrarily, capriciously, with an abuse of discretion, or otherwise in violation of the law. *Sorenson Commc'ns, Inc. v. FCC*, 659 F.3d 1035, 1045 (10th Cir.

2011).  The regulations are presumptively valid, and the Petitioners bear the burden of proof.  *Id.* at 1046.  We will uphold the regulations if the FCC has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  Agency action is arbitrary and capricious only if the agency:

> has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

In reviewing the regulations, we can consider only the rationale articulated by the agency.  *Licon v. Ledezma*, 638 F.3d 1303, 1308 (10th Cir. 2011).  But "we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974); *Licon*, 638 F.3d at 1308.

Our review under the "'arbitrary and capricious' standard is particularly deferential in matters implicating predictive judgments and interim regulations."  *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009); *see Sorenson Commc'ns, Inc.*, 659 F.3d 1035, 1046 (10th Cir. 2011) (substantial deference is appropriate for interim ratemaking); *accord Alenco Commc'n, Inc. v. FCC*, 201 F.3d 608, 616 (5th Cir. 2000)

(review of transitional regulations is "especially deferential"). When we review the FCC's predictive judgment on a matter within its expertise and discretion, "complete factual support in the record . . . is not possible or required." *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 814 (1978).

**D.      Consideration of the Apportionment Requirement in *Smith***

The Petitioners argue that the FCC failed to apportion the costs attributable to interstate and intrastate traffic. Joint Intercarrier Compensation Principal Br. of Pet'rs at 50-51, 54 (July 17, 2013); Joint Intercarrier Compensation Reply Br. of Pet'rs at 5 (July 31, 2013). This argument is rejected.

**1.      The Apportionment Requirement**

The apportionment requirement originated in *Smith v. Illinois Bell Telephone Co.*, 282 U.S. 133 (1930). There, a state commission set intrastate rates; but the district court invalidated the rate schedule, reasoning that the rates were too low to allow the carriers to recover their costs. *Id.* at 142, 146. In determining the sufficiency of the rates, the state regulator and the district court assumed that the carriers used all of their property for intrastate service. *Id.* at 144-46. But the carriers also used their facilities for interstate service. *Id.* at 146-47. The Supreme Court viewed the district court's conclusion as flawed because it had failed to account for interstate service. *Id.* at 150-51. To determine whether the intrastate rates were high enough, the district court had to decide which of the

carrier's properties were used for intrastate service; otherwise, the court could not know how much the carrier had to recoup for the cost of that property. *Id.* at 150-51, 162.

*Smith*'s protection is narrow: A regulator may not impose confiscatory rates, assuming that a regulator in another jurisdiction will exercise its unilateral independent authority to allow a fair recovery. *Id.* at 148-49.

### 2. Application of *Smith* to the FCC's Recovery Mechanism

The Petitioners contend that the FCC failed to apportion costs between the intrastate and interstate jurisdictions. Joint Intercarrier Compensation Principal Br. of Pet'rs at 50-51, 54 (July 17, 2013); Joint Intercarrier Compensation Reply Br. of Pet'rs at 5 (July 31, 2013). According to the Petitioners, the failure to apportion costs renders the FCC's recovery mechanism inadequate because it: (1) requires recovery of intrastate revenues through the interstate jurisdiction, and (2) does not provide sufficient recovery of costs. Joint Intercarrier Compensation Principal Br. of Pet'rs at 54 (July 17, 2013); *see* Joint Intercarrier Compensation Reply Br. of Pet'rs at 6 n.6 (July 31, 2013) (challenging the recovery of intrastate costs through interstate charges).

We disagree. *Smith* requires jurisdictional separation to ensure that the regulator sets rates based on costs of service in the regulator's jurisdiction. *Smith*, 28 U.S. at 148-49. The problem in *Smith* was that the state regulator had jurisdiction only for intrastate service, but was setting rates based on the cost of both intrastate and interstate service. *Id.* at 150-51, 162.

52

Our circumstances differ because the FCC enjoys authority to: (1) set interstate rates, and (2) regulate access traffic that is either interstate or intrastate. Because the FCC obtained regulatory authority over intrastate traffic, it can affect intrastate rates through regulation. The FCC's regulatory authority over intrastate traffic supports flexibility in our application of *Smith*. *See Lone Star Gas Co. v. Texas*, 304 U.S. 224, 241 (1938) (distinguishing *Smith* from the case of a federal agency acting within its authority); *MCI Telecomms. Corp. v. FCC*, 750 F.2d 135, 141 (D.C. Cir. 1984) ("*Smith* appears to be based on the limits of state jurisdiction, rather than on constraints imposed on federal agencies by the due process clause.").

*Smith* does not require the apportionment to be exact, for it requires "only reasonable measures." *Smith*, 282 U.S. at 150. When the FCC acts on an interim basis to transition to a new regulatory structure, *Smith* is flexible in requiring "reasonable measures." *See Rural Tel. Coal. v. FCC*, 838 F.2d 1307, 1315 (D.C. Cir. 1988) (holding that a cost allocation constituted a reasonable measure under *Smith* as "part of a transitional process, and '[i]nterim solutions may need to consider the past expectations of parties and the unfairness of abruptly shifting policies'"); *MCI Telecomms. Corp.*, 750 F.2d at 141 (rejecting MCI's challenge because *Smith* "was not considering the constitutionality of an interim ratemaking solution"). This flexibility is particularly appropriate when the FCC implements: "(a) an interim ratemaking solution (b) justified

53

by a substantial policy objective." *ACS of Anchorage, Inc. v. FCC*, 290 F.3d 403, 408 (D.C. Cir. 2002).

The FCC's transition plan appropriately allows recovery of lost intrastate revenues through a federal recovery mechanism. By funding shortfalls for intrastate services, the FCC did not leave LECs to obtain recovery from another jurisdiction. The situation in *Smith* was the opposite, and the FCC's recovery mechanism is valid under any reasonable interpretation of *Smith*. *See id.* at 409-10.

### 3. Waiver of the Challenge to the Access Recovery Charge

The National Association of State Utility Consumer Advocates challenges the Access Recovery Charge on two grounds: (1) The FCC did not analyze its authority to implement the charge; and (2) the FCC acted arbitrarily and capriciously by allowing carriers to pass along state-specific costs to customers in other states. National Association of State Utility Consumer Advocates Principal Br. at 5-6, 11-14 (July 12, 2013). But we cannot reach these issues because they were not properly raised before the FCC. *See* 47 U.S.C. § 405(a); *Sorenson Commc'ns, Inc. v. FCC*, 567 F.3d 1215, 1227-28 (10th Cir. 2009).

The National Association contends that these issues were raised in the petition for reconsideration filed by the Public Service Commission for the District of Columbia. National Association of State Utility Consumer Advocates Reply Br. at 1 (July 31, 2013) (citing 6 R. at 4046-53). It is true that the National Association's second challenge was

54

raised in the D.C. Commission's petition for reconsideration. 6 R. at 4049. But this petition had not been decided when the present action began. *See* National Association of State Utility Consumer Advocates Reply Br. at 2 (July 31, 2013).[6] Thus, the National Association cannot avoid waiver based on the D.C. Commission's presentation of a similar challenge. *See Petroleum Commc'ns, Inc. v. FCC*, 22 F.3d 1164, 1170-71 (D.C. Cir. 1994).

### 4. Recovery of Interstate Costs through End-User Rates and Universal Service Support

In their reply, the Petitioners challenge the FCC's ultimate bill-and-keep framework on grounds that it will require interstate cost recovery through local end-user rates once the federal recovery mechanism phases out. Joint Intercarrier Compensation Reply Br. of Pet'rs at 5-6 (July 31, 2013). According to the Petitioners, local end-user rates are subject to the intrastate jurisdiction and cannot be used for interstate cost recovery. *Id.*

This argument does not fit our facts. Bill-and-keep allows carriers to recover their interstate costs not only from end-users, but also from the Universal Service Fund. *See* 2

---

[6] The parties have not advised us of an eventual decision on the D.C. Commission's petition for reconsideration. But even if the FCC has eventually decided the petition for reconsideration, the present challenge would have been premature. *See TeleSTAR, Inc. v. FCC*, 888 F.2d 132, 134 (D.C. Cir. 1989) (per curiam) ("We hold . . . that when a petition for review is filed before the challenged action is final and thus ripe for review, subsequent action by the agency on a motion for reconsideration does not ripen the petition for review or secure appellate jurisdiction."); *see also Council Tree Commc'ns, Inc. v. FCC*, 503 F.3d 284, 287 (3d Cir. 2007) (stating that because a petition for reconsideration remained pending when the petition for review was filed, as well as the time of the court's eventual decision, the petition for review was "incurably premature").

R. at 403 ¶ 34, 648-49 ¶ 775 n.1408. The FCC concluded that these sources can provide carriers with a sufficient return without shifting the burden to another jurisdiction. *Id.* at 723-24 ¶ 924. This conclusion involved a reasonable predictive judgment.

Even if the prediction had been unwise, however, the FCC has not required carriers to recover federal costs based on rates outside of the FCC's jurisdiction. Thus, we reject the Petitioners' *Smith* challenge based on recovery of costs through local end-user rates.

### E. Challenges Involving the Adequacy of the Recovery Mechanism

The Petitioners also contend that the FCC arbitrarily and capriciously failed to allow carriers to recover a fair return. Joint Intercarrier Compensation Principal Br. of Pet'rs at 53-54, 56-57 (July 17, 2013). According to the Petitioners, the eligible recovery declines precipitously at 5% per year, the recovery mechanism will not allow carriers to recover even this amount, and the recovery mechanism will eventually disappear. *Id.* With these limitations, the Petitioners argue that the FCC has capped other intercarrier compensation rates and limited financial support. *Id.* With less revenue and inadequate financial support, the Petitioners contend that future rates will be too low. *Id.* at 56. The Court rejects the Petitioners' argument as a facial challenge; as an as-applied challenge, the issue is not ripe.

The facial challenge fails because the FCC's Order will not necessarily lead to confiscatory rates. The FCC has concluded that the telecommunications industry is

56

transitioning to IP networks, the bill-and-keep regime will advance that transition, and the FCC's funding mechanism will phase out at a slower rate than the baseline. 2 R. at 631 ¶ 736, 707-08 ¶ 894. With these developments, the FCC could consider existing trends in the marketplace and alternative opportunities for carriers to generate revenue.

With landline revenues in steady decline, the FCC concluded that its recovery mechanism would fairly represent what carriers would have earned without the reforms. *Id.* at 724 ¶ 924.

The FCC considered not only the downward trends in the market, but also other opportunities for carriers to generate revenue. It is true that bill-and-keep will end intercarrier compensation for transport and termination of switched access. *Id.* at 640 ¶ 756. But the FCC reasoned that LECs can continue to collect compensation from other carriers and that the reforms would improve productivity and decrease costs. *Id.* at 725-26 ¶ 928. For example, incumbent LECs could continue to collect compensation for originating access and dedicated transport. *Id.* With continuation of these charges, the FCC projected gains in productivity and decreases in expenses. *Id.* at 726-27 ¶¶ 929-30. The FCC's reasoning does not suffer any facial flaws, and we reject the Petitioners' facial challenge.

We also decline to entertain the as-applied challenge because it is not ripe. When a carrier faces an insufficient return, it can seek greater support under the Total Cost and Earnings Review Process. *Id.* at 723-26 ¶¶ 924-28. Until this process is invoked, the as-

applied challenge is premature.  If the FCC imposes confiscatory rates, carriers could then bring as-applied challenges.  *See Verizon Commc'n, Inc. v. FCC*, 535 U.S. 467, 526-27, 528 n.39 (2002).

## IV.    Procedural Irregularities in the Rulemaking Process

The Petitioners also challenge the Order on due-process grounds.

### A.    The FCC Proceedings

The FCC issued the Order after four formal notices and a lengthy rulemaking process.  *In re Universal Serv. Reform Mobility Fund*, 25 FCC Rcd. 14716 (2010); *In re Connect America Fund*, 26 FCC Rcd. 4554 (2011); *Further Inquiry into Tribal Issues Relating to Establishment of a Mobility Fund*, 26 FCC Rcd. 5997 (2011); *Further Inquiry Into Certain Issues in the Universal Serv.-Intercarrier Compensation Transformation Proceeding*, 26 FCC Rcd. 11112 (2011).  Through that process, the FCC obtained hundreds of comments and thousands of *ex parte* submissions.  *See* 2 R. at 398 ¶ 12, 1029-45.

In ultimately determining how to proceed, the FCC relied on a plan (called the "ABC Plan") proposed by six price-cap carriers in response to the FCC's 2011 notice. *See, e.g.*, *id.* at 445-46 ¶ 142.  The FCC's final notice requested additional comment on the ABC Plan.  1 R. at 290.  For this plan, the FCC provided a three-week notice and comment period, followed by a 13-day reply period.  *See id.* at 290, 378.

The FCC rulemaking proceedings were "permit-but-disclose" proceedings. *Id.* at

26-27 ¶ 65; *see* 47 C.F.R. § 1.1200(a). In these proceedings, "*ex parte* presentations to

Commission decision-making personnel are permissible but subject to certain disclosure

requirements." 47 C.F.R. § 1.1200; *see EchoStar Satellite LLC v. FCC*, 457 F.3d 31, 39

(D.C. Cir. 2006). Thus, following *ex parte* presentations, the proponents must place

copies of all written *ex parte* presentations in the record and file written summaries of all

data and arguments presented in oral *ex parte* presentations. *See* 47 C.F.R.

§ 1.1206(b)(1)-(2). These rules also provide for submission of confidential information,

FCC notice of *ex parte* presentations it has received, and a sunshine period starting

immediately before the FCC votes (when only limited written responses to *ex partes* are

permitted). *Id.*

In following its *ex parte* rules, the FCC obtained hundreds of *ex parte* submissions

between the close of the final comment period and the "blackout" date. 6 R. at 3754-71.

As allowed under the FCC's rules, many of these submissions were confidential and

others had to sign confidentiality agreements to access unredacted versions. To promote

transparency, the FCC placed three lists (referring to more than 110 publicly available

sources) and a mobile service competition analysis into the rulemaking record after the

close of the comment period. *See id.* at 3847-53, 3918-21, 3947-61.

In the Order, the FCC not only promulgated rules, but also addressed pending

petitions. 2 R. at 757 ¶ 975.

## B. The Petitioners' Arguments

The Petitioners raise seven constitutional challenges to the FCC's order. Six involve denial of due process from the FCC's procedure. These challenges involve: (1) the number and timing of the *ex parte* submissions, (2) the consideration of specific *ex partes*, (3) the FCC's placement of documents in the rulemaking record after close of the comment period, (4) the FCC's commingling of adjudicatory and rulemaking proceedings, (5) the inadequacy of the notice issued on August 3, 2011, and (6) the brevity of the final comment schedule. Joint Intercarrier Compensation Principal Br. of Pet'rs at 58-62 (July 17, 2013); Joint Intercarrier Compensation Reply Br. of Pet'rs at 27-33 (July 31, 2013). The Petitioners' seventh challenge is that the FCC improperly commandeered state commissions. Joint Intercarrier Compensation Principal Br. of Pet'rs at 62-63 (July 17, 2013).

### 1. The Waiver Issue

Before addressing the seven challenges, we must decide whether we can entertain some of the arguments raised in the Petitioners' reply. The FCC moves to strike some of these arguments, asserting that the Petitioners had omitted them in the opening brief. Mot. to Strike Args. in the Joint Intercarrier Compensation Reply Br. of Pet'rs (Sept. 30, 2013). The Petitioners contend that in their reply brief, they simply elaborated on the due-process arguments raised in their opening brief or responded to the FCC's arguments.

Joint Pet'r Resp. to FCC Mot. to Strike Args. from the Joint Intercarrier Compensation Reply Br. at 1 (Oct. 15, 2013).

Generally, "[a]rguments inadequately briefed in the opening brief are waived." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998). To enforce this requirement, we have granted motions to strike arguments that are raised for the first time in a reply brief. *E.g.*, *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 768 n.7 (10th Cir. 2009).

Waiver is based on Federal Rule of Appellate Procedure 28(a)(8)(A), which requires a party to include its arguments and reasons, with supporting citations to the record.

In their reply, the Petitioners have referred to documents not mentioned in the opening brief and raised more specific objections to the FCC's rulemaking procedure. *Compare* Joint Intercarrier Compensation Principal Br. of Pet'rs at 58-62 (July 17, 2013), *with* Joint Intercarrier Compensation Reply Br. of Pet'rs at 27-33 (July 31, 2013). But the new references do not justify an order striking the reply.

### 2. The FCC's Motion to Strike

In their opening brief, the Petitioners mount a general challenge to the FCC's rulemaking procedure. Joint Intercarrier Compensation Principal Br. of Pet'rs at 61 (July 17, 2013). But the Petitioners' reply brief can be read in two ways: (1) The Petitioners continue to mount a general cumulative challenge to the FCC's rulemaking procedure and

61

have included more specific record citations as general examples to illustrate their broader argument; or (2) the Petitioners continue to mount a cumulative challenge, but also intend to rely on the citations identified for the first time in the reply brief. *See* Joint Intercarrier Compensation Reply Br. of Pet'rs at 27-33 (July 31, 2013). The first reading involves permissible elaboration on the opening brief. The second reading would involve a violation of Rule 28(a)(8)(A). Instead of striking the reply, we read it narrowly, with citation of the materials only to illustrate the general cumulative challenge advanced in the opening brief.

## C. Our Review of the Constitutional Challenges

The Petitioners' procedural challenges stem from the constitutional right to due process, which requires notice and a fair opportunity to be heard. *See Fuentes v. Shevin*, 407 U.S. 67, 80 (1972). The APA adds more specific requirements. For example, an agency must provide notice of the proposed rulemaking and allow interested persons "an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(b)-(c).

"'Absent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and methods of inquiry permitting them to discharge their multitudinous duties.'" *Phillips Petroleum Co. v. EPA*, 803 F.2d 545, 559 (10th Cir. 1986) (quoting *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 543 (1978)). "Congress

intended that the discretion of the agencies and not that of the courts be exercised in determining when extra procedural devices should be employed." *Wyoming v. Dep't of Agric.*, 661 F.3d 1209, 1239 (10th Cir. 2011). Therefore, the agencies enjoy discretion to establish the procedures they utilize to make substantive judgments. *See id.*

### D.     The Petitioners' Due Process Challenges

The Petitioners identify six types of errors that cumulatively resulted in a denial of due process. Joint Intercarrier Compensation Principal Br. of Pet'rs at 58-62 (July 17, 2013); Joint Intercarrier Compensation Reply Br. of Pet'rs at 27-33 (July 31, 2013).

### 1.     General Challenges to the *Ex Partes*

The Petitioners initially focus on the hundreds of *ex partes* with the FCC. Joint Intercarrier Compensation Principal Br. of Pet'rs at 59-61 (July 17, 2013). According to the Petitioners, the *ex parte* filings multiplied just before the blackout date and the FCC frequently allowed access only upon the signing of a confidentiality agreement. *Id.* at 60. The Petitioners note that eight of the *ex partes* had been posted only three days before the FCC adopted the Order. Joint Intercarrier Compensation Reply Br. of Pet'rs at 30 (July 31, 2013). For these *ex partes*, the Petitioners contend that interested parties were unable to respond before the blackout period began. Joint Intercarrier Compensation Principal Br. of Pet'rs at 61 (July 17, 2013).

*Ex parte* contacts were proper, for they "are the bread and butter of the process of administration and are completely appropriate so long as they do not frustrate judicial

review or raise serious questions of fairness." *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 57 (D.C. Cir. 1977) (per curiam).

The administrative proceedings involved continuous responses to the FCC's notices and to other responses. Ultimately, however, the proceedings had to end. When they did, many parties could legitimately contend that they needed more time to reply to others' responses. The only alternative, however, would have been to keep the comment period alive forever.

The APA ensures an opportunity to comment on the notice of proposed rulemaking, but not to reply to the rulemaking record. *See Am. Mining Cong. v. Marshall*, 671 F.2d 1251, 1262 (10th Cir. 1982) (stating that the APA provides a right to comment on proposed rulemaking, but not "the rulemaking record"). In light of this limitation under the APA, we cannot impose additional requirements under the guise of due process. *See Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 524-25 (1979).

The Petitioners have not shown a failure to comply with the APA or even reliance on any of the disputed *ex partes*. *Am. Mining Cong.*, 671 F.2d at 1261; *see Sierra Club v. Costle*, 657 F.2d 298, 398-99 (D.C. Cir. 1981) ("The decisive point, however, is that EDF itself has failed to show us any *particular* document or documents to which it lacked an opportunity to respond, and which also were vital to EPA's support for the rule."). As a result, we reject the general challenges to the *ex partes*.

## 2. *Ex Parte* Challenges Based on Specific Documents

In their reply brief, the Petitioners point to four *ex partes* to support their due process challenge: (1) an October 20, 2011, Verizon *ex parte* filing that addresses Access Recovery Charges, (2) an October 18, 2011, Verizon *ex parte* concerning regulation of Voice-Over-the-Internet ("VoIP"), (3) an October 21, 2011, Verizon *ex parte* that addresses VoIP preemption, and (4) an October 19, 2011, AT&T *ex parte* that addresses VoIP jurisdiction. 6 R. at 3980-81, 3929, 3938-45, 4005; Joint Intercarrier Compensation Reply Br. of Pet'rs at 31-32 & nn.33-34 (July 31, 2013).[7]

In their opening brief, the Petitioners did not address the *ex partes* of October 18, October 19, or October 21; thus, the Petitioners have waived any argument based specifically on these documents. *See Harman v. Pollock*, 446 F.3d 1069, 1082 n.1 (10th Cir. 2006) (per curiam).[8] Because the Petitioners raised the October 20, 2011, Verizon *ex parte* in their opening brief, we will analyze it here. *See* Joint Intercarrier Compensation Principal Br. of Pet'rs at 60-61 (July 17, 2013).

In its *ex parte* on October 20, 2011, Verizon discussed the Access Recovery Charge on end-users. *See* 6 R. at 3980-81. And, in a meeting with the FCC's general

---

[7] In their opening brief, the Petitioners also referred to five AT&T contacts as examples of *ex partes*. Joint Intercarrier Compensation Principal Br. of Pet'rs at 60 (July 17, 2013). But the Petitioners did not specifically rely on these documents; thus, we have considered them in our general discussion and do not specifically address them here.

[8] We have considered these documents as general examples of *ex parte* contacts. We will also consider them as general examples of subjects covered in pending adjudicatory petitions discussed in these proceedings.

counsel, Verizon discussed the Access Recovery Charge and its implementation at the holding-company level. *See id.* at 3980. The Petitioners contend in their reply that: (1) the FCC did not sufficiently inform them in the notice about implementation at the holding company level, and (2) Verizon unfairly obtained knowledge about this matter prior to circulation of the Order. Joint Intercarrier Compensation Reply Br. of Pet'rs at 31 (July 31, 2013); *see* Joint Intercarrier Compensation Principal Br. of Pet'rs at 60-61 (July 17, 2013).

We reject these arguments. The ABC Plan involved application of the Access Recovery Charge at the holding-company level; and in the notice on August 3, 2011, the FCC specifically asked for comments on this provision. 5 R. at 3000-01; 1 R. at 302.

### 3.    The FCC's Placement of Documents in the Rulemaking Record

The Petitioners also complain that the FCC placed over 110 documents into the rulemaking record after the close of the comment period. Joint Intercarrier Compensation Principal Br. of Pet'rs at 59-60 (July 17, 2013) (citing 6 R. at 3847-53, 3918-21, 3947-61). The FCC's handling of these documents did not result in a denial of due process.

Ordinarily, agencies should not add information to the rulemaking record after the close of the comment period. *See Small Refiner Lead Phase-Down Task Force v. U.S. EPA*, 705 F.2d 506, 540-41 (D.C. Cir. 1983). But the APA "does not require that every bit of background information used by an administrative agency be published for public comment." *Am. Mining Cong. v. Marshall*, 671 F.2d 1251, 1262 (10th Cir. 1982). And

agencies need not submit "additional fact gathering [that] merely supplements information in the rulemaking record by checking or confirming prior assessments without changing methodology, by confirming or corroborating data in the rulemaking record, or by internally generating information using a methodology disclosed in the rulemaking record" to further notice and comment. *Chamber of Commerce of U.S. v. SEC*, 443 F.3d 890, 900 (D.C. Cir. 2006).

The Petitioners do not explain the significance of the additional documents or tie them to any of the disputed provisions in the Order; thus, we reject the Petitioners' procedural challenge based on late insertion of these documents into the record. *See Am. Mining Cong.*, 671 F.2d at 1261.

### 4.     The FCC's Decision to Rule on Pending Petitions

The FCC found that its conclusions had "effectively address[ed], in whole or in part, certain pending petitions" and granted or denied several petitions. 2 R. at 757 ¶ 975. The Petitioners claim, without citation, that the FCC improperly commingled rulemaking and adjudicatory proceedings. Joint Intercarrier Compensation Principal Br. of Pet'rs at 59 (July 17, 2013). We reject the argument.

Commingling of functions is permitted when the proceeding involved rulemaking. *See AT&T v. FCC*, 449 F.2d 439, 454-55 (2d Cir. 1971). And the FCC's proceeding involved rulemaking even if the new rules had the effect of deciding others' petitions.

67

The incidental disposition of those petitions did not convert the rulemaking proceeding into an adjudication, and there was no violation of due process or the APA.

### 5. Adequacy of the August 3, 2011, Notice

In their reply, the Petitioners argue that the notice on August 3, 2011, was inadequate. Joint Intercarrier Compensation Reply Br. of Pet'rs at 28 (July 31, 2013). This argument was waived because it was omitted in the Petitioners' opening brief. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998).

In the opening brief, the Petitioners made vague references to the sufficiency of the notice. *See* Joint Intercarrier Compensation Principal Br. of Pet'rs at 58 (July 17, 2013) ("Courts vacate APA rulemakings that fail to substantially comply with the requirement for public participation or which provide no meaningful opportunity for comment."); *id.* at 61 ("Courts have previously vacated FCC rulemakings where there was no realistic notice or opportunity to be heard."). But these references would not have alerted the FCC or the Court to a challenge based on the sufficiency of the August 3 notice. As a result, we decline to consider the Petitioners' new argument in their reply about the sufficiency of the August 3 notice.

### 6. Length of the Comment Period

In their reply brief, the Petitioners also challenge the length of the FCC's comment period. Joint Intercarrier Compensation Reply Br. of Pet'rs at 28-29 (July 31, 2013).

Because the Petitioners did not present this argument in their opening brief, the issue is waived. *See Adler*, 144 F.3d at 679.

### 7. Cumulative Challenge

The Petitioners have not shown that any part of the FCC's procedure was erroneous; thus, we reject the Petitioners' cumulative challenge. *See Sorenson Commc'ns v. FCC*, 659 F.3d 1035, 1046 (10th Cir. 2011) (applying a presumption of validity to the FCC's actions).

### E. "Commandeering" of State Commissions

The Petitioners also contend that the FCC has commandeered state commissions by: (1) requiring them to regulate according to new federal standards under § 252, and (2) shifting cost recovery to the states. Joint Intercarrier Compensation Principal Br. of Pet'rs at 62-63 (July 17, 2013). We disagree.

Generally, the federal government unlawfully conscripts states when they must involuntarily enact or administer a federal regulatory program. *See Printz v. United States*, 521 U.S. 898, 932 (1997); *New York v. United States*, 505 U.S. 144, 176 (1992). The same may be true when the federal government provides a state with funding to implement a program and later "surpris[es] participating States with post-acceptance or 'retroactive conditions.'" *Nat'l Fed'n of Indep. Bus. v. Sebelius*, __ U.S. __, 132 S. Ct. 2566, 2606 (2012). But "[w]here federal regulation of private activity is within the scope of the Commerce Clause, [the Court has] recognized the ability of Congress to offer

69

States the choice of regulating that activity according to federal standards or having state law pre-empted by federal regulation." *New York*, 505 U.S. at 173-74.

That is the case here, for states are not required to regulate under § 252. Instead, the federal government has undertaken regulation of matters previously regulated by the states. *See AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 378 n.6 (1999). The federal government's creation of a federal regulatory scheme does not conscript the state commissions to do anything, and we reject the Petitioners' argument. *See Cellular Phone Taskforce v. FCC*, 205 F.3d 82, 96-97 (2d Cir. 2000) (rejecting a similar challenge under 47 U.S.C. § 332(c)(7)(B)(iv)).

The Petitioners also contend that the FCC has assumed responsibility for cost recovery as a means of coercing state commissions. Joint Intercarrier Compensation Principal Br. of Pet'rs at 62-63 (July 17, 2013). For this contention, the Petitioners rely on *National Federation of Independent Business v. Sebelius*, __ U.S. __, 132 S. Ct. 2566 (2012). That case involved federal funding to the states so they could implement a federal program. *See Nat'l Fed'n of Indep. Bus.*, 132 S. Ct. at 2605-06. Here, the federal government has assumed responsibility for financial support to third parties—not states—so the FCC can implement a federal program. *National Federation of Independent Business* is inapplicable, and the FCC has not coerced state commissions.

**V.      Individual Challenges to the Order**

In addition to the broad challenges to the FCC's regulation of access traffic,

adoption of a bill-and-keep regime, and procedural fairness, individual parties and groups

challenge specific aspects of the reforms.  We reject these challenges.

**A.      Rural Independent Competitive Alliance's Challenge to the FCC's Limitation on Funding Support for Rural Competitive LECs**

The FCC authorized financial support to incumbent LECs (but not competitive

LECs), through the Universal Service Fund.  2 R. at 688 ¶ 853, 691-93 ¶¶ 862, 864.  This

difference is challenged by the Rural Independent Competitive Alliance.  Additional

Intercarrier Compensation Issues Principal Br. (Pet'rs) at 10-19 (July 11, 2013).  We

reject the challenge.

The arbitrary-and-capricious standard requires an agency to "provide an adequate

explanation to justify treating similarly situated parties differently."  *Comcast Corp. v.*

*FCC*, 526 F.3d 763, 769 (D.C. Cir. 2008).  The FCC justified the disparity on two

grounds:  (1) CLECS, unlike ILECs, can freely raise rates on end-users without

regulatory constraints; and (2) CLECs, unlike ILECs, "typically can elect whether to enter

a service area and/or to serve particular classes of customers (such as residential

customers) depending upon whether it is profitable to do so without subsidy."  2 R. at

691-92 ¶ 864.  Because these justifications show that ILECs have a greater need than

CLECs for additional financial support, the FCC would seem to have "articulate[d] a

satisfactory explanation for its action [that] includ[es] a rational connection between the

facts found and the choice made." *Sorenson Commc'ns, Inc. v. FCC*, 659 F.3d 1035, 1045 (10th Cir. 2011) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

The Rural Independent Competitive Alliance disagrees, contending that the FCC's explanations are implausible and false. Additional Intercarrier Compensation Issues Principal Br. (Pet'rs) at 10-19 (July 11, 2013).

The FCC relies primarily on its second rationale: Competitive LECs have greater freedom to choose where and how to provide service; thus, they have less need for financial support than incumbent LECs. Federal Resp'ts' Final Resp. to Pet'rs' Additional Intercarrier Compensation Issues Principal Br. at 16-20 (July 29, 2013) (citing 2 R. at 693 ¶ 864 & n.1675). This explanation was rational. Because most incumbent LECs are carriers of last resort, they must ordinarily serve their assigned areas even when it is no longer profitable. *See* Stuart Buck, Telric v. Universal Service*: A Takings Violation*, 56 Fed. Comms. L.J. 1, 46 (2003) ("[M]any (if not all) ILECs are designated as 'carriers of last resort' under various state laws, which means that they are generally not allowed to (1) refuse local phone service to any customer in any area in which they operate, or (2) discontinue service in an area where there is no other carrier."). The FCC reasonably regarded competitive LECs as more flexible. 2 R. at 692-93 ¶ 864. Without status as carriers-of-last-resort, many competitive LECs can choose which customers to serve and freely leave the region.

72

The Alliance points to a previous FCC order, where it stated that CLECs lack lower-cost urban operations that urban ILECs can use to subsidize rural service. Additional Intercarrier Compensation Issues Principal Br. (Pet'rs) at 15-16 (July 11, 2013) (citing *In re Access Charge Reform*, 16 FCC Rcd. 9923, 9950 ¶ 65 (2001)). According to the Petitioners, this statement shows that rural CLECs cannot "pick and choose to retain their most profitable customers." *Id.* In the prior order, however, the FCC did not question the CLECs' greater opportunity to select customers or restrict service. *See In re Access Charge Reform*, 16 FCC Rcd. at 9950 ¶¶ 65-66.

It is true, as the Alliance argues, that some competitive LECs have committed to serve entire regions. Additional Intercarrier Compensation Issues Principal Br. (Pet'rs) at 15 (July 11, 2013). Notwithstanding these commitments, the FCC could reasonably rely on the flexibility available to competitive LECs and the relative lack of flexibility for incumbents. *See* 2 R. at 692-93 ¶ 864. Unlike ILECs, CLECs made a rational economic decision to enter the market and serve specific customers and areas. *Id.* at 692-93 ¶ 864-65.

The Alliance argues that once CLECs built their networks, they developed reliance interests that could not be ignored by the FCC. Additional Intercarrier Compensation Issues Principal Br. (Pet'rs) at 17-18 (July 11, 2013). It surely would have been arbitrary and capricious if the FCC had disregarded the CLECs' reliance interests. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). But the FCC did no such thing.

73

Instead, the FCC set out to balance the need for a recovery mechanism against the need to avoid undue burdens on those carriers contributing to the Universal Service Fund. *See* 2 R. at 690 ¶ 859. In balancing these needs, the FCC made an empirical judgment that "competitive LECs . . . [had] not built out their networks subject to [carrier-of-last-resort] obligations requiring the provision of service when no other provider [would] do so." *Id.* at 692-93 ¶ 864.

This empirical judgment may be debatable. But we must defer to the FCC in its empirical judgment on an issue involving its institutional expertise. *See Metro Broad., Inc. v. FCC*, 497 U.S. 547, 570 (1990) (deferring to the FCC in its determination of an empirical nexus). When the FCC drew on this empirical judgment, it did not ignore the CLECs' reliance interests; instead, the FCC concluded that these interests did not trump other competing considerations. *See Qwest Corp. v. FCC*, 689 F.3d 1214, 1227-31 (10th Cir. 2012) (upholding the FCC's denial of a forbearance petition, based on a change in approval that involved "moving of the goalpost," because the change was adequately explained).

The Alliance contends that this deference will undermine the FCC's own objective of broadening the array of services in rural areas. Additional Intercarrier Compensation Issues Principal Br. (Pet'rs) at 18-19 (July 11, 2013). According to the Alliance, CLECs deserve support because they are more likely than ILECs to deploy advanced telecommunications services in rural areas. *Id.* (citing *In re Access Charge Reform*, 16

FCC Rcd. 9923, 9950 ¶ 65 (2001)). But the FCC has broad discretion to balance competing policy goals, including the control of transition costs. *See Sorenson v. Commc'ns v. FCC*, 659 F.3d 1035, 1045 (10th Cir. 2011); *see also Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1108 (D.C. Cir. 2009) (the FCC "has broad discretion" to balance the objectives in funding universal service). The FCC acted reasonably in balancing the need to carefully oversee the Universal Service Fund with the goal of extending service in rural areas.

**B.      The Challenge by National Telecommunications Cooperative Association, U.S. TelePacific Corporation, and North County Communications Corporation to the Transition of CMRS-LEC Traffic to Bill-and-Keep**

The FCC decided to immediately implement bill-and-keep as the default reciprocal compensation methodology for CMRS-LEC (cellphone-landline) traffic. 2 R. at 761-62 ¶ 988. On reconsideration, the FCC extended the transition for six months for local CMRS-LEC traffic subject to an interconnection agreement. *Id.* at 1145-46 ¶ 7.

National Telecommunications Cooperative Association, U.S. TelePacific Corporation, and North County Communications Corporation challenge these decisions as arbitrary and capricious. Additional Intercarrier Compensation Issues Principal Br. (Pet'rs) at 20-21 (July 11, 2013). According to these petitioners, the FCC applied different standards to similar situations, implementing a flash-cut for CMRS-LEC traffic while professing to avoid flash cuts. *Id.* at 20-21 (quoting 2 R. at 663 ¶ 802). We conclude that the FCC's time-table satisfies the APA.

75

The FCC decided to immediately institute bill-and-keep for CMRS-LEC traffic, giving two reasons: (1) Evidence showed that arbitrage schemes were more problematic for CMRS-LEC traffic than local LEC-LEC traffic; and (2) an immediate shift for CMRS-LEC traffic would be less disruptive than it would have been for other types of traffic. 2 R. at 764-65 ¶¶ 995-96 & n.2099.

The FCC downplayed concerns about disruption for three reasons.

First, CMRS providers and CLECs had only recently developed arrangements for reciprocal compensation. *Id.* at 765 ¶ 996. Without a longer history of these arrangements, CLECs "had no basis for reliance on such a methodology in their business models." *Id.*

Second, without an interconnection agreement, ILECs do not receive reciprocal compensation. *Id.* at 765-66 ¶ 997. And, the FCC found that most large ILECs with such an agreement had "already adopted $0.0007 or less as their reciprocal compensation rate." *Id.* at 766 ¶ 997.

Third, the FCC found that ILECs with interconnection agreements might have more time to adjust to bill-and-keep because the FCC was not abrogating existing agreements. *Id.* at 767 ¶ 1000.

For these reasons, the FCC concluded that an immediate transition to bill-and-keep for CMRS-LEC traffic would not be too disruptive or "overburden[] the universal service

76

fund." *Id.* The FCC's rationale was internally consistent, facially reasonable, and supported by the evidence. As a result, the FCC's explanation sufficed under the APA.

## C. Core Communications, Inc. and North County Communications Corporation's Challenge to the FCC's New Regulations on Access Stimulation

In the Order, the FCC addressed an interim arbitrage scheme known as "access stimulation." *Id.* at 601-17 ¶¶ 656-701. Access stimulation occurs when an LEC with high access charges enters into an arrangement with a provider of high call-volume operations, such as chat lines, adult-entertainment calls, or free conference calls. *Id.* at 601 ¶ 656. The arrangement "inflates or stimulates the access minutes terminated to the LEC, and the LEC then shares a portion of the increased access revenues . . . with the 'free' service provider." *Id.* Because an IXC cannot pass along these higher access costs to the customers making these more expensive calls, the IXC must recover these extra costs from all of its customers. *Id.* at 602 ¶ 663.

This scheme works because LECs entering "traffic-inflating revenue-sharing agreements" need not reduce their access rates "to reflect their increased volume of minutes." *Id.* at 601 ¶ 657. According to the FCC, these LECs experience a "jump in revenues and thus inflated profits that almost uniformly make the LEC's interstate switched access rates unjust and unreasonable under section 201(b) of the Act." *Id.*

The FCC defined "access stimulation" in the Order. *Id.* at 604 ¶ 667. "Access stimulation" occurs when an "LEC has entered into an access revenue sharing agreement"

77

and "the LEC either has had a three-to-one interstate terminating-to-originating traffic ratio in a calendar month, or has had a greater than 100 percent increase in interstate originating and/or terminating switched access MOU in a month compared to the same month in the preceding year." *Id.* at 604 ¶ 677.

Petitioners Core Communications, Inc. and North County Communications Corporation challenge two aspects of the rules: (1) The FCC allowed access-stimulating ILECs, but not access-stimulating CLECs, to utilize procedures allowing retariffs of charges for terminating access; and (2) the FCC required access-stimulating CLECs to benchmark to the price-cap LEC with the lowest terminating access rates in the state. Additional Intercarrier Compensation Issues Principal Br. (Pet'rs) at 31-36 (July 11, 2013). The Petitioners challenge both provisions as arbitrary and capricious under the APA. *Id.* These challenges are rejected.

### 1. The FCC's Refusal to Allow CLECs to Use ILEC Ratemaking Procedures

The Petitioners challenge the refusal to allow access-stimulating CLECs to set rates above the FCC's chosen benchmark. *Id.* at 31. According to the Petitioners, the FCC did not explain its refusal to allow "CLECs to have the same option as ILECs to rely upon the § 61.38 rules to demonstrate actual costs and demand in the rate-of-return territories in which they provide switched access." *Id.* We disagree.

The issue involves a regulation in place before the recent reforms: 47 C.F.R. § 61.38. This regulation called for incumbent LECs to file tariffs supported by cost-of-

78

service data. *See Aeronautical Radio, Inc. v. FCC*, 642 F.2d 1221, 1234 (D.C. Cir. 1980). Because these tariffs have supplied benchmarks for CLECs,[9] they have not ordinarily had to submit cost data.

Core and North County contend that for access stimulation, the remedy is harsher for CLECs than ILECs. ILECs can obtain relief from rate adjustments by submitting cost studies under 47 C.F.R. § 61.38; CLECs cannot. Additional Intercarrier Compensation Issues Principal Br. (Pet'rs) at 31-32 (July 11, 2013). According to Core and North County, the FCC failed to explain the disparity. *Id.* We disagree.

The FCC explained its rationale in the Order: Determining the reasonableness of CLEC pricing has proven impractical. 2 R. at 614-15 ¶ 694. Thus, the FCC "has specifically disclaimed reliance on cost to set competitive LEC access rates." *In re Access Charge Reform: PrairieWave Telecomms., Inc.*, 23 FCC Rcd. 2556, 2560 ¶ 13 (2008).

This rationale is neither arbitrary nor capricious. The FCC previously noted the advantages of setting CLEC rates through benchmarking rather than the submission of cost data:

> [A] benchmark provides a bright line rule that permits a simple determination of whether a CLEC's access rates are just and reasonable. Such a bright line approach is particularly desirable given the current legal and practical difficulties involved with comparing CLEC rates to any objective standard of "reasonableness."

---

[9] *See In re Access Charge Reform*, 16 FCC Red. 9923, 9943-45 (2001).

*In re Access Charge Reform*, 16 FCC Rcd. 9923, 9939 ¶ 41 (2001).

Core and North County do not address the historical differences between the pricing of ILECs and CLECs. Instead, Core and North County argue that CLECs should have the opportunity to support relief through cost data under 47 C.F.R. § 61.38. The FCC feared that this option would create difficulty in assessing the reasonableness of CLEC rates. 3 R. at 1933 (cited at 2 R. at 614 n.1172).

The FCC addressed a similar issue six years ago when confronted with a waiver petition by a CLEC (PrairieWave Telecommunications, Inc.), which submitted extensive cost data and requested an opportunity to charge based on its own costs rather than a benchmark tied to ILEC rates. *See In re Access Charge Reform: PrairieWave Telecomms., Inc.*, 23 FCC Rcd. 2556, 2556 ¶ 1 (2008). Like Core and North County, PrairieWave discounted the burden because it had been the only CLEC to seek a waiver. *See id.* at 2560-61 ¶ 13. The FCC explained that if it were to accept PrairieWave's cost data, "every competitive LEC" would request a waiver. *Id.* And with this flood of data, the FCC would need to alter CLEC rates from a "straightforward comparison" to an "administratively difficult cost study analysis." *Id.* at 2561 ¶ 14; *see also In re Access Charge Reform*, 16 FCC Rcd. 9923, 9939 ¶ 41 (2001) (stating that a benchmarking approach provides a simple way to determine the reasonableness of a CLEC's access rates and avoids the "legal and practical difficulties involved with comparing CLEC rates to any objective standard of 'reasonableness'").

The FCC's explanation here was similar. For example, the FCC cited comments from one LEC that had acknowledged the "legal and practical difficulties involved with comparing CLEC rates to any objective standard of reasonableness." 2 R. at 614 n.1172 (citing 3 R. at 1933).

Core and North County downplay the burden in preparing the cost data, but do not address the FCC's concern about how the data would be utilized. The FCC rationally concluded that the cost data would prove useful only if the agency were to abandon its benchmarking approach for CLEC rates and face the legal and practical difficulties of setting CLEC rates based on an objective standard of reasonableness. Core and North County do not present any reason for the FCC to reverse course in this manner, and we are left without any reason to question the FCC's decision. Thus, its refusal to open the § 61.38 procedures, allowing submission of cost data for rate-setting, is neither arbitrary nor capricious.

### 2. The FCC's Requirement for Access-Stimulating CLECs to Benchmark to the Price-Cap LEC with the State's Lowest Access Rates

The FCC not only declined to allow CLECs to use the § 61.38 procedures, but also required access-stimulating CLECs to benchmark their switched-access rates to the state's price-cap LEC with the lowest access charges. *Id.* at 612-13 ¶ 689. According to the Petitioners, this benchmark was arbitrary and capricious because: (1) it applies to CLECs

statewide, and (2) the FCC lacked evidentiary support for its decision.  Additional

Intercarrier Compensation Issues Principal Br. (Pet'rs) at 32-36 (July 11, 2013).

Core and North County initially argue that it was irrational to tie the benchmark to a price-cap LEC's statewide rates when the CLEC was stimulating access in only a small part of the state.  *Id.* at 32-33.  The FCC took a different view.  It reasoned that when a CLEC artificially increases traffic, its volumes resemble those of the price-cap LEC in the state.  2 R. at 612-13 ¶ 689.  Thus, the FCC concluded that for CLECs improperly stimulating traffic, rates should be tied to the state's price-cap LEC.  *Id.*

Core and North County regard this explanation as "irrational" because the CLEC may not even be operating in territories served by rate-of-return LECs.  Additional Intercarrier Compensation Issues Principal Br. (Pet'rs) at 33 (July 11, 2013).  This argument ignores the FCC's view that the pertinent comparator is the state's price-cap LEC, not the smaller rate-of-return carriers.  The FCC's view may be debatable, but it is neither arbitrary nor capricious.

Core and North County also question the evidentiary basis for the FCC to use price-cap LECs, rather than rate-of-return LECs.  *Id.* at 34-35.  The Petitioners contend that the FCC grounded its benchmarking decision on a finding that the "access stimulating LEC's traffic volumes are more like those of the price cap LEC in the state, and it is therefore appropriate and reasonable for the access stimulating LEC to benchmark to the price cap LEC."  *Id.* at 34 (citing 2 R. at 612-13 ¶ 689).

82

The FCC's conclusion has some evidentiary support. *See* 3 R. at 1536 (AT&T's evidentiary submission, showing that rural traffic-stimulating CLECs are terminating three to five times as many minutes as the largest ILECs in Iowa, Minnesota, and South Dakota). This evidence suggests that traffic-stimulating CLECs do not operationally resemble the ILECs they benchmark. *See id.* at 1538 (AT&T's submission, showing that traffic-stimulating CLECs "clearly are not in the same business as NECA Band 8 ICOs").

Based on this evidence, the FCC's decision was reasonable. The FCC chose to require benchmarks of access-stimulating CLECs to price-cap LECs based on evidence that their volumes were comparable. This decision was reasonable, and we reject the APA challenge by Core and North County.

### D. AT&T, Inc.'s Challenge to the FCC's Decision to Allow VoIP-LEC Partnerships to Collect Intercarrier Compensation Charges for Services Performed by the VoIP Partner

AT&T challenges one aspect of the new rules: the opportunity for VoIP-LEC partnerships to charge intercarrier compensation during the transition to bill-and-keep. AT&T Principal Br. at 16-23 (July 16, 2013). This challenge is rejected.

LECs have partnered with VoIP providers and wireless carriers (like AT&T). Eventually, when bill-and-keep is fully implemented, LECs in these partnerships will be unable to impose any access charges. But during the transition period, LECs can impose access charges, though they will be phased downward. AT&T's challenge focuses on differences between the rules pertaining to LEC-VoIP partnerships and LEC-wireless

partnerships.  During the transition period, LECs can impose access charges for functions performed by VoIP partners.  *See* 2 R. at 753-54 ¶ 970.  But LECs that partner with wireless providers (like AT&T) cannot charge for functions performed by the wireless partner.  *Id.* at 753 n.2024.[10]

AT&T argues that it was arbitrary and capricious to deny the same opportunities to LECs that partner with wireless providers.  AT&T Principal Br. at 18-23 (July 16, 2013).  According to AT&T, the FCC failed to:  (1) adequately explain its decision to give VoIP providers an advantage over wireless providers, and (2) address the concern over competitive equality.  *Id.* at 16.  We disagree, concluding that the FCC adequately responded to AT&T's objection.  This explanation was two-fold:  (1) The ability of VoIP providers to charge for access would promote development of IP networks; and (2) VoIP providers partnered with LECs to interconnect, and wireless providers voluntarily partnered with LECs to avoid FCC regulation.  2 R. at 752 ¶ 968, 753 n.2024.

As discussed in Chief Judge Briscoe's separate opinion, Congress set out in the 1996 Act to promote the development of IP networks.  *See, e.g.*, *In re LAN Tamers, Inc.*, 329 F.3d 204, 206 (1st Cir. 2003) (explaining that universal service includes high-speed

---

[10]     AT&T is inconsistent in its argument.  It sometimes focuses on the CLEC's ability to *tariff* for work done by VoIP providers; other times, AT&T addresses the ability to *receive* intercarrier compensation for this work.  This distinction matters because the ability to obtain intercarrier compensation is separate from the ability to use a tariff to do so.  *In re Sprint PCS*, 17 FCC Rcd. 13192, 13196 (2002).  The rule preventing CLECs from tariffing for work done by their CMRS partners is based on the absence of an independent right to intercarrier compensation.  *See In re Access Charge Reform*, 19 FCC Rcd. 9108, 9116 (2004).

internet access). Unlike conventional wireless service, VoIP service depends on IP

facilities. *See, e.g.*, *In re Universal Serv. Contribution Methodology*, 21 FCC Rcd. 7518,

7526 ¶ 15 (2006). To promote development of IP networks, the FCC attempted to

support VoIP providers because they were developing these networks. *See* 2 R. at 752

¶ 968.

This strategy was at least reasonable. Any decision would have created an

asymmetry between VoIP providers and either wireless providers or LECs. The FCC

could reasonably have concluded that a contrary decision would have slowed IP

deployment and undercut the FCC's stated goal of encouraging the deployment of IP

networks.

The FCC relied not only on the goal of promoting IP deployment, but also on the

need for wireless providers to partner with LECs. *Id.* at 753 n.2024. As the FCC

explained, VoIPs frequently partner with LECs to interconnect with the network, while

wireless providers frequently partner with LECs to avoid FCC regulations. *Id.* at 753-54

¶ 970, 753 n.2024. Until the FCC issued the Order, it had not determined the intercarrier

compensation obligations for VoIP traffic. Federal Resp'ts' Final Resp. to the AT&T

Principal Br. at 14 (July 29, 2013) (quoting Notice of Proposed Rulemaking ¶ 610, Supp.

R. at 192). In contrast, the FCC had long prohibited wireless carriers from collecting

access charges through CLEC partners. 2 R. at 753 ¶ 970 n.2024. These differences

between LEC-VoIP partnerships and wireless-LEC partnerships provided a reasonable

foundation for the FCC's distinction in the interim rules. *See id.* The FCC did not act arbitrarily or capriciously when it allowed access charges for functions provided by VoIP providers in partnership with LECs, but not for functions performed by wireless providers in partnership with LECs.

AT&T argues that the FCC's explanation did not address the complaint about a "market-distorting competitive bias" in favor of VoIP providers. AT&T Principal Br. at 18 (July 16, 2013). Prior to entry of the Order, however, AT&T had complained only that it would be arbitrary to treat wireless providers differently than VoIP providers. 6 R. at 3987 (AT&T's argument that the FCC's proposed rule would "arbitrarily tilt the regulatory playing field"); *id.* at 3989-90 (AT&T's argument that there "could be no rationale for such an arbitrary distinction, which would represent nothing more than a flagrant instance of competition-distorting regulatory favoritism"). Because the FCC presented sound regulatory reasons for treating VoIP providers differently than wireless carriers, it adequately responded to AT&T's allegation that it was arbitrarily favoring VoIP providers.

### E. Voice on the Net Coalition, Inc.'s Challenges to the FCC's No-Blocking Obligation

To avoid high access charges, some long-distance carriers began to block long-distance calls that terminated with certain LECs. *Establishing Just & Reasonable Rates for Local Exchange Carriers*, 22 FCC Rcd. 11629, 11629 ¶ 1 (2007). The FCC attempted to stop this practice, reiterating its general prohibition on "call blocking." *Id.* In the

Order, the FCC also extended this prohibition to interconnected VoIP or one-way VoIP service providers obtaining intercarrier compensation. 2 R. at 756 ¶ 974. The FCC feared that VoIP providers, like the long-distance companies, could have incentives to block calls to avoid high access charges. *See id.*

Voice on the Net challenges this prohibition on three grounds: (1) The FCC gave inadequate notice that it was considering a "no-blocking" obligation; (2) the FCC failed to adequately explain its decision; and (3) the FCC lacked statutory authority to impose the no-blocking obligation on information services. Voice on the Net Coalition, Inc. Principal Br. at 9-19 (July 15, 2013). The first challenge is invalid because the FCC's notice was sufficient. The other two challenges were waived.

### 1. The Waiver Test

We would ordinarily decline to entertain any of the present arguments because they were not raised in the FCC's rulemaking proceedings or in a petition for rehearing. "The filing of a reconsideration petition to the Commission is 'a condition precedent to judicial review . . . where the party seeking such review . . . relies on questions of fact or law upon which the Commission . . . has been afforded no opportunity to pass.'" *Sorenson Commc'ns, Inc. v. FCC*, 659 F.3d 1035, 1044 (10th Cir. 2011) (quoting 47 U.S.C. § 405(a)).

Voice on the Net has not drawn our attention to a petition for reconsideration; thus, "we must determine whether the FCC was otherwise given an opportunity to pass on

87

[these] issue[s]." *Id.* This opportunity existed only if one of the commenters had developed the issue in the administrative proceedings. *See Sorenson Commc'ns, Inc. v. FCC*, 567 F.3d 1215, 1227-28 (10th Cir. 2009) (holding that the issue was waived because the petitioner failed to raise in the FCC proceedings the "basis" for the present legal challenge).

The D.C. Circuit Court of Appeals has adopted a straightforward test for waiver under § 405. "The pith of the test is this: 'the argument made to the Commission' must 'necessarily implicate[]' the argument made to us." *Sprint Nextel Corp. v. FCC*, 524 F.3d 253, 257 (D.C. Cir. 2008) (quoting *Time Warner Entm't Co. v. FCC*, 144 F.3d 75, 80 (D.C. Cir. 1998)). This test reflects a practical method of applying § 405, and we adopt the test for our circuit. Like the D.C. Circuit, we apply the test by distinguishing between procedural and substantive challenges. *See Time Warner Entm't Co.*, 144 F.3d at 80. When the challenge involves only a "technical or procedural mistake," the party must have raised the same claim to the FCC. *Id.* at 81. But if a petitioner makes a substantive challenge, such as one involving FCC policy, we determine whether the FCC would necessarily have viewed the question as part of the case. *See New England Pub. Commc'ns Council, Inc. v. FCC*, 334 F.3d 69, 79 (D.C. Cir. 2003).

We apply this test to each of Voice on the Net's arguments to determine if the argument was preserved in the FCC proceeding.

### 2.      Challenge to the Notice

According to Voice on the Net, the FCC failed to provide adequate notice and an opportunity to comment on the no-blocking obligation on one-way VoIP providers. Voice on the Net Coalition, Inc. Principal Br. at 9-13 (July 15, 2013). Because this challenge is procedural, rather than substantive, we address whether Voice on the Net raised the same challenge in the FCC proceeding. *See Time Warner Entm't Co.*, 144 F.3d at 81.

Voice on the Net contends that the issue was preserved in a VoIP White Paper presented to the FCC. Voice on the Net Coalition, Inc. Reply Br. at 1 (July 31, 2013). We disagree except for the narrow contention that the FCC failed to define "'one-way' VoIP services." *See id.* at 10.

The VoIP White Paper discussed potential FCC rate regulation on one-way VoIP, but not the challenged no-blocking obligation on one-way VoIP providers:

> The FCC . . . has not undertaken the pre-requisites under the [APA] necessary to impose rate regulation on "one-way" VoIP. The term "one-way interconnected VoIP" is not defined by the Act or in the Commission's rules. Neither has the FCC provided a proposed definition of the term, or provided notice, explanation or justification of the proposed regulation.

6 R. at 3830. The White Paper also stated in a footnote, without mentioning a no-blocking obligation, that "[n]otice must be 'sufficient to fairly apprise interested parties of all significant subjects and issues involved.'" *Id.* at 3830 n.32 (quoting *Am. Iron & Steel Inst. v. EPA*, 568 F.2d 284, 291 (3d Cir. 1977)).

89

Voice on the Net acknowledges that rate regulation is not the same as a no-blocking obligation. Voice on the Net Coalition, Inc. Reply Br. at 2 (July 31, 2013). But Voice on the Net points to the FCC's assertion of a close connection between intercarrier compensation and a no-blocking obligation. *Id.* Because the two issues are closely related, Voice on the Net contends that the challenge to rate regulation on one-way VoIP service necessarily implicated the present challenge. *Id.*

This contention fails. In opposing rate regulation on one-way VoIP, Voice on the Net did not provide the FCC with a fair opportunity to pass on a separate, narrower no-blocking obligation. For example, if parties were to allege that the FCC failed to notice the transition to bill-and-keep, they would not preserve a much narrower claim that the FCC failed to adequately notice the Access Recovery Charge. Though the two are related, a general challenge does not necessarily implicate a more specific one. *See Sprint Nextel Corp. v. FCC*, 524 F.3d 253, 257 (D.C. Cir. 2007).

The VoIP White Paper did preserve a potential challenge to the FCC's use of the term "one-way interconnected VoIP." *See* 6 R. at 3830. But the FCC explained in its notice that one-way interconnected VoIP constituted VoIP service that "allow[s] users to terminate calls to the [Public Switched Telephone Network], but not receive calls from the PSTN, or vice versa." 1 R. at 365 n.57. Because the FCC defined "one-way interconnected VoIP" in the notice, we reject the challenge.

### 3. Challenge to the Adequacy of the Explanation

Voice on the Net also invokes the APA in challenging the sufficiency of the FCC's explanation for no-blocking rules. Voice on the Net Coalition, Inc. Principal Br. at 13-15 (July 15, 2013). Because this challenge is procedural, rather than substantive, we examine whether the same issue was raised in the administrative proceeding. *See Time Warner Entm't Co.*, 144 F.3d at 81.

According to Voice on the Net, its argument on the no-blocking rules was preserved in the VoIP White Paper. Voice on the Net Coalition, Inc. Reply Br. at 2 (July 31, 2013). But the VoIP White Paper did not address the sufficiency of the explanation for the no-blocking rules on one-way VoIP providers; thus, this challenge has been waived.

### 4. Challenge to the FCC's Ancillary Jurisdiction

Voice on the Net also challenges the FCC's ancillary jurisdiction. Voice on the Net Coalition, Inc. Principal Br. at 15-19 (July 15, 2013). This challenge involves FCC's policy; thus, "we ask whether a reasonable Commission *necessarily* would have seen the question raised before us as part of the case presented to it." *Time Warner Entm't Co.*, 144 F.3d at 81. The question would have constituted part of the case as long as it had been presented by one of the parties. *See EchoStar Satellite, LLC v. FCC*, 704 F.3d 992, 996 (D.C. Cir. 2013).

According to Voice on the Net, the FCC's ancillary jurisdiction was challenged in the VoIP White Paper and a letter on October 18, 2011. Voice on the Net Coalition, Inc. Reply Br. at 1 (July 31, 2013). These documents contain arguments that: (1) VoIP services were "likely to be information services and may even [have been] software applications or online offerings wholly outside of the Commission's jurisdiction," (2) the FCC could not "avoid obvious limitations in its ability to regulate services outside of its primary jurisdiction, including information services and other online services and applications," and (3) VoIP did not involve "Title II telecommunications services," but were "information services, outside of the scope of Section 201 Title II rate regulation." 6 R. at 3830, 3935-36. These arguments did not cover the FCC's ancillary authority.

Voice on the Net also urges a futility exception. Voice on the Net Coalition, Inc. Reply Br. at 3-4 (July 31, 2013). No such exception exists, and the Supreme Court stated in *Booth v. Churner* that it would not "read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise." *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001). Because § 405(a) involves a statutory exhaustion requirement, we are not free to recognize a futility exception. *See Fones4All Corp. v. FCC*, 550 F.3d 811, 818 (9th Cir. 2008) (holding that futility does not excuse exhaustion because it is specifically required in § 405). In the absence of a futility exception, we conclude that Voice on the Net has waived its substantive challenges.

**F.** **Transcom Enhanced Services, Inc.'s Challenges to the FCC's Intra-MTA Rule, Provisions on Call-Identification, and Blocking of Calls**

Petitioner Transcom calls itself "an enhanced service provider." 6 R. at 3855. As an enhanced service provider, Transcom regards itself as an end-user rather than a telecommunications carrier. *Id.* at 3965. Because Transcom views itself as an end-user rather than a telecommunications carrier, it argues that it can never be in the middle of a telecommunication for intercarrier compensation purposes and cannot be regulated as a common carrier. Transcom Principal Br. at 21-22 (July 12, 2013).

Based on this characterization, Transcom challenges three aspects of the FCC's Order: (1) the FCC's interpretation of its intraMTA rule governing reciprocal compensation between wireless providers and LECs; (2) the FCC's ancillary jurisdiction to impose call-identifying rules on non-carriers who do not originate or terminate traffic; and (3) the validity of the FCC's no-blocking rules on VoIP providers. *Id.* at 39-40, 45-48. We reject each argument. Transcom is not the called party, and Transcom has not preserved its second and third challenges.

### 1. Transcom's Challenge to the FCC's IntraMTA Rule

Transcom initially challenges the FCC's clarification of its "IntraMTA rule." This rule addresses calls between an LEC and a wireless provider that originate and terminate in the same "Major Trading Area." These calls are characterized as local and are subject to reciprocal compensation. 2 R. at 768 ¶ 1003; 47 C.F.R. 51.701(b)(2).

This characterization was addressed in the FCC proceedings by a wireless carrier, Halo Wireless. *See* 2 R. at 768-69 ¶ 1005; 6 R. at 3926-28. Halo asserted that it had provided "'Common Carrier Wireless Exchange Service to [Enhanced Service Providers] and Enterprise Customers.'" *Id.* at 3975. According to Halo, its traffic originated at the base station where its customers (enhanced service providers like Transcom) connected wirelessly. *See* 2 R. at 768 ¶ 1005. Halo would then deliver its traffic to the terminating LEC and characterize its traffic as local (or "intraMTA"). *See id.*

Multiple parties presented evidence that Halo's traffic did not originate on a local wireless line. *See id.* These parties stated that Halo's traffic originated as access traffic and progressed to Halo's enhanced service providers, who then handed off the call to Halo to deliver to the terminating LEC. *Id.* This process is illustrated in Diagram 9, which shows a typical long-distance call from Oklahoma City to Denver:



Halo's "customer" (the enhanced service provider) is not the party who was calling or being called. Nonetheless, Halo argued that its traffic was not subject to access charges because the enhanced service provider terminated each long-distance call and originated a new local wireless call. *See id.* at 769 ¶ 1006. In response, the FCC clarified that for purposes of the intraMTA rule, the "re-origination of a call over a wireless link in the middle of a call path [did] not convert a wireline-originated call into a [wireless]-originated call for reciprocal compensation." *Id.* For the intraMTA rule, the FCC ignores the presence of an enhanced service provider, such as Transcom, in the middle of a call; instead, the FCC looks to the calling party's location in relation to the called party. *See id.*

This conclusion requires Halo (as a common carrier) to pay access charges; however, the FCC has not addressed Transcom's status as an end-user or common carrier. Though its status was not addressed, Transcom argues that it can no longer enjoy the benefits of being an "end user." Transcom Principal Br. at 11, 26-30 (July 12, 2013).

According to Transcom, calls terminate and originate with enhanced service providers. *Id.* at 21. Under this view, even when the enhanced service provider is in the middle of a communication, the call terminates; when the call leaves the enhanced service provider, a new call has begun. *See id.*

For this characterization, Transcom misreads two cases and overlooks the FCC's prior determination that a call "terminates" only when the call reaches the called party. *Id.* at 33-34; Transcom Reply Br. at 12-13 (July 30, 2013).

Transcom relies on *Atlantic Bell Telephone Companies v. Federal Communications Commission*, 206 F.3d 1 (D.C. Cir. 2000), and *Worldcom, Inc. v. Federal Communications Commission*, 288 F.3d 429 (D.C. Cir. 2002), two cases involving dial-up internet *Id.* at 44.

In *Atlantic Bell Telephone Companies*, the D.C. Circuit Court of Appeals vacated an FCC order that excluded internet service providers from the reach of 47 U.S.C. § 251(b)(5). *Atl. Bell Tel. Cos.*, 206 F.3d at 5, 8. The FCC had found that calls to internet service providers were not considered "local" because they usually involved further communications with out-of-state websites. *See id* at 5. The court rejected this "end-to-end" analysis because it ignored the FCC regulation defining "termination" as "the switching of traffic that is subject to section 251(b)(5) at the terminating carrier's end office switch (or equivalent facility) and delivery of that traffic from that switch to the called party's premises." *See id.* at 6. Applying this regulation, the court concluded that calls terminated when they reached the internet service providers; thus, the internet service providers were "clearly the 'called part[ies].'" *Id.*

Transcom has not explained how it meets the FCC's regulatory definition of "termination," rendering *Atlantic Bell Telephone Companies* inapplicable. In addition to

96

this lack of explanation, Transcom has not pointed to any authority making its purported position as an enhanced service provider or an end-user relevant to the FCC's interpretation of the intraMTA rule.

*Atlantic Bell Telephone Companies* presented a different situation because Transcom is not the called party. Dial-up providers are treated differently because they are the parties being called. *See In re Core Commc'ns, Inc.*, 455 F.3d 267, 271 (D.C. Cir. 2006) ("Under the dial-up method, a consumer uses a line provided by a local exchange carrier . . . to dial the local telephone number of an Internet service provider."). Because Transcom is not the called party, calls do not terminate with it; and the FCC reasonably interpreted its intraMTA rule.

## 2. Transcom's Challenge to the Call-Identifying Rules

Transcom also challenges the FCC's caller-identification rules. In the Order, the FCC prohibited "intermediate providers" from altering "path signaling information identifying the telephone number, or billing number, if different, of the calling party that is received with a call." 47 C.F.R. § 64.1601(a)(2); *see* 2 R. at 624-25 ¶¶ 719-20. The FCC defined an "intermediate provider" as "any entity that carries or processes traffic that traverses or will traverse the PSTN at any point insofar as that entity neither originates nor terminates that traffic." 47 C.F.R. § 64.1600(f); 2 R. at 624 ¶ 720. Because this regulation regulates non-carriers, the FCC concedes it lacks Title II authority. Federal Resp'ts' Final Resp. to the Transcom Principal Br. at 21 (July 24,

97

2013). Transcom contends that this regulation also exceeds the FCC's ancillary jurisdiction. Transcom Principal Br. at 46-47 (July 12, 2013).

We do not reach the jurisdictional challenge because Transcom failed to preserve it in the administrative proceeding. *See* 47 U.S.C. § 405(a). In its response brief, the FCC contended that Transcom had waived its jurisdictional argument. Federal Resp'ts' Final Resp. to the Transcom Principal Br. at 21 (July 24, 2013). Transcom responded, without explanation, by citing over 100 pages in the record. Transcom Reply Br. at 23 (July 30, 2013). These citations are not helpful.

Of the cited material, only two footnotes and four pages are potentially relevant. *See* 3 R. at 1220, 1222 n.30, 1325-26, 1478-79 n.5, 1834. Two of the pages state only that information services are outside the FCC's Title II authority. *Id.* at 1220, 1834. The other pages discuss policy reasons weighing against regulation of information services under Title I. *Id.* at 1325-26. And one footnote states generally that "the FCC lacks 'blanket' Title I authority to regulate non-telecommunications industries." *Id.* at 1478-79 n.5.

The other footnote broadly challenges ancillary jurisdiction for a much broader rule: one requiring information service providers to transmit call identification data "even if the communications never touch the PSTN and even if the 'phone number' is not used for that communication." *Id.* at 1222 n.30. The FCC rule applies only to calls that

traverse the PSTN; as a result, we have no reason to address the FCC's ancillary authority over calls that do not traverse the PSTN. *See* 2 R. at 755-56 ¶¶ 973-74.

Transcom has failed to identify a single place, amid the 100+ pages cited, in which it alerted the FCC to its jurisdictional attack on the call-identifying rules. Accordingly, this challenge has been waived.

### 3. Transcom's Challenge to the FCC's No-Blocking Rules

Like Voice on the Net, Transcom challenges the FCC's no-blocking rules for VoIP providers. Transcom Principal Br. at 48-49 (July 12, 2013). In addressing Voice on the Net's argument, we held that this challenge is waived because this challenge was not presented in the administrative proceeding. For the same reason, we conclude that Transcom has waived this challenge. *See* 47 U.S.C. § 405(a).

### G. Windstream Corporation and Windstream Communications, Inc.'s Challenges to Origination Charges

Windstream Corporation and Windstream Communications, Inc., which operate a price-cap LEC, challenge the FCC's treatment of originating access charges for VoIP traffic. Windstream Principal Br. at 20-32 (July 17, 2013). This challenge is rejected.

In the Order, the FCC immediately set the default access rates for interstate and intrastate toll VoIP traffic "equal to [the] interstate rates applicable to non-VoIP traffic." 2 R. at 735 ¶ 944. Thus, charges for VoIP traffic would be capped at interstate rates for origination and termination. *Id.* at 746-47 ¶ 961. The FCC added that it would allow VoIP originating access charges at interstate rates on a transitional basis, "subject to the

99

phase-down and elimination of those charges pursuant to a transition to be specified." *Id.* at 746 n.1976. The caps allegedly hurt Windstream because access charges are generally higher for intrastate calls than for interstate calls. *See id.* at 656-57 ¶ 791, 663 n.1508.

Because the Order largely focused on charges for terminating access, Windstream asked the FCC to "clarify 'that the Order [did] not apply to, and [was] not intended to displace, intrastate originating access rates for PSTN-originated calls that [were] terminated over VoIP facilities.'" Windstream Principal Br. at 13 (July 17, 2013) (quoting 6 R. at 4076).

In response, the FCC modified its VoIP rules in a second reconsideration order. 2 R. at 1162 ¶ 30. There the FCC acknowledged that Windstream had presented evidence undermining the initial assumption that all VoIP intercarrier compensation, including originating access charges for TDM format originated traffic, had been "widely subject to dispute and varied outcomes." *Id.* at 1163-65 ¶¶ 32-34. Based on the new evidence, the FCC allowed LECs to resume charging intrastate originating access rates for VoIP calls for two years. *Id.* at 1165-66 ¶ 35. Although originating VoIP intrastate access charges would be capped at interstate levels after two years, the FCC did not allow use of its recovery mechanism to recoup lost revenue. *See id.* at 1165 ¶ 35 n.97.

Windstream invokes the APA to challenge this treatment of intrastate VoIP originating access charges on four grounds: (1) The FCC failed in the initial order to provide a reasoned explanation for reducing origination charges for VoIP traffic; (2) the

100

FCC acted irrationally in treating VoIP originating access differently than originating access for traditional landline service; (3) the FCC failed to provide funding support; and (4) the FCC acted arbitrarily and capriciously in failing to grant relief for the initial six-month period preceding the Second Reconsideration Order. Windstream Principal Br. at 20-32 (July 17, 2013); Windstream Reply Br. at 15 (July 31, 2013). We reject these arguments.

### 1.    Windstream's Challenge to the FCC's Explanation in the Original Order

Windstream contends that in the original order, the FCC failed to explain the decision to "flash-cut[] intrastate VoIP originating access rates to much-lower interstate rates." Windstream Principal Br. at 20 (July 17, 2013). According to Windstream, the FCC did not clearly reduce VoIP originating access charges because the discussion involved only terminating access. *Id.* at 21-22.

We reject Windstream's characterization of the original order. There the FCC stated that it would reduce intrastate VoIP originating access charges to the same level as interstate rates. In the Order, the FCC: (1) defined "VoIP-PSTN traffic" to cover "traffic exchanged over PSTN facilities that originates and/or terminates in IP format," and (2) stated that "VoIP-PSTN traffic" would be "subject to charges not more than originating and terminating interstate access rates." 2 R. at 732-33 ¶ 940, 746-47 ¶ 961.[11] This

---

[11]    Windstream argues that footnote 1976 undermines this reading of the Order. Windstream Principal Br. at 21 (July 17, 2013). We disagree. Though footnote 1976 appears in the VoIP section of the Order, it generally discusses originating access charges under 47 U.S.C. § 251(b)(5) and the anticipated reforms involving originating access.

language is clear even though the FCC elsewhere focused on terminating access charges. The FCC's VoIP framework applied to the origination of access VoIP traffic.

The FCC also explained its decision to cap VoIP intrastate originating access charges at interstate rates. In the Order, the FCC established (for the first time) an entitlement to originating and terminating access charges for VoIP traffic during the transition to bill-and-keep. *Id.* at 729 ¶ 933.

When the FCC issued its initial order, it had little reason to believe that billing disputes were more prevalent for termination than for origination. Thus, termination and origination were subjected to the same rules. *See id.* at 730-32 ¶¶ 937-39. After the Order was issued, Windstream presented evidence that disputes were less frequent for origination than for termination. *Id.* at 1164 ¶ 33. This evidence prompted the FCC to modify its order, and we must now review the FCC's explanation for the new version. *Id.* at 1164-66 ¶¶ 34-35.

### 2. Windstream's Challenge to the FCC's Explanation for the New Rule

Windstream contends that the FCC failed to explain its decision to treat originating access VoIP traffic differently than traditional originating access traffic. Windstream Principal Br. at 22-24 (July 17, 2013). In the Second Reconsideration Order, the FCC determined that "there were fewer disputes and instances of non-payment or under-payment of origination charges billed at intrastate originating access rates for intrastate

*See* 2 R. at 746 n.1976.

102

toll VoIP traffic than was the case for terminating charges for such traffic." 2 R. at 1164 ¶ 33. Arguing that this acknowledgment applies equally to originating access charges for traditional service, Windstream contends that the FCC failed to explain why it was treating intrastate originating access differently in VoIP and traditional service. Windstream Principal Br. at 24 (July 17, 2013). We reject this contention.

The FCC explained that in the overarching transition to bill-and-keep for all traffic, originating access charges need not be treated the same for traditional service and VoIP service. 2 R. at 1162-63 ¶ 31. In the initial order, the FCC pointed out that it was adopting "a distinct prospective intercarrier compensation framework for VoIP traffic based on its findings specific to that traffic." *Id.* But before entry of the original order, the FCC had not extended access charges to VoIP traffic; thus, carriers had less reason to rely on continuing revenue for VoIP intercarrier compensation. *See id.* at 1162 ¶ 31 & n.84. Without this reliance interest, the FCC thought LECs should have to justify extension of the intercarrier compensation regime for VoIP traffic during the transition. *See id.*

In the Second Reconsideration Order, the FCC credited evidence that carriers were actually receiving originating access charges for VoIP traffic. *Id.* at 1164 ¶ 33. Whether entitled to the access charges or not, carriers were collecting these charges on VoIP traffic; and with this reality, the FCC gave carriers two years to charge the higher origination rates for intrastate access on VoIP traffic. *See id.* at 1165-66 ¶ 35.

In doing so, the FCC was careful to address originating VoIP access traffic in the context of its transitional VoIP intercarrier compensation regime. *See id.* In the context of the FCC's transition to bill-and-keep for all traffic, this decision was not arbitrary and capricious. *See Sorenson Commc'ns, Inc. v. FCC*, 659 F.3d 1035, 1046 (10th Cir. 2011) (stating that special deference is given to transitional measures).

### 3. Windstream's Challenge to the FCC's Failure to Provide Funding Support

Windstream also challenges the FCC's refusal to provide funding support for reductions in intrastate originating VoIP access charges, calling the refusal arbitrary and capricious. Windstream Principal Br. at 25-29 (July 17, 2013). This challenge is rejected.

In other parts of the Order, the FCC: (1) emphasized its "commitment to a gradual transition" to bill-and-keep and rejection of flash-cuts, and (2) adopted a funding mechanism for traditional terminating access charges because "[p]redictable recovery during the intercarrier compensation reform transition [was] particularly important to ensure that carriers '[could] maintain/enhance their networks while still offering service to end-users at reasonable rates.'" 2 R. at 695 ¶ 870, 689-90 ¶ 858, 704 ¶ 890. And, the FCC decided not to reduce traditional originating access charges until it could "further evaluate the timing, transition, and possible need for a recovery mechanism." *Id.* at 632 ¶ 739. With these statements, Windstream argues that the FCC failed to explain its

refusal to adopt a recovery mechanism for the reduction in intrastate originating VoIP access charges. Windstream Principal Br. at 25-29 (July 17, 2013). We disagree.

The FCC provided carriers with a two-year transition period before lowering intrastate VoIP originating access charges to interstate levels. 2 R. at 1165-66 ¶ 35. With this step, the FCC explained that reduction in intrastate originating VoIP access charges would not require replacement revenue in the context of "the Commission's overall VoIP intercarrier compensation framework." *Id.* The FCC predicted that under its VoIP intercarrier compensation framework, "most providers [would] receive, either via negotiated agreements or via tariffed charges, additional revenues for previously disputed terminating VoIP calls and [would] also realize savings associated with reduced litigation and disputes." *Id.* In light of these benefits, the FCC found that "indefinitely permitting origination charges at the level of intrastate access for prospective intrastate toll VoIP traffic [was] not necessary to ensure a measured transition." *Id.* Thus, in capping VoIP intrastate originating access charges without a separate recovery mechanism, the FCC reasoned that carriers would obtain sufficient revenue. *Id.*

This explanation sufficed under the APA. In transitioning the industry to bill-and-keep for all traffic, the FCC could reasonably conclude that the interim measures would ease many of the burdens on LECs. As recognized above, we give substantial deference to interim regulations and transitional measures. *See Sorenson Commc'ns, Inc.*, 659 F.3d at 1046. And we are "particularly deferential when [we] review[] an agency's predictive

105

judgments, especially those within the agency's field of discretion and expertise."

*Franklin Sav. Ass'n v. Dir., Office of Thrift Supervision*, 934 F.2d 1127, 1146 (10th Cir.

1991).

   We apply these principles in reviewing the FCC's prediction that carriers would

obtain sufficient revenue for terminating access to offset losses in revenue for originating

VoIP access. Windstream criticizes this prediction on four grounds: (1) The FCC did not

address the absence of a recovery mechanism for intrastate VoIP originating access

charges; (2) the FCC failed to support its assertion that carriers would receive sufficient

revenue in the overall context of the VoIP intercarrier compensation framework; (3) a

flash cut would occur at the end of the two-year transition period; and (4) the FCC was

inconsistent in establishing a recovery mechanism for the loss of access charges for

terminating VoIP, but not originating VoIP access. Windstream Reply Br. at 10-15 (July

31, 2013). We reject each argument.

   The FCC found that a recovery mechanism was unnecessary for intrastate VoIP

originating access charges. *See* 2 R. at 1165-66 ¶ 35. The FCC explained its approach to

"the transition of origination charges for intrastate toll VoIP traffic in the context of the

Commission's overall VoIP intercarrier compensation framework." *Id.* The FCC

predicted that most providers would receive "additional revenues for previously disputed

terminating VoIP calls" and save in litigation costs. *Id.* These predictions led the FCC to

conclude that a recovery mechanism was not necessary to prevent undue disruption from reduced charges for the origination of intrastate calls. *See id.*

We also reject Windstream's argument (presented in its reply brief)[12] that intercarrier compensation would be inadequate. This argument was omitted in Windstream's opening brief; thus, the argument has been waived. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998).

Windstream characterizes the two-year transition period as an unwarranted "flash cut." Windstream Principal Br. at 19-24 (July 17, 2013). But the FCC applied its institutional expertise in concluding that carriers could adjust their business models before dropping rates. We again have little reason to question the FCC's predictive judgment based on Windstream's characterization of the two-year period as a "flash cut."

In addition, Windstream argues that the FCC acted inconsistently by creating a recovery mechanism for reductions in access charges for termination, but not origination. Windstream Reply Br. at 14-15 (July 31, 2013). The FCC acknowledged the difference, but explained it. *See* 2 R. at 1165-66 ¶ 35. This explanation was based on the disputed nature of termination charges for VoIP providers. *See id.* By resolving these disputes in favor of VoIP providers, the FCC reasoned that access charges for termination access could be used to offset reduction in revenue for origination access. *Id.* With greater overall termination charges for VoIP carriers, the FCC could reasonably decline to offer a recovery mechanism for losses in origination charges.

---

[12]     Windstream Reply Br. at 11-12 (July 31, 2013).

As Windstream points out, the FCC provided different treatment for origination- and termination-charges; but the FCC explained the difference. This explanation might have been debatable, but it was neither arbitrary nor capricious. As a result, we defer to the FCC in applying its institutional expertise when it declined to provide a separate recovery mechanism for lost revenue in originating access.

### 4.     Windstream's Challenge to the Initial Period of Six Months

Windstream argues that the FCC should have ordered carriers to pay higher originating access rates retroactively for the six-month period between the initial order and the second reconsideration order. Windstream Principal Br. at 29-32 (July 17, 2013). Even if the FCC could require retroactive payment of higher rates, the FCC could have chosen to make the higher rates prospective (rather than retroactive). *See Mountain Solutions, Ltd. v. FCC*, 197 F.3d 512, 520 (D.C. Cir. 1999). And Windstream did not ask the FCC to exercise this discretion in the petition for rehearing. 6 R. at 4076-84. Because the FCC would have had no obligation to consider the issue *sua sponte*, we decline to disturb the Order on this ground.

## VI.     Conclusion

We deny all of the petitions for review involving the FCC's regulations regarding intercarrier compensation. In addition, we deny the FCC's Motion to Strike New Arguments in the Joint Intercarrier Compensation Reply Brief of Petitioners.